**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRIT OF COLUMBIA CIRCUIT**

State of New York, District of Columbia, State of Illinois, State of Maine, State of Maryland, Commonwealth of Massachusetts, People of the State of Michigan, State of Minnesota, State of New Jersey, State of New Mexico, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, State of Wisconsin, and City of Philadelphia,

Petitioners,

v.

Andrew Wheeler, as Administrator of the Environmental Protection Agency, and the Environmental Protection Agency,

Respondents.

Case No. 20-1022

**PETITION FOR REVIEW**

Pursuant to Federal Rule of Appellate Procedure 15, D.C. Circuit Rule 15, and section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), the State of New York, District of Columbia, State of Illinois, State of Maine, State of Maryland, Commonwealth of Massachusetts, People of the State of Michigan, State of Minnesota, State of New Jersey, State of New Mexico, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, the

State of Wisconsin, and the City of Philadelphia (collectively, the "State Petitioners"), petition this Court to review the Environmental Protection Agency's final agency action entitled "Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act," published at 84 Fed. Reg. 69,834 (Dec. 19, 2019). A copy of the rule is attached hereto as Attachment A.

State Petitioners seek a determination by this Court pursuant to section 307(d)(9) of the Clean Air Act, 42 U.S.C. § 7607(d)(9), that the rule is unlawful and therefore must be vacated.

January 29, 2020

Respectfully Submitted,

FOR THE STATE OF NEW YORK

LETITIA JAMES
ATTORNEY GENERAL

*/s/ Sarah K. Kam*

Michael J. Myers
Senior Counsel
Sarah K. Kam
Special Assistant Attorney General
Environmental Protection Bureau
The Capitol
Albany, NY 12224
Tel: (518) 776-2400
Michael.Myers@ag.ny.gov
Sarah.Kam@ag.ny.gov

FOR THE DISTRICT OF COLUMBIA

KARL A. RACINE
ATTORNEY GENERAL

*/s/ Loren L. AliKhan*

Loren L. AliKhan
Solicitor General
Office of the Attorney General for the District of Columbia
441 4th Street, NW
Suite 600 South
Washington, D.C. 20001
Tel: (202) 727-6287
loren.alikhan@dc.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
ATTORNEY GENERAL

*/s/ Daniel I. Rottenberg*

Daniel I. Rottenberg
Assistant Attorney General
Matthew J. Dunn
Chief, Environmental Enf./Asbestos Litig. Div.
69 W. Washington St. Ste. 1800
Chicago, IL 60602
Tel: (312) 814-3816
drottenberg@atg.state.il.us

FOR THE STATE OF MAINE

AARON M. FREY
ATTORNEY GENERAL

*/s/ Laura E. Jensen*

Laura E. Jensen
Assistant Attorney General
6 State House Station
Augusta, ME 04333
Tel: (207) 626-8800
Laura.Jensen@maine.gov

FOR THE STATE OF MARYLAND

BRIAN E. FROSH
ATTORNEY GENERAL

*/s/ Joshua M. Segal*

Joshua M. Segal
Special Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
Tel: (410) 576-6446
jsegal@oag.state.md.us

FOR THE COMMONWEALTH OF MASSACHUSETTS

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Christophe Courchesne*
Christophe Courchesne
Assistant Attorney General
Chief, Environmental Protection Division
Megan M. Herzog
Special Assistant Attorney General
1 Ashburton Place
Boston, MA 02108
Tel: (617) 963-2423
christophe.courchesne@mass.gov
megan.herzog@mass.gov

FOR THE PEOPLE OF THE STATE OF MICHIGAN

DANA NESSEL
ATTORNEY GENERAL

*/s/ Elizabeth Morrisseau*
Elizabeth Morrisseau
Assistant Attorney General
Environment, Natural Resources, and Agriculture Division
6th Floor G. Mennen Williams Building
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
Tel: (517) 335-7664
MorrisseauE@michigan.gov

FOR THE STATE OF MINNESOTA

KEITH ELLISON
ATTORNEY GENERAL

*/s/ Peter N. Surdo*
Peter N. Surdo
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street Suite 900
Saint Paul, MN 55101
Tel: (651) 757-1061
peter.surdo@ag.state.mn.us

FOR THE STATE OF NEW JERSEY

GURBIR S. GREWAL
ATTORNEY GENERAL

*/s/ Lisa J. Morelli*
Lisa J. Morelli
Deputy Attorney General
New Jersey Division of Law
25 Market Street
Trenton, NJ 08625
Tel: (609) 376-270
Lisa.Morelli@law.njoag.gov

FOR THE STATE OF NEW MEXICO

HECTOR BALDERAS
ATTORNEY GENERAL

*/s/ Bill Grantham*
Bill Grantham
Assistant Attorney General
Consumer & Environmental Protection Div.
New Mexico Office of the Attorney General
201 Third Street NW, Suite 300
Albuquerque, NM 87102
Tel: (505) 717-3500
wgrantham@nmag.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
ATTORNEY GENERAL

*/s/ Paul Garrahan*
Paul Garrahan
Attorney-in-Charge
Steve Novick
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Tel: (503) 947-4593
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

FOR THE COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
ATTORNEY GENERAL

*/s/ Ann R. Johnston*
Ann R. Johnston
Senior Deputy Attorney General
Public Protection Division, Health Care Section
Pennsylvania Office of Attorney General
1600 Arch St., Suite 300
Philadelphia, PA 19103
Tel: (267) 940-6696
ajohnston@attorneygeneral.gov

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ Gregory S. Schultz*
Gregory S. Schultz
Special Assistant Attorney General
Rhode Island Department of Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400
gschultz@riag.ri.gov

FOR THE STATE OF VERMONT

THOMAS J. DONOVAN, JR.
ATTORNEY GENERAL

*/s/ Nicholas F. Persampieri*

Nicholas F. Persampieri
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
Tel: (802) 828-6902
nick.persampieri@vermont.gov

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
ATTORNEY GENERAL

*/s/ Gabe Johnson-Karp*

Gabe Johnson-Karp
Assistant Attorney General
Tressie K. Kamp
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53702-7857
Tel: (608) 266-9595
johnsonkarpg@doj.state.wi.us
kamptk@doj.state.wi.us

FOR THE CITY OF PHILADELPHIA

MARCEL S. PRATT
CITY SOLICITOR

/s/ *Scott J. Schwarz*

Diana P. Cortes,
Chair, Litigation Group
Scott J. Schwarz
Patrick K. O'Neill
Divisional Deputy City Solicitors
The City of Philadelphia
Law Department
One Parkway Building
1515 Arch Street, 16th Floor
Philadelphia, PA 19102-1595
Tel: (215) 685-6135
Scott.Schwarz@phila.gov
Patrick.ONeill@phila.gov

# ATTACHMENT A

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 68**

**[EPA–HQ–OEM–2015–0725; FRL–10002–69–OLEM]**

**RIN 2050–AG95**

## Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is revising regulations that are designed to reduce the risk of accidental releases of hazardous chemicals. These regulations are part of the EPA's Risk Management Program (RMP), which the Agency established under authority in the Clean Air Act and recently amended on January 13, 2017. After a process of reconsidering several parts of the 2017 rule, EPA has concluded that a better approach is to improve the performance of a subset of facilities by achieving greater compliance with RMP regulations instead of imposing additional regulatory requirements on the larger population of facilities that is generally performing well in preventing accidental releases. For this and other reasons, EPA is rescinding recent amendments to these regulations that we no longer consider reasonable or practicable relating to safer technology and alternatives analyses, third-party audits, incident investigations, information availability, and several other minor regulatory changes. EPA is also modifying regulations relating to local emergency coordination, emergency response exercises, and public meetings. In addition, the Agency is changing compliance dates for some of these provisions.

**DATES:** This final rule is effective on December 19, 2019.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OEM–2015–0725. All documents in the docket are listed on the *http://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *http://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** James Belke, United States Environmental Protection Agency, Office of Land and Emergency Management, 1200 Pennsylvania Ave. NW (Mail Code 5104A), Washington, DC 20460; telephone number: (202) 564–8023; email address: *belke.jim@epa.gov,* or: William Noggle, United States Environmental Protection Agency, Office of Land and Emergency Management, 1200 Pennsylvania Ave. NW (Mail Code 5104A), Washington, DC 20460; telephone number: (202) 566–1306; email address: *noggle.william@epa.gov*.

Electronic copies of this document and related news releases are available on EPA's website at *http://www.epa.gov/rmp*. Copies of this final rule are also available at *http://www.regulations.gov*.

**SUPPLEMENTARY INFORMATION:** *Good cause finding.* The EPA finds that there is good cause under Administrative Procedures Act (APA) section 553(d)(3) for this rule to become effective on the date of publication of this action. Section 553(d)(3) of the APA allows an effective date of less than 30 days after publication ''as otherwise provided by the agency for good cause found and published with the rule.'' 5 U.S.C. 553(d)(3). The purpose of the 30-day waiting period prescribed in APA section 553(d)(3) is to give affected parties a reasonable time to adjust their behavior and prepare before the final rule takes effect. Most provisions of this final rule rescind regulatory requirements or revise regulatory requirements that sources are not yet required to comply with. The rule does not create any new regulatory requirements such that affected parties would need time to prepare before the rule takes effect. For these reasons, the EPA finds good cause under APA section 553(d)(3) for this rule to become effective on the date of publication of this action.

*Acronyms and abbreviations.* We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

AAH Air Alliance Houston
ACC American Chemistry Council
BATF Bureau of Alcohol, Tobacco, Firearms, and Explosives
CAA Clean Air Act
CAAA Clean Air Act Amendments of 1990
CalARP California Accidental Release Prevention
CBI confidential business information
CCC Contra Costa County
CCPS Center for Chemical Process Safety
CFATS Chemical Facility Anti-Terrorism Standards
CFR Code of Federal Regulations
CSB U.S. Chemical Safety and Hazard Investigation Board
CSAG Chemical Safety Advocacy Group
CSISSFRRA Chemical Safety Information, Site Security and Fuels Regulatory Relief Act
CVI Chemical-terrorism Vulnerability Information
DHS Department of Homeland Security
DOJ Department of Justice
DOL Department of Labor
DOT Department of Transportation
EJ environmental justice
E.O. Executive Order
EPA Environmental Protection Agency
EPCRA Emergency Planning & Community Right-To-Know Act
FOIA Freedom of Information Act
FR Federal Register
ICR information collection request
ICS Incident Command System
ISD inherently safer design
ISO Industrial Safety Ordinance
ISSA inherently safer systems analysis
IST inherently safer technology
LEPC local emergency planning committee
NAAQS National Ambient Air Quality Standards
NAICS North American Industrial Classification System
NESHAP National Emissions Standards for Hazardous Air Pollutants
NIMS National Incident Management System
NPRM Notice of Proposed Rulemaking
NSI National Security Information
NRC National Response Center
OCA offsite consequences analysis
OLEM Office of Land and Emergency Management
OMB Office of Management and Budget
OSHA Occupational Safety and Health Administration
PCII Protected Critical Infrastructure Information
PHA process hazard analysis
PRA Paperwork Reduction Act
PSI process safety information
PSM Process Safety Management
RIA Regulatory Impact Analysis
RFA Regulatory Flexibility Act
RFI request for information
RMP Risk Management Program or risk management plan
RTC Response to Comments
SBAR Small Business Advocacy Review
SBREFA Small Business Regulatory Enforcement Fairness Act
SDS safety data sheet
SSI Sensitive Security Information
STAA safer technology and alternatives analysis
TCPA Toxic Catastrophe Prevention Act
TCEQ Texas Commission on Environmental Quality
TQ threshold quantity
TRI Toxic Release Inventory
TURA Toxic Use Reduction Act
UMRA Unfunded Mandates Reform Act
U.S.C. United States Code

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 9 of 91


USCA United States Court of Appeals
US SOC United States Special Operations Command

*Organization of this document.* The contents of this preamble are:

I. General Information
A. What is the Risk Management Program?
B. Does this action apply to me?
C. What action is the Agency taking?
D. What is the Agency's authority for taking this action?
E. What are the incremental costs and benefits of taking this action?
F. What are the procedures for judicial review?
II. Background
A. Overview of EPA's Risk Management Program Regulations
B. Events Leading to This Action
C. EPA's Authority To Reconsider and Revise the 2017 RMP Amendments Rule
D. EPA's Principal Rationale for Final Rule Actions
III. General Comments and Legal Authority
A. Discussion of Comments on Procedural Requirements
B. Discussion of Comments on EPA's Substantive Authority Under CAA Section 112(r)
C. Discussion of General Comments on Costs and Benefits
IV. Rescinded Incident Investigation, Third-Party Audit, Safer Technology and Alternatives Analysis (STAA), and Other Prevention Program Amendments
A. Summary of Proposed Rulemaking
B. Summary of Final Rule
C. Discussion of Comments and Basis for Final Rule Provisions
V. Rescinded and Modified Information Availability Amendments
A. Summary of Proposed Rulemaking
B. Summary of Final Rule
C. Discussion of Comments and Basis for Final Rule Provisions
VI. Modified Local Coordination Amendments
A. Summary of Proposed Rulemaking
B. Summary of Final Rule
C. Discussion of Comments and Basis for Final Rule Provisions
VII. Modified Exercise Amendments
A. Summary of Proposed Rulemaking
B. Summary of Final Rule
C. Discussion of Comments and Basis for Final Rule Provisions
VIII. Revised Emergency Response Contacts Provided in Risk Management Plan
A. Summary of Proposed Rulemaking
B. Summary of Final Rule
C. Discussion of Comments and Basis for Final Rule Provisions
IX. Revised Compliance Dates
A. Summary of Proposed Rulemaking
B. Summary of Final Rule
C. Discussion of Comments and Basis for Final Rule Provisions
X. Corrections to Cross Referenced CFR Sections
A. Summary of Proposed Rulemaking
B. Summary of Final Rule
C. Discussion of Comments and Basis for Final Rule Provisions
XI. Statutory and Executive Order Reviews
A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
B. Executive Order 13771: Reducing Regulation and Controlling Regulatory Costs
C. Paperwork Reduction Act (PRA)
D. Regulatory Flexibility Act (RFA)
E. Unfunded Mandates Reform Act (UMRA)
F. Executive Order 13132: Federalism
G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use
J. National Technology Transfer and Advancement Act (NTTAA)
K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
L. Congressional Review Act (CRA)

## I. General Information

### *A. What is the Risk Management Program?*

The Risk Management Program regulations (40 CFR part 68) aim to prevent or minimize the consequences of accidental chemical releases. These regulations require facilities that use, manufacture and store particular hazardous chemicals to implement management program elements that integrate technologies, procedures, and management practices. In addition, the RMP rule requires covered sources to submit (to EPA) a document summarizing the source's risk management program—called a risk management plan (or RMP).

### *B. Does this action apply to me?*

This rule applies to those facilities (referred to as "stationary sources" under the CAA) that are subject to the chemical accident prevention requirements at 40 CFR part 68. This includes stationary sources holding more than a threshold quantity (TQ) of a regulated substance in a process. Table 1 provides industrial sectors and the associated North American Industrial Classification System (NAICS) codes for entities potentially affected by this action.

The Agency's goal is to provide a guide for readers to consider regarding entities that potentially could be affected by this action. However, this action may affect other entities not listed in this table. If you have questions regarding the applicability of this action to a particular entity, consult the person(s) listed in the introductory section of this action under the heading entitled **FOR FURTHER INFORMATION CONTACT**.

TABLE 1—INDUSTRIAL SECTORS AND ASSOCIATED NAICS CODES FOR ENTITIES POTENTIALLY AFFECTED BY THIS ACTION

| Sector | NAICS code |
|---|---|
| Administration of Environmental Quality Programs | 924 |
| Agricultural Chemical Distributors: | |
| Crop Production | 111 |
| Animal Production and Aquaculture | 112 |
| Support Activities for Agriculture and Forestry Farm | 115 |
| Supplies Merchant Wholesalers | 42491 |
| Chemical Manufacturing | 325 |
| Chemical and Allied Products Merchant Wholesalers | 4246 |
| Food Manufacturing | 311 |
| Beverage Manufacturing | 3121 |
| Oil and Gas Extraction | 211 |
| Other [1] | 44, 45, 48, 54, 56, 61, 72 |
| Other manufacturing | 313, 326, 327, 33 |
| Other Wholesale: | |
| Merchant Wholesalers, Durable Goods | 423 |
| Merchant Wholesalers, Nondurable Goods | 424 |
| Paper Manufacturing | 322 |
| Petroleum and Coal Products Manufacturing | 324 |
| Petroleum and Petroleum Products Merchant Wholesalers | 4247 |

TABLE 1—INDUSTRIAL SECTORS AND ASSOCIATED NAICS CODES FOR ENTITIES POTENTIALLY AFFECTED BY THIS ACTION—Continued

| Sector | NAICS code |
|---|---|
| Utilities | 221 |
| Warehousing and Storage | 493 |

*C. What action is the Agency taking?*

1. Purpose of the Regulatory Action

The purpose of this action is to make changes to the Risk Management Program regulations (40 CFR part 68) to reduce chemical facility accidents without disproportionately increasing compliance costs or otherwise imposing regulatory requirements that are not reasonable or practicable. This rule addresses issues raised in three petitions for EPA to reconsider amendments EPA made to the RMP regulations in 2017 and other issues that EPA believed warranted reconsideration.

On January 13, 2017, the EPA issued a final rule (82 FR 4594) amending 40 CFR part 68, the chemical accident prevention provisions under section 112(r) of the CAA (42 U.S.C. 7412(r)). The 2017 rule addressed various aspects of risk management programs, including prevention programs at stationary sources, emergency response preparedness requirements, information availability, and various other changes to clarify and otherwise technically correct the underlying rules. This rulemaking is known as the ''Risk Management Program Amendments'' or ''RMP Amendments'' rule.

Prior to the RMP Amendments rule taking effect, EPA received three petitions for reconsideration of the rule under CAA section 307(d)(7)(B), two from industry groups [2] and one from a group of states.[3] Under that provision, the Administrator is to commence a reconsideration proceeding if, in the Administrator's judgement, the petitioner raises an objection to a rule that was impracticable to raise during the comment period or if the grounds for the objection arose after the comment period but within the period for judicial review. In either case, to convene a proceeding for reconsideration, the Administrator must also conclude that the objection is of central relevance to the outcome of the rule.

In a letter dated March 13, 2017, the Administrator responded to the first of the reconsideration petitions received by announcing the convening of a proceeding for reconsideration of the RMP Amendments.[4] As explained in that letter, having considered the objections raised in the petition, the Administrator determined that the criteria for reconsideration had been met for at least one of the objections. This action addresses the issues raised in all three petitions for reconsideration, as well as other issues that EPA believed warranted reconsideration.

2. Summary of the Provisions of the Regulatory Action

The major provisions of this rule include rescinding amendments made to the Risk Management Program in 2017 relating to safer technology and alternatives analyses, third-party audits, incident investigations, information availability, and several other minor provisions. EPA is also modifying regulations relating to local emergency coordination, emergency response exercises, and public meetings after an accident, changing the compliance dates for some of these provisions and modifying risk management plan and air permit requirements relating to rescinded or modified provisions.

a. Chemical Accident Prevention Provisions

This action rescinds almost all the requirements added in 2017 to the accident prevention program provisions of Subparts C (for Program 2 processes) and D (for Program 3 processes). EPA is rescinding all requirements for third-party compliance audits (§§ 68.58, 68.59, 68.79 and 68.80), safer technology and alternatives analysis (STAA) (§ 68.67(c)(8)) for facilities with Program 3 regulated processes in NAICS codes 322 (paper manufacturing), 324 (petroleum and coal products manufacturing), and 325 (chemical manufacturing) and removing the words ''for each covered process'' from the compliance audit provisions in §§ 68.58 and 68.79. This action also rescinds the requirement in § 68.50(a)(2) for the hazard review to include findings from incident investigations. For incident investigations (§§ 68.60 and 68.81), this action rescinds the following requirements added in 2017:

1. Conducting root cause analysis;
2. Added data elements for incident investigation reports, including a schedule to address recommendations and a 12-month completion deadline, and
3. Investigating any incident resulting in a catastrophic release that also results in the affected process being decommissioned or destroyed.

In §§ 68.60 and 68.81, EPA is also removing text ''(*i.e.,* was a near miss)'' that EPA added in 2017 to describe an incident that could reasonably have resulted in a catastrophic release. In § 68.60, EPA is retaining the term ''report(s)'' instead of replacing with the word ''summary(ies)'' and is retaining the requirement for Program 2 processes to establish an incident investigation team consisting of at least one person knowledgeable in the process involved and other persons with experience to investigate an incident.

This action removes the language added to the Program 2 (§ 68.54) and Program 3 (§ 68.71) training requirements, which more explicitly included supervisors and others involved in operating a process. This action also rescinds minor wording changes in § 68.54 describing employees involved in operating a process. EPA is also rescinding the requirement in § 68.65 for the owner or operator to keep process safety information up-to-date and the requirement in § 68.67(c)(2) for the process hazard analysis to address the findings from all incident investigations required under § 68.81, as well as any other potential failure scenarios. EPA will retain two changes that revised the term ''Material Safety Data Sheets'' to ''Safety Data Sheets (SDS)'' in §§ 68.48 and 68.65.

[1] For descriptions of NAICS codes, see *http://www.census.gov/cgi-bin/sssd/naics/naicsrch.*

[2] RMP Coalition's Petition for Reconsideration and Request for Agency Stay Pending Reconsideration of Final RMP rule (82 FR 4594, January 13, 2017), February 28, 2017. Hogan Lovells US LLP, Washington, DC. Document ID: EPA–HQ–OEM–2015–0725–0759 and Chemical Safety Advocacy Group (CSAG)'s Petition and Reconsideration and Stay Request of the Final RMP rule (82 FR 4594, January 13, 2017) March 13, 2017, Hunton & Williams, San Francisco, CA, EPA–HQ–OEM–2015–0725–0766 and EPA–HQ–OEM–2015–0725–0765 (supplemental petition).

[3] Petition for Reconsideration and Stay on behalf of States of Louisiana, Arizona, Arkansas, Florida, Kansas, Texas, Oklahoma, South Carolina, Wisconsin, West Virginia, and the Commonwealth of Kentucky with respect to Risk Management Program Final Rule, (82 FR 4594, January 13, 2017), March 14, 2017. State of Louisiana, Department of Justice, Attorney General. EPA–HQ–OEM–2015–0725–0762.

[4] EPA–HQ–OEM–2015–0725–0758.

This action rescinds the following definitions in § 68.3: Active measures, inherently safer technology or design, passive measures, practicability, and procedural measures related to amendments to requirements in § 68.67; root cause related to amendments to requirements in § 68.60 and § 68.81; and third-party audit related to amendments to requirements in §§ 68.58 and 68.79 and added in §§ 68.59 and 68.80.

b. Emergency Response Provisions

This action modifies the local emergency response coordination amendments by replacing the phrase in § 68.93(b) that requires facilities to share information that local emergency planning and response organizations identify as relevant to local emergency response planning with revised language pertaining to sharing information necessary for developing and implementing the local emergency response plan.

EPA is retaining the requirement for owners or operators to provide the local emergency planning and response organizations with the stationary source's emergency response plan (if one exists), emergency action plan, and updated emergency contact information, as well as the requirement for the owner or operator to request an opportunity to meet with the local emergency planning committee (or equivalent) and/or local fire department as appropriate to review and discuss these materials. EPA is also incorporating appropriate classified and restricted information protections to regulated substance and stationary source information required to be provided under § 68.93 and revising the existing classified information provision of § 68.210 to incorporate protections for restricted information identical to those in § 68.93. Restricted information includes Sensitive Security Information (SSI), Protected Critical Infrastructure Information (PCII), Chemical-terrorism Vulnerability Information (CVI), and any other information restricted by Federal statutes or laws.

This action is modifying the exercise program provisions of § 68.96(b), by removing the minimum frequency requirement for field exercises. EPA is also establishing more flexible scope and documentation provisions for both field and tabletop exercises by only recommending, and not requiring, items specified for inclusion in exercises and exercise evaluation reports, while still requiring documentation of both types of exercises. This action retains the notification exercise requirement of § 68.96(a) and the provision for alternative means of meeting exercise requirements of § 68.96(c).

c. Public Information Availability Provisions

This action rescinds the requirements for providing to the public upon request, chemical hazard information and access to community emergency preparedness information in § 68.210(b) through (d), as well as the requirement to provide specific chemical hazard information at public meetings required under § 68.210(e).

This action modifies the requirement in § 68.210(e) [now redesignated as § 68.210(b) because former paragraphs (b) through (d) are rescinded] for the owner/operator of a stationary source to hold a public meeting to provide accident information required under § 68.42(b) by only requiring a public meeting following the occurrence of a risk management plan (or RMP [5]) reportable accident with offsite impacts specified in § 68.42(a) (*i.e.,* known offsite deaths, injuries, evacuations, sheltering in place, property damage, or environmental damage). This is a modification to the RMP Amendments rule that required a public meeting after any accident subject to reporting under § 68.42, including accidents that resulted in on-site impacts only.

EPA will retain the requirement that public meetings required under § 68.210(e) [now redesignated as § 68.210(b)] occur within 90 days of an accident. EPA will also retain the change to § 68.210(a) that added 40 CFR part 1400 as a limitation on RMP availability (part 1400 addresses restrictions on disclosing RMP offsite consequence analysis information under CSISSFRRA),[6] and the provision for control of classified information in § 68.210(f) [now redesignated as § 68.210(c)], with a modification to address restricted information under the provision (*e.g.,* PCII, SSI, and CVI). This action deletes the provision for CBI in § 68.210(g), because the only remaining information required to be provided at the public meeting is the source's five-year accident history, which § 68.151(b)(3) prohibits the owner or operator from claiming as CBI.

[5] 40 CFR part 68 is titled, ''Chemical Accident Prevention Provisions,'' but is more commonly known as the ''RMP regulation,'' the ''RMP rule,'' or the ''Risk Management Program.'' This document uses all three terms to refer to 40 CFR part 68. The term ''RMP'' is also used to refer to the document required to be submitted under subpart F of 40 CFR part 68, the risk management plan. See *https://www.epa.gov/rmp* for more information on the Risk Management Program.

[6] Chemical Safety Information, Site Security and Fuels Regulatory Relief Act, Public Law 106–40. EPA–HQ–OEM–2015–0725–0135.

d. Risk Management Plan

This action rescinds requirements to report in the risk management plan any information associated with the rescinded provisions of third-party audits, incident investigation, safer technology and alternatives analysis, and information availability to the public (except that pertaining to the public meeting requirement now in § 68.210(b)). The list of RMP registration information in § 68.151(b)(1) excluded from being claimed as CBI, is modified by the final rule to also exclude from CBI claims, whether a public meeting was held following an RMP accident, pursuant to § 68.210(b). This public meeting reporting is to be included in the RMP under § 68.160(b)(21). This action also slightly modifies the emergency response contact information required by § 68.180(a)(1) to be provided in a facility's RMP.

e. Compliance Dates

This action requires compliance with the revised emergency response coordination requirements on the effective date of the final rule. This action retains the compliance date for public meetings established in the final Amendments rule and therefore requires that the owner or operator comply with the revised public meeting requirements following any RMP reportable accident with offsite impacts specified in § 68.42(a) that occurs after March 15, 2021. This action delays the rule's compliance dates in § 68.10 and § 68.96 as follows:

i. Emergency response exercises:

A. *Planning and Scheduling.* Owners and operators will be required to have exercise plans and schedules meeting the requirements of §§ 68.93 and 68.96 in place by December 19, 2023;

B. *Notification exercise.* Perform first notification exercise by December 19, 2024;

C. Perform first tabletop exercise by December 21, 2026; and

D. *Field exercise.* There is no specified deadline to perform the first field exercise, other than that established by the owner or operator's exercise schedule in coordination with local response agencies; and

ii. Updating risk management plan provisions for the following, only for initial RMP submissions or when re-submission or update for an existing RMP is required under § 68.190:

A. Reporting under § 68.160(b)(21) after December 19, 2024, whether a public meeting required by § 68.210(b) occurred; and

B. Reporting after December 19, 2024, emergency response program information specified in § 68.180 as revised by the January 13, 2017 final Amendments rule and this final rule.

For a detailed review of the changes from the regulatory text (which has the

2017 Amendments rule changes incorporated), EPA has provided a copy of 40 CFR part 68 with changes shown in redline/strikeout format, which is available in the rulemaking docket.[7]

*D. What is the Agency's authority for taking this action?*

The statutory authority for this action is provided by section 112(r) of the CAA (42 U.S.C. 7412(r)). Each of the portions of the Risk Management Program rule we are modifying in this document is based on section 112(r) of the CAA. EPA's authority for convening a reconsideration proceeding for certain issues is found under CAA section 307(d)(7)(B) or 42 U.S.C. 7607(d)(7)(B). The Agency's procedures in this rulemaking are controlled by CAA section 307(d). EPA's authority for convening a reconsideration proceeding for certain issues is found under CAA section 307(d)(7)(B) or 42 U.S.C. 7607(d)(7)(B). A more detailed explanation of these authorities can be found in Section II.C. of this preamble, *EPA's authority to reconsider and revise the RMP Amendments rule.*

*E. What are the incremental costs and benefits of taking this action?*

1. Summary of Potential Cost Savings

Approximately 12,500 facilities have filed current RMPs with EPA and are potentially affected by this action. These facilities range from petroleum refineries and large chemical manufacturers to water and wastewater treatment systems; chemical and petroleum wholesalers and terminals; food manufacturers, packing plants, and other cold storage facilities with ammonia refrigeration systems; agricultural chemical distributors; midstream gas plants; and a limited number of other sources, including Federal installations, that use RMP regulated substances.

Table 2 presents the number of facilities according to the RMP reporting as of February 2015 by industrial sector and chemical use.

TABLE 2—NUMBER OF AFFECTED FACILITIES BY SECTOR

[As of February 2015]

| Sector | NAICS codes | Total facilities | Chemical uses |
|---|---|---|---|
| Administration of environmental quality programs (*i.e.*, governments). | 924 | 1,923 | Use chlorine and other chemicals for treatment. |
| Agricultural chemical distributors/wholesalers | 111, 112, 115, 42491 | 3,667 | Store ammonia for sale; some in NAICS 111 and 115 use ammonia as a refrigerant. |
| Chemical manufacturing | 325 | 1,466 | Manufacture, process, store. |
| Chemical wholesalers | 4246 | 333 | Store for sale. |
| Food and beverage manufacturing | 311, 312 | 1,476 | Use mostly ammonia as a refrigerant. |
| Oil and gas extraction | 211 | 741 | Intermediate processing (mostly regulated flammable substances and flammable mixtures). |
| Other | 44, 45, 48, 54, 56, 61, 72 | 248 | Use chemicals for wastewater treatment, refrigeration, store chemicals for sale. |
| Other manufacturing | 313, 326, 327, 33 | 384 | Use various chemicals in manufacturing process, waste treatment. |
| Other wholesale | 423, 424 | 302 | Use (mostly ammonia as a refrigerant). |
| Paper manufacturing | 322 | 70 | Use various chemicals in pulp and paper manufacturing. |
| Petroleum and coal products manufacturing | 324 | 156 | Manufacture, process, store (mostly regulated flammable substances and flammable mixtures). |
| Petroleum wholesalers | 4247 | 276 | Store for sale (mostly regulated flammable substances and flammable mixtures). |
| Utilities | 221 | 343 | Use chlorine (mostly for water treatment), ammonia and other chemicals. |
| Warehousing and storage | 493 | 1,056 | Use mostly ammonia as a refrigerant. |
| Water/wastewater Treatment systems | 22131, 22132 | 102 | Use chlorine and other chemicals. |
| Total | | 12,542 | |

Table 3 presents a summary of the annualized cost savings estimated in the regulatory impact analysis.[8] In total, EPA estimates annualized cost savings of $87.4 million at a 3% discount rate and $87.8 million at a 7% discount rate.

TABLE 3—SUMMARY OF ANNUALIZED COST SAVINGS

[Millions, 2015 dollars]

| Provision | 3% | 7% |
|---|---|---|
| Third-party Audits | (9.8) | (9.8) |
| Incident Investigation/Root Cause | (1.8) | (1.8) |
| STAA | (70.0) | (70.0) |
| Information Availability | (3.1) | (3.1) |
| Public Meetings | (0.28) | (0.28) |

[7] EPA. 40 CFR part 68 Regulatory Text Redline/Strikeout Changes for Final RMP Reconsideration Rule.

[8] A full description of costs and benefits for this rule can be found in the Regulatory Impact Analysis—Reconsideration of the 2017 Amendments to the Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act, section 112(r)(7). This document is available in the docket for this rulemaking (Docket ID Number EPA–HQ–OEM–2015–0725).

TABLE 3—SUMMARY OF ANNUALIZED COST SAVINGS—Continued
[Millions, 2015 dollars]

| Provision | 3% | 7% |
|---|---|---|
| Rule Familiarization (net) | (2.4) | (2.8) |
| Total Cost Savings * | (87.4) | (87.8) |

* Values may not sum due to rounding.

Most of the annual cost savings under this action are due to the repeal of the STAA provision (annual savings of $70 million), followed by third-party audits (annual savings of $9.8 million), information availability (annual savings of $3.1 million), rule familiarization (annual net savings of $2.8 million), root-cause incident investigation (annual savings of $1.8 million), and public meetings (annual savings of $0.28 million).

2. Summary of Potential Benefits and Benefit Reductions

The January 2017 RMP Amendments rule was estimated to result in a variety of benefits from prevention and mitigation of future RMP and non-RMP accidents at RMP facilities, avoided catastrophes at RMP facilities, and easier access to facility chemical hazard information. This final Reconsideration rule will largely retain the revised local emergency coordination and exercise provisions of the RMP Amendments rule, which convey mitigation benefits. The rescission of the prevention program requirements (*i.e.,* third-party audits, incident investigation, STAA), will result in a reduction in the magnitude of accident prevention benefits that we projected would have accrued under the RMP Amendments. As discussed in this notice and supporting documents, in developing this final rule, we have received data and conducted analyses that call into question whether some of the originally projected accident reduction benefits claimed by the Agency when promulgating the RMP Amendments would have been likely to occur. The rescission of the chemical hazard information availability provision will result in a reduction of the information sharing benefit, although a portion of this benefit from the RMP Amendments rule would still be conveyed by the public meeting, emergency coordination and exercise provisions. This action will also convey the benefit of improved chemical site security, by modifying previously open-ended information sharing provisions of the RMP Amendments rule that might have resulted in an increased risk of terrorism against regulated sources. See the RIA for additional information on benefits and benefit reductions.

*F. What are the procedures for judicial review?*

Under CAA section 307(b)(1), judicial review of this final rule is available only by filing a petition for review in the U.S. Court of Appeals for the District of Columbia Circuit (the Court) by February 18, 2020. Under CAA section 307(d)(7)(B), only an objection to this final rule that was raised with reasonable specificity during the period for public comment can be raised during judicial review.

## II. Background

*A. Overview of EPA's Risk Management Program Regulations*

EPA's RMP regulations were initially published in two stages. The Agency first published the list of regulated substances and TQs in 1994 (59 FR4478, January 31, 1994) (the ''list rule'').[9] EPA then published the RMP final regulation, containing risk management requirements for covered sources, in 1996 (61 FR 31668, June 20, 1996) (the ''RMP rule'').[10 11] Subsequent modifications to the list rule and RMP rule were made as discussed in the RMP Amendments rule (82 FR 4594, January 13, 2017 at 4600). Prior to development of EPA's 1996 RMP rule, the Occupational Safety and Health Administration (OSHA) published its Process Safety Management (PSM) standard in 1992 (57 FR 6356, February 24, 1992), as required by section 304 of the 1990 CAAA, using its authority under 29 U.S.C. 653. The OSHA PSM standard can be found in 29 CFR 1910.119. The EPA RMP rule and the OSHA PSM standard aim to prevent or minimize the consequences of accidental chemical releases through implementation of management program elements that integrate technologies, procedures, and management practices. In addition, the EPA RMP rule requires covered sources to submit (to EPA) a document summarizing the source's risk management program—called a risk management plan (or RMP).

The EPA's risk management program requirements include the following: (1) Conducting a worst-case release scenario analysis, alternative release scenario analyses, and a review of accident history; (2) coordinating emergency response procedures with local response organizations; (3) conducting a hazard assessment; (4) documenting a management system; (5) implementing a prevention program and an emergency response program; and (6) submitting a risk management plan that addresses all aspects of the risk management program for all covered processes and chemicals. A process at a source is covered under one of three different prevention programs (Program1, Program 2 or Program 3) based on the threat posed to the community and the environment. Program 1 has minimal requirements and is for processes that have not had an accidental release with specified off-site consequences in the last five years prior to submission of the source's risk management plan, and that have no public receptors within the worst-case release scenario vulnerable zone for the process. Program 3 has the most requirements and applies to processes not eligible for RMP Program 1 and covered by the OSHA PSM standard or classified in specified industrial sectors.[12] Program 2 has fewer requirements than Program 3 and applies to any process not covered under Programs 1 or 3. Programs 2 and

[9] Documents and information related to development of the list rule can be found in the EPA docket for the rulemaking, docket number A–91–74.

[10] Documents and information related to development of the RMP rule can be found in EPA docket number A–91–73.

[11] 40 CFR part 68 applies to owners and operators of stationary sources that have more than a TQ of a regulated substance within a process. The regulations do not apply to chemical hazards other than listed substances held above a TQ within a regulated process.

[12] See ten industry NAICS codes listed at § 68.10(d)(1) [redesignated as § 68.10(h)(1) in this final rule] representing pulp mills, petroleum refineries, petrochemical manufacturing, alkalies and chlorine manufacturing, all other basic inorganic chemical manufacturing, cyclic crude and intermediates manufacturing, all other basic chemical manufacturing, plastic material and resin manufacturing, nitrogenous fertilizer manufacturing and pesticide and other agricultural chemicals manufacturing.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 14 of 91


3 both require a hazard assessment, a prevention program and an emergency response program, although Program 2 prevention program requirements are less extensive and more streamlined. For example, the Program 2 prevention program was intended to cover simpler processes located at smaller businesses and does not require the following process safety elements: Management of change, pre-startup review, contractors, employee participation and hot work permits. The Program 3 prevention program is fundamentally identical to the OSHA PSM standard and designed to cover those processes in the chemical industry. For further explanation and comparison of the PSM standard and RMP requirements, see the ''Process Safety Management and Risk Management Plan Comparison Tool'' published by OSHA and EPA in October 2016.[13]

*B. Events Leading to This Action*

1. 2017 Final Rule

On January 13, 2017, the EPA issued a final rule amending 40 CFR part 68, the chemical accident prevention provisions under section 112(r) of the CAA (42 U.S.C. 7412(r)) (*i.e.,* the ''RMP Amendments'' rule). The RMP Amendments addressed various aspects of risk management programs, including prevention programs at stationary sources, emergency response preparedness requirements, information availability, and various other changes to clarify and otherwise technically correct the underlying rules.

a. Accident Prevention Program Requirements

The RMP Amendments added new accident prevention program provisions in 40 CFR 68 Subparts C (for Program 2 processes) and D (for Program 3 processes), including:

i. A requirement in § 68.60 and § 68.81 for all facilities with Program 2 or 3 processes to conduct a root cause analysis using a recognized method as part of an incident investigation of a catastrophic release or an incident that could have reasonably resulted in a catastrophic release (*i.e.,* a near-miss).

ii. Requirements in § 68.58 and§ 68.79 for regulated facilities with Program 2 or Program 3 processes to contract with an independent third-party, or assemble an audit team led by an independent third-party, to perform a compliance audit after the facility has an RMP reportable accident or when an implementing agency requires a third-party audit due to conditions at the stationary source that could lead to an accidental release of a regulated substance, or when a previous third-party audit failed to meet the specified competency or independence criteria. Requirements were established in new § 68.59 and § 68.80 for third-party auditor competency, independence, and responsibilities and for third-party audit reports and audit findings response reports.

iii. A requirement in § 68.67(c)(8) for facilities with Program 3 regulated processes in NAICS codes 322 (paper manufacturing), 324 (petroleum and coal products manufacturing), and 325 (chemical manufacturing) to conduct a safer technologies and alternatives analysis (STAA) as part of their process hazard analysis (PHA).

The RMP Amendments rule also made several other minor changes to the Subparts C and D prevention program requirements.

b. New Emergency Response Requirements

The RMP Amendments added new emergency response program requirements in 40 CFR 68 Subpart E, including:

i. Requirements for owners or operators of ''responding'' and ''non-responding'' stationary sources to perform emergency response coordination activities under new § 68.93. These activities included coordinating response needs at least annually with local emergency planning and response organizations, as well as documenting these coordination activities.

ii. Requirements for owners and operators of responding facilities to conduct exercises under a new § 68.96—Emergency response exercises. Required exercises included annual notification exercises, tabletop exercises at least once every three years, and field exercises at least once every ten years. Exercises schedules and plans are required to be coordinated with local emergency response officials, and the owner or operator must also document completed exercises.

The RMP Amendments also made other minor changes to the emergency response provisions of Subpart E.

c. New Information Availability Requirements

The RMP Amendments added new information availability requirements in 40 CFR 68 Subpart H, including:

i. A requirement for the owner or operator to provide, within 45 days of receiving a request by any member of the public, specified chemical hazard information for all regulated processes. The provision requires the owner or operator to provide ongoing notification on a company website, social media platforms, or through other publicly accessible means that the information is available to the public upon request, along with the information elements that may be requested and instructions for how to request the information.

ii. A requirement for the owner or operator of any facility having an accident meeting RMP reporting criteria to hold a public meeting within 90 days of the accident to provide information about the accident to members of the public.

iii. New provisions in § 68.210 to address classified information and confidential business information (CBI) claims for information required to be provided to the public.

The RMP Amendments also made other minor changes to Subpart H.

d. Updated Facility Risk Management Plan Requirements

Lastly, the RMP Amendments contained a requirement to update a facility's risk management plan to reflect information associated with new provisions, made other minor changes and technical corrections to 40 CFR part 68, and established various compliance dates for new provisions. For further information on the RMP Amendments, see 82 FR 4594 (January 13, 2017).

2. Delay-Related Actions and Requests to Reconsider

On January 26, 2017, the EPA published a final rule delaying the effective date of the RMP Amendments from March 14, 2017 to March 21, 2017, see 82 FR 8499. This revision to the effective date of the RMP Amendments was part of an EPA final rule implementing a memorandum dated January 20, 2017, from the Assistant to the President and Chief of Staff, entitled ''Regulatory Freeze Pending Review.'' This memorandum directed the heads of agencies to postpone, until 60 days after the date of its issuance, the effective date of rules that were published prior to January 20, 2017, but which had not yet become effective.

In a letter dated February 28, 2017, a group known as the ''RMP Coalition,'' submitted a petition for reconsideration of the RMP Amendments (''RMP Coalition Petition'') as provided for in CAA section 307(d)(7)(B) (42 U.S.C.7607(d)(7)(B)).[14] Under that

[13] Available at *https://www.osha.gov/chemical executiveorder/psm_terminology.html.* EPA–HQ–OEM–2015–0725–0922.

[14] RMP Coalition's Petition for Reconsideration and Request for Agency Stay Pending Reconsideration of Final RMP rule (82 FR 4594, January 13, 2017), February 28, 2017. Hogan Lovells

provision, the Administrator is to commence a reconsideration proceeding if, in the Administrator's judgement, the petitioner raises an objection to a rule that was impracticable to raise during the comment period or if the grounds for the objection arose after the comment period but within the period for judicial review and if the objection is of central relevance to the outcome of the rule. The Administrator may stay the effective date of the rule for up to three months during such a reconsideration. On March 13, 2017, the Chemical Safety Advocacy Group (''CSAG'') also submitted a petition (''CSAG Petition'') for reconsideration and stay (including a March 14, 2017 supplement to the CSAG Petition).[15] On March 14, 2017, the EPA received a third petition for reconsideration and stay from the State of Louisiana, joined by Arizona, Arkansas, Florida, Kansas, Oklahoma, South Carolina, Texas, Wisconsin, West Virginia, and the Commonwealth of Kentucky (the ''States Petition'').[16] The Petitioners CSAG and States also requested that EPA delay the various compliance dates of the RMP Amendments.

In a letter dated March 13, 2017, the Administrator announced the convening of a proceeding for reconsideration of the Risk Management Program Amendments (a copy of this letter is included in the docket for this rule, Docket ID No. EPA–HQ–OEM–2015–0725).[17] As explained in that letter, having considered the objections raised in the RMP Coalition Petition, the Administrator determined that the criteria for reconsideration had been met for at least one of the objections. EPA issued a three-month (90-day) administrative stay of the effective date of the Risk Management Program Amendments until June 19, 2017 (82 FR 13968, March 16, 2017). EPA subsequently further delayed the effective date of the Risk Management Program Amendments until February 19, 2019, via notice and comment rulemaking, referred to herein as the ''Delay Rule'' (82 FR 27133, June 14, 2017). The purpose of the Delay Rule was to allow EPA to conduct a reconsideration proceeding and to consider other issues that may benefit from additional comment. On August 17, 2018, the U.S. Court of Appeals for the District of Columbia Circuit issued its decision in *Air Alliance Houston, et. al.,* v *EPA,* 906 F.3d 1049 (D.C. Cir. 2018), vacating the Delay Rule, and on September 21, 2018, the Court issued its mandate which made the RMP Amendments rule immediately effective.

3. 2018 RMP Reconsideration Proposed Rule

EPA published a proposed rulemaking to reconsider the RMP Amendments on May 30, 2018 (83 FR 24850). The proposed rule (Reconsideration proposal) proposed several changes to the RMP Amendments. These included:

a. Rescinding the accident prevention program provisions of the RMP Amendments rule (*i.e.,* third-party audits, STAA, incident investigation root cause analysis, and most other minor changes to the prevention program).

b. Rescinding the public information availability provisions to provide chemical hazard information, exercise schedules, local emergency contacts and community preparedness information to the public upon request.

c. Modifying the public meeting provision by retaining the requirement for the facility to provide accident history elements but eliminating the requirement to provide ''other relevant chemical hazard information'' at the meeting.

d. Modifying the emergency coordination and exercise provisions of the Amendments rule to address security concerns raised by petitioners and give more flexibility to regulated facilities in complying with these provisions.

e. Extending compliance dates for modified provisions to provide additional time for regulated sources to comply with revised provisions. For additional information on the proposed Reconsideration rule, see 83 FR 24850, May 30, 2018.

EPA hosted a public hearing on June 14, 2018[18] to provide interested parties the opportunity to present data, views or arguments concerning the proposed action. EPA received a total of 77,360 public comments on the proposed rulemaking. Several public comments were the result of various mass mail campaigns and contained numerous copies of letters or petition signatures. Approximately 76,355 letters and signatures were contained in these several comments, related to 12 different form letter campaigns. The remaining comments include 987 submissions with unique content, 13 duplicate submissions, and 5 non-germane submissions. Included in this count of public submissions are written comments and verbal comments from 38 members of the public that provided verbal comments at a public hearing on June 14, 2018. Discussion of public comments can be found in topics included in this final rule and in the Response to Comments document,[19] available in the docket for this rulemaking.

*C. EPA's Authority To Reconsider and Revise the 2017 RMP Amendments Rule*

1. Procedural Requirements for Reconsidering RMP Amendments

Congress granted the EPA the authority for rulemaking on the prevention of chemical accidental releases as well as the correction or response to such releases in subparagraphs (A) and (B) of CAA section 112(r)(7). The substantive scope of this authority is discussed in more detail in the next section. The EPA has used its authority under CAA section 112(r)(7) to issue the RMP Rule (61 FR 31668, June 20, 1996), the RMP Amendments rule, and this Reconsideration rulemaking.

When promulgating rules under CAA section 112(r)(7)(A) and (B), the EPA must follow the procedures for rulemaking set out in CAA section 307(d). See CAA sections 112(r)(7)(E) *and* 307(d)(1)(C). Among other things, section 307(d) sets out requirements for the content of proposed and final rules, the docket for rulemakings, requirement to provide an opportunity for oral testimony on the proposed rulemaking, the length of time for comments, and judicial review. Only objections raised with reasonable specificity during the public comment period may be raised during judicial review. Section 307(d) has a provision that requires the EPA to convene a reconsideration proceeding when the person makes an objection that meets specific criteria set out in

US LLP, Washington, DC. Document ID: EPA–HQ–OEM–2015–0725–0759.

[15] Chemical Safety Advocacy Group (CSAG)'s Petition and Reconsideration and Stay Request of the Final RMP rule (82 FR 4594, January 13, 2017) March 13, 2017, Hunton & Williams, San Francisco, CA, EPA–HQ–OEM–2015–0725–0766 and EPA–HQ–OEM–2015–0725–0765 (supplemental petition).

[16] Petition for Reconsideration and Stay on behalf of States of Louisiana, Arizona, Arkansas, Florida, Kansas, Texas, Oklahoma, South Carolina, Wisconsin, West Virginia, and the Commonwealth of Kentucky with respect to Risk Management Program Final Rule, (82 FR 4594, January 13, 2017), March 14, 2017. State of Louisiana, Department of Justice, Attorney General. EPA–HQ–OEM–2015–0725–0762.

[17] EPA–HQ–OEM–2015–0725–0758.

[18] See written transcript of public meeting, EPA–HQ–OEM–2015–0725–0985.

[19] Response to Comments on the 2018 Proposed Rule (May 30, 2018; 83 FR 24850) Reconsidering EPA's Risk Management Program 2017 Amendments Rule (January 13, 2017; 82 FR 4594). This document is available in the docket for this rulemaking, EPA–HQ–OEM–2015–0725.

CAA section307(d)(7)(B). The statute provides:

> If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within [the comment period] or if the grounds for such objection arose after the period for public comment (but within the time period specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed.

As noted in the previous section, when several parties petitioned for reconsideration of the RMP Amendments, the Administrator found that at least one objection the petitioners raised met the specific criteria for mandatory reconsideration and therefore he convened a proceeding for reconsideration under CAA section 307(d)(7)(B). While section 307(d)(7)(B) sets out criteria for when the Agency must conduct a reconsideration, the Agency has the discretion to reopen, revisit, amend and revise a rule under the rulemaking authority granted in CAA section 112(r)(7) by following the procedures of CAA 307(d) at any time, including while it conducts a reconsideration proceeding required by CAA section 307(d)(7)(B). In light of the fact that EPA must already grant petitioners ''the same procedural rights as would have been afforded had the information been available at the time the rule was proposed,'' it is efficient to conduct a discretionary amendment proceeding simultaneously with the reconsideration proceeding.

As previously noted, EPA issued a rule delaying the effectiveness of the RMP Amendments in 2017 only to have the rule vacated in *Air Alliance Houston* v. *EPA,* 906 F.3d 1049 (D.C. Cir. 2018). The Court held that EPA could not delay the effective date of provisions of a CAA section 112(r)(7) rule beyond three months for the purpose of allowing itself a longer period of time to conduct a CAA section 307(d)(7)(B) reconsideration. *Id.* at 1063. The Court also found EPA's action was inconsistent with the mandate in CAA section 112(r)(7)(A) that we set effective dates that ''assur[e] compliance as expeditiously as practicable'' when our delay of effectiveness merely delayed the Amendments ''based on speculation about future amendments,'' rather than new evidence or a new substantive conclusion regarding preventing accidents. *Id.* at 1065. Finally, the Court found EPA's reasoning to be arbitrary and capricious because we failed to explain why the rule could not become effective while we conducted our reconsideration, did not contradict the previous conclusions about how long was needed for compliance, and did not limit delays based on the late finding regarding the West Fertilizer incident [20] to provisions clearly implicated by that report. *See id.* at 1066–69.

2. EPA's Substantive Authority Under Clean Air Act Section 112(r)(7)

Congress granted EPA authority for accident prevention rules under two provisions in CAA section 112(r)(7). Under subparagraph (A) of CAA section 112(r)(7), EPA may set rules addressing the prevention, detection, and correction of accidental releases of substances listed by EPA by rule (''regulated substances'' listed in the tables in 40 CFR 68.130). Such rules may include data collection, training, design, equipment, work practice, and operational requirements. EPA has discretion regarding the effective date (''as determined by the Administrator, assuring compliance as expeditiously as practicable'').

Under subparagraph (B) of CAA section 112(r)(7), Congress authorized EPA to develop ''reasonable regulations and appropriate guidance'' that provide for the prevention and detection of accidental releases and the response to such releases, ''to the greatest extent practicable.'' Congress required an initial rulemaking under this subparagraph by November 15, 1993. Subparagraph (B) sets out a series of mandatory subjects to address, interagency consultation requirements, and discretionary provisions that allowed EPA to tailor requirements to make them reasonable and practicable. For example, the regulations needed to address ''storage, as well as operations'' and ''emergency response after accidental releases;'' EPA was to use the expertise of the Secretaries of Labor and Transportation in promulgating the regulations; and EPA had the discretion (''shall, as appropriate'') to recognize differences in ''size, operations, processes . . . and the voluntary actions'' of regulated sources to prevent and respond to accidental releases (CAA section 112(r)(7)(B)(i)). At a minimum, the regulations had to require stationary sources with more than a ''threshold quantity to prepare and implement a risk management plan.'' Such plans needed to provide for compliance with rule requirements under CAA section 112(r) and include a hazard assessment with release scenarios and an accident history, a release prevention program, and a response program (CAA section 112(r)(7)(B)(ii)). Plans were to be registered with EPA and submitted to various planning entities (CAA section 112(r)(7)(B)(iii)). The rules would apply to sources three years after promulgation or three years after a substance was first listed for regulation under CAA section 112(r). (CAA section 112(r)(7)(B)(i)).

In addition to the direction to use the expertise of the Secretaries of Labor and Transportation in subparagraph (B) of CAA section 112(r)(7), the statute requires EPA to consult with these secretaries when carrying out the authority of CAA section 112(r)(7) and to ''coordinate any requirements under [CAA section 112(r)(7)] with any requirements established for comparable purposes by'' OSHA. (CAA section 112(r)(7)(D)). This consultation and coordination language derives from and expands upon provisions on hazard assessments in the bill that eventually passed the Senate as its version of the 1990 CAAA, section 129(e)(4) of S. 1630. The Senate committee report on this language notes that the purpose of the coordination requirement is to ensure that ''requirements imposed by both agencies to accomplish the same purpose are not unduly burdensome or duplicative.'' Senate Report at 244.[21] The mandate for coordination in the area of safer chemical processes was incorporated into the CAA in section 112(r)(7)(D). In the same legislation, Congress directed OSHA to promulgate a process safety standard that became the PSM standard. See CAAA of 1990 section 304.

The 2017 RMP Amendments and this reconsideration rule address the following three requirements of the Risk Management Program: Prevention programs, emergency response provisions, and information disclosure requirements. The prevention program provisions rescinded in this rule (third-party auditing, incident investigation, and safer technologies and alternatives analysis) address the ''prevention and detection of accidental releases.'' The emergency coordination and exercises provisions in this rule modify existing provisions that provide for ''response to such releases by the owners or operators of the sources of such releases.'' The

[20] On May 11, 2016, the Bureau of Alcohol, Tobacco, Firearms and Explosives (BATF) announced its conclusion that the fire at the West Fertilizer facility was intentionally set. See EPA–HQ–OEM–2015–0725–0641.

[21] Clean Air Act Amendments of 1989, Report of the Committee on Environment and Public Works, U.S. Senate together with Additional and Minority Views to Accompany S. 1630. S. Report No. 101–228. 101st Congress, 1st Session, December 20, 1989.—''Senate Report'' EPA–HQ–OEM–2015–0725–0645.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 17 of 91


information disclosure provisions that are rescinded or modified in this document are related to the development of ''procedures and measures for emergency response after an accidental release of a regulated substance in order to protect human health and the environment.'' [22] (CAA section 112(r)(7)(B)(i)).

In considering whether it is legally permissible for the Agency to rescind and/or modify provisions of the RMP Amendments rule while continuing to meet EPA's obligations under CAA section 112(r), EPA notes that the CAA did not require EPA to promulgate the RMP Amendments rule. There are four provisions of CAA section 112(r) that require or authorize the Administrator to promulgate regulations. The first two relate to the list of regulated substances and their threshold quantities. CAA section 112(r)(3) required EPA to promulgate a list of at least 100 regulated substances. Section 112(r)(5) required EPA to establish, by rule, a threshold quantity for each listed substance. EPA met these obligations in 1994 with the publication of the list of regulated substances and threshold quantities (59 FR 4493, January 31, 1994). Section 112(r)(7) contains the other two regulatory provisions. Section 112(r)(7)(B) required EPA to publish accidental release prevention, detection, and response requirements and guidance. EPA met this obligation in 1996 with the publication of the original RMP rule (61 FR 31668, June 20, 1996), and associated guidance documents published in the late 1990s. The other regulatory promulgation provision of section 112(r)(7)—section 112(r)(7)(A)—is permissive. Subparagraph (A) authorizes EPA to promulgate regulations but does not require it.

Therefore, EPA had met all of its mandatory duty regulatory obligations under section 112(r) prior to promulgating the RMP Amendments rule. In promulgating the RMP Amendments rule, EPA took a discretionary regulatory action in response to Executive Order 13650, ''Improving Chemical Safety and Security.'' [23] We have made discretionary amendments to the RMP rule several times without a dispute over our authority to issue discretionary amendments. See 64 FR 964 (January 6, 1999); 64 FR 28696 (May 26, 1999); 69 FR 18819 (April 9, 2004). As EPA's action in the 2017 RMP Amendments rule was discretionary, the Agency may take additional action to rescind or modify provisions adopted in the 2017 rule if the Agency finds that it is reasonable to do so. The *Air Alliance Houston (AAH)* decision noted that ''EPA retains the authority under Section 7412(r)(7) [CAA section 112(r)(7)] to substantively amend the programmatic requirements of the [2017 RMP Amendments] . . . subject to arbitrary and capricious review.'' 906 F.3d at 1066. This rule makes substantive amendments to 40 CFR part 68. Our action is authorized by both CAA 112(r)(7)(A) and (B), as explained herein.

### *D. EPA's Principal Rationale for Final Rule Actions*

The Supreme Court has recognized that agencies may change policy when such changes are ''permissible under the statute, . . . there are good reasons for [them], and that the agency *believes* [them] to be better'' than prior policies. *See FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis original). As discussed in detail below, there are good reasons for the policies adopted in this rule and the EPA believes they are better than policies we are rescinding or amending.

In the 2017 RMP Amendments rule, we found that the costs of the changes we made were reasonable in comparison to what we called the ''likely benefits,'' which included non-monetized benefits and some unspecified portion of accidents that we did monetize that we believed would be prevented. 82 FR 4598 (January 13, 2017). After taking comment on the issue of the reasonableness of the burdens and the appropriate role of cost in our decision-making, we remain convinced that a more reasonable and practicable approach to accident prevention is to emphasize case-specific oversight of those facilities that are performing poorly over regulatory changes that increase compliance costs for the entire regulated community. Such an approach recognizes that, because a relatively small number of facilities have accidental releases, the Agency can best prevent future accidents by enhancing safety measures at the poorest performers, through tailored injunctive relief when appropriate, to best suit the circumstances of each case rather than imposing broad regulatory requirements that unreasonably impose additional burdens on the vast majority of regulated facilities that have performed well. We previously labeled this approach as ''enforcement-led,'' but is better described as ''compliance-driven'' because it involves both routine compliance oversight of all facilities and more intensive post-accident oversight of weaker performers, including requiring additional safety measures as injunctive relief in enforcement actions.

Furthermore, we believe it is better not to impose substantial new regulatory requirements on all facilities in the RMP program on the basis of information about individual incidents and opinions where available, more comprehensive data does not demonstrate the efficacy of such a requirement across the board. EPA considered stakeholder input that both favored and opposed the rescission of the prevention program elements adopted in 2017 and considered data submitted by commenters. We also analyzed multiple years of accident history data in the RMP database, both nationally and in states and localities with programs that contain some or all the elements of the prevention program provisions. Based on this assessment, it cannot be established that regulatory programs that emphasize inherently safer technologies (IST) methods, such as chemical substitution and process redesign, have resulted in a reduction in accident rates involving RMP chemicals. This evidence suggests that IST regulations would not likely be effective at reducing accidents if applied on a national scale.

We do not dispute that there may be circumstances where the prevention program measures we adopted in the RMP Amendments rule are effective. However, we believe that many of the sources that would have had to conduct STAA and the other 2017 prevention measures already have successful prevention programs. The data support the conclusion that incorporating STAA into all such programs will not clearly reduce accidents (see *section IV.C* for further discussion of data relating to the effectiveness of STAA). Thus, rather than take a rule-driven approach that requires an STAA and/or new auditing and investigation requirements at all facilities, we have concluded that we can obtain accident-prevention benefits at lower cost through implementing and enforcing the pre-2017 RMP prevention program rules, and that the finalized regulatory changes in 2017 were a less appropriate execution of the statutory direction to establish reasonable regulations that promote the prevention, detection, and response to accidents to

[22] Incident investigation, compliance auditing, and STAA are also authorized as release prevention requirements pertaining to stationary source ''design, equipment . . . and work practice'' as well as ''record-keeping [and] reporting.'' Information disclosure is also authorized as ''reporting.'' CAA section 112(r)(7)(A).

[23] See 82 FR 4594, January 13, 2017: ''Section 6(c) of Executive Order 13650 requires the Administrator of EPA to review the chemical hazards covered by the Risk Management Program and expand, implement and enforce the Risk Management Program to address any additional hazards.''

the greatest extent practicable than the measures in this final rule. Through oversight on a source-specific basis, when we identify a facility that is not implementing a successful prevention program, we have the ability to seek injunctive relief that includes appropriate safety measures. This approach is supported by the observed reduction in the rate of RMP-reportable accidents over many years.

Reconsideration petitioners asserted that EPA failed to sufficiently coordinate the changes to the RMP regulations with OSHA, and that the regulations as revised by the Amendments rule left important gaps and created compliance uncertainties. Our approach in the final rule is more consistent with our historic practice to keep the EPA and OSHA prevention programs in alignment to the extent we are able to do so consistent with each Agency's statutory mission. It is plain from the legislative history and text of the statute that the interaction of the two programs was a concern of Congress at the time of the 1990 Clean Air Act Amendments. EPA does not delegate to OSHA or assign it primacy in the subject matter. We do not take the position that neither agency can act without the other moving in synch. Rather, reflecting on the potential burden of the changes adopted in the RMP Amendments as well as the lack of data concerning the benefits of the rule-driven approach adopted in the Amendments, we believe more work with OSHA on the issues being addressed would lead to better accident prevention.

We also believe that it is better to reduce the costs of compliance with regulatory requirements, when that is reasonable and practicable and has no significant impact on accidental release prevention and response. We recognize the terms of the statute allow for many policy considerations in deciding what is reasonable and practicable. To the extent the statute provides us with the flexibility to reflect the considerations in numerous executive orders, the Administrator has decided to use his discretion to take actions consistent with those executive orders. Of greatest concern to commenters has been executive orders issued by President Trump, but the rule also reflects consideration of other executive orders that predate this Administration. The decision to reduce regulatory burden by eliminating many of the prevention program provisions, as well as largely redundant information disclosures, is consistent not only with the executive orders but also is consistent with what may be considered as reasonable and practicable under the statute.

The final rule also addresses important security concerns that were raised in reconsideration petitions and by numerous commenters. We granted the RMP Coalition's request for reconsideration of the 2017 Amendments in part because of the timing of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (BATF) finding that the West Fertilizer incident was caused by a criminal act. In the proposed rule, EPA requested additional comment on the import of that finding. See 83 FR 24870, May 30, 2018. After weighing comments received on this issue, we reaffirm our view of the importance of balancing the public's need for chemical hazard information with chemical facility security. From the beginning of the Risk Management Program, one of its objectives has been to improve the availability of information about chemical hazards to community members and emergency planners in order to improve emergency preparedness. However, the sensitivity of certain information elements associated with RMP-regulated facilities has required Congress and EPA to strike a balance between a community's right-to-know and facility security. The Chemical Safety Information, Site Security and Fuels Regulatory Relief Act (CSISSFRRA), Public Law 106–40, recognized the need for such a balance by restricting the availability of certain information relating to the potential offsite effects of releases while also requiring it to be made available under controlled circumstances (*i.e.,* dissemination at public meetings and availability in reading rooms). EPA's final rule action addresses these issues in similar fashion—the final rule makes minor changes to the emergency coordination and public meeting provisions of the Amendments to avoid potential security risks associated with two open-ended information disclosure provisions. EPA does not believe these changes will impede the ability of local emergency planners and responders or members of the public to obtain necessary information about chemical facility hazards.

There are good reasons to retain the improvements to the emergency response provisions adopted in 2017, but with a few changes that make these provisions better. The West Fertilizer incident and others showed that improvements in the rule's emergency response provisions were necessary, and we reaffirm this view with this action. The final rule therefore retains the enhanced emergency coordination provisions adopted in 2017 with minor changes as described above and below. The emergency exercise provisions of the RMP Amendments rule are also mostly retained. However, EPA's final rule changes in this area are intended to allow facilities and local responders greater time and flexibility in meeting the exercise provisions. We believe these changes are particularly important in communities with multiple RMP-regulated facilities, where the RMP Amendments rule's exercise provisions could have overburdened local responders with requests to participate in exercises.

## III. General Comments and Legal Authority

After EPA solicited public comments, commenters raised numerous issues that included discussion on:

1. Statutory authority and procedural issues;
2. Costs and benefits of various regulatory provisions;
3. EPA's rationale for rescinding or modifying various regulatory provisions;
4. Maintaining consistency with the OSHA PSM standard;
5. Numbers of accidents and accident rates;
6. Accidents occurring during adverse weather events;
7. Security concerns regarding accident prevention, emergency response coordination and information availability provisions;
8. Timing and scope of public meetings after an accident;
9. Information disclosure during local emergency coordination;
10. Frequency, scope, documentation and other aspects of emergency exercises; and
11. Concerns from communities about the impact of accidents, especially those affecting low-income and minority populations.

We have structured the discussion of comments as they correspond to various topics: Statutory authority and procedural issues, accident prevention provisions, information availability provisions (including public meetings), local emergency coordination, emergency response exercises and compliance dates.

This section focuses on general comments regarding procedural aspects of the reconsideration rulemaking, EPA's authority under the statute to revise the RMP Amendments and to rescind aspects of that rule, and general comments on costs and benefits. Procedural objections include claims that EPA violated notice and comment requirements. Commenters also identified purported docketing deficiencies, raised claims of impermissible bias on the part of various decisionmakers, and found fault with EPA's choice to follow various

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 19 of 91


executive orders in its decision making. General substantive authority issues discussed below include whether EPA may emphasize compliance and enforcement rather than new regulations under the CAA, whether EPA has the authority to consider costs under CAA section 112(r)(7), whether EPA's approach is consistent with the requirement that reasonable regulations provide for the preventing and mitigating of accidents ''to the greatest extent practicable,'' and whether EPA may rescind provisions purportedly related to CSB recommendations. Cost and benefit issues include whether the vacatur of the Delay rule should affect estimated cost savings, cost impacts to fence line communities, accident data submitted by commenters relating to estimated accident costs, and other arguments for and against EPA's cost-benefit analysis and cost-saving rationale. Some cost/benefit issues that relate to specific regulatory provisions are discussed in subsequent sections relating to those provisions.

### *A. Discussion of Comments on Procedural Requirements*

#### 1. Claims That EPA Violated Notice-and-Comment Requirements

Several advocacy groups asserted that EPA failed to consider what additional steps were necessary to allow for environmental justice communities a ''reasonable period for public participation,'' as required by 42 U.S.C. 7607(h). A joint submission from multiple advocacy groups argues that EPA's statement that its proposal ''does not impose any additional costs on affected communities'' is incorrect and arbitrary because EPA's own record highlights the costs for fence-line communities in the form of deaths, injuries, toxic exposure, and other harm related to shelter-in-place and evacuation orders, as well as property value and other economic harms. The commenter asserted that the CAA requires EPA to provide a reasonable opportunity for an oral presentation of data, views, or arguments, and that EPA has failed to do so by providing insufficient time to register for the public hearing and holding a hearing in one location only. The commenter also contended that EPA's justification for not performing any additional engagement activities, and not providing any community-based public hearings or listening sessions contravenes the statutory requirement for a ''reasonable period for public participation,'' and is arbitrary and capricious.

The same commenter contended that EPA did not provide 30 days' notice of the public hearing scheduled for June 14, 2018 because the notice of hearing was published on May 30, 2018 and CAA 7607(h) requires EPA to ''ensure a reasonable period for public participation of at least 30 days'' in conjunction with giving interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions.'' 42 U.S.C. 7607(d)(5). This commenter noted that because the hearing notice also stated that ''[t]he last day to preregister in advance to speak at the hearing is June 8, 2018,'' this implied that participants should register to ensure they could participate in that hearing and gave communities only nine days to do so. This commenter stated that EPA refused to hold public hearings elsewhere or to provide a second public hearing, despite requests from stakeholders to do so. This commenter argued that EPA provided no opportunity for telephone presentation/participation and agreed to provide a ''listen-only'' phone line. The commenter argued that only communities that had been in contact with EPA or were checking the EPA website were made aware of this line because EPA gave no public notice of the listen-only phone line.

The commenter also argued that EPA held two rounds of public comment and included eight public listening sessions in the first round of participation for the RMP Amendments rule, but the Agency's decision to hold only a single public hearing (in D.C.) makes this rulemaking process inadequate and its proposed action arbitrary. This commenter maintains having only one hearing was contrary to EPA's original practice on this rule and its own recognition previously that it is necessary and important to consider input from the most affected and most-exposed community members who live and work near RMP facilities.

The commenter also contended that EPA refused to give the minimum of 30 days' accurate notice even though the REAL ID Act requirements it had provided in its initial notice were incorrect, as they stated that if a participant had a driver's license from 12 listed states or territories, that additional identification would be required to attend the hearing. This commenter stated that EPA admitted the public notice was incorrect after receiving questions from the public and then published on its website, but not in the **Federal Register**, the information that no state residents, and only American Samoa residents, would be required to provide an additional form of identification. This commenter argues that EPA's failure to provide public notice of this error and to delay its hearing or hold a second hearing in response renders its process unlawful and arbitrary because REAL ID Act requirements pose an additional and disproportionate barrier to individuals who do not speak English as their first language and the lack of adequate notice by EPA made it impossible for them to participate.

*EPA Response:* EPA disagrees with these comments. The Agency met the statutory requirement to provide a ''reasonable period for public participation.'' We believe the initial notice and hearing were sufficient to satisfy the requirements of CAA section 307(d) and other relevant rulemaking procedures that apply to this rulemaking. The ''reasonable period for public participation'' referred to in CAA 307(h) is the presumptive minimum comment period for a proposed rule and not a mandatory minimum period before a public hearing. Regarding the commenter's contention that EPA was required to give more than 15-days' notice prior to the hearing, the Federal Register Act provides that a notice of a hearing required by statute ''shall be deemed to have been given to all persons'' when the notice is published in the **Federal Register** ''not less than fifteen days'' prior to the date of the hearing, ''without prejudice, however, to the effectiveness of a notice of less than fifteen days where the shorter period is reasonable.'' 44 U.S.C. 1508. The public hearing for the RMP Reconsideration Proposal was held on June 14, 2018, 15 days after publication of the notice of proposed rulemaking (NPRM) in the **Federal Register**. Additionally, EPA notes that the date and location of the public hearing were fixed in advanced, and web-accessible copies of the NPRM were made available to the public a few hours after the Administrator's signature on the NPRM on May 17, 2018.

Another public participation provision of the CAA requires that the rulemaking docket must remain open for public comment at least 30 days after the last hearing (CAA section 307(d)(5)). The initial close of comment period was July 30, 2018 (60 days after notice), and the comment period was later extended to August 23, 2018. Therefore, the statutory requirement for public participation of at least 30 days was met.

The implication made by the commenter that hearing participants had to register by June 8, 2018 in order

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 20 of 91


to participate in the hearing is incorrect. The May 30, 2018 **Federal Register** notice (83 FR 24850) for the hearing made clear that pre-registration was intended to assist EPA and participants to determine preferences on speaking time and how they could fit into the hearing schedule. The FR notice explained that requests to speak would also be taken at the day of the hearing at the registration desk and anyone wishing to make a comment as a walk-in registrant would be heard after any scheduled speakers. Thus, speakers at the hearing were not required to pre-register.

EPA did decline a request from an advocacy group for additional public hearings. EPA believes that holding a public hearing in Washington, DC, on June 14, 2018, and the notice announcing the hearing, meet the requirements of CAA section 307(d), as well as other relevant federal statutes.

While EPA did provide listening-only telephone participation for this hearing, this was beyond what is necessary for compliance with proper rulemaking procedure, and EPA did so to facilitate additional participation.

The procedures EPA followed here are consistent with how the Agency proceeds in other rulemakings under section 307(d). For example, providing fifteen days between publication of an NPRM and a public hearing is routine, and holding one hearing at EPA headquarters is also not uncommon even when all the affected communities are outside Washington.

The commenter is incorrect that EPA held two rounds of public hearings for the Amendments rule, and EPA disagrees that having only one hearing for the RMP Reconsideration rule was contrary to EPA's original practice on the RMP Amendments rule. EPA had only one public hearing on the RMP Amendments rule content, which was held on March 29, 2016. EPA held another hearing (April 18, 2017) for a separate rulemaking on the delay of the effective date for the RMP Amendments while the Agency began the reconsideration process for the RMP Amendments rule. Therefore, the opportunity to comment on the RMP Reconsideration proposed rule was similar to the opportunity to comment on the proposal underlying the RMP Amendments.

The eight public listening sessions to which the commenter refers were held prior to EPA proposing the RMP Amendments and were not part of the comment period for the Amendments rulemaking. Rather, these listening sessions were part of the Agency's input-gathering process under Executive Order 13650, which was a broader initiative directing the federal government to improve the safety and security of chemical facilities and reduce the risks of hazardous chemicals to workers and communities.

EPA disagrees that community members who live and work near RMP facilities did not have sufficient opportunity to participate in the proposed Reconsideration rule public hearing held on June 14, 2018. Holding a hearing in Washington, DC represented a reasonable balance of the need to have agency personnel familiar with the rule at the hearing, as well as accessibility to representatives of various stakeholders. With approximately 12,500 stationary sources in over 1,000 counties subject to the RMP rule, it would have been impossible to conduct hearings in all locales.

Furthermore, participation in the public hearing for the proposed RMP Reconsideration rule was larger (38 speakers) than the public hearing held for the proposed RMP Amendments rule (22 speakers) or the public hearing for the proposed Delay rule held on April 19, 2017 (28 speakers). Local and state advocacy and community groups were well represented at the Reconsideration rule hearing, numbering 13 of the 38 speakers. EPA also notes that states that had not previously commented on the Amendments rule and that had not sought to implement the RMP program through delegation were active in this rulemaking and testified during the June 14, 2018 public hearing.

Regarding the commenter's contention that the REAL ID Act requirements posed an additional and disproportionate barrier to individuals who do not speak English as their first language, EPA must follow these requirements for persons entering Federal buildings. The REAL ID Act requirements allow for other types of IDs to be used as acceptable alternative forms of identification. Once EPA made further inquiries about the ID requirements and discovered that many of the ID restrictions for 11 of the 12 states and territories had been removed, EPA provided the updated REAL ID Act requirements on the public hearing registration web page whose internet address was provided in the FR notice to direct potential hearing speakers to pre-register. The number of states/territories with restrictions on type of ID accepted were less than indicated by the FR notice, so providing valid ID for the hearing should not have been problematic. EPA was not contacted by or made aware of any potential speakers who were deterred by the REAL ID Act requirements.

2. Claims of Omitted Documents in Rulemaking Docket

A joint comment submission from multiple advocacy groups and other commenters argued that EPA violated notice- and comment requirements by failing to provide a meaningful opportunity for public participation in the rulemaking by omitting key documents from the public docket, including a March 2018 version of the RMP database, query techniques used to obtain facility counts from the RMP database, and spreadsheet outputs of queries.

*EPA Response:* Regarding the commenters' claim that EPA omitted key documents from the public docket, EPA disagrees with this claim. EPA docketed a November 2017 version of the RMP database that was used to obtain facility statistics for the 2014–2016 period on July 11, 2018 (Docket ID EPA–HQ–OEM–2015–0725–0989) and provided it directly to one of these commenters a day earlier. EPA also, on a notice of data availability published on July 24, 2018,[24] extended the comment period for the proposed rule from July 30 to August 23, 2018, to give other members of the public an opportunity to obtain the more recent database if they so desired. Furthermore, as EPA explained in the notice of data availability for the November 2017 database, because the November 2017 database was used mostly for corroboration, we do not believe there were fundamental data about sources subject to the RMP Rule that could not have been observed in the 2015 database that was already in the docket.

In addition to docketing an updated version of the database at the request of a commenter, EPA used a March 2018 version of the RMP database only to extract accident statistics for the 2014–2016 period, which were presented in the RIA. Because EPA used this version of the database only for accident information, instead of docketing the entire database, EPA docketed an Excel spreadsheet output of accident records for 2014–2016 derived from this version of the database prior to publishing the proposed rule. See Docket ID: EPA–HQ–OEM–2015–0725–0909. The accident counts from this spreadsheet were presented in the RIA to corroborate the decline in accidents seen in the 2004–2013 period. On October 3, 2018, EPA also docketed a spreadsheet containing

[24] 83 FR 34967, July 24, 2018, EPA–HQ–OEM–2015–0725–1389.

RMP facility accidents that occurred during 2017, extracted from the September 2018 version of the RMP database. EPA docketed this spreadsheet to corroborate the continued decline in RMP facility accidents in 2017 (there were 94 RMP facility accidents reported to EPA in 2017). See Docket ID: EPA–HQ–OEM–2015–0725–1974.

EPA also disagrees that it failed to adequately explain query techniques used to obtain information from the RMP database. At the request of a commenter, EPA held an information session for the commenter and other associated commenters on July 26, 2018, where EPA demonstrated methods and techniques for querying the RMP database and demonstrated how EPA obtained facility, process and accident counts from the database.[25] During that session, commenters noted no errors associated with EPA's query methods or results. A record of this meeting and a copy of the presented materials were placed in the docket on August 6, 2018.[26] EPA notes that other commenters were able to extract information from the docketed database and provide it in their public comments without apparent difficulty.

3. Claims That Trump Administration Executive Orders Undermined the Rulemaking Process

A joint comment submission from multiple advocacy groups and other commenters argued that the presence of E.O.s 13771, 13777, and 13783[27] in EPA's decision-making process undermined the integrity of the agency rulemaking process and violated the Due Process clause by forcing the agency to act with an unalterably closed mind. The commenters cited the legal standard established in *Air Transp. Ass'n of Am., Inc.* v. *Nat'l Mediation Bd.,* (663 F.3d 476, 487 (D.C. Cir. 2011)), asserting that the Executive Orders left EPA with no option but to deregulate (or else be forced to promulgate significant deregulatory actions elsewhere to balance out the cost), leaving the EPA unwilling or unable to rationally consider arguments. The commenters concluded that this limitation on EPA's decision-making is antithetical to reasoned decision making, making the proposed rule arbitrary and capricious and in violation of the Due Process Clause.

*EPA Response:* EPA disagrees that the Agency's consideration of E.O.s 13771, 13777, and 13783 undermines the integrity of the rulemaking process, violates the Due Process Clause, or is otherwise unconstitutional, unlawful, or irrational. EPA agrees that the Agency may not rely on executive orders as the basis for rulemaking—the Agency must have statutory authority to issue regulations, as it does in this case. While the action we take is consistent with the executive orders as a matter of policy, we have not acted inconsistently with CAA section 112(r) and other statutes in this rulemaking, nor have we relied on the executive orders as a source of authority to take this action. The E.O.s do not supersede any provision of the CAA, and they are not the cause or legal basis of EPA's decision to undergo this rulemaking or the outcome reached in the final rule. Nevertheless, we believe the orders themselves can be seen as identifying reasonable concerns about how we implement our underlying authority, much like E.O. 13132 (Federalism), E.O. 13175 (Consultation and Coordination with Indian Tribal Governments), E.O. 12898 (Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations), and other E.O.s To the extent the underlying statutes allow, we may consider the policies of the E.O.s in determining how to reasonably exercise our authority.

As the proposal notes, E.O.s 13771, 13777, and 13783 all support a policy direction of carefully examining the economic burden of regulations, which is ''directly relevant to whether the Amendments are 'practicable' for sources, as that term is used in CAA section 112(r)(7).'' 83 FR 24871. We have placed greater weight on the lack of demonstrable accident prevention benefits than we had at the time of promulgating the 2017 RMP Amendments. Id. The accident history analyses in the record support the conclusion that the economic burdens of the 2017 Amendments' prevention provisions were unreasonably disproportionate to the accident prevention benefits. While our further analysis of the burdens of the rule are in keeping with the themes or general direction of the E.O.s, assessing the reasonableness and practicability of the 2017 Amendments is consistent with CAA section 112(r)(7) and would be appropriate regardless of the E.O.s *Id.*

The Agency's rationale for rescissions and modifications to the Amendments rule is multifaceted—it includes maintaining consistency in accident prevention requirements with the OSHA PSM standard, addressing security concerns with the Amendments, and reducing unnecessary regulations and regulatory costs, consistent with EPA's statutory authority. If EPA had relied on these E.O.s without other considerations and was acting with an ''unalterably closed mind,'' the Agency would have simply rescinded the entire Amendments rule, rather than retain significant portions of it. EPA's actions in the final rule demonstrate that the Agency carefully and rationally considered public comments and arguments. For example, EPA carefully analyzed available data relating to the Amendments rule's prevention provisions prior to rescinding them, made narrowly-tailored changes to the emergency coordination, emergency exercise, and public meeting provisions, and carefully considered security and burden concerns prior to rescinding the information availability provisions. Further evidence that EPA did not approach this rule with an unalterably closed mind can be seen from EPA not going forward with various proposed deregulatory revisions as a result of comments. For example, while we proposed deletion of the requirement to provide information to local emergency planners upon request altogether, we finalized an amendment that required sources to provide information necessary for the emergency plan upon request.

*B. Discussion of Comments on EPA's Substantive Authority Under CAA Section 112(r)*

While many commenters agreed that EPA has ample authority to make substantive changes to the RMP rules, various other commenters suggested that particular provisions of the proposed rulemaking were not consistent with or violated CAA section 112(r) or other relevant statutes. We address these comments in each relevant section of the preamble and in the Response to Comments document,[28] available in the docket for this rulemaking.

---

[25] EPA. July 26, 2018. Summary of Meeting between EPA and Earthjustice, Union of Concerned Scientists and NY Attorney General's Office regarding Analysis of RMP Database. EPA–HQ–OEM–2015–0725–1463.

[26] EPA–HQ–OEM–2015–0725–1463.

[27] E.O. 13771 ''Reducing Regulation and Controlling Regulatory Costs'', January 30, 2017; E.O. 13777 ''Enforcing the Regulatory Reform Agenda'', February 24, 2017 and E.O. 13783 ''Promoting Energy Independence and Economic Growth'', March 28, 2017. EPA–HQ–OEM–2015–0725–0863, –0864, and –0865.

[28] EPA. Response to Comments on the 2018 Proposed Rule Reconsidering EPA's Risk Management Program 2017 Amendments Rule. This document is available in the docket for this rulemaking.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 22 of 91


1. Claims That Prioritizing Compliance With Existing Regulations Over Imposing New Requirements Violates CAA

Several commenters, including advocacy groups and State elected officials, stated that EPA's proposal to prioritize enforcement of the pre-2017 RMP rule over the additional requirements of the 2017 RMP Amendments rule was inconsistent with Congress's mandate in the CAA. These commenters stated that the emphasis on compliance oversight proposed by EPA violates the statute because the CAA requires EPA to promulgate ''regulations'' that provide ''to the greatest extent practicable'' for the prevention of chemical disasters. Another commenter stated that Congress clearly intended that accident risk be minimized at the outset, not only after an accident has occurred, which the commenter argued could not be achieved through enforcement alone.

*EPA Response:* EPA disagrees with these comments. The relevant statutory phrase describing EPA's authority to regulate under CAA 112(r)(7)(B)(i), authorizes ''reasonable regulations . . . to provide, to the greatest extent practicable,'' for the prevention and detection of and response to accidental releases of substances listed in 40 CFR 68.130 (''regulated substances,'' as the phrase is used in CAA 112(r)). An interpretation of the statute that does not give meaning to the qualifier ''reasonable'' to the authority to regulate ''to the greatest extent practicable,'' as the commenters suggest, is not in keeping with the structure of the statute. As recognized by the Supreme Court in *Michigan* v. *EPA,* 135 S. Ct. 2699, 2707 (2015), ''reasonable regulation'' generally involves some sort of examination of the benefits and the burdens of a rule.

EPA recognizes that the ''reasonable regulations'' should promote the prevention, detection, and response to accidents to the greatest extent practicable, but we must also construe ''practicable'' when developing regulations under CAA 112(r)(7)(B). We interpret the term practicable to include concepts such as cost-effectiveness of the regulatory and implementation approach, as well as the availability of relevant technical expertise and resources to the implementing and enforcement agencies and the owners and operators who must comply with the rule. While the Supreme Court recognized in the *Michigan* case that phrases that ordinarily encompass cost as a consideration may be further constrained in specific settings, because of the inclusion of the word ''practicable,'' we do not read ''to the greatest extent practicable'' to be such a constraint.

We interpret the CAA to give us the discretion, when assessing whether specific provisions (such as the STAA) are in fact ''reasonable regulations,'' to consider the prior rule structure and the enforcement and implementation program under it, and then determine, based on data on accident history required to be collected by the statute, that the STAA provision is not reasonable because it targets entire sectors rather than the facilities within those sectors that have problematic prevention programs.

The RMP accident data show that over a ten-year period, at least 90% of the RMP facilities have had no reported accidents, 6% had only one accident, and about 2% had two or more accidents. Nearly half of the total reportable accidents were from less than 2% of the RMP facilities, which reported multiple releases.[29]

Given the relatively small number of facilities that have RMP-reportable accidents, rather than imposing new requirements on all facilities that are costly and diffuse in targeting, a better approach is to retain the RMP rule as it stood prior to the 2017 RMP Amendments rule and improve compliance with that rule in the population of sources that are underperforming. This is both reasonable and addresses accidents to the greatest extent ''practicable.'' Broad regulatory requirements that unnecessarily impose burdens on the vast majority of regulated facilities that are performing well are not reasonable regulations. Reasonable and practicable prevention, protection, and response can be achieved by requiring those facilities that are not complying with the RMP rules to improve regulatory compliance through injunctive relief in enforcement actions. Such an approach is more practicable than the rescinded prevention provisions because EPA can tailor relief to best suit the circumstances of the case without unduly burdening sources that are implementing effective prevention programs.

[29] EPA. March 9, 2017. Notes and Documentation Related to a March 9, 2017 Meeting between the Risk Management Programs (RMP) Coalition and EPA regarding a Petition for Reconsideration of the RMP Amendments rule (82 FR 4594, January 13, 2017). EPA–HQ–OEM–2015–0725–0929 and American Chemistry Council public comments, August 17, 2018. EPA–HQ–OEM–2015–0725–1628.

2. EPA's Authority To Consider Regulatory Costs

A few commenters stated that the CAA does not permit EPA to rescind provisions of the RMP Amendments rule based on cost. These commenters stated that EPA has failed to identify its authority to consider cost in its analysis of whether or not to revise the RMP Amendments rule. Some commenters argued that the reduction of cost is an unlawful consideration and irrelevant because the CAA requires regulation based on certain factors, which do not include cost.

*EPA Response:* EPA disagrees with these comments. The common definitions of the words ''reasonable'' and ''practicable'' permit the consideration of cost. Merriam-Webster provides ''not too expensive'' as one definition for ''reasonable'' and indicates ''Practicable implies that something may be effected by available means or under current conditions.'' See *https://www.merriam-webster.com/dictionary/reasonable; https://www.merriam-webster.com/dictionary/practicable.* In *Michigan* v. *EPA,* the Supreme Court held that ''reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.'' *Michigan* v. *EPA,* 135 S. Ct. at 2707 (2015) (original emphasis). A practicable measure would be one that can come to fruition without imposing unreasonable demands. See *https://thelawdictionary.org/practicable/.* Synonyms not only include terms like feasible and possible but also viable and workable. See *https://www.merriam-webster.com/dictionary/practicable.* The lack of a specific reference to cost as a statutory factor should not be read to prohibit EPA from considering cost when the word ''reasonable'' ordinarily requires such consideration and what is ''practicable'' has the flexibility to encompass what is workable and not unreasonable. Cf. *Entergy Corp.* v. *Riverkeeper, Inc.,* 556 U.S. 208, 222 (2009) (silence regarding cost and other factors, without more, does not prohibit their consideration in standard-setting).

The legislative history of section 112(r) supports this reading. The House Energy and Commerce (HE&C) Committee version of the accident prevention provisions contained the phrase ''reasonable regulations . . . to provide, to the greatest extent practicable, for the prevention and detection of accidental releases.'' [House Rep. at 87 (HR 3030 section 112(m)].[30]

[30] CRS. November 1993. A Legislative History of the Clean Air Act Amendments of 1990 S. Prt. 103–38 *Committee Print,* Volume II, Report

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 23 of 91


The HE&C Committee Report explains that its bill would create a program to ''prevent and detect accidental releases to the maximum extent practicable.'' [House Rep. at 157.] While the reasonable regulations/greatest extent practicable language was ultimately retained in CAA section 112(r)(7)(B)(i), additional language not in the House committee version of the accident prevention provisions emerged at various stages of Senate and House consideration of the 1990 CAA Amendments that clarified that one of the goals of Congress was to have EPA consider the burden it would be imposing when it drafted its accident prevention Risk Management Program. As noted in the proposed rule preamble (83 FR 24864–5, May 30, 2018), in discussing the purpose of the coordination language of section 112(r)(7)(D), the Senate Committee asked both EPA and OSHA to coordinate to ensure the regulations would not be ''unduly burdensome.'' Senate Rep. at 244. Clean Air Act Amendments of 1989, Report of the Committee on Environment and Public Works, U.S. Senate together with Additional and Minority Views to Accompany S. 1630. S. Report No. 101–228. 101st Congress, 1st Session, December 20, 1989. EPA–HQ–OEM–2015–0725–0645.

Section 112(r)(7)(C) also requires that the regulations be consistent with third-party-set standards and recommendations ''to the maximum extent practicable,'' and that EPA take into account the concerns of small businesses. The Senate Committee report discussion of the hazard assessment provisions that are early versions of section 112(r)(7)(C) show that the Senate was concerned about minimizing the burden of its hazard assessment provisions. Senate Rep. at 226–27. In the context of the overall requirements for accident prevention regulations, it would be difficult to prohibit EPA from considering the burdens associated with the regulations authorized by CAA section 112(r)(7) and still fulfill these portions of the statute. Therefore, we believe that an interpretation that allows EPA to consider cost issues and other burdens of compliance among the factors in deciding what is a reasonable regulation to prevent accidents better fulfills the intent of the statute than the position offered by the commenters.

accompanying H.R. 3030 (H. Rept. 101–490). Prepared by the Congressional Research Service (CRS) for U.S. Senate Committee on Environment and Public Works. 103d Congress, 1st Session, available in the rulemaking docket.

3. Regulations Must Prevent and Mitigate Accidents ''to the Greatest Extent Practicable''

A few commenters stated that the Reconsideration rule is inconsistent with CAA requirement that regulations prevent and minimize risks from chemical accidents ''to the greatest extent practicable.'' One commenter stated that none of EPA's rationales demonstrate the legal or rational justification needed for EPA to be able to finalize the proposal or satisfy the CAA's requirements to prevent and reduce chemical releases. The commenters also stated that EPA may not rely on any generalized justification without explaining how or why the rationale provides a reasoned explanation for each of EPA's specific proposed actions, based on the record. One commenter stated that rescinding portions of the Amendments rule based on a rationale that accident rates at RMP facilities have declined would be entirely inconsistent with the EPA's statutory obligation for an RMP program that prevents and mitigates accidents ''to the greatest extent practicable.''

*EPA Response:* EPA disagrees with these comments. As discussed above, the concept of ''to the greatest extent practicable'' allows for EPA to consider burden issues for sources and implementing agencies as well as other factors that would lead EPA to consider the rules workable and effective at preventing accidents and providing for response. For example, imposing the burden of the new STAA assessments on whole industry sectors when most individual sources have successful accident prevention programs may be less workable and effective, even counterproductive for safety, than a compliance-driven alternative if the STAA requirement requires a source with an effective prevention program to divert resources from implementing another safety measure. *See Entergy Corp.,* 556 U.S. at 232–233 (Breyer, J., concurring in part and dissenting in part) (''an absolute prohibition [on the consideration of costs and benefits] would bring about irrational results . . . in an age of limited resources available to deal with grave environmental problems, where too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems''). In another example discussed below, EPA views a requirement for sources to have field exercises at least every 10 years to be impracticable because the burden it would impose on many local emergency response organizations with multiple RMP-covered facilities would discourage the participation of such organizations in the exercises; in other words, it would not be workable and effective.

Moreover, even before considering practicability, the regulations must be reasonable. In this rulemaking, EPA has concluded that some of the provisions adopted in 2017 are not ''reasonable regulations'' on one or more of the following grounds: (1) The requirement has burdens that are disproportionate to the accident prevention benefits that can be established; (2) the requirement increases the potential for chemical disasters through the creation of heightened security risks; or (3) the regulation diverges from OSHA's PSM requirements without demonstrably improving prevention performance.

Where a regulation is clearly not reasonable, then we need not assess whether it provides protection to the greatest extent practicable. However, among those regulatory options that are reasonable, the statute directs that EPA provide the greatest level of practicable protection in its regulations. We consider the workability, effectiveness, and reasonableness of demands on impacted entities when assessing if an option is practicable.

In considering whether regulations are both reasonable and practicable, burdens we considered included not only costs to regulated entities but also impacts on local emergency response organizations and their ability to carry out coordinated planning for response. Benefits and disbenefits to impacted entities (*e.g.,* the public, workers, or the sources themselves) that we considered include improvements in or lessening of incident prevention. These principles drawn from the terms ''reasonable'' and ''practicable'' guided our decisions on the prevention program and other aspects of this rule.

4. Rescinding Provisions Relating to Chemical Safety Board Recommendations

A joint submission from multiple advocacy groups and other commenters stated that EPA's failure to acknowledge that it is rescinding provisions that responded to rule changes recommended by the Chemical Safety Board (CSB) based on their review of specific incidents also renders the proposed rescissions arbitrary and capricious. The commenters cite page 246 of the Amendments RTC document, which states: ''Several of the amendments respond to CSB's suggested rule changes based on their review of specific incidents, which is

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 24 of 91


consistent with the structure of CAA 112(r)(6)(C)(ii) and EPA's rulemaking authority in CAA 112(r)(7).'' The commenters argued that to create a valid regulation, EPA must acknowledge these recommendations, citing as an example the investigation recommendations from the Tesoro Refinery accident in Anacortes, Washington, and explain how its newly proposed regulations will respond to them. Relatedly, the commenters argued that the EPA generally failed to consider evidence from experts like the CSB on the increased, foreseeable, and preventable health and safety threats at chemical facilities.

*EPA Response:* EPA disagrees with this comment. Since the CSB became operational, it has been the practice of EPA to respond to individual incident investigation reports with letters to the CSB as called for in CAA 112(r)(6)(I). In the excerpt from the RMP Amendments rule response to comment (RTC) document cited by commenters, EPA uses the term ''respond'' in the sense of being responsive, rather than constituting the Agency's official response as required under CAA 112(r)(6)(I). Our response letters did not commit to implement these recommendations in full or in part in a rule. EPA therefore disagrees with the assertion that we are rescinding provisions that were our required response to CSB recommendations. Although the STAA provision of the RMP Amendments rule may have been responsive to a CSB recommendation in the sense it addresses the same matter raised by the CSB, EPA has reexamined its position taken in 2017 and concluded that the STAA requirement is not a reasonable regulation because its costs are disproportionate to its benefits.

EPA also disagrees that, as a general matter, the Agency failed to consider input from the CSB in the final rule. This preamble and the response to comments contain multiple discussions of specific CSB investigations and recommendations that EPA has considered as input from the CSB along with other public comments on the Reconsideration proposal. (See the RTC document for additional responses to public comments.) We recognize that the proposed and final RMP Amendments contain extensive citations to incident investigation reports of the CSB for both factual descriptions of incidents and recommendations resulting from investigations. Nevertheless, EPA disagrees that rescinding provisions that are based in part on CSB report recommendations renders the rescissions arbitrary and capricious. The record as a whole as discussed in the Reconsideration proposed and final rules and supporting documents explains the basis for changing our position on the need for new regulation. EPA's responses to CSB recommendations did not commit the Agency to making specific regulatory changes, and the Clean Air Act does not require EPA to implement every recommendation received from the CSB.

Among the CSB recommendations issued under CAA 112(r)(6)(C)(ii), the one most directly related to the RMP Amendments rule prevention provisions is the STAA/IST recommendation from the CSB's investigation of the Tesoro Refinery accident in Anacortes, Washington. Our statutorily required response to the Tesoro recommendation indicated that we would evaluate and determine whether regulatory changes should be made.[31] In the case of the Tesoro Refinery accident, cited by the commenter, the CSB recommended that EPA revise 40 CFR part 68 to ''require the documented use of inherently safer systems analysis and the hierarchy of controls to the greatest extent feasible when facilities are establishing safeguards for identified process hazards.'' The CSB also recommended that EPA ''enforce through the Clean Air Act's General Duty Clause, section 112(r)(1), 42 U.S.C.§ 7412(r)(1), the use of inherently safer systems analysis and the hierarchy of controls to the greatest extent feasible when facilities are establishing safeguards for identified process hazards.''

Our response to the CSB indicated that EPA would develop an alert and voluntary guidance on safer technology and alternatives analysis and consider regulatory options. Our response did not commit to adoption of the CSB recommendation via rulemaking. Regardless of whether EPA's RMP Amendments rule STAA provision addressed the same issues as CSB's Tesoro incident recommendations, EPA's more recent analysis of data relevant to the 2017 RMP Amendments rule's STAA requirement indicates that such requirements have not been effective at improving accidental release prevention rates when enacted at the state level, while their costs remain high. *See* sections III.C.2 and IV.C.2.c, below. Therefore, notwithstanding any CSB recommendations on this subject, EPA's view is that it is not reasonable or practicable to impose the 2017 STAA requirement through a generally-applicable regulation.

### *C. Discussion of General Comments on Costs and Benefits*

#### 1. Effect of Delay Rule Vacatur on Estimated Costs

Multiple state elected officials stated that the assumptions underlying EPA's estimate of the proposal's costs and benefits are no longer accurate since the D.C. Circuit Court vacated the Delay rule in *Air Alliance Houston et al.* v. *EPA et al.* The commenter stated that the proposed rule assumes that the Amendments rule will not go into effect, but with the court ruling on the delay, those provisions will go into effect, therefore influencing the cost-benefit analysis. An advocacy group commented that this assumption directly overlooks numerous benefits to the information availability provisions in the Amendments rule.

*EPA Response:* EPA disagrees that the Delay rule vacatur materially impacts EPA's estimates in the cost benefit analysis. The Court of Appeals issued the *AAH* decision on August 17, 2108, and the vacatur of the RMP Delay rule made the Amendments rule effective on September 21, 2018. At that time, the only major provision of the Amendments rule that required immediate compliance was the emergency coordination provision.[32] All other major provisions of the Amendments rule had compliance dates in 2021 or later. By the time of the Delay rule vacatur, EPA had already proposed to rescind or modify most of the Amendments rule's provisions.

Our estimates of the cost and benefit impact of this final rule reflect reasonable judgments about the behavior of affected entities during the reconsideration process, including that period before the *AAH* decision vacated the Delay rule. In the Reconsideration RIA, EPA assumed a new cost associated with the labor of becoming familiar with the non-rescinded and revised provisions of the 2017 Amendments rule, and a cost savings associated with regulated facilities not being required to become familiar with the provisions of the 2017 RMP Amendments final rule. The emergency coordination provision is not rescinded in this rulemaking and therefore rule

[31] EPA. February 25, 2015. Letter from Mathy Stanislaus, EPA, Office of Land and Emergency Management to Rafael Moure-Eraso, Ph.D., Chemical Safety and Hazard Investigation Board (CSB) responding to CSB's recommendations on the April 2, 2010 accident at Tesoro Refinery in Anacortes. Washington. pp 2 and 5. Available in the rulemaking docket.

[32] Various other provisions that we have labelled the ''minor changes'' also became effective, but the RIA for the 2017 Amendments rule did not attribute costs to these provisions and the RIA for this final rule attributes no cost savings to those minor changes that we rescind in this rule.

familiarization burden for this provision is accounted for in the Reconsideration RIA. With EPA's proposal, regulated facilities could reasonably expect that Amendments rule provisions with future compliance dates might either be rescinded or modified before the original compliance date occurred.[33] Given this regulatory landscape, most sources would reasonably choose to delay complying with or preparing to comply with remaining Amendments rule provisions (*i.e.,* all major prevention provisions and the information disclosure provisions excluding public meetings) except those requiring immediate compliance due to the Delay rule vacatur. Therefore, it is reasonable for EPA to assume that the Delay rule vacatur has had a de minimis impact on EPA's estimates in the cost benefit analysis.

EPA has acknowledged in the Reconsideration RIA that the elimination of the Amendments rule information availability provisions will reduce the magnitude of the rule's information disclosure benefits. EPA notes, however, that almost all of the information elements provided under the Amendments rule were already publicly available via other means, so this loss of benefits should be small. EPA has decided to rescind the information availability provisions of the Amendments to address facility security concerns. In the preamble to the proposed Reconsideration rule, EPA stated that ''EPA in the final amendments may not have struck the appropriate balance between various relevant policy concerns, including information availability, community right to know, minimizing facility burden, and minimizing information security risks. EPA agrees with petitioners that requiring unlimited disclosure of the chemical hazard information elements required under the RMP Amendments may create additional policy concerns, particularly with regard to the potential security risks created by disclosing such information.'' Despite the acknowledgement that some of the benefits of the information availability provisions will be lost, EPA determined that the rescission of these provisions was necessary to more appropriately balance these benefits with facility security concerns.

[33] We also note that, prior to the vacatur of the Delay rule, sources had a basis to believe that compliance with the 2017 RMP Amendments would not be required so long as the rule had not become effective.

2. Comments Regarding EPA's Cost-Saving Rationale

Some commenters supported EPA's approach in the proposed Reconsideration rule to reducing unnecessary regulations and regulatory costs. An industry trade association, supporting the proposed rule, stated that the Amendments rule provided no quantifiable benefits relative to its high compliance costs. Another commenter stated that the proposed rule is necessary because the Amendments would be costly to regulated entities and do little to prevent chemical accidents. Similarly, two industry trade associations expressed support for EPA's reconsideration proposal because the costs of the Amendments rule far exceeded the benefits of the rulemaking, and another industry trade association stated that while it supports the Reconsideration rulemaking, they believe the rulemaking understates the costs and overstates the benefits of the Amendments rule. Another industry trade association stated that the Amendments rule would substantially increase the burdens and costs associated with RMP compliance and would not help the cause of process safety. A trade association commented that the benefits of the Reconsideration rulemaking are clear, due to the heavy cost burden placed on regulated entities in the Amendments rule.

In contrast, other commenters disagreed with EPA's cost-saving rationale. An advocacy group and several other commenters stated that the proposed rule emphasized industry cost savings over public safety and that the costs in the Amendments rule are small when spread across thousands of regulated facilities. The advocacy group also stated that EPA does not and cannot show that the cost savings to the facilities that pose the risk of accidental releases would be greater than the foregone benefits to the public and environment that bear the risk.

Several commenters, including State elected officials and a State government, argued that the proposed rescissions in the Reconsideration rule are arbitrary and capricious. Multiple State elected officials commented that EPA's cost-saving rationale does not provide the ''more detailed justification'' necessary for EPA to disregard its previous findings to the contrary. An advocacy group argued that a lopsided focus on the compliance costs of a regulatory action is arbitrary and capricious. Specifically, the commenter stated that EPA's emphasis on reducing regulatory burden above the benefits of the protections provided by the rule is unreasonable. A joint submission from multiple advocacy groups and other commenters stated that EPA's preference to avoid cost on industry, while neglecting the health and financial cost to communities, prioritizes industry's interest over people and is arbitrary and capricious. The commenters also argued that the proposed rule and Regulatory Impact Analysis (RIA) are unlawful and arbitrary because EPA failed to meet its own cost-benefit goals of finding that the benefits of the Reconsideration rule outweigh the costs, and its statements disregarding the benefits of the Amendments rule because of uncertainty are unsupported and contradictory to the record. A joint submission from multiple advocacy groups and other commenters stated that EPA's adoption of the enforcement-led approach in the proposed Reconsideration rule is arbitrary and capricious because the Agency has not provided a reasoned explanation for the change or the requisite detailed explanation for abandoning its prior findings in the Amendments rule that the enforcement-led approach was insufficient. This commenter also stated that it would be arbitrary and capricious for EPA to proceed with the proposed Reconsideration rule because it runs directly counter to the effective and efficient measures that several State and local developments represent (referring to the New Jersey TCPA, Massachusetts TURA, and CCC ISO regulatory programs), and that it would be arbitrary and capricious to proceed with the rule without fully evaluating those initiatives. And, for the State and local initiatives that EPA had relied upon as a rationale for the Amendments rule, the commenters argued that EPA has provided no basis to change its opinion that these initiatives demonstrate the need and likely benefits of the Amendments rule.

*EPA Response:* The Agency has provided a detailed rationale for rescission of each of the Amendments rule provisions removed by the final rule. Regulatory costs are an important consideration in the rescission of some provisions, but EPA's decision also considered other factors, including the potential lack of effectiveness of some provisions, EPA's ability to obtain the benefits of certain provisions without imposing regulatory mandates, the desire for regulatory consistency with the OSHA PSM standard, and security risks.

In the Amendments rule, EPA indicated that ''The 10-year RMP baseline suggests that considering only the monetized impacts of RMP

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 26 of 91


accidents would mean that the rule's costs may outweigh the portion of avoided impacts from improved prevention and mitigation that were monetized.'' EPA also noted that the monetized impacts omitted other categories of accident impacts, including lost productivity, the costs of emergency response, transaction costs, property value impacts in the surrounding community, environmental impacts, and the impacts of non-RMP accidents at RMP facilities and any potential impacts of rare high consequence catastrophes. However, EPA had no data on any of these additional benefit categories and some of them were speculative, in the sense there was an argument that the benefit would exist but no studies confirming its existence. For example, EPA is aware of no studies of property value impacts in areas surrounding RMP facilities that have had accidents, and no studies quantifying the reduction, if any, in non-RMP accidents at RMP facilities. Were these benefits sizeable, we think the multiple rounds of comments on the RFI, the 2017 Amendments rule, and the Reconsideration would have highlighted to us relevant studies. Therefore, even prior to initiating the Reconsideration proceeding, EPA believed that absent other non-monetized benefits, the Amendments rule provisions would need to prevent a large fraction of the annual average number of RMP-facility accidents in the 10-year baseline in order to be cost effective. (82 FR 4597–8, Jan. 13, 2017).

EPA now believes that its previous estimate of the benefits of the Amendments rule was overly optimistic, for two reasons. First, the average number of accidents in the baseline (whose costs were used as a proxy for the possible monetized benefits of preventing RMP facility accidents), and their impacts, likely overestimates the actual number and impact of accidents that will occur under the final Reconsideration rule going forward. Over the pre-Amendments rule ten-year baseline, RMP facility accidents did not occur at a steady rate but declined in frequency. EPA's RIA for the Reconsideration rule shows that from 2004 through 2016, RMP facility accidents declined at a rate of approximately 3.5% per year. The most recent three-years of accident data available in the docket show that the number of RMP facility accidents in the years 2014–2016 were 128, 113, and 99, respectively. While these numbers may increase slightly due to late reporting, they indicate that the declining trend in accident frequency seen under the pre-Amendments rule continues. Two commenters (ACC and CSAG) presented additional analysis showing that the impacts of accidents, as measured by deaths, injuries, and property damage, have also declined. While the costs of some Amendments rule provisions (*e.g.,* third-party audits, root cause analysis) also scale with the number of accidents, and would therefore also decline with fewer accidents, most of the costs of the Amendments rule were ''fixed'' in that they were imposed on regulated facilities whether an accident occurred or not. For example, the costliest provision of the Amendments rule—STAA—would have impacted all facilities with Program 3 processes in NAICS 322, 324, and 325. Also, even for provisions such as root cause analysis or third-party audits, that are triggered by an accident, some costs, such as investigator training or auditor screening, may occur without any accident occurring.

This means that to have costs that are not disproportionate to their benefits, Amendments rule provisions would have needed to prevent a greater share of future accidents than previously thought. For example, if the future rate of RMP-facility accidents under the pre-Amendments rule has declined to about 100 accidents per year, and the consequences of accidents remain at the level seen during the baseline, the Amendments rule would have needed to prevent more than 70% of future accidents to be cost effective, absent other non-monetized impacts. But since the consequences of accidents have also declined, as indicated by commenters' analyses [34] and corroborated by EPA's own analysis,[35] the Amendments rule would need to prevent an even greater share of accidents to not have unreasonable, disproportionate costs.

However, EPA now believes the Amendments rule was likely to be less effective at preventing accidents than the Agency previously believed. Prior to its reconsideration of the Amendments, EPA had not attempted to quantify the effects of state level regulations that are comparable to the Amendments rule's STAA provision. EPA has now conducted a detailed analysis of RMP-facility accident rates in New Jersey and Massachusetts—two states with long-established state-level regulations comparable to the Amendments rule STAA provision—and found that accident rates in these states have not improved more than accident rates at RMP facilities nationwide under the pre-Amendments rule. In fact, the average number of accidents per RMP facility in both states have exceeded the national average. Therefore, EPA believes that the STAA provision of the Amendments is an unreasonable regulation because its costs are disproportionate to its benefits.

EPA disagrees that its approach to the Reconsideration rule is a lopsided focus on costs. As EPA has described above, the Agency considered both costs and effectiveness of regulatory provisions, as well as other factors. If a regulatory provision is of minimal or no effectiveness (*e.g.,* STAA), virtually any cost imposed for its implementation would be unjustified. For other prevention provisions of the Amendments rescinded under the final rule—third-party audits and root cause analysis—these take place after an accident has occurred, and the Agency can still obtain their benefits through compliance settlement agreements if these are appropriate based on the violation alleged, without imposing a broad regulatory mandate. Therefore, the Agency is not merely considering the cost savings associated with rescinding these provisions, but rather whether those costs are disproportionate to any benefits gained, and whether those benefits can be obtained more efficiently without a regulatory mandate. Additionally, the disproportionality of costs versus benefits is not the only rationale that EPA relied upon to rescind the prevention program provisions of the Amendments. Rescinding these provisions will also bring the RMP prevention program provisions back into alignment with the OSHA PSM standard, which will avoid confusion among facilities subject to both regulations due to divergent regulatory requirements.

Regarding the Agency's rescission of the information availability provision, while the Agency noted that rescission of this provision would reduce regulatory costs, the primary justification for its removal was not its cost, but rather the increased security risks associated with the provision. As EPA stated in the proposed rule preamble, ''EPA now proposes *for security reasons* to rescind the requirements for providing to the public upon request, chemical hazard information and access to community emergency preparedness information in

[34] See American Chemistry Council public comments, August 17, 2018, EPA–HQ–OEM–2015–0725–1628, and Chemical Safety Advocacy Group public comments, August 23, 2018, EPA–HQ–OEM–2015–0725–1930.

[35] See attachments to EPA–HQ–OEM–2015–0725–0929, EPA Verification of ACC's RMP Accident Analysis with 2 Tables, March 26, 2018, and RMP Accident Data 2004–2013, EPA Verification of ACC Analysis.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 27 of 91


§ 68.210 (b) through (d). . . .'' (83 FR at 24859, May 30, 2018) (emphasis added). Therefore, the final rule's rescission of this provision cannot fairly be described as a lopsided focus on its compliance costs.

EPA also disagrees that the Reconsideration rule avoids cost on industry by neglecting the health and financial cost to communities. The final rule does not make this tradeoff. Rather, the rule provides for streamlining of the RMP Amendments to provide appropriate regulatory requirements to address risks from RMP facility processes, including security risks from terrorism. The rule also facilitates rule implementation by removing potential inconsistencies with the OSHA Process Safety Management standard. While EPA indicated that rescinding certain provisions of the Amendments rule may result in foregone benefits, EPA had no data to demonstrate the benefits of specific provisions of the Amendments rule. EPA again notes that the rate of accidents at RMP facilities in New Jersey since the enactment of that state's TCPA IST provision has declined less than the rate of accidents at RMP facilities nationwide, suggesting that the STAA provision of the Amendments rule may not have had a significant impact on accident prevention. EPA retains the ability to continue to employ such prevention measures in enforcement actions as appropriate, which we believe can be a more effective way to employ these measures than a broad regulatory mandate that may unnecessarily impose burden on many regulated facilities. It is also important to note that the Reconsideration rule does not eliminate the body of comprehensive RMP requirements that existed prior to the Amendments rule. Facilities that were previously required to identify and control process hazards, implement operating procedures, investigate incidents, and comply with the other parts of the pre-Amendments RMP rule are still required to do so. The preventive and mitigative effects of these regulatory requirements remain in full effect. Under the pre-Amendments rule, the rate and consequences of RMP-reportable accidents have reached their lowest levels since EPA began collecting these data.[36]

EPA disagrees that the proposed rule and RIA are unlawful or arbitrary because of any failure to conclude that the benefits of the Reconsideration rule exceed its costs. For reasons stated above, EPA believes that the costs of the final rule are reasonable in comparison to its benefits. In short, EPA believes the benefits of rescinded Amendments rule provisions were likely to be lower than previously thought, making the costs of the Amendments rule disproportionate to its benefits. EPA also disagrees that the Agency's current reliance on a compliance-driven approach is arbitrary or that EPA has not provided a reasoned explanation for this change in position from the 2017 RMP Amendments rule. In EPA's most specific rejection in 2017 of reliance on enforcement rather than new regulations, we relied on incident discussions in the proposed rule as well as ''lessons learned'' from these incidents and our experience to support the 2017 RMP Amendments rule.[37] As EPA has noted above, the Agency's latest analysis has demonstrated that RMP facility accidents have declined substantially under the pre-Amendments rule and are currently at the lowest levels since EPA began collecting these data. This low level of accidents diminishes the potential benefits of any additional accident prevention regulations, particularly when the benefits of those provisions are in doubt (*e.g.,* STAA). It also makes a compliance-driven approach more feasible. While EPA cannot inspect every RMP facility every year, the Agency performs approximately 300 RMP facility inspections each year and prioritizes inspections at facilities that have had accidental releases. Therefore, EPA's enforcement resources and posture are capable of addressing accident-prone facilities without additional broad regulatory mandates. The Agency's choice to use a more surgical approach to accident prevention at these facilities is reasonable and practicable.

EPA disagrees with the commenter's claim that it would be arbitrary and capricious for EPA to proceed with the proposed Reconsideration rule if it runs counter to State and local regulations. EPA has analyzed the state and local regulatory programs that commenters are referring to and does not agree that they provide evidence of the effectiveness of the Amendments rule. EPA's detailed examination of these regulatory programs is described elsewhere in this preamble and in the Response to Comments document.

3. Comments Relating to Environmental Justice and Fence-Line Communities

a. Proximity of RMP Facilities to EJ Communities

Many commenters, including multiple form letter campaigns, commented on the disproportionate proximity of minority populations, low-income populations, and/or indigenous peoples (''environmental justice (EJ) communities'') to RMP facilities and emphasized the risk posed by RMP facilities to these communities. Several of these commenters provided extensive data and descriptions in support of their comments. Two advocacy groups cited statistics describing the rates of student proximity to RMP vulnerability zones. A few commenters stated that the poverty rate near RMP facilities is 50 percent greater than the US average, and that the difference is more pronounced for low-income children of color.

An advocacy group stated that 15 percent of RMP-regulated facilities in New York are located in EJ areas. Another advocacy group commented that 600,000 people, or 67% of Louisville residents, live within three miles of 23 RMP facilities. The commenter stated that a large part of that population is black or Latino. The commenter went on to give some history of relaxed regulation, incidents, and the specific harms caused by RMP facilities in Louisville, noting especially an accident the commenter said was preventable at a Carbide Industries facility. An advocacy group stated that communities and individuals often live in proximity to RMP facilities unaware of the chemicals stored and their potential hazards and may be from different cultural communities who may

[36] The RIA for the final rule demonstrates that the number of accidents in 2016 was lower than for any prior year over the period studied for this rule (2004–2016). EPA also compiled a spreadsheet containing RMP facility accidents for 2017 to corroborate the continued decline in RMP facility accidents (there were 94 RMP facility accidents reported to EPA in 2017). See Docket ID: EPA–HQ–OEM–2015–0725–1974. The complete accident record at RMP facilities since 1999 (the year the original RMP regulation went into effect) through 2016 is contained within the RMP database (Docket ID EPA–HQ–OEM–2015–0725–0989). Studies of RMP facility accident data conducted by the Wharton School at the University of Pennsylvania confirm that RMP accident totals for all prior years were well above 2016 and 2017 levels. See, *e.g., Kleindorfer*, et al., Accident Epidemiology and the RMP Rule: Learning from a Decade of Accident History Data for the U.S. Chemical Industry, Final Report for Cooperative Agreement R-83033301 between Risk Management and Decision Processes Center, The Wharton School of the University of Pennsylvania and Office of Emergency Management. U.S. Environmental Protection Agency, December 18, 2007, Figure 5.1 (showing number of accidents from cohort of RMP facilities that filed in first two five-year ''waves'' of RMP submissions). See also sections III.C.2 and IV.C.2.c, below.

[37] Amendments rule Response to Comments at 246 (''the history of implementation of the RMP rule has given EPA sufficient experience to support modernizing and improving the underlying RMP rule and not simply resort to compliance oversight of the existing rule''). Commenters also suggested EPA enforce existing requirements rather than issue new rule provisions regarding third-party audits and emergency coordination. *See* 82 FR 4613–144654.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 28 of 91


have a different way of handling emergencies. This commenter stated that EPA should work with states, regions and local government to explain to communities what chemicals are present and the dangers around them. An advocacy group commented that information could be more effectively shared through different channels, like churches.

*EPA Response:* EPA agrees that RMP facilities are more likely to be located in EJ communities—EPA provided data in both the Amendments rulemaking and the Reconsideration proposal that characterize the disproportionate proximity of EJ communities to RMP facilities. However, neither this information, nor any submitted by commenters, allows EPA to more accurately characterize the effects of the Reconsideration proposal upon those communities.

Regarding community members' awareness of facility chemical hazards, EPA notes that since the 1986 enactment of EPCRA, facilities storing and handling hazardous substances must provide to local government emergency officials the identities and quantities of these hazardous chemicals through annual Hazardous Chemical Inventory reporting and through provision of Safety Data Sheets with the chemical, physical and hazardous properties of these chemicals stored on-site. The thousands of hazardous substances covered under these reporting requirements include the 140 substances regulated under the RMP regulations.[38] The LEPCs established under EPCRA use this information to develop community emergency response plans to address any accidental releases in the community involving these hazardous chemicals. Members of the public are allowed to participate on LEPCs, and EPA encourages interested community members to get involved with their LEPC or attend LEPC meetings to learn more about the chemical hazards in their community and how the community would receive notifications and other emergency information when a chemical accident occurs. Some local governments may provide information on warning systems or emergency procedures on government websites. Community members also can request copies of hazardous chemical inventory reports and Safety Data sheets from their local LEPC. LEPCs serve as focal point in the community for information and discussion about hazardous substance emergency planning.

b. Costs to Fence-Line Communities

Many commenters expressed concerns about the costs of the rule to fence-line communities. A commenter stated that EPA's cost estimate only calculates savings to regulated facilities and there is no attempt to estimate the costs of incidents to fence-line communities, emergency workers, the facilities' workers, and the public in terms of lost lives, injuries, illnesses and property damage. A joint submission from multiple advocacy groups and other commenters stated that there are significant costs imposed on local communities who live near and around chemical facilities. The commenters stated that there can be economic impacts to the community due to lost work days, time spent sheltering-in-place or evacuating, emergency response costs, and general disruption in the event of an emergency. A federally elected official stated that the proposed rule artificially diminishes the benefits associated with protecting EJ communities in order to avoid addressing or reducing the risk posed to those communities. An industry trade association stated that EPA should be aware that low income and minority communities will bear the brunt of the costs of the proposed rule. Similarly, an advocacy group stated that while the proposed rule would save industry money, it would impose costs on poor communities. The commenter provided estimates of the potential costs of chemical accidents to local communities and argued that local communities are more likely to have to pay these costs with the rescission of the Amendments rule. Another commenter stated that the Reconsideration rule would cause impacts including fires and toxic releases in disproportionately EJ communities. These impacts include health impacts to first responders, contamination of community property, and people being forced to shelter-in-place. Several commenters described past chemical plant accidents and their impacts on nearby communities, including explosions, hospitalizations, evacuations, deaths, and fear. A group of State elected officials provided an extensive discussion with information on the susceptibility of EJ communities to RMP-related harm in their States, with incidents and data on the same. A commenter stated that EJ populations are disproportionately affected by RMP-threats, and that past EPA accident calculations did not adequately address the impact of accidents to productivity, the environment, property values, regional economies, government expenses, and long-term health consequences. A group of U.S. Senate members compared EPA's projected cost savings of $88 million against the industry's $767 billion value and argued that this saving does not justify the Reconsideration rule's negative impacts to vulnerable communities. Similarly, a form letter campaign joined by approximately 35,000 individuals asserted that the dangers associated with RMP facilities fall disproportionately on EJ communities.

Some commenters stated that EPA failed to follow its own ''Guidance on Environmental Justice During the Development of Regulatory Actions'' by failing to act on any of the seven recommendations in the guidance, despite prompting from community groups. A tribal government and a tribal association stated that EPA's statement that the proposed rule would not impose any additional costs on affected communities amounted to a failure to consider health and safety impacts to EJ communities. A form letter campaign joined by approximately 2,500 individuals stated that the Reconsideration rule, if finalized, would disproportionately impact EJ communities and directly subvert the goals of E.O. 12898. An advocacy group discounted EPA's projection that the Reconsideration rule will benefit EJ communities, stating that such a claim lacks evidentiary support. The group cited a CSB report to assert that, on the contrary, evidence showed that removing chemical hazard information requirements would work to communities' detriment. The group also stated that EPA's claim runs contrary to EJ communities' own statements regarding their best interests. A joint submission from multiple advocacy groups and other commenters argued that the proposed removal of STAA provisions would particularly impact EJ communities. It stated that larger and more complex plants that would likely benefit from STAA requirements tend to be located in counties with larger African-American populations.

*EPA Response:* EPA disagrees with the assertion that EPA did not attempt to evaluate the costs of incidents to offsite personnel and the broader community. In the Amendments rule RIA, EPA qualitatively described the benefits of the Amendments rule provisions, including the prevention and mitigation of future RMP accidents. EPA considered the benefits associated with preventing serious accidents, avoiding direct costs such as worker, responder, and public fatalities and

[38] EPA acknowledges that isolated industries, such as mining facilities, may not be subject to EPCRA 311 and 312, but in the vast majority of cases, RMP facilities will also be subject to the EPCRA SDS and inventory provisions.

injuries, public evacuations, public sheltering-in-place, and property and environmental damage. The Amendments rule RIA also considered indirect costs such as lost productivity due to product damage and business interruption, both on-site and off-site, expenditure of emergency response resources and attendant transaction costs, and reduced offsite property values.

EPA acknowledges that it was not possible to estimate quantitative benefits for the 2017 Amendments rule and that EPA, in the Reconsideration rulemaking, remains unable to quantify foregone benefits of the rescinded Amendments rule provisions. However, EPA also notes that the rate and consequences of RMP-reportable accidents have reached their lowest levels since EPA began collecting these data. These trends have occurred under the pre-Amendments rule, and EPA believes that some benefits of the Amendments rule can be obtained through a compliance-driven approach without imposing broad regulatory mandates that may unnecessarily burden many facilities.

EPA disagrees that the Agency failed to adequately consider the consequences of the proposed Reconsideration rule on EJ communities or follow the Agency's own EJ guidance. EPA has acknowledged the disproportionate risks of RMP facilities to EJ communities. The Agency has documented its assessment of the EJ effects of the Reconsideration rule within the RIA. Within that assessment, EPA identified reduced risks to EJ populations from terrorism or related security hazards associated with avoiding the open-ended emergency coordination and public information availability provisions of the Amendments. We also believe that accident risks to surrounding communities are ameliorated by the emergency response coordination and public meeting provisions of the Reconsideration rule. At the same time, to the extent the Amendments rule provisions were effective at reducing risks, there would be some increase in risk to EJ communities as a result of rescinding some provisions of the Amendments rule. Given a lack of data, we have not attempted to quantify the combination of increases of risks to EJ communities and decreases of risks to those communities. We are therefore presenting those changes as a non-quantified set of risk changes, without inaccurately characterizing the net effects. EPA does not have the data to make those net calculations, nor have commenters provided such data. The rulemaking record does not provide enough information for anyone to determine the net risk effects to surrounding communities of the Reconsideration rule.

The Reconsideration rule makes small changes to the existing body of RMP regulatory requirements. The rule does not eliminate the comprehensive RMP requirements that existed prior to the Amendments rule. Facilities that were previously required to identify and control process hazards, implement operating procedures, investigate incidents, and comply with the other parts of the pre-Amendments RMP rule are still required to do so. The preventive and mitigative effects of these regulatory requirements remain in full effect. Under the pre-Amendments rule, the rate and consequences of RMP-reportable accidents have reached their lowest levels since EPA began collecting these data. Commenters have provided no data which would allow EPA to measure the risks posed by altering requirements for changes to existing audit requirements or incident investigations or safer technology analyses. Without this information, it is impossible to characterize these changes as imposing significant costs upon minority and low-income populations.

Regarding STAA, EPA is unable to gauge how facilities in the three affected sectors would have responded to the requirements to assess safer technologies for their processes. Under the 2017 Amendments rule STAA regulation, these facilities were empowered to make their own decisions about what kinds of facility changes might be beneficial. Under the Reconsideration rulemaking, those facilities still remain empowered to make those decisions. It is therefore unclear what the impact of this change, if any, would be on surrounding communities. EPA notes that accident data from RMP facilities in New Jersey since the enactment of that state's TCPA IST provision show less decline in accident rates than RMP facilities nationwide, which had no similar provision in place, suggesting that the STAA provision of the Amendments rule may not have had a significant impact on accident prevention.

c. Comments on Chronic Health and Environmental Impacts to Communities Near RMP Facilities

An advocacy group stated that EJ communities face greater impacts in the form of health and environmental consequences from unplanned releases from RMP facilities. It provided data from a Union of Concerned Scientists study on RMP accidents and their impacts of EJ communities. The comment cited increased rates of cancer resulting from air pollution as well as heightened rates of respiratory illness. Another stated that EJ communities are more likely to be exposed to chemical hazards in the form of dermal contact, ingestion, and inhalation. Other advocacy groups described the heightened vulnerability of EJ communities, stating that they tend to have higher rates of pollution and disease, while having less access to health care and other resources to deal with chemical hazards. A joint submission from multiple advocacy groups and other commenters cited a 51 percent elevated rate of acute lymphocytic leukemia in children living along the Houston Ship Channel, as well as other increased rates of leukemia in the area depending on RMP-proximity. Another advocacy group representing EJ communities commented that EPA should consider the cumulative impacts of pollution from exposure to multiple chemical facility sources. An advocacy group stated that the proposed rule RIA fails to consider the externalized social and health costs of cumulative exposure associated with RMP facilities. A tribal government also stated that the RIA does not attempt to quantify environmental impacts beyond human health.

*EPA Response:* Regarding commenters' contention of increased rates of cancer and respiratory illness resulting from air pollution, the RMP rule is not intended to address chemical releases that cause cancer or other chronic illnesses [39]—other parts of the CAA (such as the NESHAP program) and other environmental laws are intended to address such health impacts. EPA is expressly prohibited from listing NAAQS pollutants under the RMP rule. Regarding the risk of impacts from accidental releases by multiple sources, the analysis supporting the RMP rule does not include assessing exposure to specific communities from RMP-regulated facilities. Rather, the rule requires regulated sources to take preventive and response actions designed to address hazards at each facility that may pose

[39] *See* Senate Report at 210–11 (new accidental release provisions not intended to cover releases ''where the potential impact on public health is a measurable increase in the probability of death, illness or adverse effect which is normally associated with 'chronic' exposures over a long period. Episodic releases of the latter kind are to be addressed under [the NESHAP authority of] section 112.''); 136 Cong. Record 36,058 (Oct. 27, 1990) (Sen. Durenberger explaining the air toxic problem of ''accidental, catastrophic releases'' as one that ''may cause immediate death or injury'').

risks from accidental releases to nearby communities. EPA does not believe, and has received no data indicating, that rescinding or modifying RMP Amendments rule provisions will increase the risk of accidents, whether from individual or multiple sources. EPA notes that the data presented in the RIA (chapter 8) indicate that less than 5% of the U.S. population is in close proximity to two or more RMP facilities. Regarding environmental impacts, in the 2017 Amendments rule RIA, EPA qualitatively described the benefits of the Amendments rule provisions, including the prevention and mitigation of future RMP accidents. EPA considered the benefits associated with preventing property and environmental damage. In the Reconsideration rulemaking, EPA acknowledges that rescinding some of the Amendments provisions could have an impact on the environment. However, given that EPA can likely obtain some of the benefits of the rescinded provisions through a compliance-driven approach, any such impacts should be small. EPA believes that it is not possible to estimate quantitative benefits or foregone benefits, including environmental impacts, for the final rule. EPA has no data to project the specific impact on accidents made by each rule provision.

4. Comments Relating to Accident Data and Accident Rates

a. Comments Disagreeing With EPA's Characterization of RMP Facility Accident Rates

A labor union argued that EPA's characterization that there is a low and declining accident rate at RMP facilities is inaccurate because EPA failed to calculate or report any rates. The commenter asserted that EPA provided only the number of accidents that have occurred in certain years but failed to account for other relevant statistics that do not support an assertion of a decline in accident rates at RMP facilities. Specifically, the commenter argued that 2013, the most recent year for which complete data are available, saw more property damage due to RMP events than any year since 2008. Additionally, the commenter stated that 2012 saw more injuries and illnesses than any other year between 2004 and 2013 and saw more people evacuating or sheltering in place than any year since 2005.

A joint submission from multiple advocacy groups and other commenters stated that gaps in EPA's chemical accident data lead EPA to underestimate the problems that the Amendments rule was attempting to address. Specifically, the commenters argued that EPA's data underestimates the problem because it does not include incidents when a release occurred that either destroyed or decommissioned a process. This commenter also submitted data on all National Response Center release reports for calendar years 2016 and 2017 and indicated that incidents reported to the National Response Center show additional information on contemporaneous reports of hazardous air (and other) releases from chemical facilities during and after the 2017 hurricanes. A tribal organization also referenced National Response Center release reports, indicating that during 2007–2016 the National Response Center received reports of 285,867 releases of all kinds averaging 28,587 reported incidents each year. The commenter indicated that these numbers indicate that EPA's estimate of only 150 incidents per year is a gross underestimate of the actual number of incidents.

In contrast, an industry association stated that in the Amendments rulemaking, EPA assumed that accident rates would continue in the future at the same rate as they had for the previous ten years but provided no basis for this assumption. The commenter stated that this flawed assumption—in addition to EPA's failure to acknowledge the declining accident rate at RMP facilities—led EPA to overstate the consequences of RMP accidents as well as the benefits related to the 2017 RMP Amendments.

*EPA Response:* EPA disagrees with the commenter who stated that EPA did not provide accident rates, and EPA continues to maintain that there is a low and declining accident rate at RMP facilities. In the Reconsideration RIA, EPA provided a summary table of the number of accidents from 2004–2016. EPA has also provided additional trend analysis of accident data in the Technical Background Document, which is available in the rulemaking docket.[40] EPA noted in Exhibit 3.7 of the proposed Reconsideration RIA that the number of accidents per year at RMP facilities with reportable impacts had declined over time, particularly in the most recent three years of analysis (2014–2016). In the proposed Reconsideration RIA, EPA did not provide an analysis of the impacts or severity of the accidents in the three years of new data analyzed. EPA has now reviewed the accident severity data from 2014–2016 and concluded that average annual accident severity has declined with the number of accidents. Specifically, the average number of onsite fatalities at RMP facilities between 2004 and 2013 was 5.8 deaths per year; however, from 2014 to 2016, the average number of onsite fatalities decreased to 4.0 deaths per year. Similarly, RMP facilities did not experience an offsite death between 2014 and 2016, while one was reported between 2004 and 2013.

Concerning property damage, the average annual onsite property damage from RMP accidents from 2004 to 2013 was $205.5 million per year, while from 2014 to 2016, the annual average decreased to $169.9 million per year. For offsite property damage, the average offsite property damage from RMP accidents increased to an average of $1.7 million per year between 2014–2016 from $1.1 million per year between 2004 and 2013. Despite the relatively small increase in offsite damage, the overall decrease in property damage and fatalities from RMP accidents supports the conclusion that, similar to declining accident rates, the severity of accidents at RMP facilities is also declining.

Concerning data on incidents where a release occurred that either destroyed or decommissioned a process, EPA acknowledges that there may be some accidents associated with destroyed or decommissioned processes that are not reported to the RMP database because facilities were not required to report such accidents, under the pre-Amendments regulations. However, EPA is not aware of a significant number of examples of this occurrence, and commenters have not provided such data. Therefore, EPA does not believe that the possible omission of a few accidents associated with destroyed or decommissioned processes would materially impact the analyses included in the Reconsideration RIA and continues to believe that relying on the accident information in the RMP database is reasonable and the best source of available information.

Regarding commenters' references to and submission of National Response Center (NRC) incident report information, EPA disagrees that these data demonstrate that EPA has underestimated the number of RMP-reportable accidents. Commenters provided no analysis of NRC data to substantiate this claim. Incidents reported to the National Response Center encompass a far greater range of chemicals and sources than accidents reported under the RMP rule. The National Response Center was established under the National Oil and

[40] EPA. July 18, 2019. Technical Background Document for Final RMP Reconsideration Rule Risk Management Programs Under the Clean Air Act, Section 112(r)(7).

Hazardous Substances Pollution Contingency Plan (40 CFR part 300) and operates a 24-hour communications center for federally-mandated reporting of incidents involving oil, hazardous substances, nuclear material, chemical, biological, radiological, and etiological (*i.e.,* infected substances, medical wastes) releases, as well as maritime reports of suspicious activity and security breaches within the waters of the United States and its territories. The NRC accepts release and incident reports required to be reported under numerous statutes, including the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), the Clean Water Act, the Toxic Substances Control Act, the Resource Conservation and Recovery Act, the Natural Gas Pipeline Safety Act, and the Hazardous Materials Transportation Act. However, CAA section 112(r) contains no requirement for regulated sources to make release reports to the National Response Center. Therefore, RMP-reportable releases are not required to be reported to the NRC unless the release also triggers reporting under another statute. While some RMP-listed substances are also regulated under other statutes and may therefore require release reporting to the NRC under those statutes if specified conditions are met, not all releases of RMP-regulated substances reported to the NRC meet RMP reporting criteria. This is because the criteria for reporting an accidental release in a facility's RMP are based on meeting consequence criteria listed in § 68.42(a), while reporting to the NRC is based on different criteria. For example, under CERCLA, releases to the environment of listed hazardous substances exceeding specified reportable quantities over a 24-hour period are required to be reported to the NRC. Under 40 CFR 68.42, such an accidental release would only be reported in the RMP accident history if it resulted in specified impacts, even if the CERCLA RQ was exceeded.

The great majority of hazardous chemical releases reported to the National Response Center are from sources not regulated under the RMP rule (*i.e.,* transportation sources or non-RMP-regulated stationary sources), or involve chemicals not listed under the RMP rule. EPA analyzed one set of the NRC data [41] provided by commenters to determine the number and types of materials that are reported to the NRC. See Appendix F in the Technical Background Document [42] for a characterization of the number and types of materials reported in releases to the NRC in 2017. Over 14,000 of the 24,680 NRC release reports in 2017 were for oil or oil-related waste and 4,011 of the reports were for releases identified by a specific chemical name. Not all these chemicals are regulated RMP substances. Other large categories of releases included gasoline, fuel oil or liquid petroleum fuels (1,854), unknown materials (1,117) and natural gas or petroleum gas fuels (770).

Additionally, for reasons stated above, some releases of RMP-listed substances from RMP-regulated facilities that are reported to the NRC do not require reporting in a facility's RMP. Lastly, there is no limit on who may call and make a report to the NRC—it accepts release reports from facility owners and operators, government employees, foreign entities, media, and other members of the public—often resulting in duplicate release reports being made for a single incident. Therefore, the number of releases reported to the National Response Center provides no indication of the number, rate, or trend of accidental releases subject to reporting under the RMP rule.

Regarding the effects of declining accidents on the Amendments rule baseline, EPA agrees that the average number of accidents in the baseline (whose costs were used as a proxy for the maximum possible monetized benefits of preventing RMP facility accidents), and their impacts, likely overestimates the actual number and impact of accidents that will occur under the final Reconsideration rule going forward. In the Reconsideration rule RIA, EPA has noted that in the most recent years of analysis annual accident data continue to show a decline in accident frequency, consistent with the trend over the previous 10-year period. EPA noted in the Reconsideration RIA that this decrease would result in a decrease in the estimated cost savings of repealing rule provisions triggered by reportable accidental releases relative to their costs as estimated in the 2017 Amendments rule RIA. EPA also noted that the decrease in accidents would also result in a commensurate reduction in the benefits of implementing these provisions, if they had gone into effect (*i.e.,* both the cost estimate for provisions required following an accident and the maximum potential benefits of Amendments rule provisions as estimated in the 2017 RMP Amendments final rule RIA, would now be understood to have been too high). However, because of the net offsetting effect of the change in accident frequency on anticipated cost savings and benefit reductions, EPA has not adjusted the Amendments rule costs or benefits estimates to account for declining accident rates where relied on to calculate the cost savings or foregone benefits in the Reconsideration rule.

b. Other Additional Sources of Accident Data

A private citizen stated that EPA has a good opportunity to collect real data on RMP related costs and benefits through OSHA and the California Accidental Release Prevention Program (CalARP). The commenter suggested that both organizations have recently implemented programs with provisions similar to those included in the Amendments rule. Another private citizen commented that the CCPS and a number of other organizations have monetized the potential costs of chemical incidents and the commenter cited several estimates of industrial accident costs from various sources. The commenter submitted information sourced from CCPS, the RAND Corporation, Marsh & McClennan, an insurance industry analysis of hypothetical chlorine spills and terrorist attacks on major metropolitan areas, the West Fertilizer incident, and the Freedom Industries chemical spill. Based on these sources, the commenter stated that the costs of an accident could be many times larger than EPA's monetized estimates and should direct EPA to maintain the Amendments rule.

*EPA Response:* EPA notes that CalARP now requires additional process safety measures at California refineries, including requirements to adopt inherently safer designs and systems to the greatest extent feasible. Many of the new requirements went beyond what was required by the Amendments rule. The CalARP regulations, along with companion regulations adopted by Cal/OSHA, became effective in October 2017.[43] EPA will consider the CalARP and Cal/OSHA programs moving forward and evaluate whether the accident data produced has any useful relevance to the RMP program.

Regarding a commenter's suggestion that EPA consider additional sources of data, EPA acknowledges that many

[41] EPA–HQ–OEM–2015–0725–1963, attachment ''FOIA files CY2017.''

[42] EPA. July 18, 2019. Technical Background Document for Final RMP Reconsideration Rule Risk Management Programs Under the Clean Air Act, Section 112(r)(7).

[43] Cal EPA and CA DIR. August 4, 2017. News Release: New Regulations Improve Safety at Oil Refineries. California Environmental Protection Agency and California Department of Industrial Regulations. *https://www.dir.ca.gov/DIRNews/2017/2017-71.pdf.*

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 32 of 91


sources of data and information exist for estimating the costs of incidents, and EPA has evaluated accident data from a number of sources, including the RAND Corporation, CCPS, and others. As discussed later in this preamble (see section IV) and in the Response to Comments document, data collected by CCPS does not appear to significantly overlap with RMP reportable accidents, and EPA does not believe that the RAND Corporation estimates are applicable to the RMP program. The commenter also submitted data from insurance industry analyses of hypothetical chlorine spills and terrorist attacks on major metropolitan areas, stating that potential RMP accident costs are much higher than EPA's estimates. EPA, in its analysis in the Amendments and Reconsideration rule RIAs, has evaluated actual reported accident costs from RMP facilities, and has not relied on hypothetical analyses. EPA believes that it has the best and most accurate available accident data for RMP facilities in its RMP database.

The commenter's submission of accident data from the Marsh & McLennan ''100 Largest Losses 1978–2017, Large Property Damage Losses in the Hydrocarbon Industry, 28th edition'' includes 100 major incidents with property damage losses over $100 million each. EPA believes the stated loss amounts in this document overstate damage impacts that are associated or could be associated with the RMP universe of regulated facilities. For example, the 100 incidents are within five categories, refineries (41 incidents), petrochemicals (25 incidents), gas processing (5 incidents), terminals and distribution (5 incidents) and upstream (24 incidents). Many of these incidents predate the effective date of the original RMP rule, which was June 21, 1999. Of the remaining incidents, many occur outside of the United States and therefore are not subject to the RMP regulations. Others involve off-shore oil and gas drilling or production or transportation (barge) accidents, which are not covered by the RMP rule. For example, in the petrochemicals category, 16 of the 25 incidents occurred before the implementation of the original RMP rule and 7 of the remaining 9 incidents occurred outside the United States. Therefore, the Marsh & McLennan property loss data is of limited use, and EPA believes that estimating RMP accident costs using data reported in the RMP database is more appropriate.

In regard to the data submitted concerning the costs of the West Fertilizer Company incident in 2013, EPA has acknowledged that the incident has provided EPA with valuable information and has yielded significant lessons; however, EPA does not believe that the incident is reflective of RMP facility accident costs because the incident was not associated with an RMP covered substance or process. Specifically, the West, Texas incident involved a chemical, ammonium nitrate, that is not covered by the RMP rule. Additionally, the BATF concluded that the incident was the result of an intentional act and not an accident.

Finally, the commenter's reference to data related to the Freedom Industries chemical spill in West Virginia, while important to chemical facility safety generally, is not directly relevant to the RMP program. The Freedom Industries incident did not involve an RMP substance or an RMP-regulated facility.[44]

c. Claims That EPA's Cost-Benefit Analysis Should Include Data on Near-Misses

A joint submission from multiple advocacy groups and other commenters also stated that EPA has not adequately included data on near misses in the rulemaking, and without such data, EPA's accident-rate estimates are severe underestimates of the problem. The commenter stated that EPA refuses to collect or consider information on most near misses and that EPA's estimates of the harm caused by chemical disasters deliberately exclude harms not attributable to the release of a regulated substance. The commenter stated that many of near-misses include fires, explosions, or other dangerous situations that cause immediate harm, in addition to nearly causing the release of an RMP chemical. The commenter contended that the EPA definition of ''accidental release'' which is ''an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source,'' does not include many dangerous events including fires and explosions nor other events that do not otherwise satisfy the reporting criteria. The commenter argued that costs of these events must be considered because such incidents are also prevented and mitigated by the Risk Management Program and omission of such accidents from the 10-year accident data used in EPA's analysis may under-represent the number and magnitude of RMP chemical accidents. The commenter cited examples of omitted incidents, such as the 2013 West Fertilizer disaster, the 2017 Arkema explosion, and the 2018 Husky Refinery fire, which the commenter stated caused harm and also was a near miss for a hydrogen fluoride release. The commenter acknowledged that when estimating costs of the Amendments rule, EPA assumed one near miss for each accident, but also recognized that some industry publications project much higher ratios of near misses to actual releases.

*EPA Response:* EPA disagrees that the Agency's estimate of the costs of accidents is a severe underestimate. First, the Agency treats as an accidental release fires and explosions involving regulated substances. These events are not near misses, as the commenter suggests. The Agency has taken multiple enforcement actions after events involving fires and explosions (see, *e.g.,* RTC at section 3.1 regarding Chevron settlement). These events are accidental releases. When these events result in impacts required to be reported under 40 CFR 68.42, such events are included in RMPs. Events like the Arkema Crosby and the West Fertilizer incident are not reflected in accident history reporting not because they were fires or explosions; these events are not reported under 40 CFR 68.42 because the substances involved in the fires and explosions were not regulated substances. Second, EPA is gathering the type of information on accidents that the statute identified as necessary. CAA section 112(r)(7) required the RMP hazard assessment to include ''a previous release history of the past 5 years, including the size, concentration, and duration of releases.'' Therefore, the EPA's regulations track the statutory mandate to gather information on actual release events. Also, it would be illogical to base RMP accident cost estimates on the number of near misses because near misses represent events that did not result in impacts from an accidental release of an RMP-regulated substance. Thus, for the Husky Refinery incident, the report for the flammable release/explosion of regulated substances would capture the actual damages of the incident but not the hypothetical costs of any potential HF release that did not occur. In any event, EPA does not have data on the number of RMP near-miss events. While owners and operators are already required to investigate incidents that could reasonably have resulted in a catastrophic release under the pre-Amendments rule, and the final rule retains that provision, owners and

[44] CSB. February 2017. Investigation Report-Freedom Industries, Inc., January 9, 2014. Report No. 2014–01–I–WV. pp. 28–30, 81. *https://www.csb.gov/freedom-industries-chemical-release-/.*

operators are not required to report data on near-miss events.

EPA also notes that the term ''near-miss'' is not well defined. While some commenters have collected what they have characterized as near-miss data and submitted that information to EPA for this rulemaking, much of this information may not represent near-miss accidents at RMP-covered processes. Whether or not an incident is a near miss event for an RMP-covered process depends on the specific circumstances of each incident. Many of the incidents at RMP facilities cited by commenters from news reports do not provide enough information to conclude that they were near misses that could have involved a release of an RMP-covered substance. To qualify as an RMP-reportable accident, the accident must involve the accidental release of an RMP-regulated substance from an RMP-covered process that results in deaths, injuries, or significant property damage on-site, or known offsite deaths, injuries, evacuations, sheltering in place, property damage, or environmental damage. Not every incident that occurs at a chemical facility constitutes an RMP-reportable accident or near miss. Not every release, fire or explosion at an RMP facility necessarily constitutes a near miss for an RMP-covered process. Therefore, EPA continues to believe it is reasonable that near-miss accident rates are not considered in the accident rate analyses. EPA's estimate of one near-miss per accident was based on the experience of an industry consultant and was used to estimate the burden for conducting root-cause analysis for investigation of near-misses.

Regarding harms not attributable to the release of a regulated substance, we do not consider these because the Agency can only act within the bounds of its CAA authority, which extends the RMP provisions under CAA 112(r)(7) only to regulated substances and covered processes. Besides being difficult to quantify, accepting the commenter's argument would require EPA to include a large universe of incident data and speculative harms that would in many cases be unrelated to RMP-covered processes, resulting in a vast overestimate of the harmful impacts of accidents at RMP-regulated processes.

## IV. Rescinded Incident Investigation, Third-Party Audit, Safer Technology and Alternatives Analysis (STAA), and Other Prevention Program Amendments

### *A. Summary of Proposed Rulemaking*

In the RMP Amendments rule, EPA added three major provisions to the accident prevention program of Subparts C (for Program 2 processes) and D (for Program 3 processes). These included:

(1) A requirement in § 68.60 and § 68.81 for all facilities with Program 2 or 3 processes to conduct a root cause analysis using a recognized method as part of an incident investigation of a catastrophic release or an incident that could have reasonably resulted in a catastrophic release (*i.e.,* a near-miss).

(2) Requirements in § 68.58 and § 68.79 for regulated facilities with Program 2 or Program 3 processes to contract with an independent third-party, or assemble an audit team led by an independent third-party, to perform a compliance audit after the facility has an RMP reportable accident or when an implementing agency requires a third-party audit due to conditions at the stationary source that could lead to an accidental release of a regulated substance, or when a previous third-party audit failed to meet the specified competency or independence criteria. Requirements were established in § 68.59 and § 68.80 for third-party auditor competency, independence, and responsibilities and for third-party audit reports and audit findings response reports.

(3) A requirement in § 68.67(c)(8) for facilities with Program 3 regulated processes in NAICS codes 322 (paper manufacturing), 324 (petroleum and coal products manufacturing), and 325 (chemical manufacturing) to conduct a STAA as part of their process hazard analysis (PHA). This required the owner or operator to address safer technology and alternative risk management measures applicable to eliminating or reducing risk from process hazards; to consider, in the following order or preference, inherently safer technologies, passive measures, active measures and procedural measures while using any combination of risk management measures to achieve the desired risk reduction; and to evaluate the practicability of any inherently safer technologies and designs considered.

(4) The RMP Amendments rule also made several other minor changes to the Subparts C and D prevention program requirements. These included the following:

- § 68.48 Safety information—changed requirement in subparagraph (a)(1) to maintain Safety Data Sheets (SDS) in lieu of Material Safety Data Sheets.
- § 68.50 Hazard review—added language to existing subparagraph (a)(2) to require hazard reviews to include findings from incident investigations when identifying opportunities for equipment malfunctions or human errors that could cause an accidental release.
- §§ 68.54 and 68.71 Training—changed description of employee(s) ''operating a process'' to ''involved in operating a process'' in § 68.54 paragraphs (a) and (b); and changed ''operators'' to ''employees involved in operating a process'' in § 68.54(d). EPA also added paragraph (e) in § 68.54 and paragraph (d) in § 68.71 to clarify that employee training requirements also apply to supervisors responsible for directing process operations (under § 68.54) and supervisors with process operational responsibilities (under § 68.71).
- §§ 68.58 and 68.79 Compliance audits—changes to paragraph (a) for Program 2 and Program 3 provisions added language to clarify that the owner or operator must evaluate compliance with each covered process every three years.
- §§ 68.60 and 68.81 Incident investigation—made the following changes: Revised paragraph (a) in both sections by adding clarifying text ''(*i.e.,* was a near miss)'' to describe an incident that could reasonably have resulted in a catastrophic release; revised paragraph (a) in both sections to require investigation when an incident resulting in catastrophic releases also results in the affected process being decommissioned or destroyed; added paragraph (c) to § 68.60 to require for Program 2 processes, incident investigation teams to be established and consist of at least one person knowledgeable in the process involved and other persons with appropriate knowledge and experience to thoroughly investigate and analyze the incident; redesignated paragraphs (c) through (f) in § 68.60 as paragraphs (d) through (g); revised redesignated paragraph (d) in § 68.60 and paragraph (d) in § 68.81 to require an incident investigation report to be prepared and completed within 12 months of the incident, unless the implementing agency approves, in writing, an extension of time, and in § 68.60 replaced the word ''summary'' in redesignated paragraph (d) with ''report'' and added the word ''Incident'' before ''investigation'' and replaced the

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 34 of 91


word ''summaries'' with ''reports'' in redesignated paragraph (g). The following changes were made in both paragraph (d) of § 68.81 and redesignated paragraph (d) of § 68.60 to specify additional required contents of the investigation report: Revised paragraph (d)(1) to include time and location of the incident; revised paragraph (d)(3) to require that description of incident be in chronological order, with all relevant facts provided; redesignated and revised paragraph (d)(4) into paragraph (d)(7) to require that the factors that contributed to the incident include the initiating event, direct and indirect contributing; added new paragraph (d)(4) to require the name and amount of the regulated substance involved in the release (*e.g.,* fire, explosion, toxic gas loss of containment) or near miss and the duration of the event; added new paragraph (d)(5) to require the consequences, if any, of the incident including, but not limited to: Injuries, fatalities, the number of people evacuated, the number of people sheltered in place, and the impact on the environment; added new paragraph (d)(6) to require the emergency response actions taken; and redesignated and revised paragraph (d)(5) of § 68.81 and paragraph (c)(5) of § 68.60 into paragraphs (d)(8) of both sections to require that the investigation recommendations have a schedule for being addressed.

• § 68.65 Process safety information—change to paragraph (a) to no longer require written process safety information to be compiled in accordance with a schedule in § 68.67 and to require the owner or operator to keep process safety information up-to-date; change to Note to paragraph (b) revised the term ''Material Safety Data Sheets'' to ''Safety Data Sheets (SDS).''

• § 68.67 Process hazard analysis—change to subparagraph (c)(2) added requirement for PHA to address the findings from all incident investigations required under § 68.81, as well as any other potential failure scenarios.

• § 68.3 Definitions—added definitions for terms *active measures, inherently safer technology or design, passive measures, practicability,* and *procedural measures* related to amendments to requirements in § 68.67. Added definition of *root cause* related to amendments to requirements in § 68.60 and § 68.81. Added definition for term *third-party audit* related to amendments to requirements in § 68.58 and added § 68.59.

In the Reconsideration rule, EPA proposed to rescind all of the above changes, with the exception of the two changes that would revise the term ''Material Safety Data Sheets'' to ''Safety Data Sheets (SDS)'' in §§ 68.48 and 68.65. This includes deleting the words ''for each covered process'' from the compliance audit provisions in § 68.58 and § 68.79, which apply to RMP Program 2 and Program 3, respectively.

In conjunction with the proposed rescinding of prevention program changes, EPA proposed to rescind the requirements to report the following data elements in the risk management plan: In § 68.170(i), whether the most recent compliance audit was a third-party audit, pursuant to §§ 68.58 and 68.59; in § 68.175(k), whether the most recent compliance audit was a third-party audit, pursuant to §§ 68.79 and 68.80; and in § 68.175(e)(7), inherently safer technology or design measures implemented since the last PHA, if any, and the technology category (substitution, minimization, simplification and/or moderation). In § 68.175(e), EPA proposed to rescind the 2017 RMP Amendments rule's deletion of the expected date of completion of any changes resulting from the PHA for Program 3 facilities. Adding back this requirement would revert reporting of the PHA information in the risk management plan to what was required prior to the Amendments rule. This would also be consistent with the similar § 68.170(e) requirement for Program 2 facilities to report the expected date of completion of any changes resulting from the hazard review, a requirement that was not deleted in the RMP Amendments rule. EPA also proposed to rescind the requirement in § 68.190(c), that prior to deregistration, the owner or operator shall meet applicable reporting and incident investigation requirements in accordance with §§ 68.42, 68.60 and/or 68.81.

Alternatively, EPA proposed to rescind all of the above changes, except for the following:

• Requirement in § 68.50(a)(2) for the hazard review to include findings from incident investigations;

• Retain the term ''report(s)'' in place of the word ''summary(ies)'' in § 68.60;

• Requirement in § 68.60 for Program 2 processes to establish an incident investigation team consisting of at least one person knowledgeable in the process involved and other persons with experience to investigate an incident;

• Requirements in §§ 68.54 and 68.71 for training requirements to apply to supervisors responsible for process operations and minor wording changes involving the description of employees operating a process in § 68.54; and,

• Retain the two changes that would revise the term ''Material Safety Data Sheets'' to ''Safety Data Sheets (SDS)'' in §§ 68.48 and 68.65.

*B. Summary of Final Rule*

After review and consideration of public comments, EPA is rescinding all the prevention program related changes in the Amendments rule, while retaining the term ''Safety Data Sheets (SDS)'' in §§ 68.48 and 68.65, as proposed, with the following modifications:

• Retain the term ''report(s)'' in place of the word ''summary(ies)'' in § 68.60 for Program 2 processes. The term ''Incident'' before ''investigation reports'' in Amendments rule § 68.60(g) will also be retained from the Amendments rule because this is consistent with the investigation language for Program 3, although the proposed Reconsideration rule omitted this term.

• Retain the requirement in § 68.60 for Program 2 processes to establish an incident investigation team consisting of at least one person knowledgeable in the process involved and other persons with appropriate knowledge and experience to investigate and analyze the incident.

• Retain change to § 68.65(a) for Program 3 processes to not require written process safety information to be compiled in accordance with a schedule in § 68.67.

The requirement in § 68.65(a) for Program 3 processes to compile written process safety information in accordance with a schedule in § 68.67 had been deleted in Amendments rule because it appeared to have been adopted from OSHA's PSM PHA completion schedule of May 1994 to May 1997; it was not relevant to the RMP rule because the compliance date of June 21, 1999 was after OSHA's PSM PHA completion schedule. (See 82 FR 4675, January 13, 2017 and 81 FR 13686, March 14, 2016). EPA intended to not keep this irrelevant text in § 68.65(a), but the schedule requirement was included in the regulatory text of § 68.65(a) in EPA's reconsideration proposal in error. EPA will maintain the Amendments rule's deletion of phrase in § 68.65(a) that had referenced a schedule in § 68.67.

To clarify, EPA will not adopt the alternative proposed changes:

• Requirement in § 68.50(a)(2) for the hazard review to include findings from incident investigations;

• Deletion of the word ''Incident'' before ''investigation summaries'' in Amendments rule § 68.60(g) and

• Training requirements in §§ 68.54 and 68.71 to apply to supervisors

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 35 of 91


responsible for process operations and minor wording changes involving the description of employees operating a process in § 68.54.

EPA is rescinding the requirement in § 68.190(c) regarding updates to the risk management plan, that prior to deregistration, the owner or operator shall meet applicable reporting and incident investigation requirements in accordance with §§ 68.42, 68.60 and/or 68.81. EPA is also rescinding reporting of the following data elements in the risk management plan associated with the rescinded prevention program requirements of this final rule:

- In § 68.170(i) and 68.175(k), whether the most recent compliance audit was a third-party audit; and
- in § 68.175(e)(7), inherently safer technology or design measures implemented since the last PHA, if any, and their technology category.

EPA is adding back the pre-Amendments rule requirement in § 68.175(e) to provide in the RMP the expected date of completion of any changes resulting from the PHA for Program 3 facilities. This requirement had been deleted by the Amendments rule and was proposed to be restored.

*C. Discussion of Comments and Basis for Final Rule Provisions*

1. Overview of Basis for Final Rule Provisions

As discussed in section II.D, our approach to this final rule is more data-driven than the 2017 final rule, which relied more on incident information and opinions. As discussed below in several of the comments and responses, the data derived from EPA's RMP database shows that accidents are highly concentrated in a few facilities and that rule-based state mandates that require examination of STAA, IST, and chemical use reduction have not resulted in reducing accidental release frequency of or reduced accident impacts from accidental releases from processes to which the RMP rule applies. We have examined data and statements about the impact of Hurricanes Katrina, Rita, and Harvey on accidental releases subject to the RMP rule, but find little or no evidence that extreme weather events have, to date, led to incidents that would have been prevented had the new prevention provisions added in 2017 been in place and had compliance been required prior to these events. As explained below, many of the incidents extracted from databases maintained by TCEQ and others involved units not subject to the RMP regulations (*e.g.,* naturally occurring hydrocarbon storage prior to entry to a natural gas processing plant or a petroleum refining process unit), regulated substances that are not included in threshold calculations (*e.g.,* substances in gasoline storage), and substances not subject to the RMP rule (*e.g.,* benzene, carbon monoxide). With respect to RMP-regulated substances in RMP covered processes, these likely tend to be more carefully managed than chemicals that are less inherently hazardous, so it is reasonable to expect that other chemicals are more frequently released when held in greater quantities in the absence of use reduction programs.

We find that the observed trend that accidental releases subject to the RMP rule have steadily declined over time continues to be valid. One implication of the decline in accidental releases is that the estimate of 150 accidental releases per year used in calculating the cost of accidental releases in the 2017 rule overstates the number of recent releases occurring under the RMP rule as it was prior the 2017 rule changes. With an overstated baseline of accidental releases, a higher percentage of accidental release would need to be prevented by the measures added in 2017 in order for these provisions to be reasonable and practicable (*i.e.,* costs not disproportionate to their effectiveness). As noted, there is little evidence that IST-like regulatory programs have resulted in improved accidental release prevention trends or that recent extreme weather events have resulted in more accidental releases.

With releases declining under the pre-2017 prevention provisions and the concentration of releases among a small percentage of sources, we maintain the view we expressed in the proposed rule—that a compliance oversight approach addressing the small number of facilities with inadequate prevention programs can obtain much of the accident prevention benefit at a fraction of the cost of a rule-based approach that imposes additional prevention program requirements on all facilities.

Moreover, rescinding the prevention program provisions described in this section is consistent with our historic practice of keeping aligned the RMP prevention provisions that overlap with PSM. This coordination approach has the benefit of simplifying compliance for affected sources and facilitating program implementation by state and local delegated programs. At a minimum, EPA believes it should have a better understanding of the direction of the OSHA program before adding costly and difficult to implement prevention program provisions to the RMP rule.

While EPA did not justify the additional prevention program provisions added by the RMP Amendments rule on the basis of security, we considered claims made by some commenters that these provisions, and particularly STAA, should be retained because they may reduce security risks. However, as explained further below, we maintain the view that the pre-2017 prevention provisions already allowed facilities to appropriately balance security and safety risks, and reverting to those provisions is not inconsistent with other parts of this rule that address new security risks created by the emergency response and information availability provisions of the 2017 RMP Amendments.

Below and in the RTC we discuss in more detail the basis for our decisions to rescind the prevention program elements described in this section.

2. Comments on Rescission of Prevention Program Provisions in General

While several commenters expressed general support for the rescission of the Amendments rule prevention program rescissions, many other commenters, including a form letter campaign joined by approximately 18,310 individuals, recommended maintaining those provisions.

a. Claims That Rescinding Prevention Provisions While Retaining Other Provisions Is Inherently Contradictory

A joint comment submission by multiple advocacy groups argued that the proposed Reconsideration rule is inherently contradictory, reasoning that it is arbitrary for EPA to recognize that the incident data shows a need for certain emergency response coordination and public meeting requirements but argue that the same need does not exist for the prevention program requirements.

*EPA Response:* EPA disagrees that the Reconsideration rule is inherently contradictory because it retains Amendments rule emergency response provisions while rescinding accident prevention provisions. At no point in the record for the RMP Amendments rule or the Reconsideration rule do we represent that either the pre-Amendments prevention program or the addition of STAA, third-party audits, or root cause analyses to the prevention programs will prevent all accidental releases. There will still be accidents that will need responses with or without the prevention program amendments rescinded today. EPA believes that much of the accident prevention

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 36 of 91


benefits of the Amendments rule prevention provisions can be achieved by including injunctive relief, as appropriate, in enforcement actions without a broad regulatory mandate that potentially imposes unnecessary costs on many facilities. The retention of the Amendments rule's emergency response program provisions, with modifications, is not inconsistent with this view. We retain many of the RMP Amendments emergency response provisions because, regardless of whether we go forward with the prevention program changes under the RMP Amendments, improvements in the response program provisions are reasonable and practicable. We have struck a reasonable balance of measures that will provide, to the greatest extent practicable, for preventing accidental releases and minimizing the impacts of such releases.

b. Claims That OSHA Coordination Is Not a Reasonable Justification for Rescinding Prevention Requirements

Multiple State elected officials commented that because EPA's rationale regarding the need for greater coordination with OSHA does not provide a reasonable justification for eliminating the benefits of the accident prevention requirements, the proposed rescission would be arbitrary and capricious if finalized. These commenters argued that greater coordination with OSHA is not a prerequisite to imposing the prevention program provisions of the Amendments rule for four reasons: (1) Congress did not intend for the OSHA coordination requirement to prevent EPA from taking action; (2) EPA did in fact coordinate with OSHA throughout the development of the 2017 rule; (3) There is no conflict between the accident prevention requirements and OSHA's regulations; and (4) EPA should not wait for OSHA to act because, as EPA found during the Amendments rulemaking effort, its regulations are needed now. A joint submission from multiple advocacy groups and other commenters made a similar argument that repeal and delay pending a new rulemaking by EPA and/or OSHA is arbitrary and capricious.

*EPA Response:* EPA disagrees that EPA's rationale regarding the need for greater coordination with OSHA for eliminating accident prevention requirements is unreasonable, arbitrary or capricious. Congress requires EPA to consult and coordinate with OSHA in order to establish coordinated regulatory requirements. As we discussed in section II.C.2, above, the Senate committee report on this language notes that the purpose of the coordination requirement is to ensure that ''requirements imposed by both agencies to accomplish the same purpose are not unduly burdensome or duplicative.'' Senate Report at 244. The proposed Reconsideration rule did not suggest that there was any legal requirement to defer to OSHA in rulemaking, rather EPA acknowledged in the proposed rule that there is no legal requirement for EPA and OSHA to proceed on identical timelines in making changes to the RMP rule and PSM standard, and that some divergence between the RMP rule and PSM standard may at times be necessary given the agencies' separate missions. See 83 FR 24863–64. EPA also indicated, however, that while there is no legal bar to EPA proceeding on a separate rulemaking schedule or having requirements divergent from the OSHA PSM standard, the Amendments rule represented a departure from PSM requirements. While EPA's approach to coordination with OSHA under the Amendments rule was legally permissible, EPA does not have a record showing significant benefits of the added prevention program provisions. Without such benefits, EPA believes it is better to take its traditional approach of maintaining consistency with OSHA PSM. The creation of additional complexity and burden associated with new provisions where EPA has not demonstrated any benefit is evidence of the new prevention provisions' impracticability and that the rule divergence is unreasonable.

By adding significant new requirements to the accident prevention program under the Amendments rule, EPA caused the RMP prevention requirements to diverge substantially from the OSHA PSM standard for the first time. For example, with the Amendments rule's STAA and third-party audit provisions, EPA added completely new and complex components of the PHA and auditing provisions that are not contained in the PSM standard. Such new provisions impose additional compliance and oversight burdens that could cause implementation problems. With respect to root cause investigations, expert testimony at EPA's public hearing indicated that the pre-Amendments RMP rule does not require root cause investigation. In requiring EPA to coordinate its rulemaking under CAA section 112(r)(7) with OSHA, Congress urged EPA to avoid this situation by indicating that the purpose of the coordination requirement was to ensure that ''requirements imposed by both agencies to accomplish the same purpose are not unduly burdensome or duplicative.''[45] By rescinding the Amendments rule's changes to the accident prevention program, EPA is restoring the pre-Amendments consistency between the RMP rule and PSM standard. At a minimum, EPA believes it should have a better understanding of the direction of the OSHA program before adding costly and difficult to implement prevention provisions to the RMP rule.

While coordination meetings and communications certainly occurred, Congress did not require consultation and coordination for their own sake. Rather, the objective was to establish coordinated regulatory requirements and thereby avoid unduly burdensome or duplicative requirements. EPA agrees with other commenters who indicated that the Amendments rule did not accomplish these objectives. EPA does not have a record showing significant benefits of the added prevention program provisions. Without such benefits, EPA believes it is better to take its traditional approach of maintaining consistency with OSHA PSM. The creation of additional complexity and burden associated with new provisions where EPA has not demonstrated any benefit is evidence of the new prevention provisions' impracticability and that the rule divergence is unreasonable.

c. Claims That Rescinding Prevention Provisions Will Contribute to Future Chemical Emergencies

Several commenters were concerned about safety and health issues that could result from rescinding the Amendments rule accident prevention provisions. Multiple private citizens commented that removing the prevention program requirements will contribute to future chemical emergencies at RMP facilities. An advocacy group stated that the changes to the prevention program in the proposed Reconsideration rule would endanger the public and that EPA should learn from California's new safety regulation for oil refineries, which includes nearly all the provisions that EPA is proposing to remove and was informed by the industry's own best engineering and management practices developed over the last 20 years. Some advocacy groups stated that the prevention program saves lives and

[45] Clean Air Act Amendments of 1989, Report of the Committee on Environment and Public Works, U.S. Senate together with Additional and Minority Views to Accompany S. 1630. S. Report No. 101–228. 101st Congress, 1st Session, December 20, 1989.—''Senate Report'' p. 244. EPA–HQ–OEM–2015–0725–0645.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 37 of 91


decreases costs. Multiple State elected officials stated that EPA has acknowledged in the proposed rule that the prevention program provisions subject to rescission produced a variety of benefits that would be reduced if the proposed Reconsideration rule were implemented. The commenters recommended that EPA retain the provisions to attempt to reduce the number of incidents. One commenter stated that preventative measures are not only financially wise, but, as seen in West, Texas, are a matter of life and death for the populace and environment around chemical industries, as well as for employees of the chemical industry. Another commenter stated that EPA's proposed changes will endanger the lives of workers and millions of community members and their families who live around our nation's chemical facilities. Another commenter stated that third-party audits are necessary for profit-based companies who can err in favor of profit and that investigating near-misses and determining root causes is needed to learn from accidents. This commenter stated that the $88 million in savings to industry from rescinding parts of the Amendments rule pales in comparison with the $2 billion in damage, 58 deaths, and nearly 17,000 people injured over the last 10 years from RMP accidents and the profits made the by chemical industry.

*EPA Response:* While EPA anticipated in the final Amendments rule that implementation of prevention program elements would result in the reduction in frequency and magnitude of damages from releases, EPA was unable to quantify what specific damage reductions would occur as a result of the prevention elements. EPA notes that the accident rate trend shows a continual decrease under the pre-Amendments RMP rule. This downward trend is evidence that the prevention elements of the pre-Amendments RMP rule are working and that the cost of additional prevention requirements may not be necessary. In part because the state-specific data on enhanced prevention programs do not show a clear benefit from imposing the prevention program amendments broadly, EPA does not believe that the additional prevention requirements (*i.e.* third-party audits, STAA, investigation root cause analysis and other prevention program changes) add environmental benefits beyond those provided by the pre-2017 requirements that are significant enough to justify their added costs when imposed by rule rather than on a case-specific basis. When considering scarce resources, there even may be disbenefits from diverting resources towards costly STAA studies at those stationary sources that have successful accident prevention programs as shown by a record of no accidental releases.

The West, Texas incident involved a chemical, ammonium nitrate, that is not covered by the RMP rule. Investigation of near-misses is already required under the pre-Amendments rule, as the regulations require investigation of incidents which could reasonably have resulted in a catastrophic release of a regulated substance. The $88 million in savings projected by EPA is the annualized cost savings for all provisions rescinded by the final rule over the ten-year period (2004–2013) analyzed. These costs did not include the indirect costs of facilities choosing to implement safer technologies and alternatives in the RMP Amendments, although examples of implementing some safer technologies could be very high, such as $500 million to convert a hydrogen fluoride alkylation unit to sulfuric acid or $1 billion to convert a paper mill from gaseous chlorine bleaching to chlorine dioxide. Facilities subject to the STAA requirements were not required to implement STAA, and EPA has no data from which to predict how many facilities might choose to implement these technologies and what the technologies might be.

Although the annual average quantified damages from accidents over the ten-year period were estimated at $274.7 million, EPA was not able to quantify how much of this damage could be reduced in the future by the Amendments prevention program elements. Based on this estimate of the annual cost of accidents, the accident damages would have to be reduced by over 30% annually [46] from the addition of the rescinded elements alone just to break even on their costs, unless other significant non-quantified benefits are assumed. However, EPA found a 3.5% average annual decline in RMP accident rate using the RMP data from 2004–2016, without the added prevention provisions (See Exhibit 3–8, Proposed Reconsideration rule RIA), and as commenters have noted, the severity of accidents has also declined over the period of study. Both trends mean that the annual cost of accidents estimated under the Amendments rule was likely too high, and that rescinded Amendments rule provisions would have needed to prevent an even larger portion of accident damages in order to have benefits that are in proportion to their costs.

However, EPA's analysis of RMP accident data in states with state-level inherent safety or chemical use reduction programs casts doubt on the effectiveness of the Amendments rule STAA provision in particular. EPA analyzed RMP-facility accident trends in states with regulatory programs that require sources to consider inherently safer technology (New Jersey) or to reduce toxic chemical use (Massachusetts) to see what possible effect these particular provisions had on accident rates.[47] The data on RMP facility accidents in these states indicated no discernible reduction in accident frequency or severity associated with the state regulatory programs (the effects of state inherent safety and toxic use reduction programs is discussed further in section IV.C.4, below). In fact, the average number of accidents per RMP facility in both states have exceeded the national average. Therefore, EPA does not see sufficient evidence to show that the STAA provision of the Amendments would reduce RMP facility accident rates enough for the provision to be a reasonable regulation; the costs of STAA are disproportional to projected benefits. For other prevention provisions of the Amendments rescinded under the final rule—third-party audits and root cause analysis—these take place after an accident has occurred,[48] and the Agency can still obtain some of their benefits by including such measures in enforcement actions, where appropriate, through CAA section 113 orders or through settlement, without imposing a broad regulatory mandate.

EPA disagrees that California's new safety regulation for oil refineries provides support for retaining Amendments rule prevention provisions. This comment refers to the California Accidental Release Prevention (CalARP) program, which now requires additional process safety measures at 15 California refineries, including requirements to adopt inherently safer designs and systems to the greatest extent feasible. These regulations became effective in October

[46] See Table 3; combined annual cost of Amendments rule STAA, third-party audit, root cause analysis and information disclosure provisions equal $84.7 million.

[47] EPA. July 18, 2019. Technical Background Document for Final RMP Reconsideration Rule Risk Management Programs Under the Clean Air Act, Section 112(r)(7), Section 3.0 Analysis of Accident Frequency at RMP Facilities in New Jersey and Massachusetts. Available in the rulemaking docket.

[48] Removing the ''*i.e.,* near-miss'' language from §§ 68.60 and 68.81 of the 2017 rule does not alter the requirement to conduct incident investigations for incidents that could reasonably have resulted in a catastrophic release.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 38 of 91


2017.[49] The new regulations include requirements for safeguard protection analysis, hierarchy of hazard control analysis (includes analyzing and recommending inherent safety measures and safeguards to reduce each hazard to the greatest extent feasible), damage mechanism review, incident root cause analysis, process safety culture assessment, human factors, corrective action process, effective stop work procedures, and process safety performance indicators.[50] Of these new CalARP regulations, EPA's RMP Amendments included only provisions comparable to inherently safer design analysis (*i.e.,* the Amendments rule STAA requirement) and incident root cause analysis. None of the other new CalARP provisions were included in the Amendments rule. EPA notes that the very recent establishment of the California requirements means that little data bearing on their effectiveness exists. Without such data and considering that state-level data from New Jersey suggests that an IST regulatory requirement may not result in any discernible reduction in accident frequency or severity, the fact that California has adopted such provisions is not sufficient justification for EPA to include them in the RMP rule. However, EPA will consider the CalARP program moving forward and evaluate whether any accident data related to the program has useful relevance to the RMP rule.

d. Claims That Rescinding Prevention Provisions Will Increase Security Risks

A joint submission from multiple advocacy groups and other commenters and a State elected official stated that while EPA cites national security as a risk of the 2017 Amendments rule and a rationale to rescind the information sharing provisions, EPA does not weigh security concerns as a reason to retain the prevention measures. The commenters stated that there are already security risks at these sites due to the chemicals they store. Having a prevention program that makes chemical facilities safer by reducing hazards also minimizes risks, whether due to intentional acts or accidents. One commenter contended that the way to protect communities from terrorism and to advance national security is to reduce hazards, by requiring prevention and safer technologies alternatives analyses that would make chemical facilities safer up front. A State elected official commented that because accidents from the three industry sectors subject to STAA requirements account for 49% of all RMP reportable accidents, it makes economic sense to have them consider potential changes that would eliminate the possibility of a release entirely, by making a process more tolerant of fault or security breaches.

These commenters also argued that it is arbitrary and capricious for EPA to fail to weigh national security concerns as a reason to retain the prevention program provisions. The commenters argued that EPA cannot rationally address national security concerns only as a risk and not also as a potential benefit. In particular, multiple State elected officials commented that the rescission of the STAA requirement is arbitrary and capricious because EPA failed to consider the potential security benefits from STAA. The commenters stated that this is especially true in light of the security concerns cited by EPA as a basis for cutting back on chemical hazard information that must be shared with local emergency response officials and communities.

*EPA Response:* EPA disagrees that the Agency failed to properly weigh national security concerns during the Reconsideration, or that it should have assumed an increase in security risks from rescission of the Amendments rule's prevention program provisions. In the Amendments rule, EPA did not justify the prevention provisions on the basis of decreasing security risks. During development of the Amendments rule various commenters stated that the STAA provision could increase, not reduce, security risks. Our approach in the final rule was to allow facilities to balance security risks among all others, and that the STAA provision allowed for ''enough flexibility to consider risk management measures to minimize hazards without prescribing an approach that could compromise facility security or transfer or increase risks.'' 82 FR 4649, January 13, 2017. With or without the STAA and other Amendments rule prevention provisions, the rule allows for facilities to continue balancing security and safety risks. We continue to rely on facilities to balance these risks appropriately. Therefore, EPA does not believe that rescinding the STAA and other prevention provisions increases security risks. Changes made by EPA to the RMP accident prevention program were designed to reduce accidental releases and were not specifically undertaken to reduce the risk of releases from intentional criminal acts.

While implementation of some inherently safer technologies could reduce risks of release from criminal acts and the root cause incident investigation process can be useful in determining whether the cause of a release is accidental or intentional, EPA does not believe that rescinding the STAA and root cause analysis provisions increases security risks beyond those already present. The Amendments rule STAA provision did not require implementation of any technologies considered, and the pre-Amendments RMP rule already required investigating the causes of incidents. Regarding the Amendments rule requirements to provide increased availability of chemical hazard information to the public and other relevant planning information to LEPCs, EPA considered whether these requirements were potentially increasing security risks because the Department of Justice (DOJ) has found that the increased availability of information would increase the risk of the misuse of information by criminals or terrorists. Therefore, we do not see any inconsistency in our actions or rationale by trying to avoid increasing security risks for these requirements.

EPA also notes that rescinding the Amendments rule prevention provisions should not result in increased security risks because of the regulatory and legal framework that exists outside of the RMP rule. Specifically, addressing security concerns at high-risk chemical facilities is covered by other laws and regulations. For example, addressing security concerns at high-risk chemical facilities is covered by the Chemical Facility Anti-Terrorism Standards (CFATS), managed by the Department of Homeland Security (DHS).[51] The purpose of CFATS is to ensure facilities have security measures in place to reduce the risks associated with over 300 chemicals of interest and prevent them from being exploited in a terrorist attack. CFATS requires vulnerability assessments, development of site security plans, and implementation of Risk-Based Performance Standards for security of chemical facilities. Security risks at drinking water and waste water treatment facilities are not covered by CFATS but instead are subject to requirements managed by EPA's Water Security Division as authorized by the Public Health Security and Bioterrorism

[49] Cal EPA and CA DIR. August 4, 2017. News Release: New Regulations Improve Safety at Oil Refineries. California Environmental Protection Agency and California Department of Industrial Regulations. *https://www.dir.ca.gov/DIRNews/2017/2017-71.pdf.*

[50] See Program 4 Prevention Program requirements in 19 CCR § 2762, specifically section 2762.2.1, 2762.13, 2762.5(e), 2762.9(e) and (i)(4), 2762.14, 2762.15 and 2762.16(d), (e), (f) and (h) at *https://www.caloes.ca.gov/FireRescueSite/Documents/CalARP%20Regs%20Title%2019%20Division%202%20Chapter%204.5.pdf.*

[51] *https://www.dhs.gov/cisa/chemical-facility-anti-terrorism-standards.*

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 39 of 91


Preparedness and Response Act of 2002, also known as the Bioterrorism Act of 2002. Facilities on or adjacent to waters of the U.S. must also comply with regulations promulgated under the Maritime Transportation Security Act, which requires security vulnerability assessments and security plans.[52]

e. Commenters Disagree That the Accident Record Supports Rescinding Prevention Provisions

A Federal agency, State elected officials, and a joint submission for multiple advocacy groups and other commenters stated that they are disappointed that EPA has decided to revise the prevention program requirements as EPA's own RMP accident data from 2004 through 2013, which averages about 150 incidents per year, cited in the 2017 Amendments rule, supports implementing greater protections and shows that there is no basis to undermine or weaken the prevention programs. Some of these commenters also cited RMP accident data from 2014–16 and a list of reports of accidents at RMP facilities tracked on a web page by Earthjustice (now totaling 73) that have occurred since the Amendments rule was delayed as evidence that prevention program provisions are needed. These commenters argued that harmful accidents continue to occur, that over 500 accidents have occurred in the last 5 years, that he accident dataset is incomplete and does not include 2017 and 2018 accidents, and that EPA has not demonstrated any significant decline in the accident rate.

An advocacy group expressed disagreement with what they characterized as an EPA suggestion in the proposed Reconsideration rule that the decline in accidental releases that have already occurred is a reason for not requiring additional accident prevention and mitigation steps. The commenter stated that this is like arguing that since seat belts already save lives, there is no need for air bags even though they can save more lives. The commenter reasoned that the fact that existing safety measures have lowered accident rates has no bearing on whether other feasible measures for further reducing accident risk should be adopted.

An advocacy group also stated that the 2017 RMP database that EPA placed into the docket only goes through October 2017 but noted that EPA's proposal was not published until May 30, 2018 and claims that EPA has drawn data from the 2018 database. The commenter asserts that EPA has not given any justification for failing to include the most current data it has into the public record and considering it for the current proposal.

A joint submission from multiple advocacy groups and other commenters argued that the rescission of the prevention program provisions is arbitrary and capricious because EPA's record shows a need for them to be at least as strong, if not stronger, than when EPA promulgated the Amendments rule. The commenters argued that data show that a significant number of accidents are continuing to occur frequently and cause serious harm, which the commenters argued makes it arbitrary and capricious for EPA to rescind almost all prevention measures without enacting an adequate replacement.

*EPA Response:* EPA disagrees with these comments. While EPA reported in the Amendments rule that RMP accidents averaged about 150 incidents per year from 2004–2013, EPA's further analysis during the reconsideration process shows that RMP accidents continue to decline over time (Reconsideration RIA, Exhibits 3–7 and 3–8) with an average annual decline of approximately 3.5%. EPA disagrees that this is not a significant decline in the accident rate.

EPA examined the data compiled by Earthjustice on their website from 73 incident reports that occurred between the Amendment's rule original effective date of March 14, 2017 and September 21, 2018 when US Court of Appeals for the D.C. Circuit issued a mandate to make the Amendments effective. The 73 incident reports along with their descriptions and result of EPA's review is presented in a Technical Background document,[53] available in the rulemaking docket. The 73 reports involved a total of 75 incidents, all occurring at RMP regulated facilities, except four which are now deregistered. Many (42) of these incidents did not involve processes or chemicals that appear to be covered by the RMP regulations or there was not enough information to judge whether the processes or chemicals were RMP-covered. Some (14) of the 33 incidents that did involve or could have potentially involved covered processes or chemicals were not required to be reported as RMP accidents because they did not appear to have any reportable impacts. The press reports from which the list of 75 incidents was compiled did not always contain sufficient information on the identity of the chemicals released and the other process information needed to ascertain the regulatory status of the process involved. Therefore, EPA views this compiled list of incidents as having limited usefulness for any analysis for the rulemaking. EPA believes that accident data reported by RMP-regulated facilities in their RMPs to be the best source of information for counting accidents relevant to the RMP regulation.

Regarding the RMP accident dataset for 2017 and 2018, the analysis for the proposed Reconsideration rule RIA was completed in March 2018 before the rule was sent for White House Office of Management and Budget (OMB) review in mid-March. Although EPA had access to the March 2018 version of the RMP database that had facility submissions through the end of February 2018, the dataset of accidents that occurred in 2017 would not have been complete. Facilities have up to six months after a reportable accident occurs to update their RMP submission for that accident. Because the RIA analysis was completed in March 2018, most 2018 accidents had not occurred yet, much less been reported on, so naturally the proposed rule analysis could not use them. Thus, the last complete calendar year of RMP accident data available to EPA at the time of completing the proposed rule RIA was 2016. As explained in Chapter 3 of the proposed rule RIA, EPA found that comparisons of the numbers of facilities in the RMP data used in the Amendments rule (which used the February 2015 version of the RMP data) with the November 2017 version[54] of the database, revealed that number of RMP facilities and processes had experienced minor changes in the more than two years between rulemakings (*e.g.* the number of RMP facilities decreased by 1.8% over the time period). As a result, EPA utilized the costs estimated for the 2017 RMP Amendments RIA as the baseline set of costs to be impacted by the proposed Reconsideration rule (see proposed rule RIA at 24).

In October 2018, we provided in the rulemaking docket an extracted Excel file containing the RMP accident data for calendar year 2017, in the same format that had been provided in the

[52] 33 CFR part 105.

[53] EPA. July 18, 2019. Technical Background Document for Final RMP Reconsideration Rule Risk Management Programs Under the Clean Air Act, Section 112(r)(7).

[54] As explained in the Correction to the Notice of Data Availability and Extension of Comment Period for the Proposed Rule (83 FR 36837, July 31, 2018), the updated number of RMP facilities and processes used in the RIA was extracted from the November 2017 version of the RMP database, while the 2014–2016 accident data cited in the RIA was extracted from a March 2018 version of the RMP database. EPA–HQ–OEM–2015–0725–1423.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 40 of 91


rulemaking docket for the 2004–2013, and 2014–2016 RMP accident data. These 2017 accident data in the Excel spreadsheet file were extracted from a September 2018 version of the RMP database (*i.e.,* which contained RMP reports submitted through August 31, 2018). While we did not use the 2017 RMP accident data in the RIA or as support for the proposed rule (a complete set of accidents for 2017 was not available when the RIA was done), we provided this same Excel spreadsheet in the docket in order to share the information with interested stakeholders. The docketed Excel spreadsheet for 2017 RMP accidents reported through August 31, 2018 totaled 94 accidents, which is lower than the total for any previously reported year.[55] However, as noted in RIA, the total number of 2017 accidents could increase slightly because a few sources may update their accident history information only when their next full five-year RMP update occurs, which for some facilities occurs in 2019. See the RIA and Response to Comments document for a further explanation of this effect. Based on past five-year reporting cycles (that show a declining number of reporting entities with reports due on the five-year anniversary of the original due date and our observation of the number of extra incidents reported in resubmitted RMPs on the anniversary),[56] EPA does not expect late accident reporting to significantly impact the accident totals for 2014–2017.

Regarding one commenter's claim that the fact of declining accidents has no bearing on whether other accident prevention measures should be adopted, EPA disagrees with this claim and with this commenter's claim that EPA's rescission of the Amendments rule's accident prevention requirements is akin to not requiring air bags in automobiles due to the presence of seat belts. RMP accident prevention program measures are not discrete safety devices like air bags and seat belts. Rather, they represent a comprehensive system-based approach to accident prevention based on each individual facility's analysis of process hazards and subsequent implementation of appropriate engineering, administrative, and procedural controls to manage those hazards. The rule allows for continuous improvement over an iterative cycle of hazard analyses and other measures. Under the pre-Amendments rule, each individual facility is already required to select the appropriate set of risk control measures based on the specific set of hazards present at the facility. The fact that since the enactment of this regulatory regime, accidents and accident consequences have declined substantially and are now at historically low rates suggests that this system has been very effective at preventing accidents. The historically low accident rate matters because with an already low rate of accidents, the maximum potential benefits (*i.e.,* the baseline of preventable accidents) that can accrue from additional regulatory requirements is also lower, whereas their costs are at least partially fixed, and potentially high. For example, EPA's review of available data on IST/STAA [57] provides no clear evidence that the Amendments rule STAA requirement would result in further accident reduction, but the costs of the requirement are calculable and substantial. For more than 90 percent of impacted sources, the STAA provision in particular appears to be an impracticable and unreasonable ''do loop'' unlikely to improve accident prevention performance while also being a cost, time, and focus diversion for sources and their staff. It is reasonable to believe that prevention program measures in place prior to 2017 already encompassed many of the benefits of the STAA provision. Some facilities may already have considered and implemented safer technologies in conjunction with their process hazard analysis so subsequent mandates under regulatory programs would not have not led to additional accidental release prevention. Also, facilities may be using other effective accident prevention measures in lieu of IST (*i.e.* passive, active, and administrative controls) so that IST reviews become simply a procedural burden rather than a method that identifies more effective ways to prevent accidents than those already employed. EPA believes that the balance of the considerations discussed above has shifted in favor of not imposing broad new regulatory requirements without clear evidence of their efficacy, particularly when EPA believes benefits similar to those intended by these provisions are obtained by ensuring compliance with the pre-Amendments rule's accident prevention requirements on a case-specific basis in particular enforcement actions. 83 FR 24873, May 30, 2018.

Lastly, EPA disagrees with a commenter's claim that rescission of the prevention program provisions of the Amendments rule is arbitrary and capricious because the accident record shows a need for the Amendments rule prevention provisions. The RMP accident record shows that RMP-reportable accidents have declined to the lowest level since the origination of the pre-Amendments rule, indicating that the pre-Amendments prevention program provisions, and EPA's enforcement and implementation program, are effective at preventing accidents. It is illogical to argue that the ongoing decline in accident frequency to unprecedently low levels highlights a need for substantial changes to such a successful program.

f. Obtaining Safety Benefits Through Improved Compliance With RMP Regulations

Several commenters supported EPA's proposal to prioritize compliance by poor performers over adding regulatory requirements for all RMP facilities, indicating that this approach will avoid unnecessary burdens on many facilities, is consistent with recent EOs, and will focus compliance costs on those facilities that pose the greatest risks. Several other commenters disagreed with EPA's emphasis on compliance with existing regulations. The commenters emphasized that in the 2017 rulemaking EPA stated that enforcement of the existing program was not sufficient, and that EPA found a ''regulatory need'' for changes to the prevention program. A labor union stated that this type of compliance-driven approach would not have prevented serious accidents at facilities without a prior history of accidents. In addition, an advocacy group stated that during and prior to the West Fertilizer incident, EPA and OSHA both had enforcement authority over the facility, but neither was able to prevent the disaster. Multiple State elected officials commented that the possibility of increased enforcement does not justify the proposed rescissions. The commenters stated that incidents have occurred at more than a thousand facilities, and EPA has not explained how individualized enforcement measures at more than a thousand

[55] See docket item EPA–HQ–OEM–2015–0725–1974. Had this data shown a significant change in trend, it may have been of central relevance to our rulemaking and we would have considered reopening the comment period, but, since it was largely confirmatory of past trends, we rely on the previously observed trends and not on this new information in our decision.

[56] See sections 3 and 10 of the Response to Comment document (available in the rulemaking docket), 4600 RMP facilities are expected to resubmit RMPs in 2019. EPA received over 16,000 RMP reports during 1999, approximately 12,000 during 2004, approximately 8,600 during 2009, and approximately 7,000 during 2014.

[57] EPA, July 18, 2019, Technical Background Document for Final RMP Reconsideration Rule Risk Management Programs Under the Clean Air Act, Section 112(r)(7). Section 3.0 Analysis of Accident Frequency at RMP Facilities in New Jersey and Massachusetts. Available in the rulemaking docket.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 41 of 91


facilities can plausibly address such widespread risks and harms. The commenters claim that the agency appears to have accepted—without any confirming analysis—industry trade association data regarding the percentage of facilities at which accidents have occurred.

*EPA Response:* As discussed in the proposed rule, the RMP accident data (as analyzed by American Chemistry Council (ACC) in its comments on the proposed rule) [58] tend to support the reasonableness of an approach to strengthening accident prevention that focuses on achieving compliance at problematic facilities rather than broader regulatory mandates. ACC's analysis of the RMP accident data for 2004–2013 shows that 1,517 reportable accidents occurred at 1,008 facilities. EPA verified ACC's analysis prior to proposing to rely on it, and the verification analysis was docketed on the date of the proposed Reconsideration rule.[59] ACC submitted as part of its public comments on the proposed Reconsideration, an analysis of the RMP accident data for 2007–2016 that shows 1,368 accidents occurred at 947 facilities.[60] Looking at both analyses overall, ACC's analysis showed that fewer than 10% of the 12,500 facilities subject to the RMP rule reported any accidental releases, while fewer than 2% of facilities that reported multiple releases were responsible for nearly half of reportable accidents from all types of facilities. In the chemical manufacturing sector only, fewer than 7% of the chemical manufacturers had multiple reportable accidents that accounted for about two-thirds of all reportable accidents in this sector.

EPA disagrees that it is implausible that an approach that focuses on achieving compliance at poor performing facilities can address accidental release incidents at RMP facilities. EPA does not claim that enforcement will be increased, but that when a facility is not implementing a successful prevention program, the enhanced prevention program measures reflected in the 2017 RMP Amendments rule (*e.g.,* implementing a third-party audit, conducting root cause analysis or examining safer technologies) can be applied as part of settlement agreements to the extent appropriate based on the violations alleged. In addition, it should be noted that EPA inspections and enforcement actions are not only taken in response to accidents and releases from facilities. EPA routinely performs inspections of RMP-regulated facilities throughout the country, and resulting enforcement actions address non-compliance at facilities, reducing the likelihood of accidents and releases. EPA has previously employed measures such as third-party audits and safer technologies in enforcement actions not only after reported releases but also after other (non-accident-related) inspections where such measures were appropriate to address potential weaknesses in a source's prevention program. Additionally, EPA is currently implementing a National Compliance Initiative under CAA section 112(r) with the goal of reducing risks to human health and the environment by decreasing the likelihood of chemical accidents.[61]

After considering the burdens and benefits of broadly imposing the additional prevention program requirements of the RMP Amendments, and in consideration of new emphasis on reducing unnecessary regulations, EPA has reexamined more carefully whether the benefits of such regulatory provisions are out of proportion to their costs. EPA does not contend that focusing on achieving compliance at poor performing facilities would replicate the effects of the Amendments rule accident prevention provisions, but we believe this approach is more reasonable because it more effectively focuses the burden of additional safety measures on those facilities where they are most needed instead of imposing regulatory mandates across the board that may not be needed to prevent accidents at well-performing facilities. Under a compliance-driven approach, we can obtain accident prevention benefits similar to those that we said justified the 2017 RMP Amendments rule at a fraction of the burden. As further explained in the Response to Comments document,[62] the Agency took more than 1,000 enforcement actions under CAA Section 112(r) between 2014 and 2018. Some of these EPA enforcement actions have involved settlement and injunctive relief that applies to multiple facilities. Thus, an EPA action may address not only the facility that was inspected, but also may require companies to audit other facilities owned by them and require complying actions at those additional facilities, as needed. In addition, the literature on the deterrent effect of enforcement finds that inspections, sanctions or increased threats of inspections and sanctions result in improved compliance not only at the evaluated or sanctioned facility, but also improve performance at other facilities, creating general deterrence.[63]

Regarding the West Fertilizer explosion and EPA enforcement, ammonium nitrate is not currently a substance regulated under the RMP regulations. Therefore, the requirements of the 2017 RMP Amendments rule would not have applied to the ammonium nitrate (AN) process at West Fertilizer even if they had been adopted before the incident at that facility. While some benefits of implementing accident prevention measures at covered processes can sometimes extend to unregulated chemicals and equipment at an RMP facility, this would be most likely to occur for unregulated chemicals contained in a covered process or at unregulated processes presenting similar hazards. At West Fertilizer, the covered process was an anhydrous ammonia storage process, which had distinct prevention measures from AN storage.[64] Therefore, even assuming the West Fertilizer incident did not result from criminal activity,[65] we do not believe the prevention provisions of the 2017 Amendments would likely have prevented the incident. Nevertheless, EPA agrees that this incident highlighted the importance of proper coordination between facility owners and operators and local responders. While the RMP regulations already required facilities to coordinate emergency planning and response with

[58] EPA. March 9, 2017. Notes and Documentation Related to a March 9, 2017 Meeting between the RMP Coalition and EPA regarding a Petition for Reconsideration of the RMP Amendments rule (82 FR 4594, January 13, 2017). EPA–HQ–OEM–2015–0725–0929 and American Chemistry Council public comments, August 17, 2018. EPA–HQ–OEM–2015–0725–1628.

[59] See attachments to EPA–HQ–OEM–2015–0725–0929, EPA Verification of ACC's RMP Accident Analysis with 2 Tables. March 26, 2018 and RMP Accident Data 2004–2013 EPA Verification of ACC Analysis.

[60] EPA–HQ–OEM–2015–0725–1628. pp. 14–15.

[61] More information about the National Compliance Initiative is available at: *https://www.epa.gov/national-compliance-initiative-reducing-accidental-releases-industrial-and-chemical.*

[62] See Response to Comments document, section 3.1.

[63] Shimshack, J.P. (2014). The Economics of Environmental Monitoring and Enforcement. *Annual Review of Resource Economics, 6,* p. 352. Available in rulemaking docket.

[64] In simplest terms, anhydrous ammonia storage typically involves storage of ammonia gas in a pressurized metal container, with piping and control and safety valves, while AN fertilizer storage involves storage of a solid in bulk or packages, in a bin or on pallets. The processes have distinct designs, the process hazards differ, the mechanical integrity programs for pressurized storage and piping and storage of material in bins and pallets are dissimilar, and the related training for employees and operating procedures have minimal overlap.

[65] On May 11, 2016, the BATF announced its conclusion that the fire at the West Fertilizer facility was intentionally set. See EPA–HQ–OEM–2015–0725–0641.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 42 of 91


local officials, EPA has retained the enhanced local coordination and response provisions of the Amendments rule, with minor changes, based on its experience from inspections and lessons noted from several incidents including the West Fertilizer explosion.

g. Comments Concerning Extreme Weather Events and Climate Change

Many commenters stated that EPA should retain the Amendments rule prevention provisions because of increased accident risks from severe weather, which some commenters indicated were associated with climate change. One commenter contended that EPA's proposal inexplicably fails to heed lessons learned from the August 2017 disaster at the Arkema chemical facility in Crosby, Texas, which was a result of unstable peroxides decomposing after losing refrigeration due to local flooding from Hurricane Harvey. The commenter stated that the CSB found that the facility had not properly assessed the risk posed by increasingly severe weather and the PHA for the low temperature warehouses did not document any flooding risk. CSB recommended that chemical manufacturing, handling or storage facilities perform analyses to determine their susceptibility to these extreme weather events and evaluate the adequacy of relevant safeguards. Another commenter stated that rescinding certain prevention requirements would reduce opportunities for facilities to learn about their vulnerabilities to severe weather and improve their resiliency. The commenters stated that the requirement for program 2 hazard reviews to identify findings from incident investigations showing vulnerabilities, the root cause analysis requirement, and the STAA requirement, could help a facility determine if a release was caused by a vulnerability to severe weather and determine if there is safer technology that could reduce severe-weather impacts on a process. A joint comment submission from multiple advocacy groups and other commenters said that the need for maintaining the Amendments rule is especially great in communities threatened by a ''double disaster,'' which happens when chemical facilities fail to prepare to prevent and reduce harm from foreseeable hurricanes, floods, earthquakes, and severe weather. The commenter provided a detailed case study related to Hurricane Harvey in support of this argument. This commenter stated that a number of fires, explosions, and chemical releases that affected and harmed commenters and their members were related to Hurricane Harvey, and that many RMP facilities around Houston reported excess air emissions events in the days preceding and immediately following Hurricane Harvey's landfall. A report submitted by one commenter stated that out of 186 total air emissions events reported to the Texas Commission on Environmental Quality (TCEQ) between July 31 and September 7, 2017, 91 events (48.9 percent) were Harvey-related, and 134 events (72.0 percent) were in RMP facilities. The commenter also stated that a total of 1,473,184 pounds of 37 contaminants subject to the RMP rule were released in Harvey-related incidents, and an additional 5,481,871 pounds not related to Harvey were released during reported incidents in the same period. The commenters also argued that it was arbitrary and capricious for EPA to fail to consider the many chemical releases, explosions, and fires that occurred in the wake of Hurricane Harvey and the associated lessons learned regarding communities near chemical facilities that frequently face or are more prone to natural disasters.

*EPA Response:* EPA disagrees that the Amendments rule provisions were necessary because of the increased potential for accidents due to extreme weather. EPA examined the data submitted by commenters to support a case of increasing RMP facility accidents during extreme weather events but could find no examples in those data of RMP-reportable accidental releases from RMP-covered processes caused by extreme weather events. EPA notes that although the Arkema facility in Crosby, Texas is an RMP facility, the 2017 accident there did not involve the release of any RMP-regulated substances. According to the CSB, Arkema did prepare a PHA to comply with the OSHA PSM standard for all its processes (including the seven low temperature warehouses storing organic peroxides) as a best practice, although only one of its organic peroxide storage buildings met the chemical quantity requirements for coverage under the OSHA PSM standard. Even though Arkema's PHA process hazard analysis for the low temperature warehouses did not document any flooding risk, the facility did take precautions to protect the organic peroxides that required refrigeration against the loss of power, (an identified hazard) although those efforts ultimately failed due to unprecedented flood levels.[66]

EPA reviewed the data provided on emissions from specific facilities submitted by commenters indicating information on chemical releases during adverse weather events (most associated with Hurricane Harvey) in order to specifically examine whether there is an increase in RMP facility accidents during extreme weather events. While the submitted information documented reports of releases, generally the releases did not involve regulated substances listed in 40 CFR 68.130 or did not involve RMP-regulated processes or did not result in RMP-reportable impacts.

A list of these documented reports of releases (mostly air emissions) from specific facilities cited in comments and reviewed by EPA are provided in Table 6 of the Technical Background Document (available in the rulemaking docket). Some incidents or release events commonly cited in comments or references in comments are not subject to the RMP regulation. For example, many of the emissions were from floating roof storage tanks containing petroleum products such as crude oil or gasoline, which are not covered by the RMP regulation (see 40 CFR 68.115(b)(2)(ii) and (iii)). Thus, emissions of chemicals from these petroleum products are not covered by the RMP regulation regardless of whether the facility reports under RMP for other processes or if the chemicals emitted are RMP substances. Many of the emissions data quantified were not specific to a particular chemical and were only noted as pounds of emissions or pounds of volatile organic compounds (VOCs). Some of the emissions that were specified for a particular chemical, such as benzene, organic peroxides, glycerin, methanol, methyl tert-butyl ether, and carbon monoxide, are not listed RMP substances. Some chemicals that are sent to flares or released from flaring in refineries, such as sulfur dioxide or nitrogen oxide, may not be covered by RMP regulations because the chemical may not exceed a threshold quantity in a process. RMP regulations generally do not cover off-shore oil and gas drilling, exploration or production facilities.[67] EPA also reviewed RMP accident history reports during previous extreme

[66] CSB. May 25, 2018. Investigation Report: Organic Peroxide Decomposition, Release and Fire at Arkema Crosby Following Hurricane Harvey Flooding. Incident Date: August 31, 2018. U.S. Chemical Safety and Hazard Investigation Board. pp: 78–82, 86–87, 98–99. *https://www.csb.gov/arkema-inc-chemical-plant-fire-/*.

[67] Off-shore oil and gas drilling operations are not generally covered by the RMP regulations due to either the provision at 40 CFR 68.10(f), which excludes Outer Continental Shelf sources, or the provision at 40 CFR 68.115(b)(2)(iii), which exempts naturally occurring hydrocarbon mixtures prior to entry into a natural gas processing plant or petroleum refinery.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 43 of 91


weather events, including Hurricanes Katrina and Rita, and found almost no examples of such events resulting in accidental releases from RMP-covered processes.[68]

Regarding a commenters reference to air emissions events reported to TCEQ during the timeframe of Hurricane Harvey, while the submitted information documented reports of chemical releases, generally those releases did not involve regulated substances listed in 40 CFR 68.130 or did not involve RMP-regulated processes or did not result in RMP-reportable impacts. For example, some of these incidents involved National Ambient Air Quality Standards (NAAQS) pollutants specifically exempted from regulation by 42 U.S.C. 7412(r)(3), hazardous air pollutants not listed under part 68 such as benzene, and other unspecified chemicals.

As these commenters did not submit TCEQ data directly to EPA, EPA conducted a search using TCEQ's website for emissions events occurring between August 25, 2017 and September 1, 2017 (*i.e.,* the period encompassing Hurricane/Tropical Storm Harvey's impact on Southeast Texas), which yielded 93 emissions reports from facilities in Texas. EPA did not review all 93 reports but reviewed a sample of 10 emissions reports from facilities regulated under the RMP rule. These 10 emissions reports can be found in Appendix B of the Technical Background Document. Of the 10 reports reviewed by EPA, 8 were submitted for excess emissions (*i.e.,* emissions above permitted limits) from flare stacks, one was submitted for excess emissions from an electrostatic precipitator, and one to report volatile compounds emitted from a small oil release to secondary containment.

Releases reported to TCEQ's Air Emissions Event Report Database are provided by facilities regulated under the state's air quality rules to report releases of certain air pollutants above specified reportable quantities. Such reports may represent evidence that a facility has emitted pollutants above allowed limits; however, they do not necessarily indicate that an RMP-reportable accidental release has occurred (*i.e.,* the releases do not result in deaths, injuries, property damage, evacuations, or sheltering-in-place). In fact, emissions of pollutants from flare stacks of refineries and chemical plants during process startups, shutdowns, and upsets may occur as the proper functioning of refinery safety systems to prevent catastrophic accidental releases. For example, in order to prevent a process upset from resulting in a fire or explosion in a refinery process unit, a process may be designed to relieve excess gases to the refinery's flare system. Such events may cause excess flaring by the refinery, resulting in an exceedance of the facility's air permit (and for facilities in Texas, requiring a report to the TCEQ Air Emissions Event Report Database). However, these reports generally do not indicate that an RMP-reportable accident has occurred. In fact, the Senate report on the CAA Amendments indicates that ''Accidental releases would not include release from vents and releases resulting from process upsets which are planned and are designed to prevent catastrophic events . . . These ''safety'' releases, while not routine, may be authorized and necessary and would not cause death, injury or property damage. Releases of this type are appropriately subject to regulation under section 112 of the Clean Air Act rather than the new section 129 established here.'' [69]

Commenters presented no information or analysis of TCEQ emissions data to demonstrate that the data related to RMP-reportable chemical accidents, nor did commenters show that the RMP rule or the specific provisions of the Amendments rule rescinded or modified by the Reconsideration rule could have prevented these releases. In EPA's judgement, none of the TCEQ emissions reports reviewed by EPA represented RMP-reportable accidental releases, and it is unlikely that the other TCEQ emissions reports discussed by these commenters would represent RMP-reportable accidental releases.

EPA notes that under the pre-Amendments RMP rule, RMP-reportable accidents are declining, not increasing, and this trend is an important consideration in EPA's decision to rescind Amendments rule requirements, as it indicates that the pre-Amendments RMP rule was effective in preventing and minimizing the risk of accidents. The pre-Amendments RMP regulations already required that facilities investigate incidents and resolve incident investigation findings, and identify the hazards associated with their covered processes and regulated substances and the safeguards used or needed to control or mitigate all relevant hazards, including among other things, loss of power, flooding or hurricanes. Thus, rescinding the Amendments prevention requirements would not relieve facilities of their obligation to address these hazards, whether or not they arise from the potential for extreme weather events.

h. Comments Concerning Costs and Benefits of Amendments Rule Prevention Provisions

Several commenters stated that the costs of repealing the Amendments rulemaking greatly exceed the benefits. Some of these commenters provided specific cost information or estimates to support their claims. One private citizen stated that EPA's estimate of $88 million per year savings from rescinding Amendments rule provisions was more than offset by potential losses of Amendments rule benefits of up to $270 million per year, which did not include additional costs such as contamination, lost productivity, emergency response, property value impacts, and health problems from chemical exposures. The commenter also stated that a single incident at the Exxon Mobil Torrance, California refinery cost California drivers $2.4 billion—based on increased gas prices—and caused macroeconomic losses of $6.9 billion, and that these figures do not include facility and community losses associated with emergency services, health care, property values, and local tax revenue. This commenter also cited a Center for Chemical Process Safety document that states ''major industrial incidents cost an average of $80 million each'' for property damages alone and losses from business interruption ''can amount to four times the property damage.'' This commenter noted that these are among other losses to life, health, market share,

[68] Accident history records during the time frames of Hurricanes Katrina and Rita are available in the docketed RMP database (EPA–HQ–OEM–2015–0725–0989). EPA reviewed accident history data for the following periods: August 25–31, 2005 (Hurricane Katrina) and September 20–25, 2005 (Hurricane Rita). EPA identified one facility—Mississippi Phosphates, that had an ammonia release from a flare that was extinguished due to storm surge during Hurricane Katrina. The same facility also had an ammonia release from a flare that was extinguished due to high winds during Hurricane Rita, and from a flare that was shut down in preparation for Hurricane Cindy (July 2005). However, no accident impacts were reported for any of these releases. Regarding Hurricane Harvey, EPA identified one facility—the Chevron Phillips Chemical Company plant in Sweeny, Texas—that reported an accidental release from an RMP-covered process on August 27, 2017 which was during the period that Southeastern Texas was being impacted by Hurricane/Tropical Storm Harvey. According to the facility's RMP, this incident involved a release of 65 pounds of ethylene that caused a fire resulting in onsite property damage, but no deaths, injuries, offsite property or environmental damage, evacuations, or sheltering-in-place. Based on information in the facility's RMP, it is unclear whether the release was directly related to the storm.

[69] Clean Air Act Amendments of 1989, Report of the Committee on Environment and Public Works, U.S. Senate together with Additional and Minority Views to Accompany S. 1630. S. Report No. 101–228. 101st Congress, 1st Session, December 20, 1989.—''Senate Report'' EPA–HQ–OEM–2015–0725–0645, pp 210.

reputation, litigation, insurance, investigations, and penalties. An advocacy group contended that EPA's justification for repealing the root cause and third-party audit provisions is inadequate because the commenter believes that benefits of these provisions are more than likely to outweigh the compliance costs. The commenter argued that the [third-party] audit provision would only need to reduce the risk of accidents by 3.5% for the costs of that provision to break even with the benefits of the rule and the root cause provision would only need to reduce the risk of accidents by 0.6% to break even.

A group of state elected officials maintained that EPA was not able to quantify what specific reductions in accident harms would occur as a result of implementation of the RMP Amendments but (citing the proposed Amendments rule at 81 FR 13642–3) found that they ''would provide benefits to potentially affected members of society,'' including reducing the probability and severity of chemical accidents. This commenter stated that in the RMP Amendments RIA, EPA cited numerous direct costs avoided including worker, responder, and public fatalities and injuries, public evacuations, public sheltering-in-place, and property and environmental damage, and indirect costs avoided, such as lost productivity due to product damage and business interruption both on-site and off-site, expenditure of emergency response resources and attendant transaction costs, and reduced offsite property values. The commenter argued that EPA may not ignore these benefits just because they are unquantified.

An advocacy group and a union stated that in the proposed Reconsideration rule RIA, EPA states that the agency ''believes the benefits and averted costs are large enough to justify the foregone benefits.'' However, the commenters stated that the Agency's conclusion is unsupported and ignores the significant unquantified benefits of the Amendments rule. The commenters stated that EPA's only justification is declining accident rates at chemical facilities, which the commenter claims is a flawed justification. An advocacy group also stated that the burden of the incident investigation root cause provisions is less than the identifiable benefits. The commenter stated that through a breakeven analysis, EPA can see that the burden provides no justification for repeal.

*EPA Response:* EPA disagrees with these comments. EPA did not project that the prevention benefits of the Amendments rule would be $270 million per year. That figure included the average annual monetized costs of RMP facility accidents occurring from 2004–2013. The Agency did not claim that the prevention program provisions of the Amendments rule would prevent all future accidents, and there is no reason to expect that this would have occurred.

The Reconsideration rule does not eliminate any pre-Amendments rule RMP requirements, so facilities that were previously responsible for implementing the prevention and emergency response program provisions of that rule will still be required to comply with those requirements, as well as the additional Amendments rule requirements not rescinded by the final rule.

Regarding the cost of the ExxonMobil Torrance, California refinery accident, EPA mentioned this accident in the final RMP Amendments RIA as an example of the regional impacts that can occur due to accidents.[70] The ExxonMobil Torrance refinery accident occurred in February 2015 and was after the ten-year period (2004–2013) for the RMP data that were analyzed for the monetized impacts of RMP accidents. While EPA did mention avoiding the lost productivity due to such accidents as an example of potential additional benefits, EPA had not previously reviewed in depth the RAND study that was the source of this estimate during development of the Amendments rule, and simply took the study's conclusions at face value. EPA has now further reviewed that study in detail and does not believe that it demonstrates that EPA's estimate of the costs of accidents is too low, or that its conclusions can be extrapolated to the nationwide universe of RMP facilities (see Section IV.C of this preamble for a further explanation).

EPA disagrees that the CCPS estimate of major accident damages is representative of the typical cost of RMP facility accidents. The CCPS ''Business Case for Process Safety'' (p.8) states that ''Property damage costs are reduced—In the U.S., major industrial incidents cost an average of $80 million each.'' The Amendments RIA (Exhibit 6–5) shows that the total costs of property damage for all reportable RMP accidents over the 2004–2013 time period analyzed were $2.1 billion for on-site damages, and $11.4 million for off-site damages. This averages $1.4 million per accident of on-site damages and $0.01 million per accident for offsite damages. Since the RMP accident data are self-reported by regulated sources, they likely represent the owner or operator's best estimate of the costs of the accident. CCPS may have derived its number from a definition of accident that is different from what we require to be reported under the RMP rule. For example, the RMP rule requires reporting of accidents that cause ''significant property damage on site'' or ''known offsite'' property damage, whereas the CCPS document purports to describe ''major industrial accidents.''

It does not appear that the set of accidents considered in the CCPS document has much overlap with RMP reportable accidents. The CCPS data on ''major'' industrial accidents are based in part on accidents that are not subject to the RMP rule, while the portion that are RMP accidents is a very small subset of the full RMP accident database. As EPA indicates in the Response to Comments document,[71] only 4 RMP reportable accidents that occurred during 2004–2013 and only one that occurred during 2014–2016 caused $80 million or more in onsite property damage.

EPA disagrees with the commenters that the non-monetized benefits discussed in the Amendments rule were ignored in the Reconsideration rule. In the Amendments rule RIA, EPA qualitatively described the benefits of the Amendments rule provisions, including the prevention and mitigation of future RMP accidents. EPA considered the benefits associated with preventing serious accidents, avoiding direct costs such as worker, responder, and public fatalities and injuries, public evacuations, public sheltering-in-place, and property and environmental damage. The RIA also considered indirect costs such as lost productivity due to product damage and business interruption, both on-site and off-site, expenditure of emergency response resources and attendant transaction costs, and reduced offsite property values. In the Reconsideration RIA, EPA acknowledges that the proposed rescission of some of the Amendments rule provisions would result in a reduction in the magnitude of prevention and information benefits relative to the post-Amendments rule baseline. Specifically, Chapter 6 of the Reconsideration RIA discussed the qualitative benefits associated with the Amendments rule and how they will change in response to the

[70] See EPA, Regulatory Impact Analysis—Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act, Section 112(r)(7), December 16, 2016, pp 89–90. This document is available in the rulemaking docket as item number EPA–HQ–OEM–0725–0734.

[71] See Response to Comments document, section 9.1.1.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 45 of 91


Reconsideration rule. However, EPA also notes that the rate and consequences of RMP-reportable accidents have reached their lowest levels since EPA began collecting these data. These trends have occurred under the pre-Amendments rule, and EPA believes that some benefits of the Amendments rule can be obtained through a compliance-driven approach without imposing broad regulatory mandates that may unnecessarily burden many facilities.

With regard to incident investigation root cause analysis specifically, EPA did not rely exclusively on a comparison of costs and benefits to justify the rescission. We have been unable to make a direct connection between the presence or absence of these provisions and a number of accidents prevented. However, our decision to rescind these provisions does not rest exclusively on costs and benefits. As we have noted, in addition to reducing the burden on the regulatory community, EPA has decided to rescind the incident investigation root cause analysis provision to maintain consistency with the OSHA PSM Standard.

3. Comments on Rescission of Incident Investigation Provisions

Many commenters supported rescinding the Amendments rule incident investigation and root cause analysis provisions, for various reasons. Some commenters claimed that the Amendments rule lacked adequate justification for adding the provisions. Other commenters stated that the provisions were too burdensome or would not improve safety. Still other commenters stated that the requirements caused conflicts with the OSHA PSM standard and should be rescinded to assure continued unity with the standard. On the other hand, many other commenters opposed rescinding the Amendments rule incident investigation and root cause analysis provisions. These commenters also provided various reasons for opposing the rescission, which are discussed individually below.

a. Claims That Rescinding Provisions Will Weaken Safety Standards and Not Avoid Future Accidents

A State government agency commented that the rescission of the incident investigation provisions would be harmful, as the details collected by the incident investigation provisions help facilities to understand the causes and consequences of incidents, in turn helping to eliminate future incidents. The State government agency also commented that specifying that the initiating event, direct and indirect contributing factors, and root causes must be included in the factors that contributed to the incident is crucial for a thorough incident investigation. A joint submission from multiple advocacy groups and other commenters stated that EPA's own analysis demonstrates that EPA should keep and strengthen incident investigation and auditing requirements. The commenters stated that a conditional probability calculation based on the data in EPA's 2004–2013 accident spreadsheet confirms that facilities that have had even one accident are significantly more likely to have a second one, which shows the importance of retaining all of the improved investigation requirements. The commenters stated that, under the RMP rule in existence prior to the Amendments rule, EPA's data show that facilities are not learning from their mistakes. Additionally, the data show that facilities that experience one problem are likely to have additional issues without regulatory intervention. Other commenters, including private citizens, multiple form letter campaigns joined by approximately 2,275 individuals, and a labor union stated that incident investigations, including root cause analyses, can prevent accidents and should remain a part of the RMP program. These commenters stated that a root cause analysis is common sense and is critical to determining accountability, that the investigations are not a burden on industry, but are necessary and obvious solutions to learn how to prevent dangerous mistakes and enhance business practices. One commenter stated that root cause analysis has resulted in a strong safety record for nuclear facilities. Another commenter indicated that the state of California requires root cause analysis of accidents and that the analysis increases safety and saves companies money.

*EPA Response:* EPA agrees that incident investigation with root cause analysis is an important method to determine the underlying causes of an accident, so that they may be addressed to prevent future accidents. However, as noted earlier, many facilities may already use root cause analysis for incident investigations. All RMP facilities with Program 2 or 3 processes were already required to conduct incident investigations that include identification of ''contributing factors,'' and EPA's RMP guidance document already encouraged owners and operators to identify ''root'' and ''underlying'' causes of incidents. Several commenters noted that some facilities already conduct root cause analyses as part of their incident investigations and that root cause analysis is the modern, industry accepted approach in incident investigations. The Center for Chemical Process Safety (CCPS), based upon a survey of its membership and other processing companies, observed that companies reported using an average of two or three different public domain and proprietary tools methodologies for both major and minor incidents, and the most popular methodologies use different combinations of investigation tools.[72]

EPA did cite some examples in the Amendments rule of accidents where EPA, OSHA or CSB identified ineffective investigations by the owner or operator of previous, similar incidents, resulting in a failure to address the same causes. We presume that had these previous problems or near misses been identified, action would have been taken to avoid reoccurrence. However, EPA has not conducted any overall analysis of data from RMP accident investigations conducted by regulated facilities to determine how well these investigations have identified causes and contributing factors.

EPA acknowledges the commenter's point concerning facilities that have more than one accident. However, EPA disagrees that in all cases, subsequent accidents are due to a failure to conduct a root cause analysis of an earlier accident. In some cases, subsequent accidents could be due to a failure to implement incident investigation findings. In others, the causes of a subsequent accident could be completely unrelated to the causes of an earlier accident. EPA believes that the commenter's statement ''a conditional probability calculation based on the data in EPA's 2004–2013 accident spreadsheet confirms that facilities that have had even one accident are significantly more likely to have a second one,'' may mischaracterize the RMP accident data. While this observation is true, it fails to consider the possibility that subsequent accidents are unrelated to an owner's failure to identify a root cause.

Given the relatively small and declining number of facilities that have RMP-reportable accidents, and the concentration of accidents among a subset of facilities that have had accidents, EPA believes that focusing on

[72] CCPS. March 2003.Guidelines for Investing Chemical Process Incidents, Second Edition, Chapter 4, An Overview of Investigation Methodologies. Pp. 44–45. EPA–HQ–OEM–2015–0725–0251.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 46 of 91


including injunctive relief as necessary in appropriate enforcement actions is a better approach to preventing future accidents than imposing broad regulatory requirements. Such an approach will also allow EPA to tailor injunctive relief to best suit the circumstances of the case. For example, considering that EPA's existing guidance already encourages owners and operators to identify the root and underlying causes of accidents, EPA may find that a facility's failure to address earlier incident investigation findings contributed to a subsequent accident, rather than failure to conduct a root cause incident investigation. In light of the language of our pre-Amendments rule, our guidance and that of CCPS on root cause analysis, and the widespread practice of conducting root cause analyses mentioned by commenters, a bare ''root cause'' regulatory requirement is unlikely to significantly change current practices or reduce accidents as much as a case-by-case approach that examines individual source behavior.

Also, based on its record, EPA does not wish to have the RMP incident investigation requirements diverge from those in OSHA's PSM standard. EPA does not have a record showing significant benefits of the added prevention program provisions. Without such benefits, EPA believes it is better to take its traditional approach of maintaining consistency with OSHA PSM. The creation of additional complexity and burden associated with new provisions where EPA has not demonstrated any benefit is evidence of the new prevention provisions' impracticability and that the rule divergence is unreasonable. However, retaining for Program 2 investigation requirements, the words ''report'' and ''reports'' in place of ''summary'' and ''summaries'', respectively, and the requirement for an incident investigation team with at least one person knowledgeable in the process and other persons with appropriate investigation experience, does not create any inconsistencies with OSHA PSM requirements.

b. Alleged Lack of Justification for Rescission

An advocacy group stated that there is no cost justification for the rescission of the root cause analysis provisions. The commenter stated that a break-even analysis demonstrates that the burden provides no justification for repeal as the benefits greatly outweigh the costs. This commenter argued that because the root cause incident investigation provision costs $1.8 million annually and the annual cost of facility accidents is $274.5 million, the provision would only need to reduce the risk of accidents by 0.6% to break even, which seems well within the range of reasonableness to conclude that these provisions would be able to provide this level of protection. The group recommended that EPA conduct their own breakeven analysis. Similarly, a tribal government and a few other commenters stated that the small cost associated with root cause investigations are well worth the benefit.

*EPA Response:* EPA disagrees that the commenter's break-even analysis that it is within the range of reasonableness to conclude the ''benefits [of the root cause provision] greatly outweigh the costs.'' The commenter suggests if the provision prevents at least 0.6% of accidental release damages, then it would be cost-beneficial, but provides no data to support that assumption about the effectiveness of the provision. EPA has not been able to quantify how much benefit in accident reduction would be attributed to this specific provision. EPA has no data or empirical estimates of the precise impact of each rule provision on the probability and magnitude of an accident. The accidents themselves have highly variable impacts that are difficult to predict. To the extent practicable, EPA's analysis monetizes the costs of accident damages to partially estimate the baseline costs that should be affected by the final rule.

This is also complicated by the fact that many facilities may already employ root cause analysis techniques and it is difficult to estimate how much benefit is to be gained from facilities who are not already conducting root cause analysis. In at least some of the incidents mentioned in the RMP Amendments proposal, it is arguable that a contributing factor in the subsequent incident was either the failure to conduct any investigation, or the failure to implement findings from an incident investigation, rather than the failure to conduct a root cause investigation. EPA is also rescinding the root cause analysis provision because we do not wish to have the incident investigation requirements diverge from those in OSHA's PSM standard. EPA does not have a record showing significant benefits of the added prevention program provisions. Without such benefits, EPA believes it is better to take its traditional approach of maintaining consistency with OSHA PSM. The creation of additional complexity and burden associated with new provisions where EPA has not demonstrated any benefit is evidence of the new prevention provisions' impracticability and that the rule divergence is unreasonable.

c. Other Comments Opposing Rescission of Root Cause Analysis Provision

A state agency and an advocacy group stated that incident investigations should be conducted ''using a recognized method'' as standard practice and stated that informal one-on-one interviews with supervisors or an investigation committee method are flawed approaches. These commenters stated that companies should use a more structured and comprehensive team approach to identify root causes with tested data analysis tools and methodologies. An industry trade association commented that they believe root cause analyses could help determine flooding risk for accidents and influence severe weather analyses. The commenter also stated that EPA should consider CSB's recommendation regarding the 2017 disaster at the Arkema chemical facility in Texas, that chemical manufacturing, handling, or storage facilities perform analyses to determine their susceptibility to these extreme weather events and evaluate the adequacy of relevant safeguards.

*EPA Response:* Although EPA is rescinding the specific regulatory requirement for root cause analysis, the Agency's existing guidance already encouraged owners and operators to determine the root and underlying causes of incidents. EPA's guidance also provides pointers to recognized investigation methods, such as the CCPS ''Guidelines for Investigating Chemical Process Incidents'' and the ''National Fire Protection Association Guide for Fire and Explosion Investigations.''

Regarding the use of root cause analysis to determine flooding risk, root cause analysis generally is used to identify underlying system-related reasons why an incident occurred, and it is therefore probably of less utility for determination of flooding risk or for investigating events that are clearly caused by extreme weather and are not system-related. The issue with extreme weather events is recognizing the hazard, its likelihood of occurrence and its severity. The RMP regulations already require that facilities identify the hazards associated with their processes and regulated substances and the safeguards used or needed to control or mitigate all relevant hazards, including among other things, loss of power, flooding or hurricanes. Thus, rescinding the Amendments prevention requirements and in particular the root cause analysis provision would not relieve facilities of their obligation to address these hazards.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 47 of 91


d. Rescind ''near miss'' Clarifying Text

Several commenters stated that the term near miss was confusing and supported the proposal to rescind the term. These commenters recommended allowing firms the flexibility to determine what constitutes an incident that could reasonably have resulted in a catastrophic release. Several other commenters stated that in the Amendments rule EPA failed to define a near miss and its illustrations of near misses created confusion. Other commenters also supported the rescission, providing various reasons, including that EPA's earlier expansive view of the term was at odds with industry's understanding, or that the term could cause facilities to unfairly be subject to enforcement, or that EPA's description of the term would intrude on OSHA's jurisdiction. An industry trade association stated that, in addition to rescinding the near miss text, EPA also needs to clarify inaccuracies that were included in the near miss discussion in the Amendments rule preamble. Specifically, the commenter argued that EPA needed to clarify that some examples EPA included in the Amendments rule preamble were not near misses or incidents that could reasonably have resulted in a catastrophic release.

Other commenters opposed the rescission of the near miss text. A Federal government agency stated that investigating near misses can help prevent more serious and catastrophic incidents from occurring. The commenter also stated that because major process accidents are generally categorized as ''low probability, high consequence'' occurrences, near-miss incident investigations can provide a higher number of learning opportunities, providing a more complete data set for lessons learned and major process safety enhancements locally, within the company, and potentially industry-wide. A State government agency stated that to have an effective risk management program, facilities must investigate all incidents involving a regulated substance, including catastrophic releases, smaller accidental releases that are not catastrophic, and near misses. The commenter stated that the proposed revision is vague and subjective in that it leaves the owner or operator to decide what they will investigate outside of the ''catastrophic'' incidents, therefore weakening the provision. A State agency provided recommended draft text for § 68.81 that would require investigation of all accidental releases and near-misses (instead of incidents that resulted in or could reasonably have resulted in a catastrophic release) and included new definitions of ''accidental release'' and ''near miss.''

*EPA Response:* EPA is deleting the term ''near miss'' that was added in the Amendments rule. The term was added in order to further clarify those incidents which could reasonably have resulted in a catastrophic release and are also subject to investigation. However, EPA's lack of specificity about what it meant by ''near miss'' contributed to confusion about the incident investigation requirement rather than clarity. EPA does not have a record showing significant benefits of the added prevention program provisions. Without such benefits, EPA believes it is better to take its traditional approach of maintaining consistency with OSHA PSM. The creation of additional complexity and burden associated with new provisions where EPA has not demonstrated any benefit is evidence of their impracticability and unreasonableness. EPA does not wish to have the incident investigation requirements diverge from those in OSHA's PSM standard. Removing the language will prevent undue burden in complying with process safety requirements that would result from introducing a duplicative requirement for investigations. Contrary to some commenters' concerns, the addition of the term ''near miss'' in the Amendments rule was not intended to be an expansion of the type of incidents that were required to be investigated, but a clarification of the incidents which could reasonably have resulted in a catastrophic release that must be investigated. However, even without the term, incidents which could reasonably have resulted in a catastrophic release continue to require incident investigations.

While EPA did provide examples in the Amendments rule of incidents which may be considered near misses (82 FR 4606–7, January 13, 2017), EPA did not intend to imply that these examples were always events that would require investigation. EPA noted that ''facility owners or operators will need to decide which incidents could reasonably have resulted in a catastrophic release'' and that ''this will require subjective judgement.'' EPA also acknowledged ''that not all excursions of process parameters outside control levels or all instances of protective device activation should necessarily be considered to be near misses'' and ''that activation of protective devices should be investigated when the failure of such devices could have reasonably resulted in a catastrophic release.'' These situations would have to be evaluated to determine if imminent and substantial endangerment to the public health and environment could have plausibly resulted if the circumstances and been slightly different.

Regarding making any changes in the definition of a release subject to the investigation requirements, EPA had already proposed in the Amendments rule to change the definition of ''catastrophic release'' to be identical to the description of accidental releases required to be reported under the accident history reporting requirements. In the final Amendments rule, EPA decided not to make this change after reviewing many comments opposing the change and because the proposed revision may have inadvertently expanded the definition of incidents subject to investigation (see 82 FR at 4603, January 13, 2017). EPA did not propose a definition of near-miss in the proposed Amendments rule but did consider it. In the final Amendments rule, EPA chose not to provide a definition of near-miss because it was too difficult to address in a single definition the variety of incidents that may occur at RMP facilities that could be near-misses that should be investigated. The term near-miss had been added in the proposed rule as a term to help clarify and highlight those incidents that could reasonably have resulted in a catastrophic release. The difficulty in devising a single regulatory definition supports removing the term as it did not accomplish the intended clarification. Based on the reasoning given in the Amendments rule, EPA does not agree that any changes should be made regarding the catastrophic release definition for incident investigation nor should a definition of near-miss be added.

e. Requiring Program 2 Investigation Teams To Have at Least One Person Knowledgeable in the Process and Other Persons With Investigation Experience

An industry trade association expressed support for EPA's proposal to rescind the requirement for program 2 incident investigation teams to have at least one person knowledgeable in the process and other persons with investigation experience, stating that the team requirements are ambiguous and not appropriate for all incident investigations. The commenter stated that the team should be tailored to the level of incident and given that Program 2 facilities are lower risk, the team requirements should not be necessary. Two other commenters provided general support for the proposed rescission. On the other hand, a Federal agency

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 48 of 91


strongly recommended that EPA retain the staffing requirements for Program 2 investigation teams. Similarly, a State elected official questioned what kind of safety improvements could result from an investigation conducted by individuals with no experience with the failed process. Another commenter provided general opposition to the proposed rescission.

*EPA Response:* EPA is retaining the Program 2 requirement in § 68.60(c) for an incident investigation team to be established and consist of at least one person knowledgeable in the process involved and other persons with appropriate knowledge and experience to thoroughly investigate and analyze the incident. While EPA is rescinding other incident investigation requirements so that they do not diverge from those in OSHA's PSM standard, retaining the investigation team requirements for Program 2 does not create any inconsistencies with OSHA PSM requirements. The pre-Amendments rule for Program 3 already required an incident investigation team to be established and consist of at least one person knowledgeable in the process involved and other persons with appropriate knowledge and experience to thoroughly investigate and analyze the incident. This provision is the same as that required by the OSHA PSM standard. Retaining this provision for Program 2 does not make the provision more rigorous than Program 3, and EPA agrees with commenters who stated that incident investigation teams should always include at least one person who is knowledgeable in the process and other persons with investigation experience.

f. Other Comments on Incident Investigation Provisions

Commenters provided other comments relating to the incident investigation provisions. A State elected official opposed the rescission of the incident report elements added under the Amendments rule. A State government agency commented that the rescission of the added incident report elements will be detrimental to public safety because they would help the company understand the causes and consequences of the incident when the incidents are reviewed in the future, such as during process hazard analyses. Several commenters opposed EPA's proposed rescission of schedules for addressing investigation recommendations. A State government agency stated that a schedule for addressing recommendations from the incident investigation is an important requirement to ensure that recommendations are resolved in a timely manner and is necessary as part of the management system for all prevention program elements. Similarly, a Federal agency stated that EPA should continue to require that investigation reports include a schedule to address recommendations by taking appropriate corrective action(s) with a 12-month completion deadline. On the other hand, an industry trade association expressed support for the rescission of the added elements emphasizing that the additional items are not designed to meaningfully enhance incident investigations. Another trade association supported EPA's proposed rescission of additional report requirements, including schedules for addressing investigation recommendations, as unnecessary.

A few commenters supported EPA's proposal to rescind the 12-month incident investigation deadline requirement. Two industry trade associations supported EPA's proposal, reasoning that mandating a completion deadline is detrimental to the focus of the investigative team, which should be on completeness. Two industry trade associations also commented that the timeframe to complete a thorough incident investigation will vary depending on several external factors, including the consequences of the release, the complexity of the incident, the process or processes involved, the substance released, and the investigation team's experience, knowledge, and composition. In opposition to EPA's proposal, an industry trade association and a union disagreed with rescinding the 12-month deadline, stating that the deadline is reasonable to ensure the owner/operator does not let the investigation lag indefinitely. In addition, a Federal agency stated that EPA should continue to require that investigation reports include a schedule to address recommendations by taking appropriate corrective action(s) with a 12-month completion deadline.

A few commenters supported the rescission of the requirement to investigate catastrophic releases that result in a decommissioned or destroyed process. Alternatively, a few commenters opposed rescinding the provision. A joint submission from multiple advocacy groups and other commenters stated that without investigations of releases that resulted in a decommissioned or destroyed process, it would create a significant gap in current RMP accident reporting data and would be a missed opportunity to improve safety.

*EPA Response:* EPA is rescinding all the incident investigation report elements added by the Amendments rule, except that EPA will retain the words ''report'' and ''reports'' in place of the words ''summary'' and ''summaries'' in 68.60(d) and (g), respectively, and the requirement in 68.60(c) for an incident investigation team to be established and consist of at least one person knowledgeable in the process involved and other persons with appropriate knowledge and experience to thoroughly investigate and analyze the incident. This includes rescinding, among others, the requirement to complete an incident investigation within 12 months, the requirement to provide a schedule for addressing recommendations in the investigation report, and the requirement to investigate catastrophic releases that result in a decommissioned or destroyed process. EPA does not wish to have the incident investigation requirements diverge from those in OSHA's PSM standard. EPA does not have a record showing significant benefits of the added prevention program provisions. Without such benefits, EPA believes it is better to take its traditional approach of maintaining consistency with OSHA PSM. The creation of additional complexity and burden associated with new provisions where EPA has not demonstrated any benefit is evidence of their impracticability and unreasonableness. Retaining the previously mentioned Program 2 investigation requirements above does not create any inconsistencies with OSHA PSM requirements. The pre-Amendments rule already had a requirement for the owner or operator to establish a system to promptly address and resolve the incident report findings and recommendations, with resolutions and corrections to be documented. These requirements remain and the rescission of the provision for a schedule for addressing recommendations in the investigation report does not negate the requirement to promptly address the investigation findings and recommendations.

Regarding investigation of accidents that result in a decommissioned or destroyed process, commenters did not identify a significant number of release incidents at RMP facilities that had resulted in a destroyed or decommissioned process without any RMP accident report.[73] We believe these

[73] In the list of incidents provided by Earthjustice attached to comment EPA–HQ–OEM–2015–0725–1969 and subsequently updated, EPA noted two incidents that resulted in the facility deregistering from the RMP database due to damage from the incident. See EPA. July 18, 2019, Technical

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 49 of 91


events would tend to be higher profile, with job losses and visibility to news organizations and to the communities. EPA is aware of a few such incidents (*e.g.,* the June 24, 2005 fire at a Praxair facility in St. Louis, Missouri); however the Agency is not aware of a significant number of such incidents. The absence of additional examples would lead us to conclude that the gap we were addressing in the Amendments exists but is not a significant one.

4. Comments on Rescission of Third-Party Audit Provisions

Many commenters representing industry supported EPA's proposed rescission of the third-party audit provisions. Some of these commenters stated that requiring a third-party audit after every reportable accident is unwarranted, would result in a misallocation of resources, and in cases where EPA believes a third-party audit is warranted, the agency already can require a facility to conduct a third-party audit as a corrective action under an enforcement settlement. Several trade associations stated that the third-party audit provisions are duplicative given that facilities are already required to be audited every three years. Other commenters stated that the Amendments rule provided insufficient evidence that third-party audits are more robust and effective than internal compliance audits. Many commenters stated that the Amendments rule's requirements for auditor competency and independence would make it difficult for companies to find and afford qualified auditors, and that EPA provided no evidence that internal auditors were insufficiently objective or competent to perform audits. Several industry trade associations commented that it is false to assume that third parties are more capable, credible, and objective than a facility's own audit staff. Two industry trade associations stated that EPA lacks authority to impose a regulatory requirement for third-party audits.

In contrast, many other commenters, including multiple form letter campaigns joined by approximately 2,275 individuals, opposed EPA's proposed rescission of the third-party audit provisions. Many of these commenters stated that third-party audits increase accountability. Some commenters supported retaining the third-party audit provisions because the CSB has found that a company's own internal corporate PSM audits can fail to identify systemic process safety deficiencies. An advocacy group stated that third-party audits should be maintained because post-incident audits help facilities pinpoint and eliminate the cause of such incidents to prevent future accidental releases. A joint submission from multiple advocacy groups and other commenters stated that EPA previously supported and provided a rationale for third-party audits in the Amendments rule. A labor union also cited EPA's Amendments rule arguments in support of third-party audits and EPA's conclusion that ''independent compliance audits will assist stationary sources to come fully into compliance with the applicable prevention program requirements.'' The commenter stated that they fully believe that third-party audits would reduce the frequency and severity of accidents at RMP facilities. Another advocacy group stated that third-party audits are an essential part of the Contra Costa County (CCC), California Industrial Safety Ordinance (ISO), which the commenter described as a nationally-acclaimed chemical release prevention program that has reduced both the number and severity of incidents since its implementation of the third-party audit program. Other commenters stated that the costs of the third-party audit provisions do not justify their repeal, and that there is no problem if EPA requires third-party audits when OSHA does not.

*EPA Response:* EPA believes there can be benefits to third-party audits in some instances and has previously described the benefits in the Amendments rule. EPA will continue to include third-party audits as part of enforcement actions, when appropriate. The Agency's decision to rescind the third-party audit requirements is not based on a determination that third-party audits are not beneficial or justified in certain cases, but to allow for coordination of process safety requirements with OSHA before proposing future regulatory changes, and to reduce unnecessary regulatory costs and burdens of a broad rule-based approach to third-party audits rather than a case-by-case approach. As discussed in the proposed rule, one area of potential divergence between the OSHA PSM standard and the RMP rule under the Amendments is in the requirement for third-party audits. EPA noted that the August 2016 OSHA SBAR panel report [74] did not fully support third-party audits. Instead the SBAR panel recommended further review of the need and benefits of a third-party audit provision in the PSM standard. EPA therefore believes that we should not retain and put into effect changes to the prevention aspects of the Risk Management Program until we have a better understanding of OSHA's plans for changes to the PSM standard so that we may move forward in a more coordinated fashion.

Regarding commenters' claims that the Amendments rule's auditor competency and independence provisions will make it difficult for facilities to locate and afford auditors, and that EPA lacks authority to impose third-party audit regulatory requirements, these comments reiterate similar comments made on the Amendments rule, to which EPA already responded in the preamble and Response to Comments document for that rule. EPA notes that the rescission of the third-party audit requirements is not due to unavailability of auditors, or EPA's lack of authority to impose the requirement.

EPA disagrees that the CCC ISO provides evidence that third-party audits are justified on a cost-benefit basis. The CCC ISO includes many provisions that are not duplicated in the RMP regulation, and it is impossible to disaggregate the effects of individual provisions to determine their efficacy. However, the CCC audit program is not a third-party audit program comparable to the Amendments rule provision, but rather is comprised of inspections and audits that are conducted by the regulator (*i.e.,* county inspectors). The CCC Hazardous Materials Programs staff was required to audit and inspect all stationary sources regulated under the Industrial Safety Ordinance within one year after the initial submittal of their Safety Plans. In other words, these were enforcement audits, not independent third-party audits comparable to those in the Amendments.

5. Comments on Rescission of STAA Provision

Many commenters representing industry supported EPA's proposed rescission of the STAA provision. Some of these commenters argued that STAA has limited or no benefit or will even decrease safety. Some commenters indicated that the frequency of accidents in New Jersey since enactment of the NJ Toxic Catastrophe Prevention Act (TCPA) IST provision has not

Background Document for Final RMP Reconsideration Rule Risk Management Programs Under the Clean Air Act, Section 112(r)(7).

[74] OSHA, OMB and SBA. August 1, 2016. Report of the Small Business Advocacy Review Panel on OSHA's Potential Revisions to the Process Safety Management Standard. Pp. 32–33. U.S. Dept. of Labor (DOL), Occupational Safety and Health Administration (OSHA); U.S. DOL Office of the Solicitor (SOL); Office of Management and Budget (OMB), and U.S. Small Business Administration (SBA). EPA–HQ–OEM–2015–0725–0923.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 50 of 91


declined, and that this indicates that the Amendments rule STAA provision will cause facilities to incur costs without any accident reduction benefits. An industry trade association commented that the STAA provision would not reduce accidents, and that the RMP rule's existing requirements for management of change and PHAs already provide for analysis of alternatives and continuous risk mitigation. Two other industry trade associations stated that, in the course of PHAs, plants identify risks and address them according to recognized and generally accepted good engineering practice. One of these commenters also stated that companies implement risk-based analyses in order to reduce risks to an acceptable level. Another association argued that the Amendment rule's STAA provisions would provide no benefit because industries already utilize IST analysis where they determine it feasible. Other industry trade associations agreed, stating that IST analyses have been adopted as a matter of industry best-practice for years. They argued that imposing a regulatory requirement to do so will only result in waste. An industry trade association argued that STAA should not be generally required of existing facilities, and that a broad STAA requirement could only be appropriate when designing new plants, but that companies already perform STAA in these circumstances. Many associations commented that, at most, STAA should only apply to the design of a process and not be part of the PHA. An industry trade association representing specialty chemical manufacturers stated that its members manufacture specialty chemicals under designs specified in Federal regulations, and the tight specifications required by these programs limit the beneficial potential of STAA.

Some industry associations argued that STAA would increase risks. An industry trade association commented that STAA requirements, by departing from OSHA's PSM requirements, would create an overlapping, inconsistent regulatory framework and thereby decrease process safety. Another industry trade association predicted that risk shifting and a potential increase in overall risk would be a likely result of requiring STAA. An association of government agencies commented that the efficacy of the STAA requirement would be undermined if there were no required analysis for transfer of risk. An industry trade association commented that STAA requirements would stifle innovation by adding documentation costs to companies already innovating. Another commenter agreed, stating that STAA requirements, triggered by minor safety changes, could disincentivize the same changes.

On the other hand, many commenters representing environmental advocacy groups, state and tribal governments, and others opposed rescission of the Amendments rule STAA requirements. EPA also received comments from multiple form letter campaigns joined by approximately 2,275 individuals expressing opposition to the proposed rescission of STAA requirements. These commenters reasoned that if implemented, the STAA requirements would help prevent or decrease the impacts of future accidents. An advocacy group stated that STAA is the best mechanism available for improving plant safety. Another commenter agreed, elaborating that IST provides the most robust mechanism for preventing accidents by removing, rather than protecting against, hazards. Many other commenters wrote similar comments. A tribal government commented that numerous recent accidents may have been avoidable with STAA regulations. Specifically, the commenter cited the April 2, 2010 explosion at the Tesoro Refinery in Anacortes, Washington, an August 6, 2012 accident at the Chevron Refinery in Richmond, CA and CSB's similar findings for both incidents that process safety programs at both facilities failed to effectively control the hazards before these incidents occurred. This commenter noted that the CSB recommended that EPA require the documented use of inherently safer systems analysis and the hierarchy of controls to the greatest extent feasible in establishing safeguards for identified process hazards. The commenter also referred to other incidents that EPA had cited in support of the Amendments rule, stated that they all appear to have been caused by management's failure to implement adequate safety management programs, and concluded that process safety regulations were unsuccessful at preventing these major incidents. Another tribal government also argued that STAA provisions should be retained, describing the potential harm threatened by a nearby refinery's use of hydrogen fluoride. A private citizen commented that recent years have exhibited higher rates of reported incidents. The commenter argued that STAA provisions should be implemented to help reduce these occurrences. Another commenter stated that an expansion of RMP is necessary given the numbers of accidents under the RMP requirements in place prior to the Amendments rule. An anonymous commenter urged that the STAA provisions be retained, stating that nearly 135,000,000 people live in areas potentially impacted by 3,400 of the highest-risk RMP facilities' worst-case chemical releases. The New Jersey Department of Environmental Protection recommended that the Amendment rule's STAA provisions not only be retained but expanded. It commented that New Jersey's broad STAA approach, which includes safety measures short of redesigning a plant, made ongoing STAA requirements beneficial. It cited a study in support of its contention that STAA provision can improve safety in older and operational facilities.

*EPA Response:* When promulgating the Amendments rule, EPA anticipated that the STAA provision could be beneficial if facilities voluntarily implemented safer technologies in response to their analysis. However, EPA had no estimate of how many facilities would implement such measures and what the effects of these measures might be on the accident rate. EPA has since reviewed the nationwide RMP facility accident rate trend through 2016, which shows a continual decrease under the pre-Amendments RMP rule. This downward trend is evidence that the prevention elements of the pre-Amendments RMP rule are working and that the cost of additional prevention requirements may not be necessary. In addition, the accident data from RMP facilities in New Jersey indicate little or no discernible reduction in accident frequency or severity that can be associated with the NJ IST requirement to date. While comparing RMP accident data from New Jersey facilities to the full RMP database, EPA found that nationwide, the RMP accident rate has declined by an average of 4.1% per year from 2008–2016 (3.5% per year per facility), without the added prevention provisions whereas the RMP accident rate in New Jersey declined by only approximately 1.7% per year (or 2% per year per facility), with the state's IST provision in effect. The downward trend in accident rate nationwide could reflect industry efforts in this area that have been achieved without prescriptive regulatory provisions. In any case, the lack of an apparent additional accident reduction effect of the IST provision at the state level over the pre-Amendments EPA program casts doubt on whether the STAA provision is reasonable because the added costs of the measure are disproportionate to the environmental benefits that are likely to be gained beyond those provided by the

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 51 of 91


pre-Amendments requirements. Therefore, EPA is rescinding the STAA requirement based on the lack of apparent benefits of the provision when applied to existing sources across broad sectors, based on EPA's review of available data, the apparent effectiveness of pre-Amendments accident prevention regulations in reducing accidents over time and a desire to keep the Program 3 accident requirements aligned with the OSHA PSM standard at this time.

Regarding commenter's arguments that STAA is only appropriate for new processes, should not be incorporated into the PHA, and is inappropriate for specialty chemical (*i.e.,* batch toll) manufacturing facilities, while EPA's rescission of the Amendments rule requirement makes these comments moot, we note that we already addressed these comments in the Response to Comments for the Amendments rule,[75] and the Agency continues to disagree with them.

Concerning commenters' discussion of the potential usefulness of STAA in preventing specific incidents, while EPA cited factors in specific accidents as support for regulatory changes in the Amendments, the Reconsideration rule doesn't contradict those points. Rather, the proposed Reconsideration rule noted certain problems with respect to the new requirements that on further consideration, we believe can be addressed through rescission of the Amendments rule requirements while still improving chemical accident prevention and response, and using less costly means (*e.g.,* a compliance-driven approach instead of a broad regulatory requirement). EPA's objective in making regulatory revisions is to make only those changes that are likely to improve accident prevention and response while not imposing unreasonable costs.

EPA agrees that these accidents resulted from the failure by management to implement safety management programs, but the Agency does not agree with the commenter's conclusion that process safety regulations were unsuccessful at preventing them. Rather EPA believes it was the failure of these facilities to fully implement the existing process safety regulations that led to these incidents. Although CSB found that failure to use a more corrosion resistant high-chromium steel was a factor in the Tesoro Anacortes and Chevron Richmond accidents, and cited it as an example of an inherently safer strategy, the mechanical integrity provisions of the RMP regulation already required process equipment to be fabricated from the proper materials of construction and be properly installed, maintained, and replaced to prevent failures and accidental releases (see 40 CFR part 68.3). If a regulated facility fails to properly implement existing regulatory provisions, rather than imposing additional regulatory requirements, the appropriate response is for EPA to undertake regulatory enforcement, and EPA regularly does so under CAA section 112(r).

Regarding refineries' use of hydrogen fluoride, EPA notes that the Amendments rule STAA provision would not have required any facility to implement safer technologies. Thus, while some refineries still use hydrogen fluoride, the STAA requirement would not have required them to eliminate its use. EPA disagrees with commenters assertions that the accident rate is increasing. EPA's analysis of the trend in RMP accidents from 2003 through 2016 indicates that RMP facility accidents have declined in frequency by approximately 3.5% per year.

a. Costs and Benefits of STAA Provision

Many commenters provided input on the subject of STAA's potential costs and benefits. Comments in support of the rescission often emphasized the indirect costs of STAA, while those in opposition often addressed environmental, human health, and other unquantifiable benefits. Several commenters characterized the Amendments rule's STAA provisions as ''open-ended,'' with the potential of causing massive costs without justification. One industry trade association stated that changing extant processes or plants can have unforeseen costs and trigger additional safety evaluations. Another industry trade association, citing a 2010 study, commented that STAA during PHA revalidation is an inefficient, costly use of resources. A tribal government supported the rescission of STAA requirements, stating that they may be both cost-prohibitive and detrimental to the environment. Another added that STAA would cost more than EPA predicted, as it would require hiring and training personnel. An industry trade association stated that EPA recognizes STAA could cause indirect costs up to $1 billion through voluntary company action. Another commenter added that STAA requirements would become a paper formality which would especially harm small operations, because of the costs of compliance. An industry trade organization stated that rescinding the STAA requirement would advance the goals of E.O. 13771, 13777, and 13783. A trade association indicated that the frequency of accidents in New Jersey since enactment of the NJ TCPA IST provision has not declined, and that this indicates that the Amendments rule STAA provision will cause facilities to incur costs without any accident reduction benefits.

Other commenters indicated that the costs of the provision were reasonable and justified. A State elected official acknowledged other comments that argued that the adoption of alternative technologies may result in unforeseen consequences and costs. The official, however, commented that this element of uncertainty should be explored and considered within the context of STAA decision-making. Another State elected official cited EPA's conclusion in the Amendments rule that ''facilities will only incur additional costs beyond the analysis when the benefits of the change make adoption of the change reasonable for the facility.'' (82 FR at 4644).

State elected officials argued that experience of the State of New Jersey shows that IST regulations are effective, that New Jersey found that performing an IST review would not be financially burdensome, and that the cost was further justified by the potential to identify additional risk reduction measures to protect the public and the environment. This commenter argues that even if the number of reportable incidents in New Jersey has not decreased after adoption of the IST rule, IST could still yield benefits by reducing the impact of releases that do occur.

Other comments in favor of STAA argued that it could be economically beneficial in ways other than preventing the direct costs of accidents. A private citizen stated that STAA provisions would have benefits in terms of reducing cancer rates and other human costs. An anonymous commenter added that EPA failed to consider the benefits of STAA in its proposed rescission. An anonymous commenter stated that, from their experience, environmental regulations resulted in plants implementing safer technology on generating units, improving operational efficiency and profitability. A private citizen commented that STAA provisions may result in economic benefits both by improving industry efficiency and by improving the market for safer technology. Several commenters cited a publication stating that a single significant refinery disaster causes an average of $220 million in

[75] RMP Amendments Response to Comments, pgs. 105, 107–109. EPA–HQ–OEM–2015–0725–0729.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 52 of 91


economic harm,[76] and one commenter stated that the Chevron Richmond accident caused $1.7 billion in damage to California's economy.

*EPA Response:* In the RIA for the Amendments rule, EPA acknowledged that considering only the monetized impacts of RMP accidents would mean that the rule's costs may outweigh the portion of avoided impacts from improved prevention and mitigation that were monetized. The STAA provision was estimated to be the costliest provision of the Amendments rule, by itself accounting for more than 50% of estimated compliance costs. Therefore, in order for the rule's costs to be reasonable (not disproportionate to its benefits), this provision must result in substantial benefits. In monetizing the costs of RMP-reportable accidents, EPA suggested that a substantial portion of those accidents would need to be prevented by the Amendments rule provisions in order to be justified on a cost-benefit basis. However, in the Amendments rule, EPA had not attempted examine the effects of existing state (*i.e.,* New Jersey) level IST regulations. For this rulemaking, commenters have submitted data and studies that argue on both sides of this issue with regard to STAA.[77] Some commenters have indicated that the lack of decline in the frequency of accidents in New Jersey since enactment of the NJ TCPA IST provision indicates that there is no evidence that the provision has resulted in any reduction in accidents. EPA agrees that the NJ accident rate trend does not support the effectiveness of its IST provision. EPA notes that RMP facility accident data from RMP facilities in New Jersey, which has required RMP facilities to evaluate inherently safer technology options since 2008, do not show any decline in accidents beyond that occurring in RMP facilities nationwide, suggesting that evaluation of safer technologies has either already occurred without the rule change, or does not result in significant accident reduction. While comparing RMP accident rates from New Jersey facilities to the nationwide rate of RMP facility accidents, EPA found that the nationwide RMP accident rate has been reduced by an average of 4.1% per year from 2008–2016, without the added prevention provisions. Regarding the comment that IST could still yield benefits by reducing the impact of releases that do occur, EPA considered the trend of accident impacts in New Jersey. Since the beginning of 2004, RMP-reportable accidents in New Jersey have resulted in nine injuries, $23,102,000 in property damage, three offsite hospitalizations, and 80 offsite evacuations. Except for one injury, all impacts occurred in 2008 or later, after the NJ TCPA IST provision became effective. EPA can discern no declining trend in accident severity at RMP facilities in New Jersey.

While EPA did state in the Amendments rule that ''facilities will only incur additional costs beyond the analysis when the benefits of the change make adoption of the change reasonable for the facility,'' (82 FR at 4644) and we also stated, ''there is value in requiring facilities with extremely hazardous substances to evaluate whether they can improve risk management of current hazards through potential implementation of ISTs,'' we recognized this value only ''for those facilities who have not considered adopting any IST or have only done so in limited fashion.'' (82 FR at 4645). EPA also notes that facilities would incur costs for doing the analysis whether or not they are able to implement IST or other safer technology alternatives that would yield benefits. As we have reconsidered the Amendments rule, while EPA acknowledges we are not able to quantify how many facilities would implement safer technologies and what the effectiveness of particular measures might be on reducing the number of accidents, the data available from the longest-standing state-level IST regulatory provision suggest that such provisions do not have the significant impact on accident reduction that would be necessary to justify the high costs of these provisions.

Regarding the potential economic benefits of the STAA provision other than accident prevention benefits, most commenters asserted such benefits (*e.g.,* reduced cancer risk) without supplying any supporting data. Some commenters referred to a RAND Corporation study to support a conclusion that EPA had significantly underestimated the costs of accidents, and therefore the potential benefits of the STAA provision. EPA disagrees that the RAND study can be used to predict the costs of accidents at RMP facilities nationwide—see below for EPA's explanation.

b. Increased Vulnerability to Terrorism

Two private citizens reasoned that rescission of STAA provisions would result in more facilities remaining vulnerable to terrorist attack than if STAA were adopted as-is. Advocacy groups and multiple State elected officials pointed to the New Jersey IST requirements as explicitly furthering security and anti-terrorism efforts. A joint submission from multiple advocacy groups and other commenters added that STAA would help prevent terrorism and mitigate any possible attacks.

*EPA Response:* These comments are similar to comments EPA addressed in *section IV.C.2—''Comments on Rescission of Prevention Program Provisions in General.''* In short, while some commenters assert that the STAA provisions will reduce the risk of terrorism, others argued that STAA could increase security risks. EPA received no data to judge the relative significance of different security concerns associated with this provision. The intent of the STAA provision in the RMP Amendments rule was to potentially reduce accidental releases—it was not undertaken to reduce the risk of releases from intentional criminal acts. For example, the STAA provision applied only to facilities in complex manufacturing sectors with high accident rates, and the water treatment sector was not required to complete a STAA. While EPA acknowledges that implementation of some inherently safer technologies could reduce risks of release from criminal acts, EPA does not believe that rescinding the STAA provisions increases security risks beyond those already present. EPA also notes that the regulatory and legal framework outside of CAA section 112(r) (*e.g.,* DHS CFATS regulations) minimizes the risk of criminal and terrorist threats against chemical facilities.

c. Data on Accident Rates Related to State and County Programs With IST or Toxic Use Reduction Requirements

Several commenters provided input discussing STAA-analogous programs in New Jersey and CCC, California. An industry trade association stated it discerned no appreciable difference between the accident rates in New Jersey and those in other states since New Jersey's implementation of the NJ TCPA IST provision. Another industry trade association expressed concern for the reliability of evidence supporting the efficacy of New Jersey and CCC IST regulations. Commenting on the Amendments rule, an industry trade association argued that requiring STAA would be arbitrary and capricious because of the lack of reliable data. The commenter cast doubt especially on evidence on the New Jersey and CCC

[76] Gonzales, D., Gulden, T., Strong, A. and Hoyle, W. 2016. Cost-Benefit Analysis of Proposed California Oil and Gas Refinery Regulations. RR–1421–DIR. RAND Corporation, Santa Monica, CA. *www.rand.org/t/RR1421. EPA-HQ-OEM-2015-0725-0643.*

[77] See Comments EPA–HQ–OEM–2015–0725–(1481), –(0973), –(1870), –(1896), –(1925) and –(1969).

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 53 of 91


schemes. Another industry trade association argued against the adoption of STAA, stating that EPA considered the issue in 1996 and that no new data has emerged to justify a departure from its decision from that time.

An advocacy group examined an industry trade association's comment that accident rates in New Jersey had increased since IST practices were mandated. The advocacy group stated that it was unable to find an empirical study of IST's efficacy in New Jersey. The commenter then analyzed publicly available accident data, stating that companies which refused to implement safer practices accounted for 25% of accidents. The commenter described those accidents and their circumstances. A State government agency commented that, in the first 85 STAA-analogous reports submitted in New Jersey, 45 facilities implemented 205 measures. These included two water treatment facilities using different chemicals. Several State elected officials commented that data on New Jersey accidents may be misleading; the number of accidents may have remained constant, with their severity reduced by IST. A joint submission from multiple advocacy groups and other commenters provided a lengthy exploration of New Jersey's IST regulations and results. It examined data and, citing an EPA statement, commented that data cannot fully capture efficacy of IST.

An advocacy group stated that STAA is an accepted industry best practice and that the CCC ISO has implemented similar requirements without excessive financial burden. A joint submission from multiple advocacy groups and other commenters provided a history of safer alternative regulation in CCC. It cited a reduction in accident number and severity over the last 20 years. The commenters specially addressed an accident at a refinery that made CCC adopt ''greatest extent feasible language.'' The commenters stated that, since that time, none of the most severe classification of accidents occurred and few of any classification took place.

A State government agency cited extensive data on the results of Massachusetts' Toxic Use Reduction Act (TURA) program to argue that STAA provisions could lead to improvements in plant safety, environmental risks, efficiency, and access to international markets. A joint submission from multiple advocacy groups and other commenters provided extensive data on the TURA program, specifically citing that toxic waste generation was 66% below 1987 levels and that businesses reported improved safety, cost savings, and marketing, as a result of the regulation. The commenter included additional data and specific examples.

A State government agency commented that EPA failed to evaluate STAA efficacy against recent accidents. A union cited several of its own studies to assert the safety benefits of STAA. A joint submission from multiple advocacy groups and other commenters asserted that IST regulations resulted in net savings for industry, citing a study by the RAND Corporation which found that a refinery saves, on average, $220 million, in quantifiable terms alone, for an accident avoidance, and that a single accident at a California refinery caused $1.7 billion in damage to California's economy.

*EPA Response:* EPA reviewed information submitted by commenters relating to IST regulatory provisions in New Jersey and CCC, California, and the information relating to the Massachusetts TURA program. Regarding the New Jersey TCPA IST provision, EPA discussed some comments concerning New Jersey's program earlier in this section. EPA found no evidence that the provision has resulted in a reduction in either accident frequency or severity at RMP-regulated facilities subject to the provision. Using the accident data provided by EPA in the rulemaking docket, EPA calculated the average accident rate for RMP facilities in New Jersey, plotted the accident data for New Jersey RMP facilities from 2008 through 2016, calculated the accident trend using a linear regression analysis, and compared these results to the same measures for the national set of RMP facilities.[78] The results show that New Jersey RMP facilities were more likely to have RMP-reportable accidents than RMP facilities nationally over the period studied. Also, while the rate of RMP facility accidents in New Jersey has declined since adoption of the TCPA IST provision, that decline is less than half as large as the decline in accidents for RMP facilities nationally over the same period. New Jersey exhibited a 1.7% annual decline in accident frequency, whereas nationally, RMP facilities experienced a 4.1% decline in accident frequency over the same period. Some commenters suggested that the lack of a significant decline in accident frequency in New Jersey could be due to a change in the number of RMP facilities. However, this is not the case. When the accident frequency is normalized by the number of RMP facilities present in each year, the results are similar: The normalized accident rate in New Jersey declined by approximately 2% per year, whereas the normalized accident rate at RMP facilities nationwide declined by 3.3% per year. Regarding accident severity, as indicated previously, EPA examined the impacts of RMP-reportable accidents in New Jersey over the same period and can discern no declining trend in accident severity in New Jersey.

EPA also disagrees that the CCC ISO provides strong evidence that IST regulations result in marked decreases in accident rates. While the accident trend in CCC is downward since implementation of the ISO, there are several reasons to be cautious in interpreting and extrapolating the results observed under the CCC ISO to the nationwide universe of RMP facilities. The CCC IST provision was adopted in 1998 and is applicable to a total of six RMP facilities. The City of Richmond, California, adopted a similar safety ordinance in 2002, which is applicable to two additional RMP facilities. Contra Costa Hazardous Materials Programs, a division of Contra Costa Health Services, the county health department, oversees both programs. Therefore, the CCC and Richmond programs combined apply to a total of only eight RMP facilities.

In addition to the very small number of facilities from which to draw such conclusions, EPA notes that the CCC ordinance contained other regulatory provisions. Most of these provisions are not features of either the Amendments rule or the NJ TCPA and their effects are impossible to disaggregate from the inherently safer systems analysis (ISSA) provision of the ISO. For example, in addition to requiring ISSA, the CCC and Richmond programs require submission of a Safety Plan, implementation of a human factors program, implementation of expanded management of change provisions (to include management of organizational change), root cause analysis investigations for major chemical accidents, safety culture assessments, process safety performance indicators, safeguard protection analyses, and other requirements. Another important difference between the CCC ISO ISSA provisions and both the NJ IST provision and the Amendments rule STAA provision is that since 2014, the CCC ISO provision has required facilities to implement inherently safer systems ''to the greatest extent feasible and as soon as

[78] EPA. July 18, 2019, Technical Background Document for Final RMP Reconsideration Rule Risk Management Programs Under the Clean Air Act, Section 112(r)(7). Available in the rulemaking docket.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 54 of 91


administratively practicable.'' [79] Neither the NJ IST nor Amendments rule STAA provisions require implementation of IST/STAA measures.

The CCC ISO program is also unique among U.S. chemical safety regulatory programs in another important respect. CCC employs several full-time engineers to oversee implementation of the ISO at the six regulated facilities in the County and the two facilities in Richmond. According to reporting by CCC, these engineers have spent thousands of hours conducting such oversight each year. In its 2017 Annual Report, CCC reported that from 2000 to 2015, it completed five audits/inspections at each facility subject to the CCC ISO and had initiated a sixth round of audit/inspections. CCC also reported that it performed seven facility audits from the Fall of 2014 through 2016, and that each audit required ''four to five engineers four weeks to perform the on-site portion of an ISO/CalARP Program audit. The audit process encompasses off-site time that includes a quality assurance process, working with the facility to address any questions, posting public notices, attending a public forum to share audit findings, addressing any questions from the public and issuing the final report. The total time taken to perform these audits each year was 3,600 hours. Approximately one-third of the time was dedicated to the Industrial Safety Ordinance, for a total of 1,200 hours.'' [80]

As far as the Agency is aware, this level of regulated chemical facility oversight is unmatched by any other jurisdiction in the United States. It approaches the very high levels of government oversight provided by the Nuclear Regulatory Commission's resident inspector program,[81] and the Department of Energy's facility representative program,[82] both of which involve full time inspectors devoted to providing continuous oversight at a small number of, or even a single, hazardous facility. The experience of these programs demonstrates that such levels of government oversight, in conjunction with a rigorous safety management program, can prevent serious accidents. But this level of oversight is very expensive, and not feasible at facilities regulated by the RMP rule on a national basis. Such extensive staffing commitments also greatly exceed the per facility level of staffing for the operating permits program under CAA title V, and, in contrast to CAA 112(r), the operating permits program has a specific funding mechanism authorized and required by CAA 502(b)(3).

Whether it is due to the differing regulatory requirements, different levels of government oversight at regulated facilities or the small number of regulated facilities subject to the CCC/Richmond ISO provisions, the contrast between the accident trends at RMP facilities in New Jersey and CCC suggest that the reduction in accident frequency in CCC may be due to some factor other than the portion of the ISSA provision in the Industrial Safety Ordinance that is analogous to the Amendments rule's STAA provision. The NJ TCPA regulates approximately ten times the number of RMP facilities that are regulated under the CCC ISO. Further, the NJ regulations do not require implementation of alternatives considered, contain the other regulatory provisions or involve as high a level of oversight as are present in the CCC ISO program. Therefore, from the standpoint of comparing the two programs to the STAA provision of the Amendments rule, The New Jersey program serves as a more valid experiment to predict the results of the STAA provision of the Amendments rule (note, however, that the NJ TCPA IST provision is still more rigorous than the Amendments rule in that it requires facilities to submit the IST review to the State, whereas the Amendments rule's STAA provision contains no such requirement). The results in New Jersey suggest that such provisions, by themselves, do not have the significant effect on accident rates that proponents predict. Rather, the accident data from RMP facilities in New Jersey indicate little or no discernible reduction in accident frequency or severity associated with the NJ IST requirement to date. Therefore, whatever beneficial effects such provisions may have, they seem unlikely to result in anything close to the reduction in accident frequency or severity that would be required to find the benefits of STAA in terms of accident prevention and mitigation are not disproportionate to the burdens associated with the provision.

Regarding the Massachusetts TURA program, EPA found no evidence that this program has resulted in a reduction in the frequency of RMP facility accidents in Massachusetts and disagrees that other results of the program (*e.g.,* less use of toxic chemicals) can be extrapolated to predict the results of the STAA provision of the Amendments rule. The Massachusetts TURA program is not directly analogous to the Amendments rule because it is explicitly a toxic chemical use reduction program, rather than a program for preventing accidental air releases of RMP-regulated substances. Under the TURA program, large quantity toxic substance users must develop a toxic use reduction plan that examines opportunities to reduce toxic chemical use by adopting safer processes or inputs, update the plan bi-annually, and submit both an annual toxic use report and a summary of the bi-annual toxic use reduction plan to the Massachusetts Department of Environmental Protection.[83] The STAA provision of the Amendments rule required facilities covered by the provision to consider, as part of their process hazard analysis, safer technology and alternative risk management measures applicable to eliminating or reducing risk from process hazards, and to determine the practicability of the inherently safer technologies and designs considered. While one option for inherently safer risk management measures under the Amendments rule was to minimize the use of regulated substances,[84] the Amendments rule did not explicitly require facilities to plan to minimize the use of regulated substances or to submit reports to EPA about reductions in their use of regulated substances.

Although the Massachusetts TURA program is not aimed specifically at RMP-regulated facilities, because its list of covered chemicals [85] includes some common industrial chemicals that are also on the RMP-regulated substance list (*e.g.,* ammonia, chlorine), some RMP facilities in Massachusetts are covered under both regulatory programs. EPA therefore examined the frequency and trend in accidents at RMP facilities in Massachusetts over the period covered by the accident record used for the Amendments and Reconsideration rules (2004–2016). The TURA program [86] started in 1989, so presumably any downward pressure on accident frequency at RMP facilities due to the TURA program would be observable in the accident record for RMP facilities in Massachusetts. However, on a per-

[79] CCC Industrial Safety Ordinance, Chapter 450–8—RISK MANAGEMENT, paragraph (i)(3), available at: *https://cchealth.org/hazmat/pdf/iso/Chapter-450-8-RISK-MANAGEMENT.pdf.* EPA–HQ–OEM–2015–0725–0638.

[80] CCC Industrial Safety Ordinance RISO Report, Annual Performance Review and Evaluation, 2017, pp 10, 18–20. Available in the Docket EPA–HQ–OEM–2015–0725.

[81] *https://www.nrc.gov/docs/ML1819/ML18197A116.pdf*

[82] *https://www.standards.doe.gov/standards-documents/1000/1063-astd-2017*

[83] *See: https://www.mass.gov/guides/massdep-toxics-use-reduction-program#-company-requirements-.* Available in the rulemaking docket.

[84] *See* 82 FR 4629, January 13, 2017.

[85] *See https://www.mass.gov/files/documents/2018/06/13/chemlist.xls.*

[86] *https://www.mass.gov/guides/massdep-toxics-use-reduction-program.*

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 55 of 91


facility basis, Massachusetts RMP facilities were more likely to have had an RMP-reportable accident than RMP facilities nationally. EPA found little difference between the accident trend at RMP facilities in Massachusetts and nationally during the 2004–2016 period.[87]

It is reasonable to expect a difference in the trends for TURA's overall effectiveness in waste reduction and other efficiencies versus its effectiveness as an accident reduction program for RMP-listed substances. The chemicals listed under the RMP program are among the most dangerous in terms of acute impacts upon accidental release. Therefore, users are likely to carefully manage these chemicals for their own safety as well as for PSM and RMP compliance. In contrast, TURA is much less focused on such chemicals. Therefore, it is likely that facilities were less aggressively minimizing release of TURA chemicals in general in the absence of TURA than they were in managing RMP-listed substances. There likely would be more opportunities for reductions in releases of non-RMP-regulated TURA chemicals, including chemical substitution, than there would be for RMP substances at the same facilities.

While EPA agrees that reduction in the use of toxic chemicals is a laudable goal and minimizing the use of regulated substances remains an option for the owner or operator of any RMP facility to consider, analysis of state-level RMP accident data from Massachusetts does not appear to support the proposition that such regulatory provisions will result in significant accident reduction at RMP facilities. Also, the Pollution Prevention Act of 1990 already establishes a method for evaluating chemical use reduction at facilities. The Agency does not want to replicate these programs under CAA section 112(r).

Regarding commenters' claims that a study conducted by the RAND Corporation[88] proves that EPA's estimate of the benefits of accident prevention is too low, EPA disagrees with these comments. The RAND study is not suitable for nationwide extrapolation for several reasons. First, virtually all the monetized accident prevention benefits claimed in the RAND study are associated with avoiding higher gasoline prices in California following refinery accidents, such as the 2015 accident at ExxonMobil's Torrance, CA refinery and the 2012 accident at Chevron's Richmond refinery. Regarding the ExxonMobil accident, the RAND study estimated that this accident cost California consumers more than $2.4 billion in higher gasoline prices.

A consequence of California's unique gasoline rules is that gasoline sold in the state is also produced within the state. According to RAND, ''California requires a unique reformulated gasoline blend to meet the state's pollution-control requirements. Gasoline made in other states to meet other state and federal pollution-control requirements does not meet California standards. Consequently, all gasoline consumed in California is typically made in the state.'' This greatly increases the impact of a California refinery accident on California gasoline prices because of the inability to substitute to out-of-state gasoline supplies, as gasoline produced out-of-state does not meet California regulatory requirements. According to RAND, ExxonMobil was forced to import special blends of gasoline from other countries to meet demand in California following the accident. In fact, the RAND analysis itself shows that the gasoline price effects seen in California following the ExxonMobil accident did not extend to areas outside California.

The RAND study used the IMPLAN input-output model[89] to estimate the price effects of California refinery accidents. IMPLAN utilized several simplifying assumptions that are unsuitable for national-scale analysis. While input-output models such as IMPLAN will readily yield impact estimates, their underlying structure rests on strong assumptions that preclude key economic responses that would be expected in the case of national level regulation. Input-output models do not allow prices, production processes, or technologies to adjust in response to a regulatory change. Instead, at best they represent the short-term regional response to regulation better than an intermediate or longer-term national response. This does not align well with the objective of understanding responses to federal regulation. A major limitation of using input-output models for policy simulations occurs when the policy under consideration must be translated into changes in final demand. The models assume that input supplies are unlimited, and prices are fixed, suggesting that they are better at representing the response of a single region to a small regulatory change not expected to affect prices. Input-output models are of limited use for analyzing large regulatory changes or the national economy. EPA guidance on economic impact analysis cautions against using such models for specific quantitative estimates.[90] The RAND study acknowledges some of the drawbacks of using IMPLAN, including that ''it tends to capture maximum effects.'' The study also clearly states that IMPLAN is a tool used to capture ''the *regional* macroeconomic impacts of policy decisions.'' (Emphasis added.) EPA has additional concerns with the RAND study that are explained in the Response to Comments document.

In sum, retaining the STAA provision and other new prevention provisions of the Amendments rule will not result in the magnitude of savings estimated in the RAND study. The unique nature of the California gasoline market (discussed above) does not exist elsewhere in the United States. Under California law, refineries already are required to implement regulatory requirements exceeding Amendments rule provisions, so additional benefits of the Amendments rule provisions would not be expected to occur as a result of the rule's implementation at refineries in California. (See prior discussion of CalARP refinery safety regulations in *section IV.C*)

d. Claims That STAA is Required by CAA

A joint submission from multiple advocacy groups and other commenters stated that EPA is statutorily required to use STAA or an alternative because of the Agency's prior determination that such requirements are necessary to ''ensure continued public safety concerning the operation of chemical facilities in and near communities''[91] and to satisfy requirements in § 7412(r)(7)(B).

*EPA Response:* EPA disagrees with the commenter's assertion that EPA is statutorily required to use STAA or an alternative because of the Agency's prior statements determining that such requirements are necessary to ensure continued public safety. In the Amendments rule, EPA adopted a requirement for safer technology and alternatives analysis for selected industry sectors subject to Program 3

[87] EPA. July 18, 2019. Technical Background Document for Final RMP Reconsideration Rule Risk Management Programs Under the Clean Air Act, Section 112(r)(7). Available in the rulemaking docket.

[88] Gonzales, D., Gulden, T., Strong, A. and Hoyle, W. 2016. Cost-Benefit Analysis of Proposed California Oil and Gas Refinery Regulations. RR–1421–DIR. RAND Corporation, Santa Monica, CA. *www.rand.org/t/RR1421.* EPA–HQ–OEM–2015–0725–0643.

[89] See RAND study, pp. 24–26.

[90] EPA. Handbook on the Benefits, Costs, and Impacts of Land Cleanup and Reuse, EPA–240–R–11–001, October 2011, p. 81.

[91] Amendments rule Response to Comments, pp. 219, 247. EPA–HQ–OEM–2015–0725–0729

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 56 of 91


requirements. Now EPA is rescinding the STAA provision after reconsideration based on the lack of apparent benefits of the provision when applied to existing sources across broad sectors, based on our review of available data, the effectiveness of pre-Amendments accident prevention regulations in reducing accidents over time and a desire to keep the Program 3 accident requirements aligned with the OSHA PSM standard to better fulfill the EPA's coordination requirements pursuant to CAA 112(r)(7)(D). Under 42 U.S.C. 7412(r)(7)(B), the accident prevention provisions have an overriding requirement to be reasonable. ''Reasonable regulation ordinarily requires paying attention to the advantages *and* disadvantages of agency decisions.'' *Michigan* v. *EPA,* 135 S. Ct. at 2707 (original emphasis). The legislative history of the CAA 112(r) accident prevention program indicates that EPA was to ensure the regulations would not be ''unduly burdensome'' (See section III.B—*Discussions of Comments on EPA's Substantive Authority under CAA Section 112(r)*). Our accident rate analysis shows that costs associated with the STAA provision (nearly $70 million annualized) are disproportionate to the accident prevention and mitigation benefit shown in the state-level data (a benefit that we cannot discern from the available data). Therefore, we believe that EPA can consider cost issues and other burdens of compliance among the factors considered in deciding what is a reasonable regulation to prevent accidents.

e. Claims That Rescission of STAA Provision is Arbitrary and Capricious

A joint submission from multiple advocacy groups and other commenters claimed that EPA's decision to rescind STAA is arbitrary and capricious. Citing EPA's proposed Reconsideration rule language about the indirect costs of STAA (83 FR at 24872, May 30, 2018—stating that such costs could be incurred if facilities take actions based on external pressures to implement STAA recommendations regardless of whether they are necessary or practical), the commenter argued that EPA is proposing to rescind the STAA provision based on speculation that third-parties may pressure plants to adopt alternative technologies even when adoption is unfeasible or otherwise unwarranted. The commenter stated no evidence was available to corroborate this consideration and asserted that EPA only discussed these indirect costs at the prompting of OMB.

*EPA Response:* EPA disagrees that rescinding the requirement is arbitrary or capricious. The Agency is not rescinding the STAA provision because third-parties may pressure plants to adopt alternative technologies even when adoption is unfeasible or otherwise unwarranted. The commenter may have drawn this inaccurate conclusion by mistakenly assuming that EPA believes the costs of the STAA provision as described in the Amendments rule included indirect costs of implementing safer technologies and alternatives. However, while EPA discussed such indirect costs in the Amendments rule, EPA was clear that the STAA provision did not mandate adoption of any technology, and the only cost that could be directly attributed to the requirement were the cost of the assessment itself. The cost of the assessment included the $70 million annualized cost for performing an STAA and did not include any costs of implementation of any safer technology alternatives or IST.

EPA is rescinding the STAA provision after reconsideration based on the lack of apparent benefits of the provision when applied to existing sources across broad sectors, based on our review of available data, as compared to its cost for compliance (*i.e.,* performing an STAA, but not implementing any IST), the effectiveness of pre-Amendment accident prevention regulations in reducing accidents over time and a desire to keep the Program 3 accident requirements aligned with the OSHA PSM standard. EPA does not have a record showing significant benefits of the added prevention program provisions. Without such benefits, EPA believes it is better to take its traditional approach of maintaining consistency with OSHA PSM. The creation of additional complexity and burden associated with new provisions where EPA has not demonstrated any benefit is evidence of their impracticability and unreasonableness.

6. Comments on Other Prevention Program Provisions

a. Remove ''For Each Covered Process'' Language From Compliance Audit Provisions

Multiple commenters supported EPA's proposal to remove the language ''for each covered process'' from the compliance audit provisions of § 68.58(a) and § 68.79(a), stating that reviewing each covered process is inefficient and inconsistent with industry auditing practice. An industry trade association commented that when using a sampling approach, the identification and corrections of concerns in one process unit will address those concerns in all other covered process units; therefore, an audit of each covered process would be a waste of resources and create operational disruptions. A similar comment was made by another industry association who recommended EPA adopt a regulation allowing for representative sampling of covered processes for compliance audits.

An industry trade association also expressed support for EPA's proposal, stating that the requirement was a procedurally defective amendment that was made without an opportunity for the regulated community to comment on EPA's departure from auditing practice based on statistically significant representative sampling. Similarly, an industry association stated that EPA failed to conduct a proper cost-benefit analysis in the Amendments rulemaking when choosing to require audits of all covered processes rather than allow for representative sampling which is contrary to long-standing accepted auditing practice. The commenter stated that maintaining the provision would result in significant cost burdens on the regulated community. Several industry trade associations also commented that EPA, in the Amendments rule, did not justify how the provision would increase facility safety.

In contrast, other commenters disagreed with removing the language. A private citizen indicated that it is necessary to audit every covered process. Similarly, a State government agency stated that even though EPA is proposing to delete the phrase ''for each covered process,'' all covered processes still must be evaluated in the compliance audit as the phrase in question is merely a clarification.

*EPA Response:* The final rule removes the phrase ''for each covered process'' from the compliance audit requirements because it was not necessary to add the phrase and removing it will maintain consistency with the OSHA PSM standard.[92] For those facilities with more than one covered process, EPA's view that compliance audits must evaluate every process every three years does not foreclose the use of ''representative sampling'' during audits.[93] At complex facilities with multiple processes, audits do not typically involve reviewing 100 percent

[92] EPA. Response to Comments on the 2016 Proposed Rule Amending EPA's Risk Management Program Regulations, December 19, 2016, pp. 54–55. Docket ID: EPA–HQ–OEM–2015–0725–0729.

[93] Representative sampling would not apply to the majority of regulated facilities because most have only one covered process.

of records relating to a topic—rather, an auditor should review a sample of records sufficient to draw valid conclusions about a source's compliance with a particular regulatory provision. At such facilities, to audit each process, an auditor may review a process directly, or may gain confidence in the compliance of the process through representative review of compliance of other processes at the source. CCPS ''Guidelines for Auditing Process Safety Management Systems, Second Edition'' (Wiley, 2011), provides two methods for representative sampling that are designed to ensure a compliance audit at a medium to large multi-process facility represents all covered processes at the facility without sampling records or personnel for every prevention program provision at every covered process. The two methods offered by CCPS are to either (1) Audit some elements of the prevention program in all covered processes and units (CCPS provides an example indicating that different subsets of prevention elements are selected for different units, such that every element is ultimately audited under this approach), or (2) Audit all elements of the prevention program in some of the processes and units.

The Agency agrees that either of these approaches can produce an audit reflecting regulatory compliance for each RMP prevention program element at each covered process. However, where an owner or operator chooses to perform such a representative sampling approach, under either method (or a combination of both methods) they must demonstrate that the information audited is truly reflective of regulatory compliance for each process at the source. If the owner or operator can demonstrate that an audit of an accident prevention provision at one or more processes is representative of the owner's compliance with the prevention provision at other processes at the source, then a source may use the review of that aspect in one process to address and evaluate other processes, so long as all prevention requirements are evaluated and addressed for all processes at the source either directly or by such representative testing every three years. All covered processes and units must be in the pool from which the representative sample is selected, and any findings of the audit must be addressed, and deficiencies corrected at all units. If a facility implements representative sampling to satisfy compliance audit requirements for multiple processes, the Agency will evaluate whether non-compliance with an RMP prevention program element is also evidence of inadequate compliance audit procedures.

b. Rescind Requirement To Include Findings From Incident Investigations in Hazard Reviews

Several commenters expressed support for the proposal to rescind the requirement to include findings from incident investigations in hazard reviews for Program 2 sources. A trade association stated that the requirement to include this information in a hazard review is essentially a requirement to repackage this information, placing burdens on facilities already expending resources on implementing findings from the incident investigation, while providing no new benefit, arguing that it places an even heavier burden on small businesses, which make up a greater percentage of processes subject to Program 2 requirements. A few commenters expressed opposition to the proposal to rescind the requirement. Multiple State elected officials commented that eliminating the requirement for hazard reviews to identify findings from incident investigations that show vulnerabilities that could cause accidental releases, would weaken hazard reviews that evaluate the dangers associated with the regulated substances, processes and procedures at a facility.

*EPA Response:* Although not rescinding this change in the Program 2 prevention program requirements would not conflict with the OSHA PSM standard, which is equivalent to RMP Program 3, EPA is rescinding the provision to keep Program 2 requirements less burdensome than Program 3, maintaining the pre-Amendments balance of burdens on smaller entities. This is in keeping with the design for less rigorous requirements and recordkeeping for Program 2 facilities. Pre-Amendments § 68.50 (a)(2) hazard review required that the review identify opportunities for equipment malfunction and human errors that could cause an accidental release. The Amendments rule added the requirement to include findings from incident investigations in the hazard review. EPA expects that Program 2 facilities are already using incident investigations to identify situations that could cause an accidental release. Under the pre-Amendments incident investigation requirements, Program 2 facilities are required to promptly address and resolve investigation findings and recommendations, with resolutions and corrective actions documented.

c. Rescind Employee Training Requirements for Supervisors Responsible for Process Operations

A few industry trade associations expressed support for EPA's proposed rescission of the requirement to include supervisors responsible for process operations under the training requirements. One commenter stated that the rescission eliminates any ambiguity regarding the number and types of employees who must receive training. The commenter stated that without clear guidance regarding the scope of the employees covered by the provision, the provision would be difficult for owner/operators to implement with certainty. Additionally, an industry trade association stated that in the proposed Reconsideration rule, EPA mischaracterized the change in the training requirements as a minor wording change. The commenter stated that the term supervisor is vague and potentially overly broad. The commenter also stated that the Amendments rule was a departure from the prior regulations and could create ambiguity regarding who EPA intends to be trained. A trade industry association stated that the provision is in conflict with the OSHA PSM standard and increases costs for facility training. Similarly, another industry trade association stated that EPA's use of the phrase, ''involved in operating a process'' appears to be inconsistent with OSHA's interpretation of the PSM standard. The commenter stated that EPA intends the phrase to include process engineers and maintenance technicians, but that OSHA took the opposite stance and included within the class of employees involved in operating a process only ''direct hire employees not involved in maintenance.'' (February 24, 1991, 57 FR 6356). In addition, the commenter indicated that requiring the same level of training for supervisors as required for operators is not practical or consistent with the approach prior to 2017 under EPA's regulations or OSHA's regulations.

A few commenters expressed opposition to EPA's proposal and provided various reasons why EPA should retain the provision. For example, a State government agency stated that the proposed rescission would decrease safety training. A labor union opposed the rescission of the provision, stating that ''training is as important for supervisors, maintenance technicians, and control room operators as it is for the pilots of commercial airliners.'' The commenter stated that implementing the training requirements

would improve facility safety. Additionally, an advocacy group expressed opposition to EPA's proposal to rescind the provision, indicating that employees must meet competency criteria before operating covered processes.

*EPA Response:* The final rule rescinds the language added to the Program 2 (§ 68.54) and Program 3 (§ 68.71) training requirements which more explicitly included supervisors and others involved in operating a process. However, as EPA noted in the proposed Amendments rule, EPA has traditionally interpreted the training provisions of §§ 68.54 and 68.71 to apply to any worker that is involved in operating a process, including supervisors. This is consistent with the OSHA definition of employee set forth at 29 CFR 1910.2(d) (see 81 FR 13686, Monday, March 14, 2016). Although EPA did not view the added language as being inconsistent with OSHA PSM, we are rescinding the added language to maintain wording consistent with the OSHA PSM training requirements in 29 CFR 1910.119(g) and not create additional ambiguity or confusion about the type of employees who must receive training.

d. Rescind Requirement To Keep Process Safety Information Up-to-Date

An industry trade association supported EPA's proposal to rescind the requirement to keep process safety information (PSI) up-to-date. The commenter stated that the provision is likely to result in significant costs that EPA has failed to justify as PSI documentation for a single RMP-covered facility can easily consist of thousands of pages of complex information. In contrast, two commenters opposed EPA's proposal to rescind the provision. An advocacy group and Multiple State elected officials stated that out-of-date PSI could lead to dangerous system errors, and recommended EPA maintain the provision.

*EPA Response:* The language explicitly requiring that process safety information for Program 3 processes be kept up-to-date has been rescinded in the final rule because it is unnecessary. The language which is being rescinded in the final rule would only have affected Program 3 processes. However, for Program 3 processes, the management of change requirements of § 68.75 already addressed changes that affect covered processes, and § 68.75(d) already required process safety information to be updated when changes covered by the management of change provisions result in a change in the process safety information. The safety information requirements of § 68.48 for Program 2 processes already required the owner or operator to compile and maintain up-to-date safety information, and to update safety information if a major change occurs.

e. Rescind Requirement To Address Incident Investigation Findings and Any Other Potential Failure Scenarios in the PHA

Several commenters expressed support for the proposal to rescind the requirement to address incident investigation findings and any other potential failure scenarios in the PHA (Program 3). Two industry trade associations stated that facilities believe that requiring incident investigation findings to be addressed during the PHA process is a duplication of time and effort, increasing the cost of conducting a PHA without any corresponding safety benefit. Additionally, an industry trade association expressed support for EPA's proposed rescission, reasoning that it would avoid inconsistency with the PSM standard. The commenter stated that instead of being a complimentary policy, the RMP provision creates unnecessary paperwork burdens on facilities. Another commenter indicated that as written, the findings to be reviewed would include findings from all incident investigations for the entire history of the facility, and that the phrase ''as well as any other potential failure scenarios'' is inherently vague and ambiguous. A few commenters expressed opposition to the proposal to rescind the requirement. Multiple State elected officials commented that eliminating the requirement that PHAs address the findings from all incident investigations, as well as any other potential failure scenarios, would weaken hazard reviews that evaluate the dangers associated with the regulated substances, processes and procedures at a facility.

*EPA Response:* The final rule rescinds the requirement to address incident investigation findings and any other potential failure scenarios in the PHA. While EPA disagrees that the provision was inherently vague, EPA is rescinding the provision so that the Program 3 PHA requirements remain consistent with the OSHA PSM standard, and to prevent unduly burdensome or duplicative requirements. EPA does not have a record showing significant benefits of the added prevention program provisions. Without such benefits, EPA believes it is better to take its traditional approach of maintaining consistency with OSHA PSM. The creation of additional complexity and burden associated with new provisions where EPA has not demonstrated any benefit is evidence of the new prevention provisions' impracticability and that the rule divergence is unreasonable. We also note that this requirement is unnecessary because under section 68.67(c)(2) the PHA must already identify ''any previous incident which had a likely potential for catastrophic consequences'' and paragraph (c)(4) requires the PHA to consider the ''Consequences of failure of engineering and administrative controls.'' Therefore, a properly-conducted PHA should already consider the findings from previous incident investigations, and the rescinded language built in a difference with PSM without adding anything to the protectiveness of the RMP rule. The requirement will revert back to the pre-Amendments rule language that required the PHA to address any previous incident which had a likely potential for catastrophic consequences.

f. Rescind Requirement To Report Incident Investigation and Accident History Information in the RMP Prior To De-Registration

An industry trade association commented that they supported the proposed rescission of the requirement for reporting incident investigation and accident information in the RMP prior to de-registration and argued that there would be no safety benefit added by performing requirements prior to deregistration. An industry trade association argued that EPA did not provide quantifiable improvements that could result due to implementation of incident investigation requirements prior to de-registration.

*EPA Response:* EPA is finalizing the rescission of the Amendments rule requirement to report incident investigation and accident history information prior to de-registering, as this provision would impose additional regulatory requirements (*i.e.,* beyond the requirement to de-register) on sources that are no longer subject to the rule.

## V. Rescinded and Modified Information Availability Amendments

### A. Summary of Proposed Rulemaking

In the RMP Amendments rule, EPA added several new provisions to § 68.210—Availability of information to the public. These included:

(1) A requirement for the owner or operator to provide, upon request by any member of the public, specified chemical hazard information for all regulated processes, as applicable, including:

- Names of regulated substances held in a process,
- SDSs for all regulated substances located at the facility,
- Accident history information required to be reported under § 68.42,
- Emergency response program information, including whether or not the source responds to releases of regulated substances, name and phone number of local emergency response organizations, and procedures for informing the public and local emergency response agencies about accidental releases,
- A list of scheduled exercises required under § 68.96 (*i.e.,* new emergency exercise provisions of the RMP Amendments rule), and; Local Emergency Planning Committees (LEPC) contact information;

(2) A requirement for the owner or operator to provide ongoing notification on a company website, social media platforms, or through other publicly accessible means that the above information is available to the public upon request, along with the information elements that may be requested and instructions for how to request the information, as well as information on where members of the public may access information on community preparedness, including shelter-in-place and evacuation procedures;

(3) A requirement for the owner or operator to provide the requested chemical hazard information within 45 days of receiving a request from any member of the public, and;

(4) A requirement to hold a public meeting to provide accident information required under § 68.42 as well as other relevant chemical hazard information, no later than 90 days after any accident subject to reporting under § 68.42.

Additionally, the RMP Amendments rule added provisions to § 68.210 to address classified information and confidential business information (CBI) claims for information required to be provided to the public and made a minor change to the existing paragraph (a) RMP availability, to add a reference to 40 CFR part 1400 for controlling public access to RMPs.

For security reasons, EPA proposed to rescind the requirements for providing to the public upon request, chemical hazard information and access to community emergency preparedness information in § 68.210(b) through (d), as well as rescind the requirement to provide other chemical hazard information at public meetings required under § 68.210(e). Alternatively, EPA proposed to rescind all of the information elements in § 68.210(b) through (d), as well as rescind the requirement to provide other chemical hazard information at public meetings required under § 68.210(e), except for the requirement in § 68.210(b)(5) for the owner or operator to provide a list of scheduled exercises required under § 68.96. EPA proposed to retain the requirement in § 68.210(e) for the owner/operator of a stationary source to hold a public meeting to provide accident information required under § 68.42 no later than 90 days after any accident subject to reporting under § 68.42 but proposed to clarify that the information to be provided is the data listed in § 68.42(b). This data would be provided for only the most recent accident, and not for previous accidents covered by the 5-year accident history requirement of § 68.42(a). EPA proposed to retain the change to paragraph (a) ''RMP availability'' which added availability under 40 CFR part 1400 (which addresses restrictions on disclosing RMP offsite consequence analysis under CSISSFRRA).[94] The provisions for classified information in § 68.210(f) were also proposed to be retained but were separately proposed to be incorporated into the emergency response coordination section of the rule.

EPA proposed to delete the provision for CBI in § 68.210(g), because the only remaining provision for public information availability in this section (other than the provision for RMP availability) would have been the requirement to provide at a public meeting, the information required in the source's five-year accident history, which § 68.151(b)(3) prohibits the owner or operator from claiming as CBI. EPA proposed to rescind the requirements in § 68.160(b)(21) to report in the risk management plan, the method of communication and location of the notification that hazard information is available to the public, pursuant to § 68.210(c).

*B. Summary of Final Rule*

After review and consideration of public comments, EPA is finalizing the information availability related changes, as proposed (including rescinding the requirement for the owner or operator to provide a list of scheduled exercises required under § 68.96), but is modifying the public meeting requirement. The final rule modifies the requirement in § 68.210(e) for the owner/operator of a stationary source to hold a public meeting to provide accident information required under § 68.42(b) by limiting the trigger for the requirement to the occurrence of an RMP reportable accident with offsite impacts specified in § 68.42(a) (*i.e.,* known offsite deaths, injuries, evacuations, sheltering in place, property damage, or environmental damage). This is a modification to the RMP Amendments rule that required a public meeting after any accident subject to reporting under § 68.42, including accidents that resulted in on site impacts only. This action rescinds requirements to report in the risk management plan, the method of communication and the location of the notification that chemical hazard information is available to the public, pursuant to § 68.210(c). The final rule retains reporting in the RMP, as required by § 68.160(b)(21), whether a public meeting was held following an RMP accident, pursuant to § 68.210(b). Reporting of a public meeting under § 68.160(b)(22) [now redesignated as § 68.160(b)(21)], is also added to the list of RMP registration information in § 68.151(b)(1) that are excluded from being claimed as CBI.

*C. Discussion of Comments and Basis for Final Rule Provisions*

1. Overview of Basis for Final Rule Provisions

As noted above, the primary basis for our decisions on rescinding or modifying provisions adopted in 2017 regarding information availability is our view that the 2017 provisions underweighted security concerns in balancing the positive effects of information availability on accident prevention and the negative effects on public safety from the utility to terrorists and criminals of the newly available information and dissemination methods. One important factor not discussed or assessed in 2017 when balancing these concerns was the utility for terrorists and criminals of consolidating information that may otherwise be available publicly and allowing for anonymous access. We rely on the findings of DOJ in its report required by CSISSFRRA, which found that assembling the otherwise-public data is valuable in targeting sources for criminal acts. The report notes that the list of factors US Special Operations Command (US SOC) held to be useful in targeting vulnerable assets includes response information, information on which chemicals are present at a facility, knowledge that there were offsite consequences to a chemical release, and other factors. While most of the categories of information specified by US SOC are outside the OCA information restricted by CSISSFRRA,

[94] EPA–HQ–OEM–2015–0725–0135.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 60 of 91


the 2017 provisions would make such information newly and anonymously accessible via the web and other means. This anonymous access to consolidated information already available, and new mandated disclosures, undermines the practicability of the changes made in the 2017 rule.

Except for the requirement to hold a public meeting after an accidental release having offsite impacts, we have decided to return to the public information availability provisions that struck a balance between right-to-know and security. This balance allows for access and legitimate use of RMP data through multiple means of access. For members of the public, such means include viewing RMPs at Federal government reading rooms, obtaining RMP information from state or local government officials who have obtained RMP data access, or submitting a request to EPA under the FOIA (for non-OCA RMP information). Owners and operator of regulated facilities may also disclose RMP information for their own facilities if they so choose. State and local emergency response officials may obtain full access to RMP information by submitting a request to EPA.[95] Nevertheless, we agree that emergency responders would benefit from easier access to emergency planning and response-related information. We believe that, regardless of the cause of the West Fertilizer incident, a major lesson learned is that better communication and coordination between emergency responders and facilities would improve safety. Annual coordination added by the 2017 and mostly retained by this final rule should provide this benefit in a more secure way than the 2017 provisions.

In retaining the requirement to hold a public meeting after an incident that has offsite impacts, we believe we have focused the requirement for such meetings on the events of greatest public interest. The public has multiple interests that are materially advanced by the information required to be addressed in such meetings. In addition, public exchanges of information will improve the quality of incident investigations because the public may possess information the facility does not, such as information about public impacts. Public meetings conveying initial results of incident investigations to the extent known are not duplicative of media reports or release reports under other requirements, which in the case of CERCLA and EPCRA are based on initial knowledge during the first moments of an incident. We have limited the information required to be conveyed at meetings to the preliminary information that ultimately will be required to be reported in the RMP in order to limit the potential for security-sensitive information being released at public meetings. Much of this information is factual, while the rest is primarily based on the best judgment of the owner or operator. With the modifications of the public meeting requirement in the final rule, we believe we have struck a reasonable and practicable balance of the public's need for information about local incidents, the security of the source and the community, and other protected interests of the source.

2. Comments on Information Availability Provisions

a. EPA's Security Rationale for Rescinding Information Availability Provisions

Many commenters opposed the Amendments rule's expanded public disclosure requirements, arguing that they would create a security risk. An industry trade association commented that databases are especially vulnerable to terrorist data mining, where an actor could shop for especially vulnerable sites. Another trade association agreed, stating that Toxic Release Inventory (TRI) regulations and EPCRA already provide for information disclosure but, importantly, not the kind of unified information source that a bad actor could use to seek out the most vulnerable sites. A State government agency commented that the Reconsideration rule's rescissions would help protect against criminal acts by anonymous readers. An industry trade association supported EPA's proposed rescission of the requirements, arguing that under the pre-Amendments rule parties with legitimate interests can access information through more secure, controlled means. An industry trade association cited past comments from the Federal Bureau of Investigation and DHS to express concern that disclosure requirements could raise security issues. Another commenter expressed support for making chemical hazard information available to emergency response personnel, but not the public at large, because of security concerns. Another industry trade association stated that while it supported efforts to enhance information sharing and collaboration between facility owners, LEPCs, first responders, and members of the public, this should be done in a manner that balances security and safety considerations, and the Agency had not adequately justified the information requirements of the Amendments rule. Other commenters also opposed disclosing chemical hazard information on the basis of confidentiality, the costs of disclosure, the availability of information through other means (such as the FOIA and TRI), and security risks.

Other commenters disagreed with the proposed rule's security rationales. A private citizen argued that the Amendments rule's information provisions would make little difference to terrorists who already have access to significant amounts of information. A professional engineer commented that the RMP information that would remain public under the Reconsideration rule and other legally required disclosures would be sufficiently helpful to potential terrorists. He stated that enough information is already publicly available to create your own worst-case analysis, and that the Reconsideration rule would not significantly impact this issue. The commenter stated that relevant security concerns depend neither on the Amendments or Reconsideration rules, but rather depend on CSISSFRRA, and argued that withholding information for security purposes has harmed community planning. A tribal government argued that EPA cannot demonstrate any real security risk that would be caused or exacerbated by information disclosure. It added that past thefts and incidents referenced in the rulemaking were not caused by information disclosure. Other commenters also contended that there is no connection between terrorist threats and information sharing, or that EPA has not made a serious case that terrorist threats due to information reporting requirement are substantial, or that the claimed security benefits of the proposed rule are substantial. An advocacy group cited testimony from a chemical company that, in relevant part, involved the company abusing security laws. The company testified to doing so in order to hide from the public information about a deadly accident at one of their facilities. The group also stated that, while EPA provided no evidence of information availability abetting terrorist attacks, there is evidence of emergency responders struggling to respond to chemical accidents because of a company's refusal to share information.

Other commenters argued that public disclosure could, by improving public safety and responsiveness, reduce the threat of terrorism or intentional harm. An anonymous commenter stated that information availability, and the measures the public can take with information to protect themselves, help allay terrorism risks. A joint submission from multiple advocacy groups and

[95] See 40 CFR Chapter IV.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 61 of 91


other commenters stated that EPA failed to consider benefits of improved information sharing, especially in preventing or mitigating terrorist attacks by better preparing first responders and the community. The commenters argued that EPA must consider the security benefits of information sharing if the agency considers its risks. Finally, the commenters noted that, while security breaches have resulted in accidents at facilities, these were still accidents—there was no terrorist intent in the breaches or an intent to cause a chemical release. The group stated that the Congressional Research Service estimated the threat of terrorist attacks at chemical facilities is low compared with that of accidents. A private citizen stated that law and the judiciary generally favor a right-to-know over security interests. He stated that efforts to prevent disclosure are futile.

Multiple State elected officials commented that EPA has failed to supply a reasoned explanation for rescinding the community information sharing requirements included in the Amendments rule. The commenters acknowledged the need for the RMP regulations to balance between increasing public awareness of chemical hazards and maintaining facility security but concluded that the proposal upsets that balance by focusing too much on the latter concern without addressing the myriad benefits of increased public awareness.

An advocacy group stated that EPA's rationale for rescinding the online notification requirements is arbitrary and capricious. The group stated that EPA relied on the redundancy of the measure with the role of LEPCs. However, it asserted that LEPC websites are often inadequate, making necessary the requirement that facilities provide notification of available information.

*EPA Response:* EPA agrees that anonymous access to sensitive chemical facility hazard information could increase the risk of criminal acts and terrorism against regulated facilities, and believes the pre-Amendments rule's existing provisions for reading room access to RMPs, combined with the remaining Amendments rule information availability provisions (*i.e.,* enhanced local coordination requirements and public meeting requirements) strike an appropriate balance between community right-to-know and security. EPA also now believes requiring additional chemical facility hazard and emergency response information to be made available to the public imposed unnecessary burdens on regulated facilities.

After further review of the potential security concerns of the Amendments rule information availability provisions, EPA believes that these concerns have merit. Section 68.205 from the proposed RMP Amendments rule listed specific items of information that the owner or operator must provide to the LEPC or local emergency response officials upon request, but it did not include an open-ended provision requiring the owner or operator to provide any other information that local responders identify as relevant to local emergency response planning. By including such a provision in the final RMP Amendments rule, EPA may have inadvertently opened the door to local emergency officials requesting and receiving security-sensitive information even beyond the specific items included in § 68.205 of the proposed RMP Amendments about which petitioners and others had raised concerns. EPA believes that the rescission of the chemical hazard information availability provisions in § 68.210 will provide security benefits relative to the 2017 Amendments rule by eliminating the security concerns created by the Amendments rule provisions.

Another important consideration in EPA's final rule decision is to avoid providing anonymous access to consolidated chemical hazard information. As EPA indicated in the proposed rule, the combination of mandatory disclosure elements as required under the Amendments is generally not already available to the public from any single source. EPA believes that the consolidation of the required chemical hazard and facility information may present a more comprehensive picture of the vulnerabilities of a facility than would be apparent from any individual element and requiring it to be made more easily available to the public from a single source (*i.e.,* the facility itself) could increase the risk of a terrorist attack on some facilities. Additionally, as State petitioners and other commenters have pointed out, the Amendments made no provision for screening requesters of such information or for the owners or operators of regulated facilities to restrict what information was provided to a requester or to appeal a request.

Regarding commenters' claims that the Amendments rule's information provisions would make little difference to terrorists who already have access to significant amounts of information, EPA agrees that under the final Reconsideration rule, information on most of the individual disclosure elements required under the Amendments would still be available via other means, such as by visiting a Federal RMP reading room, requesting information from an LEPC, or by making a request under the FOIA. However, this information would not be available in a consolidated form that may readily identify facility vulnerabilities, and in each case a requester could be required to identify themselves before gaining access to the information. FOIA requests require a name and U.S. state or territory address to receive information. Federal Reading Rooms require photo identification issued by a Federal, state, or local government agency such as a driver's license or passport. These requirements to accurately identify the party requesting the information may provide a deterrent to those who seek to obtain chemical information for a facility for terrorist purposes without unduly impeding access to the information by those in the nearby community with a right-to-know.

EPA disagrees with commenters who claim that there are no real security risks that would be caused or exacerbated by information disclosure, and that the reporting requirements in the information availability provisions of the Amendments rule did not create security concerns. As a result of the CSISSFRRA (Pub. L. 106–40), the DOJ performed an assessment of the increased risk of terrorist or other criminal activity associated with posting off-site consequence analysis information on the internet. In that assessment, DOJ found that the increased availability of information would increase the risk of the misuse of information by criminals or terrorists, that criminals and terrorists had already sought to target U.S. chemical facilities, and that such threats were likely to increase in the future.[96] With respect to OCA information, DOJ found that the assembly of information that was otherwise public had value in targeting. See DOJ report at 41. Furthermore, the report noted that the US Special Operations Command views information about response plans, which would not be OCA data, would be of value in target selection. See DOJ Report at 38–39.

Regarding commenters who indicate that public disclosure could, by improving public safety and responsiveness, reduce the threat of terrorism or intentional harm, EPA believes that this will only be true if the disclosure occurs in a manner that

[96] Department of Justice. April 18, 2000. Assessment of the Increased Risk of Terrorist or Other Criminal Activity Associated with Posting Off-Site Consequence Analysis Information on the internet. Available in the rulemaking docket.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 62 of 91


makes information available for legitimate uses while preventing or dissuading access to it for criminal purposes. The final Reconsideration rule attempts to strike an appropriate balance between these concerns by allowing access to information via controlled means. The final rule retains the information availability provisions of the pre-Amendments RMP rule, retains a modified form of the Amendments rule's public meeting requirement and retains the enhanced local coordination requirements of the Amendments rule with minor modifications. All of these provisions increased information access relative to the pre-Amendments rule, to specific categories of chemical hazard information under controlled circumstances. These requirements should help ensure that local community members and local responders have access to appropriate information about regulated facilities without increasing the risk that such information will be used for criminal purposes.

The Agency acknowledges that removing this provision eliminates one of several ways to locate and obtain chemical hazard information. For example, RMPs are subject to FOIA (except for OCA information) and may be reviewed at Federal Reading rooms or through LEPCs. Once a member of the public reviewed the RMP, they would already have most of the information available under the Amendments rule information availability provision. Also, while LEPCs vary in quality, under EPCRA, much of this information is required to be reported to them and they are required to provide it upon request to members of the public. Those other methods remain. Our view is that removing a redundant method of access that provides consolidated chemical hazard information is a reasonable balance between community access to chemical hazard information and security risks.

b. Community Interest in Access to Information

Some commenters representing industry trade associations expressed doubt about the value of information disclosures, especially to lay audiences. One doubted that the disclosures would improve community responses to accidents. Another noted that chemical hazard information is very technical and would be very time-consuming to compile and translate into a format appropriate for the public, who may still be unable to understand it. A third cautioned that information disclosures could cause unnecessary and unjustified alarm in unsophisticated parties. An industry trade organization argued that facilities and the public are best served by flexibility in public communications, and that plants could be trusted to decide when, how, and what information to disclose. Another commenter argued that expansive and redundant reporting requirements could be counterproductive, allowing important information to be lost in the mix. A State elected official stated that much of the information required by the Amendments rule to be released, such as exercise schedules and emergency response details, does not help reduce the risk of accidents.

Many other commenters, including a form letter campaign joined by approximately 415 individuals, expressed general opposition to eliminating requirements for facilities to share information with communities on hazards at the facility and preparedness procedures. A private citizen and advocacy organization stated that emergency response agencies and community residents have a right to know where dangerous materials exist, and that if the Amendments rule provisions had been in place during the Arkema and West Texas incidents, emergency responders would have been able to better protect themselves. A Federal agency and advocacy group agreed, citing a report on the Chevron Refinery Fire. A tribal government commented that the principles of EPCRA should be applied to the RMP framework. It added that the public should both have access to emergency preparedness information and, upon request, chemical hazard information. Some other commenters asserted a need for greater information availability so that community members know how to react when an accident occurs. An advocacy group commented that community members do not know whether, when they hear sirens at chemical plants, they are to evacuate or shelter in place. This commenter argued that reduced information availability will make it more difficult for residents to prepare in case of accidents. An anonymous commenter highlighted the importance of access to emergency plans and the contact information for local coordination officials in planning. Another referenced Flint, MI, as an example of the importance of being informed as to health risks in avoiding contamination consequences. An advocacy group cited a past EPA statement that additional RMP disclosures would likely reduce the number and severity of chemical accidents. A private citizen cited a DHS publication, stating that providing information to the community helps people protect themselves during accidents. Another commenter cited a 2014 report indicating that 135 million people live within vulnerability zones of the highest-risk RMP facilities. The commenter argued that this risk, taken with evidence from the Arkema disaster, merits greater information disclosure.

Many commenters argued that reading rooms do not provide a realistic avenue for much of the public to access information. A State elected official commented that visitors are limited to gathering information for a maximum of 10 facilities, once per month, without access to copying technology beyond hand-written notes. Even then, the commenter claimed, New York Attorney General interns took more than three weeks and substantial effort to gain access to reading room materials. An anonymous commenter and advocacy group echoed these concerns. A joint submission from multiple advocacy groups and other commenters cited the distance people may have to travel to access a reading room and the difficulty the public may have in finding necessary information for reading room research such as facility identification numbers. The commenters also argued that reading rooms presented language and expertise barriers. Another commenter stated that her State failed to respond to information requests in a timely manner and that members of the public were compelled to seek legal counsel to access information. A Federal agency commented that the burden of information sharing should rest with facilities to affirmatively provide comprehensive information. It stated that the public should not have to request such information.

*EPA Response:* As EPA indicated in the proposed rule, the information elements provided by the Amendments rule's information availability requirements were already obtainable by other means.[97] As previously noted, RMPs are accessible through multiple means and contain most of the information that would have been provided under the Amendments. Once a member of the public obtains a facility's RMP, the need to make a request to that facility for the elements contained in the RMP would be eliminated, and most other elements provided for in the Amendments rule provision are available using the internet or by contacting local response agencies. In many cases, such information provided through local authorities may be most relevant to a

[97] See 83 FR 24873–4, May 30, 2018.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 63 of 91


member of the public because local authorities will be able to provide information within the context of the community emergency plan.

The Amendments rule provision would have allowed anonymous access to chemical hazard information in consolidated form that may have presented a more comprehensive picture of the vulnerabilities of a facility than would be apparent from any individual element. EPA is concerned that allowing anonymous access to sensitive chemical facility hazard information could potentially increase the risk of criminal acts and terrorism against regulated facilities. EPA believes the pre-Amendments rule's existing provisions for access to RMPs, combined with the remaining Amendments rule information availability provisions (*i.e.,* enhanced local coordination requirements and public meeting requirements as modified by the final rule) strike an appropriate balance between community access and security.

Appropriate public response actions will depend on many factors that an individual member of the public is unlikely to be aware of at the time of a release, even if the Amendments rule's information availability provisions were not rescinded. In the event of an emergency at a regulated facility requiring public evacuation or sheltering, the community emergency response plan should ultimately guide the actions taken by members of the public near the affected facility. Local authorities will generally issue appropriate evacuation or sheltering orders based on the nature of the release, their assessment of potential public impacts, and the provisions of the community emergency plan. Under the pre-Amendments rule, owners and operators of regulated facilities were already required to coordinate response actions with local authorities and ensure the source is included in the community emergency response plan, so that local authorities, in consultation with the owner or operator, are prepared to issue appropriate instructions to members of the community. The Reconsideration rule preserves this system and the enhancements made in the Amendments rule to make information more available to local authorities by requiring annual emergency coordination activities.

EPA disagrees that the Amendments rule's information availability provisions could have had any influence on the Arkema incident. The injuries that occurred to first responders at Arkema happened after facility personnel and county emergency responders had closely coordinated on the response to the emergency. According to the CSB investigation report,[98] at the time of the first responder injuries, Arkema had already warned local emergency response authorities about the hazards of organic peroxide decomposition and alerted them that emergency responders who may be exposed to this material should wear personal protective equipment and self-contained breathing apparatus. County emergency response authorities had evacuated the facility and established a 1.5-mile evacuation zone around the facility. The CSB investigation report did not recommend changes to the emergency coordination provisions of the RMP rule, or fault Arkema for failing to adequately coordinate with local emergency responders. Regarding the West Fertilizer incident, EPA believes this incident did highlight the need for better communication between regulated facilities and first responders, and EPA has therefore retained the enhanced local coordination requirements of the Amendments rule, with modifications. EPA believes these enhancements, rather than the public information availability provisions, will allow community emergency planners and first responders the opportunity to better prepare themselves to appropriately respond to accidental releases.

c. Comments on Other Benefits of the Information Availability Provisions

Several commenters argued that greater disclosure requirements could, through political and market mechanisms, be beneficial. An anonymous commenter stated that access to hazardous chemical information would allow residents to more accurately determine whether they should allow a facility to be sited near them. Another commenter stated that the benefits of economic growth associated with chemical plants must be balanced against public health concerns, stating that public information provisions can help inform this balance. An anonymous commenter stated that the Amendments rule was intended to help residents make informed decisions as to where to live and help communities determine whether to subject a plant to greater scrutiny. An advocacy group cited the RIA, stating information sharing improves efficiency of location decisions and property markets. The commenter also stated that information sharing helps appropriately allocate resources to emergency response preparation. An advocacy group cited EPA's TRI program, stating that public information requirements can prompt companies to adopt safer practices. Another advocacy group described the history of CCC's response to a 2012 refinery accident as evidence of the public making use of transparency regulations to effect safer practices. A tribal association cited the costs of compliance at $4,820 per facility for large facilities and stated that this cost would be justified by the benefits of informed community members. An industry trade organization disagreed, commenting that the costs of establishing a single, streamlined website are high and not outweighed by any benefits.

*EPA Response:* EPA disagrees that rescinding the Amendments rule's information availability provisions will hinder facility siting decisions. Facility siting decisions are generally made by facility owners and local governments, who are in the best position to decide whether and how chemical facilities will impact economic growth or public health in the community. Under the Reconsideration rule, both local governments and members of the public will have enhanced access to facility hazard information relative to the pre-Amendments rule due to the Amendments rule's local coordination and public meeting provisions, which the final rule retains in modified form. Additionally, members of the public can continue to obtain RMP facility information through Federal reading rooms and obtain information relevant to emergency preparedness in their community by contacting their LEPC or other appropriate emergency planning authorities. The Agency disagrees that the information availability requirements of the Amendments rule were analogous to the TRI program. The TRI program provides information on annual toxic releases from chemical facilities, but not on chemical facility hazards in a way that could potentially be exploited by criminals or terrorists. EPA is concerned that allowing anonymous access to sensitive chemical facility hazard information could potentially increase the risk of criminal acts and terrorism against regulated facilities. These were the same concerns that led to the pre-Amendments rule procedures for public access to RMP OCA information under the CSISSFRRA (Pub. L. 106–40). Regarding the commenter's concern about public involvement in advocating safer refinery practices following the 2012 Chevron

[98] To obtain a copy of the Arkema investigation report, see: *https://www.csb.gov/arkema-inc-chemical-plant-fire-/*

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 64 of 91


refinery accident, EPA notes that the Agency has retained a modified form of the Amendments rule's public meeting requirement, which will require RMP facility owners or operators to hold a public meeting following any accident involving the release of a regulated substance with offsite impacts. This provision will allow members of the public to gain additional information about serious accidents and engage with the owner or operator as appropriate. Regarding comments on the costs of the information availability provisions, while reducing unnecessary regulatory costs was a consideration in EPA's rescission of the provisions, EPA's primary rationale is to address security concerns.

3. Comments on Proposed Rescission of CBI Requirements in § 68.210

A commenter asserted that trade secrets should not be protected when secrecy poses a threat to human life. A private citizen stated that CBI protections privilege company profits over the health and safety of citizens. The commenter added that these can undermine emergency response readiness, violating EPA's mandate. An advocacy group cited a chemical facility's past testimony as evidence that chemical companies use security reasons as excuses to limit information disclosures and obfuscate unsafe practices. An industry trade association emphasized the necessity that the public know that disclosures are limited by CBI and classified information rules.

*EPA Response:* EPA is finalizing the proposed deletion of the CBI provision in § 68.210 (g), because with the rescission of the Amendments rule's information availability requirements and the modification of the public meeting requirements, the only remaining information required to be provided is the source's five-year accident history at the public meeting, and § 68.151(b)(3) prohibits the owner or operator from claiming this accident history information as CBI.

4. Comments on Public Meeting Requirements

a. Retention of Public Meeting Requirement

Many commenters opposed retaining the public meeting requirements. An industry trade association commented that public meetings are sparsely attended and of little value, especially given the proposed removal of other required disclosures at the meeting. Two other industry trade associations stated that, because they occur after the accident and response, public meetings do not materially advance any legitimate interest of the EPA. The commenters asserted that public meetings instead are only exercises in public shaming. Another industry trade association commented that the Amendment rule's meeting requirements would be redundant with initial release reporting and media reports, which provide the information the community would be interested in. An industry trade association commented that facilities already hold public meetings, especially under the ACC Responsible Care Program, when there is a need for one. Another stated that community advisory panels are already sufficient. Another commented that a Federal public meeting requirement would be needlessly duplicative with those required by State law. A facility commented that there is no need for the facility to host a public meeting, and instead a government entity should provide information to the community. An industry trade association, citing the CAA, stated that LEPCs should bear the responsibility of determining whether a public meeting needs be held after an accident, and whether the responsible facility should be required to attend. An industry trade association stated that the Amendment's public meeting requirement was too vague. Another commented that public meetings may not work because members of the public may protest and disrupt the meeting. An industry trade association stated that it will be difficult to discuss an incident when, because of litigation of adverse consequences, there will be legal issues impinging on the facility's speech.

Other commenters expressed support for retaining the Amendments rule public meeting requirement. A joint submission from multiple advocacy groups and other commenters stated that notice of meetings, and meetings themselves, are vital to letting the public know that they have been exposed to hazards. These commenters also stated that meetings should have translators where the local community may need them. A private citizen recommended requiring an initial meeting, not triggered by an accident, to build connections between the community and facility.

*EPA Response:* The final rule enacts an option for public meetings on which EPA had requested comment. EPA received several public comments that supported EPA's proposed option to require public meetings only after accidents with offsite impacts. EPA agrees with these commenters that incidents with no reportable offsite impacts are unlikely to generate much interest from the local community and will therefore be sparsely attended. Public meetings after serious accidents with offsite impacts, however, are likely to be well attended by the public and therefore EPA believes such public meetings should still be required. (See further discussion of public meeting criteria in the next section: *b. Requiring public meetings after accidents meeting specified criteria.*)

EPA disagrees that public meetings do not advance any legitimate interest of the EPA or that such meetings are intended to be ''exercises in public shaming.'' Public meetings give the owner or operator an opportunity to explain in detail the causes and consequences of serious accidents and respond to legitimate public concerns about potential health effects or ongoing risks from an accident. The public has a substantial interest in knowing what happened in an accident that had off-site impacts, why the accident happened and what steps the facility is taking to prevent a future occurrence, which should protect the public or environment from future impacts of releases of hazardous substances. The public's protection from the hazards of chemical accidents and ability to participate in emergency planning and readiness actions is materially advanced by being better informed about the accident, the risks posed and how they are being addressed. By meeting with the public, the quality of the facility's accident report improves due to the exchange of information, such as information regarding further impacts.

EPA is not requiring owners or operators to provide language translators at public meetings or to have initial public meetings not associated with reportable accidents with offsite impacts. EPA did not propose these provisions in either the Amendments or Reconsideration rules. EPA encourages owners or operators to accommodate language translation requests during public meetings but is not requiring them to do so. Owners or operators are free to hold additional public meetings beyond those required under the final rule if they so choose. EPA disagrees that public meetings are redundant to initial release reporting and media reports. By holding a public meeting up to 90 days after an incident, the owner or operator is likely to be able to provide more accurate and reliable information than is provided in initial notification or media reports. Also, at a public meeting, members of the public will have the opportunity to ask follow-up questions about the accident, which would not be possible through viewing initial notification reports or media reports.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 65 of 91


EPA disagrees that the final rule's public meeting requirement is duplicated in any other law or regulation that is applicable to all RMP facilities. However, if a facility conducts a public meeting to comply with another law or regulation, or as a result of complying with an industry code of practice, such a meeting may be used to comply with the final rule's requirement, provided the meeting is held within 90 days of the accident and provides the information required to be reported under § 68.42(a). EPA disagrees that the possibility of a meeting being disrupted by protesters or the owner or operator's concerns about litigation are good reasons to not require public meetings. Public meetings are used in many communities throughout the country for a variety of purposes and are rarely disrupted by protesters. Owners and operators may take appropriate and lawful measures to maintain order and security at public meetings. Regarding litigation concerns, the owner or operator already has a regulatory duty to disclose the information required under § 68.42(a)—therefore, discussing this information at a public meeting should not increase the owner or operator's vulnerability to litigation. EPA disagrees that the government entities such as LEPCs should be responsible for holding public meetings concerning RMP facility accidents. The owner or operator will have the most accurate and up to date information about the accident because of the owner or operator's incident investigation. However, a regulated facility may combine their post-accident public meeting with an LEPC meeting that is open to the public, if the LEPC agrees to such an arrangement. EPA has removed the more open-ended requirement to provide ''other relevant chemical hazard information'' beyond the information required in 40 CFR 68.42, thus making the requirement for disclosure less vague by limiting the required content of public meetings to more specific, factual information.

b. Requiring Public Meetings After Accidents Meeting Specified Criteria

Several commenters argued that public meetings should only be required for especially serious accidents. A State government agency commented that public meeting requirements should be limited to reportable incidents with off-site consequences. An industry trade association suggested that no public meeting be required when there is a shelter-in-place order just as a precaution, if there are no real offsite impacts. Another commenter recommended that meetings only be required for major accidents, noting that meetings are often sparsely attended. Another industry trade association stated that the public is unlikely to attend meetings for accidents with few offsite impacts. Another industry trade association commented that meetings for onsite-only incidents engender distrust and could be overly alarming after minor accidents. Other commenters supported limiting public meeting requirements to accidents with the offsite impacts specified in § 68.42. The commenters stated that accidents with strictly on-site consequences fall exclusively under OSHA's purview. Another commenter recommended that meetings only occur upon request by the public or an official.

*EPA Response:* EPA agrees that incidents with no reportable offsite impacts are unlikely to generate much interest from the local community and will therefore be sparsely attended. Public meetings after serious accidents with offsite impacts, however, are likely to be well attended by the public and therefore EPA believes such public meetings should still be required. EPA disagrees, however, that shelter-in-place orders should not trigger public meetings. Sheltering-in-place is considered an offsite impact under § 68.42(a) and therefore, under the final rule, a public meeting is required after an accident that results in a community shelter-in-place order, even if no other impact occurs. EPA also disagrees that accidents with only on-site consequences fall exclusively under OSHA's purview. Such accidents involving covered processes must still be reported in a source's RMP if they cause any of the consequences listed under § 68.42(a). If the accident involved a Program 2 or Program 3 process and resulted in, or could reasonably have resulted in a catastrophic release, the owner or operator must also perform an incident investigation as required under § 68.60 or § 68.81.

EPA did not require public meetings upon request of a member of the public (or an official) because such a provision would be difficult to implement for many facilities. In order to have a meeting occur within 90 days of an accident under this approach, EPA would need to establish a relatively short time frame for a member of the public to make a request, and regulated facilities would therefore have needed to provide almost immediate notice to the public to explain how and where to submit such a request. If a member of the public submitted a request, then the facility would need to provide a second public notice that a public meeting would occur, prepare for the meeting, and hold the meeting, all within 90 days of the incident. Under the final rule, regulated facilities and members of the public will know in advance that any accident from a regulated process involving specified offsite impacts will automatically trigger a public meeting. The owner or operator will only need to provide a single notice to members of the public to inform them when and where the meeting will be held. The owner or operator will also have a full 90 days to prepare for the meeting, as they will not need to await the receipt of a public request in order to determine whether or not to hold a meeting.

c. Required Timeframe for Public Meeting

Many commenters supported longer, more flexible timeframes for public meetings. An industry trade association recommended a 180-day timeframe, so more information can be gathered for the meeting. Other commenters opposed a 90-day timeframe, arguing that they may need more time to investigate the accident. An industry trade association recommended making the public meeting deadline coincide with the requirement to update accident history information in a facility's RMP, within 6-months of an accident. Another commenter suggested that timing should vary, according to the accident. An industry trade association recommended that owners or operators should be able to request time extensions for holding a public meeting if an investigation is ongoing. A facility, mentioning its positive experience with such an approach, suggested, instead of requiring a public meeting in 90 days, a meeting with the LEPC and emergency responder community be required within 120 days.

Other commenters, including a joint submission from multiple advocacy groups and other commenters and an industry trade association supported earlier meetings in order to address public health concerns.

*EPA Response:* EPA considered both longer and shorter timeframes for the public meeting but elected to retain the 90-day timeframe established in the Amendments rule. As the pre-Amendments rule already contained a requirement for facilities to update their RMP within 6 months of an accident meeting the reporting criteria of § 68.42, EPA considered whether to extend the timeframe to 6 months, as it would be more likely that a source would have completed its incident investigation by the time a public meeting was held. However, the Agency judged that even though in some cases the owner or

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 66 of 91


operator's incident investigation may not be complete within 90 days of the accident, the owner or operator is likely to know most of the elements required to be reported under § 68.42 earlier than 90 days after the accident. Of the eleven information elements required to be reported in a regulated source's accident history, EPA believes it is likely that the owner or operator will know all except perhaps the contributing factors to the accident (§ 68.42(b)(9)) and operational or process changes that resulted from investigation of the release (§ 68.42(b)(11)). The owner or operator may also lack knowledge about the full extent of offsite impacts of the accident (§ 68.42(b)(8)), and an additional benefit of holding a public meeting within 90 days of the event may be that it allows the owner or operator to gain additional information about offsite impacts. By meeting with the public in advance of needing to report the incident in its accident history, the quality of the facility's accident report improves due to the exchange of information. In some cases, the owner or operator will have completed their incident investigation and will know all eleven information elements required to be reported in the accident history. Even if the owner or operator's incident investigation is incomplete at the time of the public meeting, EPA believes holding a meeting as early as reasonably possible is most beneficial to the community. The 90-day timeframe should allow the owner or operator to share appropriate information about the accident with the local community. The facility could discuss the progress of the investigation so far and next steps planned. While EPA encourages owners and operators to hold public meetings sooner than 90 days after an accident if possible, EPA did not establish a shorter timeframe because shorter timeframes could make it less likely that the owner or operator will have complete information about the incident to present at the public meeting, and the Agency also did not want to exacerbate logistical challenges for regulated facilities in the immediate aftermath of a serious accident, when facility resources may be stressed in responding to and recovering from the accident.

d. Limiting Accident Information Discussed at Public Meetings to the Most Recent Accident

An industry trade association expressed support for limiting the content of public meetings to the accident at issue rather than including the entire 5-year accident history. Other commenters agreed, citing security concerns. A joint submission from multiple advocacy groups and other commenters disagreed, commenting that accident history is useful to understand future risks and what the community may have already been exposed to. A tribal government commented that emergency personnel should have access to past accident/incident reports, not just information about the current incident.

*EPA Response:* The final rule requires public meetings to cover only the accident at issue and not the full 5-year accident history. While EPA agrees that information about other accidents may be useful to provide context to the public and encourages the owner or operator to provide such additional information if appropriate, the Agency is not requiring sources to provide information on older accidents because the Agency believes that it would place an additional burden on the source to prepare for and present the additional accident information, which may or may not be relevant to the most recent accident. Therefore, under the final rule, the owner or operator is free to judge what additional information beyond that required to be reported under § 68.42 for the most recent accident should be presented at the public meeting. Regarding the comment about emergency personnel having access to past accident reports, while this information is not required to be presented at public meetings, it can be requested by local emergency response authorities at annual coordination meetings required under § 68.93. If local authorities can show that such information is necessary for developing and implementing the local emergency response plan, the owner or operator must provide it to them.

e. Rescission of Providing Other Relevant Chemical Hazard Information at Public Meetings

A State elected official commented that no evidence demonstrates that chemical hazard disclosure will increase the risk of a terrorist attack or other intentional harm. The commenter specifically stated that there is no indication that such disclosures played a role at the West Fertilizer explosion. A tribal government opposed the rescission and asserted that the community has a right to know what chemicals are being used in their community. The commenter added that the information that would be provided may be useful to emergency personnel. A joint submission from multiple advocacy groups and other commenters stated that EPA's rationale that the language requiring the owner or operator to provide other relevant chemical hazard information at public meetings ''could be interpreted to be an overly broad requirement'' is arbitrary and capricious. The commenters asserted that, if EPA is truly concerned about how facilities will interpret this language, it can clarify the requirement or provide examples of the types of information that would need to be shared. The commenters stated that deleting the requirement isn't necessary and deprives communities of information that EPA itself determined was valuable for them to know. An industry trade association supported rescinding the requirement, citing security concerns. Another industry trade association agreed and stated that allowing facilities to choose what to disclose would ease their ability to comply with the DHS CFATS.

*EPA Response:* EPA is finalizing the proposed rescission of the Amendments rule requirement for the owner or operator to provide other chemical hazard information at public meetings. EPA disagrees that its rationale for rescinding this requirement is either arbitrary or capricious. EPA is rescinding this requirement for the same reason that we are modifying the similar requirement for facilities to share other information that local emergency planning and response organizations identify as relevant to local emergency response planning in § 68.93—EPA believes this language is too open ended and could trigger requests for security-sensitive information at public meetings. As EPA noted in the preamble to the proposed rule, the language of the public meeting provision requiring the owner or operator to provide other information is similar to the Amendments rule requirement for the owner or operator to share with local responders other information that responders identify as relevant to local emergency response planning, which this final rule modifies to require providing other information necessary for developing and implementing the local emergency response plan. (See discussion later in *section VI.C.2.a ''Information disclosure during local emergency coordination.''*) All three of the reconsideration petitioners had security concerns with providing this type of information with no screening process for requesters or limitations on the use or distribution of information, and EPA believes that these legitimate concerns that can reasonably be addressed by deleting this language in the public meeting requirement. EPA believes deleting the language is better than attempting to narrow it by providing specific examples of the types

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 67 of 91


of other information that should be shared, because the purpose of the public meeting provision is to share information relating to the accident that resulted in the meeting, and this information is already listed in § 68.42. Any attempt to list additional types of information would presuppose that such information would be relevant to the accident and not present security risks, but EPA cannot reach such a conclusion without knowledge of the specific contents of the other information or circumstances of a particular accident.

EPA disagrees that there is no evidence that increasing information disclosure will increase security risks to regulated facilities. As a result of CSISSFRRA, the DOJ performed an assessment of the increased risk of terrorist or other criminal activity associated with posting off-site consequence analysis information on the internet. In that assessment, DOJ found that the increased availability of information would increase the risk of the misuse of information by criminals or terrorists, that criminals and terrorists had already sought to target U.S. chemical facilities, and that such threats were likely to increase in the future. EPA agrees that the community has a right to know what chemicals are being used in their community and that this information is useful to emergency personnel. The identity of the chemical involved in the accident triggering the public meeting must be disclosed during that meeting, as this is required to be reported in the facility's accident history under § 68.42(b)(2). However, EPA does not believe the owner or operator should be required to discuss other chemical hazards during public meetings, because the purpose of the meeting is to discuss the recent accident, not to hold a comprehensive discussion about all chemical hazards at the source. Both the RMP rule and EPCRA provide other means for members of the public to obtain information about the chemical hazards present at facilities in their community. The final rule also retains the enhanced local coordination provisions of the Amendments rule, so local emergency response personnel will have more opportunities to meet with the owner or operator beyond post-accident public meetings. At annual coordination meetings required under § 68.93, local emergency response authorities may request information about other chemical hazards at the facility, and the owner or operator must provide such information to the extent it is necessary for developing and implementing the local emergency response plan.

5. Other Comments on Information Availability and Public Meeting Provisions

a. Retention of Classified Information Provision in § 68.210

An industry trade association commented that the rule should make clear that classified information limitations still apply to any information that would otherwise be required to be disclosed. Another industry trade association commented that information limitations should be expanded to clearly include information protected by other Federal laws, especially Sensitive Security Information (SSI). It recommended that new language be added to the rule, protecting CVI, SSI, information classified by Federal agencies, and a catchall for all other information protected by law. Two industry trade associations stated that retaining the classified information provisions will help facilities remain in compliance with CFATS.

*EPA Response:* In the proposed rule, EPA had proposed to retain the Amendments rule's classified information provision within § 68.210. The final rule includes a modified version of this provision which addresses both classified and restricted information (EPA is making the same modification to the classified information provision proposed to be added to the emergency coordination provisions in § 68.93). Since the original RMP rule was published, DHS has developed new categories of security-sensitive information that potentially affect some RMP facilities. These include Sensitive Security Information (SSI), Protected Critical Infrastructure Information (PCII), and Chemical-terrorism Vulnerability Information (CVI). Certain facilities regulated under the RMP regulation may possess any or all of these categories of information, and EPA agrees with commenters who indicated these categories of information should be addressed in the rule. By referring to the DHS's restricted information regimes in the final rule, EPA intends to make clear that such information should be controlled via the applicable laws, regulations, and executive orders. EPA's reference to the DHS's regulations does not imply an absolute prohibition on the sharing of information controlled under these regulations, as some local emergency response officials may be authorized to receive SSI, PCII, or CVI. However, EPA expects that there will be few cases where local emergency coordination activities will require exchanges of such restricted information, and it should never be disclosed during public meetings.

Regarding classified National Security Information (NSI), very few RMP-regulated facilities possess such information (*i.e.,* information controlled under NSI laws as confidential, secret, or top-secret information), and applicable laws prohibit its disclosure to the public. Nevertheless, EPA has retained a modified form of the classified information provision in the final rule to emphasize the importance of adhering to all laws relating to control of NSI, which generally prohibit its disclosure to any persons who do not have an appropriate clearance for NSI and a need to know the information.

b. Requirement To Provide to Public a List of Scheduled Exercises

A state agency and two industry trade associations argued that disclosing exercise schedules to the public created security risks. One of these trade associations also commented that EPA's concern that the public could be alarmed by exercises is unfounded, and that facilities have hitherto successfully notified the public of drills without confusion. Another industry trade association commented that, because the public does not participate in emergency response activities, it has no significant interest in their details. A tribal government commented that the proposal was too vague. The commenter also stated that the discussion on this subject provided no reference to potential impacts to human health or the environment.

*EPA Response:* In the final rule, EPA is not requiring facilities to disclose exercise schedules. Although information on upcoming facility exercises is the one information element provided under the Amendments rule that is not already available from another source, as EPA indicated in the proposal, there is no easy way to restrict this information to only members of the local public, and wider distribution of this information could carry security risks. Most comments received by EPA that addressed the issue agreed with EPA's proposal not to require disclosure of this information.

## VI. Modified Local Coordination Amendments

### *A. Summary of Proposed Rulemaking*

In the RMP Amendments rule, EPA required owners or operators of ''responding'' and ''non-responding'' stationary sources to perform emergency

response coordination activities required under new § 68.93. These activities included coordinating response needs at least annually with local emergency planning and response organizations, as well as documenting these coordination activities. The RMP Amendments rule required coordination to include providing to the local emergency planning and response organizations the stationary source's emergency response plan (if one exists), emergency action plan, updated emergency contact information, and any other information that local responders identify as relevant to local emergency response planning. For responding stationary sources, coordination must also include consulting with local emergency response officials to establish appropriate schedules and plans for field and tabletop exercises required under § 68.96(b). Owners or operators of responding and nonresponding sources are required to request an opportunity to meet with the local emergency planning committee (or equivalent) and/or local fire department as appropriate to review and discuss these materials.

In the proposed Reconsideration rule, EPA proposed to modify the local coordination amendments by deleting the requirement in § 68.93(b), for the owner or operator to provide other information that local responders identify as relevant to local emergency response planning. Alternatively, EPA proposed to change this phrase to require the owner or operator to provide other information needed for developing and implementing the local emergency response plan, which is virtually identical to that used in EPCRA § 303(d)(3) [42 U.S.C. 11003(d)(3)]. Under both alternatives, EPA also proposed to incorporate appropriate classified information and CBI protections to regulated substance and stationary source information required to be provided under § 68.93.

EPA proposed to retain the requirement in § 68.95(a)(4) for responding facilities to update their facility emergency response plans to include appropriate changes based on information obtained from coordination activities, emergency response exercises, incident investigations or other information. In addition, EPA proposed to retain the requirement in § 68.95(a)(i) that emergency response plan notification procedures must inform appropriate Federal and state emergency response agencies, as well as local agencies and the public.

EPA proposed to retain language in § 68.93(b) referring to field and tabletop exercise schedules and plans with a proposal to retain some form of field and tabletop exercise requirement. Alternatively, in conjunction with an alternative proposal to rescind field and tabletop exercise requirements (see *section VII.* ''*Modified Exercise Amendments*'' below), the Agency also proposed to rescind this language.

EPA did not propose any other changes to the local coordination requirements of the RMP Amendments rule. Under either proposed alternative described above, the following provisions would have remained unchanged: The provisions of paragraph (b) requiring coordination to include providing to the local emergency planning and response organizations the stationary source's emergency response plan if one exists, emergency action plan, and updated emergency contact information, as well as the requirement for the owner or operator to request an opportunity to meet with the local emergency planning committee (or equivalent) and/or local fire department as appropriate to review and discuss these materials. For provisions of the RMP Amendments that EPA proposed to retain, EPA continued to rely on the rationale and responses provided when the Agency promulgated the Amendments rule. See 81 FR 13671–74 (proposed RMP Amendments rule), March 14, 2016, 82 FR 4653–58 (final RMP Amendments rule), January 13, 2017.

*B. Summary of Final Rule*

After review and consideration of public comments, EPA is finalizing the local emergency response coordination requirements related changes, as proposed, with some modifications. This rule modifies the local emergency response coordination amendments by replacing the requirement in § 68.93(b) for the owner or operator to provide any other information that local response organizations identify as relevant to local emergency response planning with the requirement to provide ''other information necessary for developing and implementing the local emergency response plan.'' Also, the final rule includes a modified form of the proposed provision for protection of classified information in § 68.93(d) but does not include the proposed CBI provision in § 68.93(e).

*C. Discussion of Comments and Basis for Final Rule Provisions*

1. Overview of Basis for Final Rule Provisions

The modifications we adopt today to the emergency coordination requirements of the 2017 rule primarily ensure that the coordination occurs in a more secure manner than the 2017 requirements. We have substituted the open-ended and somewhat vague ability of emergency response organizations to obtain any information ''relevant to'' local emergency response planning for a requirement to provide information ''necessary for'' the development and implantation of the local emergency plan. ''Necessary for'' tracks more closely the terms of EPCRA 303(d)(3) and 40 CFR 68.95(c) of the pre-2017 RMP rule. We slightly expand the applicability of this language to include non-responding sources subject to RMP Programs 2 and 3 and to sources not otherwise subject to EPCRA and retain the 2017 rule's provision that allows local emergency response organizations rather than just LEPCs to use this EPCRA-like language.

As commenters pointed out, the EPCRA provision has been successfully implemented for many years with no known security breaches. While local emergency response organizations that may use this authority would include entities other than LEPCs, LEPCs would have broader membership than fire and other public safety authorities that would be allowed to use the information gathering authority and therefore these additional entities present even less of a security risk. The provision we adopt is consistent with the National Incident Management System (NIMS) and facilitates the functioning of the NIMS and the Incident Command System (ICS) by promoting preplanning in advance of an incident.

We have previously noted that US SOC identified response plans as important targeting information for criminals or terrorists seeking to cause harm to chemical facilities. Therefore, we believe the less open-ended provision adopted today that mirrors language that has not led to known security breaches is a more reasonable and practicable approach to emergency coordination than the provision we adopted in 2017.

2. Comments on Local Coordination Provisions

a. Information Disclosure During Local Emergency Coordination

EPA received various comments on the proposed deletion of the requirement to provide any other information that local planning and response organizations identify as relevant to local emergency response planning during annual coordination activities, and the alternative proposed language, which replaces the provision with a requirement for the owner or

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 69 of 91


operator to provide other information necessary for developing and implementing the local emergency response plan. Many commenters, including industry trade associations, facilities, and State elected officials, expressed support for the proposed deletion of the language, commenting that it created an open-ended provision that could allow third parties to obtain security-sensitive or classified information about highly protected processes, threatening public health and heightening national security risks. Some of these commenters also provided additional reasons for deleting the phrase, stating that the language created an inconsistency with the OSHA PSM standard, that LEPCs have no capability to maintain the security of the information, that the provision was overly burdensome, and that it is not supported by the CAA.

Many other commenters, including private citizens, advocacy groups, and State elected officials, opposed deleting the provision because of general concerns about the availability of needed information for emergency planners and first responders. An association of government agencies commented that first responders should be entitled to all information they need to understand the risk of a release and respond. The commenter stated that EPA's proposed change to § 68.93(b) regarding requests for information is inadequate, short-sighted, and suggests that the facility information available in an RMP is materially different than the facility information provided under EPCRA. The commenter stated that the majority of RMP regulated facilities are subject to EPCRA, under provisions of which LEPCs routinely receive information from facilities relevant to emergency preparedness planning, and there is no evidence that any LEPC or first responder organization cavalierly released information obtained from a facility obtained under EPCRA or through any other mechanism. This commenter and others stated that EPA's proposed alternative language for the information disclosure requirement would be acceptable because it is virtually identical to the EPCRA language and would allow LEPCs and responders to work with regulated facilities to obtain the information and cooperation they need. Another commenter stated that EPA had failed to justify its proposal to delete the requirement and that EPA's attempt to argue that the proposed deletion will result in security benefits is erroneous and unjustified. However, this commenter also expressed a preference for the proposed alternative language to EPA's proposed deletion. An industry trade association also expressed support for EPA's proposed alternative language, which it stated would address the ambiguous, open-ended nature of the Amendments rule language and mirror the [EPCRA] statutory language.

Other commenters, including advocacy groups and State elected officials, expressed opposition to the proposed alternative language, reasoning that the alternative language would create the same or similar security risks as the language included in the Amendments rule. One of these commenters stated that local emergency planning and response organizations lack any uniform capability to keep and safeguard sensitive chemical hazard information and the proposed alternative language does nothing to address this problem. Multiple state elected officials commented that EPA did not explain the material difference between the proposed alternative language and the existing language of § 68.95(c) of the pre-Amendments rule. Another commenter stated that EPA incorrectly asserted that the alternative provision is consistent with EPCRA. The commenter stated that the fundamental distinction is that, under EPCRA, facilities must disclose certain information to LEPCs established under 42 U.S.C § 11001, whereas the RMP provision would allow or disclosure of information to local emergency planning and response organizations, local response organizations, and local authorities. The commenter concluded that because it is unknown exactly who might be able to access this information additional security risks may be created. The commenter also expressed concern about the potential burden this could place on industry without a specified mechanism for requesting review of unreasonable requests. Another trade association opposed the proposed alternative and instead recommended that EPA should adopt a rule that removes the requirement to submit any classified/confidential information and confines the information that would be provided to the basic, publicly available information that local responders need to do their job effectively. The commenter argued that their suggested approach would reduce the burdens on the regulated community and also avoid overwhelming the limited resources of the local officials. A joint submission from multiple advocacy groups and other commenters stated that the proposed alternative language would deny first responders additional information relevant to their planning activities that they cannot already receive pursuant to EPCRA. These commenters also stated that EPA has not explained how the proposed alternative language would address its finding in the Amendments rule that chemical facility information and data-sharing efforts need significant improvement and that LEPCs and first responders need more information to do their jobs. The commenters also stated that EPA has cited no evidence connecting any national security threats to sharing information with first responders and that firefighters, EMTs, and first responders are trained to protect the public and required to keep sensitive information secure.

*EPA Response:* In the final rule, EPA is adopting the alternative proposed language, which replaces the requirement to provide any other information that local planning and response organizations identify as relevant to local emergency response planning with the requirement to provide other information necessary for developing and implementing the local emergency response plan. As EPA explained in the proposed rule,[99] this language is virtually identical to that used in EPCRA section 303(d)(3), [42 U.S.C. 11003(d)(3)], and also appears in § 68.95(c) of the original RMP rule, which applies to facilities with Program 2 and Program 3 processes whose employees respond to accidental releases of regulated substances. Therefore, because of either the EPCRA section 303(d)(3) provision or the provision in § 68.95(c), most RMP facilities have long been subject to this requirement and applying it to the relatively few RMP facilities that are not already subject to it under EPCRA section 303(d)(3) or § 68.95(c) should not create any security vulnerabilities. EPA believes that the alternative proposed language will address security concerns with the Amendments rule provision while still allowing local responders to obtain information needed for emergency response planning. EPA notes that the final rule language is not open-ended, and restricts other information provided to that necessary for developing and implementing the local emergency response plan. EPA recognizes that a class of information—information that local response organizations deem ''relevant,'' but which is not ''necessary'' for the emergency plan—would be unavailable under the amended language adopted today. We view the narrowing as a compromise that helps emergency planning but

[99] 83 FR 24866, May 30, 2018.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 70 of 91


removes some information that is unnecessary for the emergency plan but which may pose a security risk. EPA is aware of no security vulnerabilities associated with language that tracks EPCRA in the past, and no commenters provided any such examples.

EPA disagrees that the Agency failed to explain the material difference between the language of § 68.95(c) in the pre-Amendments rule and the proposed alternative revision to § 68.93(b). While the pre-Amendments rule language in 68.95(c) is almost the same as the proposed alternative revision to § 68.93(b), its applicability is different. As EPA explained in the proposed rule, some RMP facilities that are subject to the final rule's requirement to provide other information needed for developing the local emergency response plan in § 68.93(b) were not already subject to it under either the pre-Amendments RMP rule provision at § 68.95(c), which applied only to responding facilities, or under EPCRA section 303(d)(3), which would generally apply only to RMP facilities that hold an EPCRA extremely hazardous substance above a threshold planning quantity. Under the Amendments and Reconsideration rules, all facilities with Program 2 and/or Program 3 processes are subject to the emergency response coordination requirements of § 68.93, whether or not the source's employees will respond to accidental releases of regulated substances. Therefore, EPA's inclusion of the alternative proposed language in § 68.93(b) applies the requirement to more RMP facilities than were subject to it under § 68.95(c) of the pre-Amendments rule.

EPA disagrees with commenters' claims that additional security risks may be created because it is unknown exactly who might be able to access information provided during local coordination activities. In the proposed rule, EPA specifically asked commenters to explain how the alternative language presents new security concerns if it has not caused such concerns in relation to its presence in EPCRA section 303(d)(3) or in § 68.95(c) of the pre-Amendments RMP rule. On this issue, one commenter attempted to draw a fundamental distinction between the EPCRA requirement, which requires disclosing certain information to LEPCs, and the proposed alternative provision, which would require disclosure of information to ''local emergency planning and response organizations.'' According to this commenter, additional security risks may be created because it is unknown exactly who might be able to access this information within the broader realm of ''local emergency planning and response organizations,'' which would include but not be limited to LEPCs. But while it is true that the term ''local emergency planning and response organizations'' encompasses LEPCs and other organizations, such as fire departments and emergency management agencies, LEPCs likely include the most diverse membership of any local response organization. If disclosure of other information related to development of the local emergency plan to LEPCs has not resulted in security risks to date, it is unlikely that disclosing the same information to fire departments or emergency management agencies will cause such problems. Also, EPA notes again that § 68.95(c) already required responding facilities to provide this information to ''local emergency response officials,'' a term that includes, but is not limited to, LEPCs. Therefore, the Agency believes it is implausible that using the previously-existing language of § 68.95(c) within § 68.93(b) would create security risks.

EPA also sees no reason to specify a mechanism for requesting review of unreasonable information requests. Since nearly all RMP facilities have been subject to this requirement for many years, with no such review mechanism in place, and without any apparent problem, EPA does not expect the § 68.93 provision to cause any proliferation of unreasonable information requests. EPA encourages local responders and owners or operators of regulated facilities to discuss the need for other emergency planning information and come to a reasonable agreement on what additional information, if any, should be provided, without the need for intervention by external arbitrators. The final rule does not require disclosure of classified information or CBI during annual coordination activities—this topic is further discussed below.

b. CBI and Classified Information Protections for Local Coordination

Several commenters agreed with EPA's proposal to include classified information and CBI protection provisions in the local coordination provisions. An industry trade association commented that EPA needs to specifically address SSI and CVI in the provision, not just classified information, a term which is too narrow to reflect current information protection regimes. Another industry trade association also recommended that EPA specifically include SSI, in addition to classified information or CBI. Another industry trade association commented that the proposed protection only addresses the disclosure of CBI to EPA and fails to consider such a disclosure to non-government entities, such as LEPCs. The commenter recommended that EPA should revise its CBI and classified information disclosure provisions to more clearly articulate how covered process facilities may address these concerns. Similarly, an industry trade association encouraged EPA to revise the proposed revision to identify how a facility can protect CBI or classified information potentially subject to a release to a non-governmental entity. An industry trade association recommended that the CBI and classified information provisions be clarified to provide that public version of the specific items identified in the regulation should be provided. Specifically, the commenter recommended that EPA clarify that regulated entities are under no obligation to provide to LEPCs or other emergency responders any information that is not already publicly available. An industry trade association encouraged EPA to specify that a ''sanitized'' version of requested materials, as referenced in § 68.93(e), means that companies may redact CBI from information provided under this provision.

Several other commenters indicated that allowing companies to claim CBI as a way of avoiding the responsibility to provide emergency planners and first responders access to essential information needed to respond to a chemical release is not acceptable.

*EPA Response:* EPA agrees with commenters who indicated that the classified information provision included in the proposed rule was too narrow. The final rule's modified form of the proposed rule's classified information protection provision should address these commenters' concerns regarding information restricted under DHS regulations.

Regarding CBI, EPA is not finalizing the proposed provision of § 68.93(e) because under the final rule, the Agency no longer believes it is necessary. With the changes EPA has made in the final rule—most notably replacing the open-ended requirement to provide any other information that local planning and response organizations identify as relevant to local emergency response planning with the requirement to provide other information needed for developing and implementing the local emergency response plan, which replicates previously existing rule language from § 68.95(c)—EPA no longer sees any need for a CBI provision in this section of the rule.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 71 of 91


Owners and operators of regulated facilities are not required to provide CBI to local response officials. EPA agrees with commenters that companies should not claim CBI merely as a way to avoid providing essential planning information to local responders, but EPA is not aware of any cases where this has occurred, and commenters provided no such examples. EPA expects that little, if any, confidential business information will be requested during coordination activities conducted under § 68.93. However, for information elements such as the names of chemicals, where facilities have made valid CBI claims in their RMP submission, where those elements are exchanged with local response officials during coordination activities, the owner or operator should provide the same sanitized information to local response officials that they provided to EPA in their RMP submission. For information requested by local response officials other than that reported in an RMP, if a local response official requests an element of information that the owner or operator judges to be CBI, the owner or operator is not required to provide the information but is encouraged to provide a non-confidential version of the information to local response officials (*i.e.,* a version with confidential business information redacted) if possible.

The reason that EPA had proposed adding a CBI provision to the local coordination provisions of § 68.93 is because the proposed Amendments rule had included a CBI provision to cover potential CBI in the itemized list of chemical hazard information that EPA proposed to require be provided to local emergency response officials upon request (see 81 FR 13711, March 14, 2016—proposed new § 68.205—Availability of information to the LEPC or emergency response officials). That list of items included information potentially containing CBI beyond the items already contained in an RMP, such as compliance audit reports, incident investigation reports, and IST information. In the final Amendments rule, EPA did not finalize the proposed § 68.205, instead finalizing a provision in § 68.93 requiring certain information to be provided during coordination activities. That information included the stationary source's emergency response plan (if one exists); emergency action plan; updated emergency contact information, and any other information that local planning and response organizations identify as relevant to local emergency response planning. In petitions submitted to EPA after publication of the final Amendments rule, petitioners objected to inclusion of the requirement to provide any other information that local planning and response organizations identify as relevant to local emergency response planning, noting that this requirement placed no limits on what could be requested under the provision, provided no protection for CBI, and provided no safeguards for security-sensitive information.[100] To address this concern, in the proposed rule, EPA proposed adding CBI and classified information provisions to § 68.93. However, with EPA's final rule option to replace the requirement to provide any other information that local planning and response organizations identify as relevant to local emergency response planning with the requirement to provide other information necessary for developing and implementing the local emergency response plan, which was already in § 68.95(c), and limiting the other specific information elements to be provided during coordination activities to emergency planning items that generally do not contain CBI, EPA no longer sees any need for a CBI provision in subpart E. Emergency coordination information generally is made up of information not entitled to CBI protection under RMP subpart G or information that would have extremely limited protection under the EPCRA trade secret provisions covering EPCRA's emergency planning subchapter. Under the final rule, the only information that Subpart E had not already required to be available to local response officials is information on responding facilities' schedules and plans for field and tabletop exercises, which should not require disclosure of any CBI.

Regarding classified and restricted information, for the same reasons previously explained in *section V.C.5.a—''Retention of classified information provision in § 68.210'',* the final rule includes a modified form of the proposed rule's classified information provision in § 68.93. As with § 68.210, the new provision in § 68.93 addresses both classified information (*i.e.,* NSI) and restricted information (*i.e.,* CVI, SSI, and PCII). EPA's reference to DHS regulations for restricted information in this section does not imply an absolute prohibition on the sharing of such information during coordination activities, as some local emergency response officials may be authorized to receive SSI, PCII, or CVI. However, EPA expects that there will be few cases where local emergency coordination activities will require exchanges of such restricted information. Regarding NSI, very few RMP-regulated facilities possess such information, and EPA does not expect that coordination activities involving facilities that possess NSI would typically involve such information. As previously stated, laws relating to control of NSI generally prohibit its disclosure to any persons who do not have an appropriate clearance for NSI and a need to know the information.

c. Conflicts With Other Federal Coordination Requirements

Most commenters supported EPA's proposal to retain the Amendments rule requirement for the owner or operator to annually coordinate with local responders and provide emergency response plans, emergency action plans, and updated contact information during coordination activities. A comment submitted by multiple state elected officials stated that the provisions in the proposed Reconsideration rule obliging local emergency planning and response organizations to coordinate annually on emergency response should be deleted from the final rule and should not be retained. The commenter argued that a determination of the necessity and effectiveness of emergency response coordination in the post-9/11 era requires consideration, among other things, of the existing incident command structure the Federal government has worked to develop through the NIMS, coordinated through the DHS and the Federal Emergency Management Agency. The commenter asserted that when an incident occurs, State and local emergency responders operate through an established incident command structure. The commenter argued that it is essential that when promulgating rules relating to emergency response coordination EPA consider the numerous overlapping emergency response coordination and preparedness requirements in other regulations and statutes. The commenter concluded that the Amendments rule failed to adequately consider these other provisions, resulting in the potential to create confusion among responders, thereby reducing the effectiveness of their response efforts in the event of a chemical facility accident. Furthermore, the commenter argued that creating an uncoordinated overlay to an existing incident command structure would result in incident response scenarios rife with potential for confusion at the precise time any such confusion could be most hazardous. The commenter also

[100] See CSAG petition, pp 5 EPA–HQ–OEM–2015–0725–0766 and RMP Coalition petition, pp 7. EPA–HQ–OEM–2015–0725–0759.

asserted that duplication of existing incident response and incident command structure makes emergency response and the organization of incident response less effective. Finally, the commenter stated that EPA should not engage in rulemaking to establish separate criteria for coordination that only frustrate the broader objective of cohesive and effective emergency response and serve to overburden already limited State and local emergency response financial resources.

*EPA Response:* EPA disagrees that the final rule creates any conflict with the NIMS.[101] The NIMS establishes a set of emergency management concepts, principles, and methods with the objective of producing a standardized but flexible approach to incident management at all levels. EPA supports the NIMS and these objectives and believes nothing in the RMP rule conflicts with them—commenters presented no evidence or examples of where the RMP emergency response coordination provisions were incompatible with the NIMS. For the most part, RMP emergency response coordination activities take place outside of the context of an actual incident; they are intended to be routine, annual activities that involve the sharing of information in advance of any incident. However, such sharing can and should include collaborating on incident planning, incident command, and incident resource and information management. Advanced coordination regarding chemical releases facilitates the functioning of the NIMS. During exercises and actual incidents, EPA encourages owners and operators and local response officials to employ NIMS doctrine, such as use of the ICS.

d. Requirement for More Frequent Coordination Should Be Clarified

An industry trade association, referring to the requirement for coordination to occur at least annually, and more frequently if necessary, commented that a determination as to whether more frequent coordination is needed should be tied to some objectively knowable change in circumstances, and notification to the source must occur.

*EPA Response:* EPA intends the ''more frequently if necessary'' language to address situations where a significant change in either the source or its surrounding community has made information exchanged during the most recent coordination activity outdated, or where the owner or operator and local response officials judge that additional coordination should take place sooner than the next annual meeting or more frequently than annually on an ongoing basis. In most cases, sources and local authorities may have no need to conduct coordination activities more frequently than annually. In others, ''more frequently'' may mean a one-time additional coordination activity to address a specific change at the source or in the community, whereas in still others, the owner or operator and local authorities may elect to establish an ongoing schedule for coordination activities that is more frequent than annual. EPA's rule leaves flexibility for the source and the community to determine when additional coordination is needed.

e. Claims That Rescinding Local Coordination Provisions Is Arbitrary and Capricious

A joint submission from multiple advocacy groups and other commenters, and a comment submitted by multiple State elected officials stated that EPA's proposal to rescind and weaken emergency coordination requirements is arbitrary and capricious. These commenters stated that according to the standard established in *FCC* v. *Fox Television,* EPA is required to provide a more detailed rationale to justify the agency's proposed changes when the Agency is contradicting prior fact-finding. The commenters concluded that EPA did not provide the requisite more detailed rationale.

*EPA Response:* EPA disagrees with these comments. The final rule does not rescind, eliminate, or weaken the Amendments rule's emergency coordination requirements. The final rule makes a minor but important change to the emergency coordination provisions of the Amendments rule in order to not create new security vulnerabilities. In the final rule, EPA is adopting the alternative proposed language for local coordination, which replaces the requirement to provide any other information that local responders identify as relevant to local emergency response planning with the requirement to provide other information necessary for developing and implementing the local emergency response plan. As EPA explained in the proposed rule, this requirement is virtually identical to the requirement in Emergency Planning and Community Right-to-Know Act (EPCRA) section 303(d)(3), [42 U.S.C. 11003(d)(3)], and also appears in § 68.95(c) of the original RMP rule, which applies to facilities with Program 2 and Program 3 processes whose employees respond to accidental releases of regulated substances. Therefore, as a result of either the EPCRA section 303(d)(3) provision or the provision in § 68.95(c), most RMP facilities have long been subject to this requirement, and the Agency is applying it in the new requirement to the relatively few RMP facilities that are not already subject to it under EPCRA section 303(d)(3) or § 68.95(c), which should not create any security vulnerabilities. We note that the RMP Amendments failed to address, or even mention, the importance of information on a facility's and a community's emergency response plan as a factor in targeting chemical facilities.[102] An open-ended provision would create new potential vulnerabilities. EPA believes that adopting the alternative proposed language in the final rule will address security concerns with the Amendments rule provision while still allowing local responders to obtain information needed for emergency response planning. EPA notes that the final rule language is not open-ended, and restricts other information provided to that needed for developing and implementing the local emergency response plan. EPA disagrees that this rationale is arbitrary or capricious—it is a rational and reasonable response to addressing legitimate security concerns raised by petitioners and does not weaken the emergency coordination provisions of the Amendments rule.

## VII. Modified Exercise Amendments

### *A. Summary of Proposed Rulemaking*

In the RMP Amendments rule, EPA added a new section entitled § 68.96 Emergency response exercises. This section contained several new provisions, including:

- *Notification exercises:* At least once each calendar year, the owner or operator of a stationary source with any Program 2 or Program 3 process must conduct an exercise of the stationary source's emergency response notification mechanisms.
- Owners or operators of responding stationary sources are allowed to perform the notification exercise as part of the tabletop and field exercises required in new § 68.96(b).
- The owner/operator must maintain a written record of each notification

[101] See National Incident Management System, *https://www.fema.gov/national-incident-management-system* and National Incident Management System Third Edition October 2017, available in the rulemaking docket.

[102] Department of Justice. April 18, 2000. Assessment of the Increased Risk of Terrorist or Other Criminal Activity Associated with Posting Off-Site Consequence Analysis Information on the internet. pp. 38–39. Available in the rulemaking docket.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 73 of 91


exercise conducted over the last five years.

• *Emergency response exercise program:* The owner or operator of a responding stationary source must develop and implement an exercise program for its emergency response program.

• Exercises must involve facility emergency response personnel and, as appropriate, emergency response contractors.

• The emergency response exercise program must include field and tabletop exercises involving the simulated accidental release of a regulated substance.

• Under the RMP Amendments rule, the owner or operator is required to consult with local emergency response officials to establish an appropriate frequency for exercises, but at a minimum, the owner or operator must hold a tabletop exercise at least once every three years, and a field exercise at least once every ten years.

• Field exercises must include tests of procedures to notify the public and the appropriate Federal, state, and local emergency response agencies about an accidental release; tests of procedures and measures for emergency response actions including evacuations and medical treatment; tests of communications systems; mobilization of facility emergency response personnel, including contractors, as appropriate; coordination with local emergency responders; emergency response equipment deployment; and any other action identified in the emergency response program, as appropriate.

• Tabletop exercises must include discussions of procedures to notify the public and the appropriate Federal, state, and local emergency response agencies; procedures and measures for emergency response including evacuations and medical treatment; identification of facility emergency response personnel and/or contractors and their responsibilities; coordination with local emergency responders; procedures for emergency response equipment deployment; and any other action identified in the emergency response plan, as appropriate.

• For both field and tabletop exercises, the RMP Amendments rule requires the owner or operator to prepare an evaluation report within 90 days of each exercise. The report must include a description of the exercise scenario, names and organizations of each participant, an evaluation of the exercise results including lessons learned, recommendations for improvement or revisions to the emergency response exercise program and emergency response program, and a schedule to promptly address and resolve recommendations.

• The RMP Amendments rule also contains a provision for alternative means of meeting exercise requirements, which allows the owner or operator to satisfy the requirement to conduct notification, field and/or tabletop exercises through exercises conducted to meet other Federal, state or local exercise requirements, or by responding to an actual accidental release.

EPA proposed to modify the exercise program provisions of § 68.96(b), as requested by state and local response officials, by removing the minimum frequency requirement for field exercises and establishing more flexible scope and documentation provisions for both field and tabletop exercises. Under the proposal, EPA would have retained the final RMP Amendments rule requirement for the owner or operator to attempt to consult with local response officials to establish appropriate frequencies and plans for field and tabletop exercises. The minimum frequency for tabletop exercises would have remained at three years. However, there would have been no minimum frequency specified for field exercises in order to reduce burden on regulated facilities and local responders as explained in rationale in *section IV.D.5.* ''*Costs of Field and Tabletop Exercises*'' in the proposed rule. Documentation of both types of exercises would still have been required, but the items specified for inclusion in exercises and exercise evaluation reports under the RMP Amendments rule would have been recommended, and not required. The content of exercise evaluation reports would have been left to the reasonable judgement of stationary source owners or operators and local emergency response officials. As described in the RMP Amendments rule, if local emergency response officials declined the owner or operator's request for consultation on and/or participation in exercises, the owner or operator would have been allowed to unilaterally establish appropriate frequencies and plans for the exercises (provided that the frequency for tabletop exercises does not exceed three years) and conduct exercises without the participation of local emergency response officials. Likewise, if local emergency response officials and the facility owner or operator cannot agree on the appropriate frequency and plan for an exercise, owners and operators must still ensure that exercises occur and should establish plans to execute the exercises on their own. The RMP Amendments rule does not require local responders to participate in any of these activities, nor would the proposed Reconsideration rule.

The proposal would not have altered the notification exercise requirement of § 68.96(a) or the provision for alternative means of meeting exercise requirements of § 68.96(c). EPA proposed to correct an error in § 68.96(b)(2)(i) related to the frequency of tabletop exercises by proposing to replace the phrase ''shall conduct a field exercise every three years'' with ''shall conduct a tabletop exercise every three years.'' For provisions of the RMP Amendments that were proposed to be retained, the Agency continued to rely on the rationale and responses provided when we promulgated the Amendments. See 81 FR 13674–76 (proposed RMP Amendments rule), March 16, 2016 and 82 FR 4659–67 (final RMP Amendments rule), January 13, 2017. In summary, EPA found that exercising an emergency response plan is critical to ensure that response personnel understand their roles, that local emergency responders are familiar with the hazards at the facility, and that the emergency response plan is appropriate and up-to date. Exercises also ensure that personnel are properly trained and that lessons learned from exercises can be used to identify future training needs. Poor emergency response procedures during some recent accidents have highlighted the need for facilities to conduct periodic emergency response exercises. Other EPA and federal agency programs and some state and local regulations require emergency response exercises. As an alternative, EPA considered whether to fully rescind the field and tabletop exercise provisions of § 68.96(b). Under that alternative proposal, EPA would have retained the notification exercise provision of § 68.96(a) but revised it and § 68.93(b) to remove any reference to tabletop and field exercises, while also modifying the provision in § 68.96(c) for alternative means of meeting exercise requirements so that it applies only to notification exercises.

EPA also considered another alternative—to remove the minimum frequency requirement for field exercises but retain all remaining provisions of the RMP Amendments rule regarding field and tabletop exercises, including the RMP Amendments rule requirements for exercise scope and documentation.

### *B. Summary of Final Rule*

After review and consideration of public comments, EPA is finalizing the changes to the Amendments rule

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 74 of 91


exercise requirements as proposed. This rule modifies the field exercise frequency provision in § 68.96(b)(1)(i) to remove the minimum frequency for field exercises, retains the required 3-year frequency for tabletop exercises in § 68.96(b)(2)(i); recommends, but does not prescribe the field and tabletop exercise scope requirements in §§ 68.96(b)(1)(ii) and 68.96(b)(2)(ii); and recommends, but does not prescribe the contents of field and tabletop exercise evaluation reports required under § 68.96(b)(3) (the final rule retains the Amendments rule requirement for such reports to be completed within 90 days of each exercise). As proposed, the final rule also corrects an erroneous cross-reference in § 68.96(a) of the final Amendments rule. In this section, the final Amendments rule required the owner or operator of a stationary source with any Program 2 or Program 3 process to conduct an exercise of the source's emergency response notification mechanisms required ''under § 68.90(a)(2) or § 68.95(a)(1)(i), as appropriate.'' However, the final Amendments rule did not contain § 68.90(a)(2); this was an incorrect reference to the notification mechanism requirement for non-responding facilities, which is at § 68.90(b)(3). This error is corrected in the final Reconsideration rule. The final rule retains all other emergency exercise provisions of the Amendments with no changes.

*C. Discussion of Comments and Basis for Final Rule Provisions*

1. Overview of Basis for Final Rule Provisions

We do not rescind or revise the emergency exercise requirements of the 2017 rule except for limited modifications noted above and discussed below. Except for the provisions we modify in this final rule, we reaffirm the basis for the positions we adopted in 2017 as stated at the time and as elaborated below and in the Response to Comments document. The changes we make today tend to add flexibility for both stationary sources as well as local emergency response organizations. Specifically, we have removed the requirement for sources to conduct field exercises no less frequently than every 10 years, and we have changed certain requirements for the scope of field exercises and after exercise reports to advisory provisions (*i.e.,* ''shall'' to ''should'').

These changes should reduce the cost and staffing burden of these provisions both for sources and for local emergency response organizations. While we have not dollarized the cost savings of these changes, we take this approach to be conservative in our estimation of the benefit of these changes rather than to say there are no cost savings. We believe reducing and managing the burden of these provisions is important because, in order to have the emergency exercise provisions be most effective, we must structure the provisions to facilitate the voluntary participation of local emergency response organizations in these exercises. These organizations are neither directly regulated under the structure of the statute nor are they funded under EPA's budget. In particular, we believe the 10 year frequency requirement for field exercises would have been burdensome on local emergency response organizations with multiple RMP facilities; 9 counties have 50 or more RMP facilities. There would be no practicable way for these response entities to participate in all the exercises within their jurisdiction.

The approach adopted today allows for flexibility in scheduling while retaining the requirement to conduct field exercises. Should sources abuse the flexibility in scheduling field exercises to the extent that they effectively negate the requirement to conduct a field exercise, we reserve the ability to argue that they are in non-compliance. The frequency modification we adopt, along with scope and documentation changes, allow for sources and response organizations to tailor the exercise plans reasonably and practicably for source-specific and community-specific conditions.

2. Comments on Proposed Changes to Exercise Requirements

a. General Comments on Exercise Requirements

Numerous commenters, including industry trade associations, a tribal government, an organization representing local governments, and an association of government agencies, supported the changes to the exercise requirements in the proposed rule. These commenters generally acknowledged the benefits of some level of exercises or emergency response training. Commenters described benefits such as promoting understanding of roles and responsibilities, assisting owners or operators in determining if the emergency response plan is adequate, and providing the opportunity to discover shortcomings and incorrect assumptions in response plans. These commenters indicated that the proposed revisions would provide needed flexibility to allow better coordination with local responders and ease the compliance burden on regulated facilities and local responders. One industry trade association provided additional reasons for allowing increased flexibility, including the range of resources available to local emergency response providers, the range in types of hazards at individual facilities, and different levels of interest by communities and local response officials.

On the other hand, several commenters, including a private citizen, a Federal agency, a professional organization, and advocacy groups, opposed the proposed changes to the emergency response exercise requirements. One commenter stated that implementing the proposed changes would reduce the safety of chemical facilities and make them more incident prone. Some commenters, including a Federal agency and a professional organization, expressed concern that the proposed changes would negatively impact the preparedness of emergency responders because responders would have less opportunity to practice skills needed in an emergency. An advocacy group stated that EPA's proposal to weaken the exercise requirements is arbitrary and capricious because while the Agency claimed its rationale for the changes was to reduce the regulatory burden on regulated facilities and local responders, the Agency did not project any cost savings from the change. The commenter argued that weakening a requirement that the Agency found had concrete benefits, without citing any benefits from the change, is arbitrary and capricious. The commenters also stated that EPA's alternative proposal to fully rescind the exercise requirements is even more arbitrary that the proposed modifications, reasoning that removing or weakening the exercise provisions is at odds with EPA's record findings and violates the statutory mandate to provide for adequate response to chemical disasters.

*EPA Response:* EPA agrees with commenters that the exercise provisions are important to enhance sources' and communities' ability to effectively respond to emergencies. The Agency believes removing the minimum exercise frequency requirements for field exercises and modifying the exercise scope and documentation requirements as proposed will still accomplish this goal while providing more flexibility to regulated facilities and local responders to plan and schedule exercises and reducing unnecessary regulatory burdens.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 75 of 91


EPA disagrees that changing the exercise requirements by removing the minimum required frequency for field exercises and providing increased flexibility for the scope and documentation of field and tabletop exercises will make facilities more incident-prone. Emergency response exercises are aimed at reducing the consequences of accidents that may occur rather than preventing accidents from occurring. Therefore, changes to these requirements should have little or no effect on a facility's propensity for incidents. EPA also disagrees that the changes will result in responders having too few opportunities to practice their skills. The Agency believes that regulated facilities and local responders are in the best position to determine how much practice they need in order to be prepared to effectively respond to accidental releases. Under the final rule, EPA has largely retained the Amendments rule's exercise provisions, which allow facilities and local responders to work together to establish a schedule for emergency response exercises that best suits their own circumstances. While the final rule removes a required minimum frequency for field exercises, it retains the required 3-year minimum frequency for tabletop exercises. Therefore, the final rule ensures that regulated facilities and local responders will still have regular opportunities to practice their skills during lower-intensity tabletop exercises, while allowing regulated facilities and local responders to schedule the more resource-intensive field exercises at a frequency that best balances their need for field response training with the larger drain on facility and community resources associated with such exercises.

EPA disagrees that its decision to remove the required minimum frequency for field exercises and make the exercise scope and documentation requirements more flexible is arbitrary or capricious or violates statutory requirements. The Clean Air Act contains no requirement that EPA impose an exercise requirement under section 112(r), and the pre-Amendments rule contained no such requirement. As EPA stated in the proposed Reconsideration rule and RIA, EPA retained its Amendments rule estimate of exercise costs ''as a conservative approach to estimating exercise costs under this proposal. By removing the minimum frequency requirement for field exercises and encouraging facilities to conduct joint exercises and using exercises already conducted under other requirements to meet the requirements of the RMP rule, EPA expects that the total number, and therefore costs, of exercises held for compliance with the rule is likely to be lower than this estimate.'' [103] EPA's decision not to project a specific amount of cost savings associated with these changes does not imply the Agency believes that there will be no actual savings. In eliminating the required minimum frequency for field exercises, EPA was particularly concerned about the burden of exercises on communities with numerous RMP facilities. For example, nine U.S. counties contain over 50 RMP facilities.[104] While not all of these facilities are responding facilities that will be required to comply with the emergency field exercise requirements, many of them are. If EPA were to maintain a 10-year minimum frequency requirement for field exercises, local emergency responders in these counties, and others with large numbers of RMP facilities, may have no practical way to effectively participate in all required field exercises conducted by responding RMP facilities in the county. While the final rule does not require local responders to participate in facility exercises, EPA believes it is in the best interest of regulated facilities and their surrounding communities for local responders to participate in exercises whenever possible, and therefore the Agency does not want to establish a minimum frequency requirement that is practically unachievable for some communities, particularly those communities with the greatest numbers of regulated facilities. EPA also believes that the final rule's modification to the exercise documentation requirements will give increased flexibility to owners and operators in meeting those requirements, making them easier to comply with.

b. Frequency of Field Exercises

Many commenters, including industry trade associations, facilities, and a Tribal government, supported the proposed modification of field exercise frequency requirements. These commenters generally stated that removing the required minimum frequency for field exercises will decrease the cost and burden associated with the exercises.

Many other commenters, including a Federal agency, a State government agency, Tribal governments, a State elected official, advocacy groups, industry trade associations, and a professional organization, opposed the removal of the minimum frequency for field exercises. A State elected official stated that EPA may not lawfully revise field exercise frequency requirements until it has additional information showing the costs were not accurately reflected in the Amendments rule and that the costs outweigh the benefits. A State elected official stated that the proposed modification of the minimum field exercise frequency would not guarantee the prepared and coordinated responses to catastrophic releases necessary to protect public health and safety. Several commenters, including Tribal governments and an industry trade association supported the 10-year minimum exercise frequency provided in the Amendments rule, asserting that providing some minimum frequency is important. An advocacy group stated that the proposed modification of field exercise frequency requirements would hurt the effectiveness of first responders and facilities during a disaster. A Federal agency stated that training in a classroom or via computer-based training modules is not an effective substitute for actual exercises, especially when combined with a debrief and lessons learned. The agency expressed concern that removal of the field exercise frequency requirement would negatively impact the coordination and identification of planning gaps and improvements with local response authorities. A State government agency stated that without a minimum field exercise frequency, exercises can be considered optional. A State government agency expressed that field exercises should occur annually to allow hands-on practice and mitigate the impacts of turnover. The commenter stated that all personnel should participate in exercises, and facilities should invite responding agencies to participate (with the understanding that they may not be able to every year). The commenter recommended that EPA revise the emergency response requirements to be consistent with N.J. Admin. Code § 7:31–5.2(b)2. An advocacy group suggested a minimum field exercise frequency of every two or three years due to turnover of facility employees.

*EPA Response:* EPA agrees with commenters who indicate that removing the minimum field exercise frequency requirement will reduce the burden of exercises on facilities and local responders and provide increased flexibility to plan and schedule

[103] See 83 FR 24874 and proposed rule RIA, pp 48.

[104] Based on RMP National Database, Docket ID: EPA–HQ–OEM–2015–0725–0909. Counties include Harris, Dallas, and Tarrant counties in Texas, Los Angeles, Kern, Fresno, and Tulare counties in California, Cook county in Illinois, and Maricopa county in Arizona.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 76 of 91


exercises. Staffing capabilities are relevant to whether a requirement is practicable.

EPA disagrees that the Agency must demonstrate that the costs of exercises outweigh their benefits in order to revise the exercise requirements. This claim is not supported by the CAA, and in any case, EPA was unable to quantify the benefits of specific provisions of the Amendments rule, so it would not be possible to quantify the change in benefits, if any, resulting from the change. EPA is making this change because the Agency believes it to be a better and more practicable approach toward implementing the field exercise requirement, as it will allow facilities and local communities greater flexibility to balance the need for responder training with the potentially high costs of field exercises, particularly in areas containing many RMP facilities and areas where response resources are more limited. EPA has decided to leave greater flexibilities for the timing of field exercises based in part on our belief that such an approach will, in the absence of federal funding, maximize the voluntary participation of local emergency responders in field exercises.

EPA also disagrees that there is any specific minimum exercise frequency that can ''guarantee'' prepared and coordinated responses to chemical accidents. However, EPA believes that allowing facilities and local responders greater flexibility to plan and schedule exercises will not harm, and may improve, facility and community preparedness for accidents, by allowing facilities and communities to better balance training needs with available resources. As indicated above, in removing the minimum frequency requirement for field exercises, EPA is particularly concerned about the burden of exercises on communities with numerous RMP facilities and the Agency does not want to establish a minimum frequency requirement that is practically unachievable for some communities, particularly those communities with the greatest numbers of regulated facilities.

EPA agrees that training in a classroom or via computer-based training modules is not an effective substitute for actual exercises, and the final rule therefore retains a requirement for all responding facilities with program 2 and/or 3 processes to implement a field exercise program. EPA disagrees that field exercises can be considered optional under the final rule. All responding facilities are still required to perform field exercises. When EPA finalized a 10-year minimum frequency requirement for field exercises under the Amendments rule, the Agency expressed concern that an important reason for such a requirement was to avoid allowing sources to schedule field exercises so infrequently that the source practically exempted itself from the exercise program requirements.[105] While the final Reconsideration rule no longer eliminates this concern, EPA believes that responding sources are unlikely to attempt such an approach. The final rule requires responding sources to have developed plans for conducting emergency response exercises within 4 years of the final rule (see later discussion in section IX. Revised Compliance Dates). If a source schedules field exercises at some extremely long periodicity, repeatedly cancels or reschedules exercises with no justification, or provides no evidence of having implemented a field exercise program, EPA can still take appropriate enforcement actions under the rule.

EPA disagrees that field exercises should be required on an annual, biennial, or triennial basis. Requiring field exercises to be held at shorter minimum frequencies such as these would significantly increase compliance costs and staffing demands for both regulated facilities and local responder agencies, which is contrary to one of EPA's main objectives in the Reconsideration rule. Such an approach would discourage the participation of local emergency responders in field exercises, which is voluntary under both the RMP Amendments and this Reconsideration. The Agency is retaining the Amendments rule requirement for responding facilities to perform tabletop exercises at least every three years, and these, along with field exercises, should mitigate the knowledge loss associated with employee turnover. Responding facilities must invite local response officials to participate in both field and tabletop exercises, but the scope of each exercise will be decided by the owner or operator, in consultation with local response officials. Under the final rule, the number of personnel participating in exercises will depend on the exercise scenario, its scope, and the resources available to regulated facilities and local responders.

c. Frequency of Tabletop Exercises

Several commenters, including industry trade associations, facilities, and a Tribal government, supported the proposed tabletop exercise frequency requirements. An industry trade association suggested that EPA require tabletop exercises less frequently than every three years, suggesting that EPA require responding facilities to perform one tabletop exercise between field exercises or base the frequency of exercise requirements on a facility's particular circumstances (*e.g.,* history of catastrophic releases or RMP noncompliance, quantity of regulated chemicals). A State government agency expressed that tabletop exercises should occur routinely and that once every three years is not sufficient because personnel turnover is often more frequent than every three years. An industry trade association suggested that EPA allow local responders and facilities, especially non-responding facilities, to determine the best frequency for tabletop exercises.

*EPA Response:* EPA acknowledges commenters' arguments for more or less frequent tabletop exercises. However, the final rule retains the Amendments rule requirement for tabletop exercise frequency, which requires responding facilities with any Program 2 or Program 3 process to consult with local response officials to establish an appropriate frequency for tabletop exercises but hold such exercises at a minimum of at least once every three years. EPA believes that a three-year minimum frequency for tabletop exercises, combined with field exercises done at a frequency established by the owner or operator in consultation with local responders, should ensure that facility personnel involved in responding to emergencies receive sufficient training in response to accidental releases, without overtaxing the resources of facilities and local responders. EPA believes that allowing owners and operators to work together with local response officials to establish exercise plans, scope, and schedules should allow each facility to adapt its exercise program to the particular circumstances of the facility.

d. Scope and Documentation Requirements

Many commenters, including industry trade associations and facilities, supported the proposed changes to the exercise scope and documentation requirements. An industry trade association stated that the proposed changes to exercise and evaluation report scope will result in a significant reduction in regulatory burden and will allow emergency response personnel to make decisions about the type of exercise activities that will yield benefits. A few industry trade associations asserted that the proposed evaluation report requirements would

[105] See Amendments rule Response to Comments, pp. 181.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 77 of 91


encourage cooperation between facility owners and local emergency response officials by allowing them to reach agreement on exercise evaluation report content. A few commenters, including industry trade associations, stated that the proposed flexibility for exercise scope will allow owners and operators to tailor exercises based on each facility.

Other commenters either opposed making the scope of exercises and exercise evaluation reports optional or objected to certain recommended data elements. A State government agency and an advocacy group opposed making the scope of exercises and evaluation reports optional. A State government agency stated that ''should'' is inappropriate in a rule and asserted that the listed activities are standard and reasonable requirements. An industry trade association recommended that the proposed items recommended for inclusion in evaluation reports be considered for rescission, asserting that owners or operators would not be able to set a schedule for report recommendations to external participants. An industry trade association recommended that EPA either rescind the proposed exercise scope provisions or revise them to clarify which emergency response equipment procedures must be tested/discussed and to clarify the requirement to include in exercises any other action identified in the emergency response plan, as appropriate. Industry trade associations and an advocacy group opposed the inclusion of the names and organizations of each participant as recommended data elements, for reasons such as burden on facilities, risks to individuals' safety, and providing no perceivable benefit.

*EPA Response:* EPA agrees that making the scope and documentation provisions non-mandatory will reduce regulatory burden and allow emergency response personnel flexibility to decide on an exercise scope and exercise documentation that will be most appropriate for the facility and community. EPA disagrees that the exercise scope provisions should be rescinded, made mandatory, or need greater clarity regarding which equipment procedures must be tested or what other actions identified in the emergency response plan should be included during exercises. EPA's reasons for only recommending the descriptions of information for the exercise scope and documentation were explained in the proposal—in short, the Agency believes that making the listed information discretionary will allow owners and operators to coordinate with local responders to design exercises that are most suitable for their own situations. EPA disagrees that using ''should'' in a regulation is always inappropriate, or that there is a recognized standard set of activities that must be completed during all exercises. Different facilities use a variety of types of emergency response equipment and may have many different actions specified in their emergency response plans. EPA cannot anticipate all variants of equipment and response procedures that might be appropriately exercised by every facility subject to the emergency exercise requirements. Therefore, EPA has finalized language which provides general guidelines for exercise scope, without mandating specific actions or procedures for exercises.

Regarding whether to include the names and organizations of each participant in exercise evaluation reports, EPA disagrees that there is no benefit of such information. Under the final rule, the frequency of both field and tabletop exercises will mainly be left to the discretion of the owner or operator, in collaboration with local response officials. In some cases, exercises may occur infrequently, and EPA believes that maintaining a written record including, among other things, the identification and affiliation of exercise participants could be useful in planning future exercises. EPA disagrees that collecting this information would be unduly burdensome. Owners and operators can collect this information using low-cost methods, such as sign-in sheets or registration websites. Local emergency response organizations participating in exercises will also likely be able to assist the owner or operator in collecting and providing this information. Nevertheless, EPA notes that under the final rule, the items listed for inclusion in exercise evaluation reports are not mandatory but suggested. Therefore, while EPA encourages owners and operators to include the names and organizations of exercise participants in exercise evaluation reports, they are not required to do so. Similarly, while EPA encourages owners and operators to include in the report recommendations for improvements or revisions to the emergency response exercise program and emergency response program, and a schedule to promptly address and resolve recommendations, under the final rule it is not mandatory to do so.

e. Retention of Requirement To Consult With Local Response Officials to Establish Exercise Frequencies and Plans

Several commenters, including industry trade associations and a local agency, supported retaining the requirement to consult with local response officials regarding exercise frequency and planning. An industry trade association stated that the requirement to consult with local response officials provides flexibility while still requiring consultation. Another industry trade association stated that exercises are most valuable when all entities mentioned in emergency response plans participate in drills, but also asked EPA to recognize in the preamble to the final rule that facilities will not be penalized for lack of participation by LEPCs or emergency responders in drills. A few commenters, including an industry trade association and a State elected official, opposed the requirement to consult with local response officials regarding exercise frequency and planning. An industry trade association stated that power plants should be exempt from this requirement due to their limited scheduling flexibility and should be allowed to develop their own schedules for field exercises, without having to agree on a schedule with local officials. This trade association recommended that EPA allow facilities to request from the regulatory authority an exemption from coordinating that facility's field and tabletop exercises with local response officials, stating that an exemption from the requirement to attempt to consult with local response officials would allow companies that have not been successful in gaining the cooperation of local response officials to suspend their efforts. The commenter added that such an exemption could be in perpetuity or could be subject to an expiration date. An industry trade association stated that the proposed emergency coordination requirements, including the requirement to consult on schedules and plans for exercises, are duplicative and conflict with other statutes and regulations.

*EPA Response:* The final rule retains the requirement to consult with local response officials to establish appropriate frequencies and plans for field and tabletop exercises. EPA disagrees that power plants should be exempt from this requirement. EPA acknowledges that some facilities, such as power plants and other utilities, may have less scheduling flexibility than other facilities. However, EPA believes that local response officials should still be involved in planning, scheduling, and conducting field and tabletop exercises at such facilities whenever possible, as they will likely be key players in the event of an actual incident, particularly an incident with

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 78 of 91


offsite impacts. By involving local public responders in exercises, responders may be able to test or simulate important offsite emergency response actions that are usually managed by local public emergency response officials, such as community notification, public evacuations, and sheltering in place. The final rule's removal of the required minimum frequency for field exercises should make it easier for owners and operators to schedule field exercises involving local responders. While the final rule retains the Amendments rule's 3-year minimum frequency requirement for tabletop exercises, it does not require the first tabletop exercise to be held until up to seven years after the effective date of the final rule (*i.e.,* the final rule requires responding sources to have exercise plans and schedules in place within four years of the effective date of a final rule (§ 68.10(d)), but provides an additional three years before the first tabletop exercise must actually be completed (§ 68.96(b)(2)(i)). EPA believes this time frame should give all responding facilities sufficient time to consult with local response officials to plan and schedule exercises.

While the final rule retains the requirement for owners and operators to coordinate with local response officials on exercise frequencies and plans, and to invite local officials to participate in exercises, EPA emphasizes that the final rule does not require local responders to participate in any of these activities. EPA understands that it may not always be possible for such participation to occur, for several reasons. First, owners and operators cannot compel local responders to participate in exercises or exercise planning. As EPA has previously stated,[106] in the past some sources have been unable to locate local response organizations who are able or willing to be involved in exercise activities. EPA also acknowledges that in areas with few public response resources or high numbers of responding facilities, requests from owners and operators for local responders to participate in exercises and exercise planning could overburden local response organizations. Therefore, if the owner or operator is unable to identify a local emergency response organization with which to develop field and tabletop exercise schedules and plans and participate in exercises, or the appropriate local response organizations are unable or unwilling to participate in these activities, then the owner or operator may unilaterally establish appropriate exercise frequencies and plans, and if necessary hold exercises without the participation of local responders. In such cases, there is no need for the owner or operator to request from regulatory authorities an exemption from the coordination requirement. The owner or operator should document its attempts to consult with local responders and continue to make reasonable ongoing efforts to consult with appropriate local public response officials for purposes of participation in emergency response and exercises coordination and participation.

Lastly, while the final rule requires the owner or operator to coordinate with local response officials on exercise schedules and plans, this does not mean that the owner or operator must accede to every recommendation made by local response officials. In most case, EPA expects that owners and operators and local response officials will be able to reach agreement on reasonable and practicable schedules and plans for field and tabletop exercises. However, in the event of a disagreement, it is the owner or operator that must comply with the exercise requirement and who therefore must have the final say on exercise schedules and plans.

EPA disagrees that the final rule's exercise requirements are duplicative of other exercise requirements or conflict with other statutes and regulations. The commenter provided no examples of any such conflicts, and there are no other existing exercise requirements that apply to all responding RMP facilities. Where exercise requirements under other Federal, state, or local laws do apply to certain RMP facilities, those facilities may use such exercises to meet the exercise requirements of the final rule, provided those exercises involve the simulated release of a regulated substance or involve the same actions that a regulated facility would take to respond to such a release.

f. Retention of Notification Exercise Requirements

Several commenters, including industry trade associations, a State government, a facility, and Tribal governments, supported the maintenance of the notification exercise requirements. A Tribal government encouraged EPA to require facilities to conduct notification exercises on a frequent enough basis to ensure that emergency contact information is accurate, and that response resources and capabilities are in place. A State government agency recommended that the notification exercise requirements be applicable to both non-responding and responding facilities. An industry trade association stated that all facilities should already be conducting notification exercises under current rules, and thus the notification exercise requirements are not necessary. The commenter also asserted that EPA's proposal added ambiguity to the notification exercise requirement by specifying that facilities are to conduct notification exercises ''as appropriate,'' and that if EPA retains the requirement, the Agency should clarify that it affords facilities the discretion to determine the appropriateness of exercises.

*EPA Response:* The final rule retains the Amendments rule notification exercise requirement, with no changes. Almost all commenters agreed with retaining this requirement. The notification exercise requirement applies to all facilities (*i.e.,* both responding and non-responding facilities) with any Program 2 or Program 3 process. EPA disagrees that there is any pre-existing requirement for notification exercises that applies to all RMP facilities with Program 2 or Program 3 processes; however, if a previously existing requirement applies to certain facilities, those facilities may use compliance with that requirement to comply with the final rule requirement, provided the owner or operator maintains a written record of each such notification exercise conducted over the last five years, as required under § 68.96(a). EPA also disagrees that the proposed rule added ambiguity to the notification exercise requirement, or that the meaning of the phrase ''as appropriate'' is unclear. Where the rule uses the phrase ''as appropriate,'' it clearly refers to the immediately preceding regulatory text. The proposed rule requires the owner or operator of a stationary source with any Program 2 or Program 3 process to conduct an exercise of the stationary source's emergency response notification mechanisms required ''under § 68.90(b)(3) or § 68.95(a)(1)(i), as appropriate.'' § 68.90(b)(3) is the requirement for non-responding facilities to have an emergency response notification mechanism in place. § 68.95(a)(1)(i) is the requirement for responding facilities to have procedures for informing the public and Federal, state, and local emergency response agencies about accidental releases. Therefore, ''as appropriate'' means that non-responding facilities should exercise the mechanism required under 68.90(b)(3) and responding facilities should exercise the procedures required under § 68.95(a)(1)(i).

[106] See Amendments rule RTC, page 185.

g. Comments on Alternative Proposal To Fully Rescind Field and Tabletop Exercise Provisions

Several commenters, including industry trade associations, a local agency, multiple State elected officials and a facility, supported the alternative to fully rescind field and tabletop exercise provisions. A facility and an industry trade association supported the proposed alternative because the exercise requirements impose significant burdens. An industry trade association supported the alternative, reasoning that neither the Amendments rule nor this proposed Reconsideration rule provided any documented justification for EPA to impose these additional requirements on top of other existing regulations. An industry trade association and multiple State elected officials asserted that the Amendments rule exercise requirements should be removed because they would overburden response organizations and facilities. These commenters also stated that EPA should not establish its own criteria for notifications and exercises, which are unnecessary and potentially inconsistent with existing requirements. These commenters stated that the NIMS provides a consistent national framework and approach to coordination of emergency preparedness, prevention, and response, and notifications and exercises should be conducted through this system and consistent with it. These commenters also stated that during an incident, operations should be conducted through the incident command structure established under NIMS, rather than by creating an ''uncoordinated overlay'' to the existing incident command structure, as the RMP Amendments rule does.

Several commenters, including a State elected official, industry trade associations, and a Tribal government, opposed the alternative to fully rescind field and tabletop exercise provisions. A State elected official stated that the alternative would not guarantee the prepared and coordinated responses to catastrophic releases necessary to protect public health and safety (1633). A State elected official opposed the alternative because the commenter stated that EPA has not provided an explanation for why previous reasons for rejecting the elimination of exercise requirements provided in the Amendments rule are no longer valid.

*EPA Response:* The final rule does not adopt the alternative proposal to fully rescind the field and tabletop exercise provisions. While EPA is conscious of the potentially high burdens associated with exercises, EPA reaffirms its view that both field and tabletop exercises are an important component of an emergency response program. EPA believes that the changes made to the exercise provisions in the final rule will reduce the burden of exercises on responding facilities by allowing facilities greater flexibility in scheduling field exercises and determining the scope of and documentation for exercises. The additional flexibilities in terms of frequency of field exercises and scope of exercises also will lessen the burden on local emergency response organizations to participate in exercises; facilitating such voluntary participation will make the exercises more effective. EPA disagrees that the final rule's requirement for exercises conflicts with the NIMS. See *section* VI. ''Modified Local Coordination Amendments'' for a further explanation of why EPA believes that nothing in the RMP rule conflicts with the NIMS.

h. Comments on Alternative Proposal To Remove the Minimum Frequency Requirement for Field Exercises, but Retain All Remaining RMP Amendments Provisions Regarding Field and Tabletop Exercises

Several industry trade associations opposed the alternative proposal to remove the minimum frequency requirement for field exercises but retain all remaining provisions of the RMP Amendments rule regarding field and tabletop exercises. An industry trade association opposed the alternative because it would not allow for flexibility in determining the scope of exercises. Another industry trade association opposed the alternative because it would not allow for flexibility in documentation requirements, stating that if a facility is captured in a community response plan, no further documentation should be needed. Another industry trade association stated that the proposed alternative would decrease facility flexibility in planning and conducting exercises.

*EPA Response:* The final rule does not adopt the alternative proposal to remove the minimum frequency requirement for field exercises but retain all remaining provisions of the RMP Amendments rule regarding field and tabletop exercises. EPA agrees with commenters that stated the alternative would not offer sufficient flexibility to schedule and plan exercises. EPA believes the changes made to the exercise provisions in the final rule will reduce the burden of exercises on responding facilities and local responders by allowing facilities and responders greater flexibility in scheduling field exercises and in deciding on the scope of and documentation for exercises.

i. Meeting Exercise Requirements Through Alternative Means

Several commenters, including industry trade associations, supported retaining the provision allowing for exercise requirements to be met through alternative means. An industry trade association suggested that EPA clarify that prior exercises that ''substantially meet'' the exercise requirements satisfy RMP requirements, such as exercises conducted under the National Preparedness for Response Exercise Program (PREP) Guidelines, stating that such a provision would help conserve resources among facilities and oversight agencies. The commenter also requested that EPA clarify in the final rule that companies can make the determination that an alternative meets the requirements of the regulation without prior approval from regulatory authorities. An industry trade association suggested that for clarity EPA should replace the term ''field exercise'' with one of the three types of operations-based exercises described under the Homeland Security Exercise and Evaluation Program: Drills, functional exercises, or full-scale exercises.

*EPA Response:* EPA agrees that the provision allowing exercise requirements to be met through alternative means should be retained, and therefore the final rule retains this provision. Exercises conducted to satisfy other exercise requirements or conducted voluntarily, or an actual response by the source to an accidental release, will also satisfy the final rule's exercise requirements if they meet the requirements of § 68.96. In order to substantially meet the exercise requirements of the final rule, a notification exercise must test the mechanisms or procedures the facility has established to notify the public and local emergency responders about the release of a regulated substance and be documented in a written record that is retained for five years. A field or tabletop exercise must involve the simulated accidental release of a regulated substance or involve the same actions (for a tabletop exercise, discussion of actions) that a regulated facility would take to respond to such a release. Field and tabletop exercises must also involve facility emergency response personnel and emergency response contractors as appropriate and include response coordination with local public emergency response officials, who would also be invited to

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 80 of 91


participate in the exercise. Field and tabletop exercises must also include preparation of an evaluation report within 90 days of the exercise. The final rule does not require the owner or operator to obtain outside approval to determine that an alternative exercise meets the requirements of the regulation.

Exercises conducted under the PREP Guidelines are intended for facilities required to comply with the federal oil pollution response exercise requirements of the Oil Pollution Act of 1990. For such an exercise to meet the requirements of the RMP rule, the owner or operator must ensure that the exercise includes the items required under § 68.96. Since not all of these items (*e.g.,* simulated accidental release of an RMP-regulated substance) would be a typical feature of an oil spill response exercise, the owner or operator would likely need to modify the oil spill response exercise scenario to incorporate any required features of § 68.96 that were not already included in the scenario.

EPA disagrees that the Agency should replace the term ''field exercise'' with one of the three types of operations-based exercises described in the Homeland Security Exercise and Evaluation Program (HSEEP).[107] The term field exercise is a general term that indicates the exercise involves mobilization of personnel and equipment. In this sense, field exercises are analogous to the general category of operations-based exercises, and EPA believes any of the three types of operations-based exercises described in the HSEEP can potentially meet the field exercise requirements of the final rule.

j. Tiered Approach To Exercise Requirements

An industry trade association recommended that EPA consider a tiered approach to exercise requirements so that they apply most stringently to the facilities that are at risk for having a catastrophic release. The commenter suggested several potential options for a tiered approach, including by quantity of ammonia, by industry sectors with a history of catastrophic events and/or RMP noncompliance, by North American Industrial Classification System codes.

*EPA Response:* EPA disagrees that the Agency should adopt a tiered approach to exercise requirements that applies more stringent requirement to facilities that are at risk for a catastrophic release, as demonstrated by larger quantities of regulated substances or a history of accidents, etc. EPA did not propose such alternatives. The Agency views field and tabletop exercises as important components of an emergency response program for all responding stationary sources, because they allow these sources to implement their emergency response plans under simulated release conditions, test their actual response procedures and capabilities, identify potential shortfalls, and take corrective action. EPA also continues to believe both field and tabletop exercises will provide essential training for facility personnel and local responders in responding to accidental releases and will ultimately mitigate the effects of such releases at RMP facilities. Therefore, in the final rule, EPA is requiring all responding stationary sources to perform both field and tabletop exercises.

k. Joint Exercises

An advocacy group disagreed with the elimination of joint exercise requirements and associated reporting requirements. An industry trade association suggested that EPA consider ways in which exercise requirements could be revised to recognize sharing of resources among neighboring facilities in conducting exercises.

*EPA Response:* The Amendments rule contained no requirement for joint exercises, and the final rule does not incorporate one. However, in the Response to Comments for the Amendments rule, EPA encouraged owners and operators of neighboring RMP facilities to consider planning and conducting joint exercises to meet the rule's requirements.[108] EPA reaffirms this view—as commenters have noted, RMP facilities participating in mutual aid agreements with other nearby facilities already coordinate response actions and resources with those facilities, and EPA believes conducting joint exercises among these facilities will more accurately simulate their behavior in the event of an actual release event, and further enhance the ability of these facilities and surrounding communities to effectively respond to accidental releases. The benefits of joint exercises can also include improved identification and sharing of response resources, enhanced training for facility personnel and local responders, improvements in facility procedures and practices resulting from information sharing, and other benefits.

l. Exercise Evaluation Report Time Frame

Several industry trade associations requested that EPA extend the time required for preparing evaluation reports, asserting that reports may take longer than 90 days to document.

*EPA Response:* EPA has retained the Amendments rule requirement for field and tabletop exercise evaluation reports to be completed within 90 days. EPA disagrees that this timeframe should be extended to some longer period. Unlike incident investigations, where report completion may require extensive and time-consuming evidence collection and forensic analysis, the basic elements required to be documented in an exercise evaluation report should be known relatively quickly after the conclusion of the exercise. Also, as the final rule only recommends a specific list of items to be included in exercise evaluation reports, the owner or operator now has additional flexibility to decide on the appropriate contents of exercise reports, and this should make it easier to meet the 90-day requirement.

## VIII. Revised Emergency Response Contacts Provided in Risk Management Plan

### *A. Summary of Proposed Rulemaking*

EPA proposed to modify the emergency response contact information required to be provided in a facility's RMP. In § 68.180(a)(1) of the RMP Amendments rule, EPA required the owner or operator to provide the name, organizational affiliation, phone number, and email address of local emergency planning and response organizations with which the stationary source last coordinated emergency response efforts. EPA proposed to modify this requirement to read: ''Name, phone number, and email address of local emergency planning and response organizations . . . .'' EPA also proposed to update a CFR paragraph cross-reference in this section referring to the emergency response coordination provision for Program 1 sources, now in § 68.10(g)(3).

### *B. Summary of Final Rule*

EPA has finalized these changes as proposed.

### *C. Discussion of Comments and Basis for Final Rule Provisions*

EPA received relatively few comments on these issues. A few industry trade associations stated that

[107] See DHS, Homeland Security Exercise and Evaluation Program (HSEEP), April 2013, pp. 2–5, available in the rulemaking docket. HSEEP discusses two categories of exercises: Discussion-based exercises which include seminars, workshops, tabletop exercises, and games; and Operations-based exercises, which include drills, functional exercises and full-scale exercises.

[108] See Amendments rule Response to Comments, pp. 189–190.

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 81 of 91


they supported the proposed change to the reporting of emergency contact information as required by § 68.180(a)(1) and argued that availability of this information could create an increase of security and safety concerns. An industry trade association argued that providing information about individuals would put the safety of the named individuals at risk. In contrast, a joint submission from multiple advocacy groups and other commenters argued that EPA's concerns with national security risks were not sufficient to limit emergency response organizations' contact information.

*EPA Response:* EPA agrees with commenters that the revised language alleviates a potential security concern. As EPA stated in the proposed rule, this change would clarify that the Agency is only requiring reporting of organization-level information about local emergency planning and response organizations in a facility's RMP rather than information about individual local emergency responders. EPA believes there is no benefit to requiring the owner or operator to identify specific emergency response personnel in their RMP. To the extent local emergency responders need the identity of specific individuals for purposes of emergency planning, they can obtain this information during annual coordination meetings.

## IX. Revised Compliance Dates

### *A. Summary of Proposed Rulemaking*

In the RMP Amendments rule, EPA required compliance with the new provisions as follows:

- Required compliance with emergency response coordination activities by March 14, 2018;
- Required compliance with the emergency response program requirements of § 68.95 within three years of when the owner or operator initially determines that the stationary source is subject to those requirements;
- Required compliance with other major provisions (*i.e.,* third-party compliance audits, root cause analyses and other added requirements to incident investigations, STAA, emergency response exercises, and information availability provisions), unless otherwise stated, by March 15, 2021; and;
- Required the owner or operator to correct or resubmit their RMP to reflect new and revised data elements promulgated in the RMP Amendments rule by March 14, 2022.

EPA did not specify compliance dates for the other minor changes to the Subpart C and D prevention program requirements. Therefore, under the RMP Amendments rule, compliance with these provisions was required on the effective date of the RMP Amendments rule. In the RMP Reconsideration rule, EPA proposed to extend compliance dates as follows:

- For emergency response coordination activities, EPA proposed to require compliance by one year after the effective date of a final rule.
- For emergency response exercises, EPA proposed to require owners and operators to have exercise plans and schedules meeting the requirements of § 68.96 in place by four years after the effective date of a final rule. EPA also proposed to require owners and operators to have completed their first notification drill by five years after the effective date of a final rule, and to have completed their first tabletop exercise by 7 years after the effective date of a final rule. Under this proposal, there would be no specific compliance date specified for field exercises, because field exercises would be conducted according to a schedule developed by the owner or operator in consultation with local emergency responders.
- For corrections or resubmissions of RMPs to reflect reporting on new and revised data elements (public meeting information and emergency response program and exercises), EPA proposed to require compliance by five years after the effective date of a final rule.
- For third-party audits, STAA, root cause analyses and other new provisions of the RMP Amendments rule for incident investigations and chemical hazard information availability and notice of availability of information, as well as other minor changes to the Subpart C and D prevention program requirements (except for (1) the two changes that would revise the term ''Material Safety Data Sheets'' to ''Safety Data Sheets (SDS)'' in §§ 68.48 and 68.65, (2) the use of the term ''report(s)'' in place of the word ''summary(ies)'' in § 68.60, and (3) the requirement in § 68.60 for Program 2 processes to establish an incident investigation team consisting of at least one person knowledgeable in the process involved and other persons with experience to investigate an incident), EPA proposed to rescind these provisions. If the final rule did not rescind these provisions, EPA proposed to require compliance with any of these provisions that are not rescinded, by four years after the effective date of a final rule.
- For the public meeting requirement in § 68.210(b), EPA proposed to require compliance by two years after the effective date of a final rule.
- EPA proposed to retain the requirement to comply with the emergency response program requirements of § 68.95 within three years of when the owner or operator initially determines that the stationary source is subject to those requirements.

For provisions of the RMP Amendments that EPA proposed to retain, EPA relied on the rationale and responses provided when EPA promulgated the Amendments. See 81 FR 13686–91 (proposed RMP Amendments rule), March 14, 2016 and 82 FR 4675–80 (final RMP Amendments rule), January 13, 2017.

For the emergency coordination requirements, EPA found that one year was sufficient to arrange and document coordination activities, three years was needed to comply with emergency response program requirements once a source determined that those requirements applied, and five years was necessary to update risk management plans. Three years to develop an emergency response program is necessary for facility owners and operators to understand the requirements, arrange for emergency response resources and train personnel to respond to an accidental release. EPA stated that compliance with emergency coordination requirements could require up to one year because some facilities who have not been regularly coordinating will need time to get familiar with the new requirements, while having some flexibility in scheduling and preparing for coordination meetings with local emergency response organizations whose resources and time for coordination may be limited. EPA also argued that a shorter timeframe may be difficult to comply with, especially for RMP sources whose local emergency organization has many RMP sources in their jurisdiction who are trying to schedule coordination meetings with local responders at the same time.

For the emergency response exercises, EPA proposed a four year compliance time for developing exercise plans and schedules, an additional year for conducting the first notification exercise, and an additional three years for conducting the first tabletop exercise, because EPA believed that additional time is necessary for sources to understand the new requirements for notification, field and tabletop exercises, train facility personnel on how to plan and conduct these exercises, coordinate with local responders to plan and schedule exercises, and carry out the exercises. Additional time would also provide owners and operators with flexibility to

plan, schedule, and conduct exercises in a manner which is least burdensome for facilities and local response agencies. Also, EPA planned to publish guidance for emergency response exercises and once these materials are complete, owners and operators would need time to familiarize themselves with the materials and use them to plan and develop their exercises. If local emergency response organizations are to be able to participate in the field and tabletop exercises, sufficient time is needed to accommodate any time or resource limitations local responders might have not only for participating in exercises, but for helping to plan them.

For the public meeting requirement in § 68.210(b), EPA proposed to require compliance by two years after the effective date of a final rule. The RMP Amendments rule allows four years for compliance for the public meeting which was consistent with the compliance date for other information to be required to the public by § 68.210. However, EPA proposed to remove the requirement to provide to the public the chemical hazard information in § 68.210(b), the notice of availability of information in § 68.210(c), and the timeframe for providing information in § 68.210(d), as well as to remove the requirement to provide the chemical hazard information in § 68.210(b) at the public meeting. The stationary source would only be required to provide the chemical accident data elements specified in § 68.42(b), data which should already be familiar to the source because this information is currently required to be reported in their risk management plan. Thus, EPA proposed that two years should be enough time for facilities to be prepared to provide the required information at a public meeting after an RMP reportable accident.

With regard to the five-year compliance date for updating RMPs with newly-required information, EPA proposed this time frame because EPA will need time to revise its RMP submission guidance for any provisions finalized and also to revise its risk management plan submission system, RMP*eSubmit, to include additional data elements. Sources will not be able to update risk management plans until the revised RMP*eSubmit system is ready. Also, once the software is ready, some additional time is needed to allow sources to update their risk management plans while preventing potential problems with thousands of sources submitting updated risk management plans on the same day.

*B. Summary of Final Rule*

With the exception of the proposed compliance dates for emergency response coordination activities and public meetings, EPA is finalizing compliance dates as proposed. For the following minor prevention provisions that EPA is retaining, the final rule does not extend their compliance date, which was the effective date of the Amendments rule:

(1) The two changes that would revise the term ''Material Safety Data Sheets'' to ''Safety Data Sheets (SDS)'' in §§ 68.48 and 68.65,

(2) the use of the term ''report(s)'' in place of the word ''summary(ies)'' in § 68.60, and

(3) the requirement in § 68.60 for Program 2 processes to establish an incident investigation team consisting of at least one person knowledgeable in the process involved and other persons with experience to investigate an incident).

The compliance date for the revised emergency response coordination provisions is set to the final rule effective date, as specified under § 68.10(a)(4), which establishes the final rule effective date as the default compliance date for any revisions to part 68 unless otherwise specified. EPA made this change from the proposed rule because of the D.C. Circuit Court vacatur of the RMP Delay Rule, which made the emergency coordination provisions from the Amendments rule effective on September 21, 2018. Because sources are already required to comply with these requirements as a result of the Delay Rule vacatur, and no new obligations are created related to emergency response coordination activities by the Reconsideration rule, EPA does not believe additional time is needed to comply with the revised emergency response coordination requirements.

For public meetings, EPA is retaining the compliance date established in the Amendments rule. The Court's vacatur of the Delay Rule made the Amendments rule public meeting provision effective with a future compliance date of March 15, 2021. As with the revised emergency coordination requirements, the final rule creates no new obligations relative to the public meeting requirements, and EPA therefore sees no reason to further delay this compliance date.

Regarding the five-year compliance date for updating RMPs with newly-required information, the final rule clarifies that applicable new information elements associated with public meetings, emergency response programs, and emergency response exercises are required to be provided in any risk management plan initial submission or update required by pre-Amendments regulations to be submitted later than five-years after the final rule effective date. In other words, newly registered sources are not required to provide applicable new information elements in their initial risk management plan submission for initial submissions made prior to five years beyond the final rule effective date, and currently registered sources are not required to update and resubmit their plans to provide the applicable new information elements until the source reaches its next five-year anniversary date or another update trigger specified in § 68.190 that occurs after five years beyond the final rule effective date. EPA notes that when any of these triggers are reached, sources must include the new information element in § 68.160(b)(21), indicating whether a public meeting has been held, and the completion dates of the most recent notification, field and tabletop exercises as required under § 68.180, as applicable. EPA added the term ''as applicable'' in the emergency response program and exercise reporting compliance date provision of § 68.10(f)(4) because the provision refers to § 68.180(b), which contains requirements that do not apply to all sources (*e.g.,* only responding sources with Program 2 or 3 processes are required to perform field and tabletop exercises). EPA added ''as applicable'' to § 68.10(b) and (d) for the same reason. EPA also notes that some sources may not have completed initial tabletop and field exercises by the time their RMP is updated following the five-year compliance date specified in § 68.10(f)—in such cases, these dates would not be required to be included in the updated submission. Sources may but are not required to update or correct their RMP to add applicable new information elements any time after EPA makes this new functionality available within EPA's online RMP submission system, RMP*eSubmit.

*C. Discussion of Comments and Basis for Final Rule Provisions*

1. Overview of Basis for Final Rule Provisions

The final rule is the culmination of a substantive review of the provisions promulgated in 2017 and in effect since the *AAH* mandate issued on September 21, 2018. In setting compliance dates for the provisions retained from the 2017 rule or modified by this rule, EPA has assessed how to achieve compliance as expeditiously as practicable with each individual provision. For example, we

have retained the Amendments rule compliance dates for the emergency coordination and public meeting provisions even though we have made minor changes because these do not impose additional burden on sources for compliance. Sources are already required to comply with the Amendments rule's emergency coordination provisions, and compliance with the final rule's revised provision can be met on a going-forward basis. These are like the minor procedural requirements that the legislative history suggests can be quickly met. See Senate Report at 245. Similarly, the Amendments rule established a compliance date of March 15, 2021 for the public meeting provision, and the changes made to this provision in the final rule narrow its applicability and do not impose any additional compliance burden on sources still subject to it. Therefore, EPA sees no reason to further delay the public meeting compliance date established under the Amendments rule.

The most significant change of compliance date and terms of compliance involves the dates by which sources must plan and conduct emergency exercises. We believe the schedule we adopt today better accounts for the burden upon local emergency response organizations for voluntarily participating in these exercises. While it is not a mandate of the rule to have local responders participate in any of the exercises, we believe the most effective drills will involve the participation of these entities in source drills. We believe retaining a March 15, 2021 compliance date for the provisions of § 68.96 would overwhelm many local emergency response organizations and discourage their participation. This is especially true at the counties with multiple facilities subject to the RMP rule, including several with more than 50 facilities. The need for local emergency responders to voluntarily participate in emergency exercises despite the lack of funding and the inability of EPA to compel their participation makes this requirement more like the specialized programs that would require more time to implement than the pure procedural provisions. See Senate Report at 245. We believe the new time frames set compliance dates that are as expeditious as practicable for meeting the goals of the emergency exercise provisions. Other changes to compliance dates we make in the final rule better coordinate information submissions in RMPs with the development of the revised content of those submissions. Allowing sources to provide new information elements whenever their next submission would otherwise have been required will also prevent thousands of sources from being required to resubmit RMPs on the same date.

2. Comments on Compliance Date for Emergency Response Coordination Activities

An advocacy group argued that emergency response coordination activity requirements should not be further delayed. A joint comment submission from multiple advocacy groups and other commenters stated that further delay of coordination activities conflicted with EPA statutory requirements. In contrast, a few industry trade associations stated that EPA should provide a longer lead time for compliance of emergency response coordination activities to increase flexibility and allow for more effective emergency plans.

*EPA Response:* The final rule requires compliance with the revised emergency response coordination requirements on the effective date of the final rule. While EPA disagrees that further delaying compliance dates for this requirement would necessarily conflict with statutory requirements, EPA made this change from the proposed rule because of the D.C. Circuit Court vacatur of the RMP Delay Rule, which made the emergency coordination provisions from the Amendments rule effective on September 21, 2018. Because sources are already required to comply with the Amendments rule coordination requirements, and no new obligations are created related to emergency response coordination activities by the Reconsideration rule, EPA does not believe additional time is needed to comply with the emergency response coordination requirements.

3. Comments on Emergency Response Program Compliance Date

An industry trade association expressed support for requiring compliance with the emergency response program requirements of § 68.95 within 3 years of when the owner or operator initially determines that the stationary source is subject to those requirements.

*EPA Response:* EPA agrees with the commenter and did not propose any changes to this requirement. The final rule retains the Amendments rule requirement for compliance with the emergency response program requirements of § 68.95 within 3 years of when the owner or operator initially determines that the stationary source is subject to those requirements.

4. Comments on Compliance Date for Emergency Response Exercises

A State government agency expressed opposition to allowing facilities seven years from the effective date of the final Reconsideration rule to conduct a tabletop exercise, indicating that facilities can coordinate with local officials and conduct an initial tabletop exercise within three years of the effective date of the rule.

An industry trade association supported the proposed changes to the exercise compliance dates, indicating that it would provide greater flexibility to meet the requirements. Another trade association supported EPA's proposed requirement to have exercise plans and schedules in place within four years of the effective date of the final rule but stated that deadlines for the first exercise would be established in the exercise schedule developed in consultation with local responders. Two industry trade associations questioned whether extended compliance times in the proposed Reconsideration Rule were necessary given that a response structure existed under EPCRA and the OSHA Hazardous Waste Operations and Emergency Response Standard. One of these trade associations stated that a shorter compliance time of a year would be appropriate if cooperation with LEPC was obtained.

*EPA Response:* As EPA stated in the proposed rule, we believe that additional time is necessary for many sources to understand the new requirements for exercises, train personnel, coordinate with local responders, and carry out the exercises. Additional time will also provide owners and operators with flexibility to plan, schedule, and conduct exercises in a manner which is least burdensome for facilities and local response agencies. EPA disagrees that either EPCRA or the OSHA Hazardous Waste Operations and Emergency Response standard contain exercise requirements analogous to those in the final rule.

While EPA agrees that in some cases, sources will not need four years to plan exercises and an additional three years to complete a tabletop exercise, EPA remains concerned about requiring exercises to be completed sooner, particularly in communities with numerous RMP facilities (see *section VII. ''Modified Exercise Amendments,''* for further discussion of this issue). If EPA requires compliance with field and tabletop exercise requirements without providing sufficient lead time for compliance, local emergency responders

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 84 of 91


in communities with large numbers of RMP facilities may have no practical way to effectively participate in tabletop and field exercises conducted by responding RMP facilities in the community. While the final rule does not require local responders to participate in facility exercises, EPA believes it is in the best interest of regulated facilities and their surrounding communities for local responders to participate in exercises whenever possible, and therefore the Agency does not want to establish a compliance time frame that overburdens facilities or local responders. Also, EPA plans to publish guidance for emergency response exercises and once these materials are complete, owners and operators will need time to familiarize themselves with the materials and use them to plan and develop their exercises. EPA encourages owners and operators and local emergency response officials to plan and conduct exercises sooner than required under the final rule if facility and community resources are available for the exercises.

5. Comments on Compliance Date for Corrections or Resubmissions of RMPs for New and Revised Data Elements

An industry trade association supported EPA's proposal to require sources to update their risk management plans by five years after the effective date of the final rule.

*EPA Response:* The final rule allows sources at least five years after the effective date of the final rule to update their risk management plans. The final rule makes clear that sources would be required to provide applicable new information elements associated with revised provisions in any required risk management plan submission made later than 5 years after the effective date of the final rule.

6. Comments on Compliance Date for Public Meeting Requirements

An industry trade association expressed support for EPA's proposed compliance date for the public meeting requirements of two years after the effective date of a final rule. Another industry trade association argued that the deadline for implementing the public meeting requirement should be four years after the effective date of the final rule.

*EPA Response:* In the final rule, EPA is requiring compliance with the public meeting requirements for specified accidents that occur after March 15, 2021. This means that for any accident with any known offsite impacts specified in § 68.42(a) that occurs after March 15, 2021, the owner or operator must conduct a public meeting within 90 days of the accident. In the proposed rule, EPA argued that with the rescission of the other public information availability requirements of the Amendments rule, two years would be enough time for facilities to be prepared to provide the required information at a public meeting. However, the D.C. Circuit Court's decision in the *AAH* case placed the Amendments rule provision into effect with a compliance date of March 15, 2021. As the changes made to this provision in the final rule narrow its applicability and do not impose any additional compliance burden on sources still subject to it, EPA sees no reason to further delay the compliance date established under the Amendments rule. Sources should still have ample time to prepare to conduct public meetings.

7. Other Comments on Compliance Dates

Many industry trade associations stated that the proposed compliance date delays would allow facilities time to evaluate and develop strategies to ensure compliance. Similarly, an industry trade association argued that the proposed compliance dates were reasonable because some requirements of the rule may require consultation with third-parties that may have time constraints and limited resources.

On the other hand, an advocacy group and multiple State elected officials argued that EPA failed to provide a reasoned explanation for further delaying compliance dates for local emergency coordination, emergency response exercises, and public meetings provisions. Similarly, a joint submission from multiple advocacy groups and other commenters argued that further delay of compliance dates of provisions that EPA proposed to retain would be unlawful and arbitrary. A tribal government argued that further delay of compliance dates would potentially endanger the public, responding emergency personnel, and the environment.

*EPA Response:* EPA has provided a reasoned explanation for each of the compliance dates established in the final rule.

An indication of EPA's serious consideration of compliance date extensions for each remaining provision of the Amendments rule is that the final rule does not extend compliance dates for every modified Amendments rule provision, and where compliance dates are extended, not all of those dates are tolled relative to their original compliance date. The Agency has not extended the compliance date of the emergency coordination provision or the few minor prevention provisions retained in the final rule, as regulated facilities are already required to comply with them, and any changes made by EPA do not introduce any new compliance obligations. EPA also retained the compliance date for the public meeting requirement established in the Amendments rule. Instead of tolling the compliance date for this provision, EPA retained the Amendments rule's compliance date (March 15, 2021) because of the reduced compliance obligation associated with the rescission of the other information availability provisions and the narrower scope and applicability of the revised public meeting provision under the final rule.

Compliance dates for the exercise provisions were extended because EPA made more substantial changes to those provisions, and because the Agency remains concerned about the high burden of emergency response exercises on both regulated facilities and emergency responders, particularly in areas with numerous RMP-regulated facilities. While we do not mandate participation of local emergency responders in any of the drills, EPA has always viewed as important and encouraged their participation. We have concerns about making the requirement overly-burdensome on their participation. By deferring the date these exercise requirements must begin, we give the responders more lead-time to plan their participation. Recognizing that the legislative history and the *AAH* decision both emphasize the need for setting compliance dates early when changes are simple to implement like small procedural changes, we believe that retaining the March 2021 compliance date would interfere with obtaining participation of local emergency responders. Deferring the compliance date until December 19, 2023, facilitates more effective exercises by allowing local response personnel to familiarize themselves with facilities, to review EPCRA information from facilities and the EPCRA plan for the community, to obtain necessary funding and staffing to participate in exercises, all while continuing to perform their overall emergency planning and response duties. While it may be nominally possible for owners and operators to reach out to local responders as had been required by the Amendments rule by March 2021, we believe delaying the compliance date for planning and scheduling exercises until December 19, 2023, and providing

additional time for conducting initial notification, tabletop, and field exercises, would promote more effective participation of emergency responders, and thus is more like the complex steps the legislative history suggests may need longer lead-times before compliance is required. Therefore, we believe requiring exercise schedules and plans to be completed by December 19, 2023, assures compliance with the emergency exercise requirement as expeditiously as practicable.

The new information required to be reported in the RMP concerns compliance with provisions of the RMP Amendments retained or modified in the RMP Reconsideration rule. The compliance date for the new information necessarily must follow the compliance dates for the substantive changes to the underlying rules. We recognize that some requirements, like the emergency coordination requirement, have required compliance since the mandate for the *AAH* decision issued, while other requirements in the final rule require compliance in 2021 or later. While it would be possible to phase in RMP changes to coincide with these compliance dates, we note that the RMP is generally a periodic report submitted every five years. Rather than requiring multiple amended or new RMP reports shortly after the compliance date for each new provision, which we believe would be impractical in terms of administration, enforcement, and compliance, we are requiring sources to comply with the amended RMP information requirements in the next RMP required to be submitted later than one year after they must comply with the requirement to have completed a plan and schedule under the new exercise requirement. This would be at the end of the phase-in period for most provisions, and after completion of the initial notification exercises for all sources subject to that provision.

EPA believes this rationale is a reasonable justification for extending the compliance dates under the final rule. The extended compliance dates do not endanger the public, emergency responders, or the environment because in every case they relate to provisions which have not yet been implemented, so delaying compliance causes no loss of public or environmental protection relative to the pre-Amendments rule, which remains fully in effect during the phase-in of the new provisions.

## X. Corrections to Cross Referenced CFR Sections

### *A. Summary of Proposed Rulemaking*

EPA proposed to correct CFR section numbers that were cross referenced in certain sections of the rule because these were changes necessitated by addition and re-designation of the paragraphs pertaining to compliance dates in § 68.10 in the RMP Amendments rule but were overlooked at the time. The addition of a new separate compliance date paragraph for public meetings added in the proposed Reconsideration rule (now § 68.10(f)), results in old paragraphs (f) through (j) being redesignated as (g) through (k). Other corrections involve cross references to CFR sections for the compliance dates proposed in § 68.96 for the first notification and tabletop exercises that were overlooked when updating compliance schedule information in § 68.215 (a)(2)(i). References to ''paragraph (b)'' and ''paragraph (g)'' in now redesignated paragraphs § 68.10 (h) and (i), were not updated in the Amendments or proposed Reconsideration rule, so EPA is correcting these references. EPA is also correcting a typographical error in the proposed rule that inadvertently deleted ''or;'' at the end of § 68.215 (a)(2)(i). Table 4 contains a list of the corrections.

TABLE 4—CORRECTIONS OR CHANGES TO CROSS REFERENCED SECTION NUMBERS

| In section: | Change in section reference: |
|---|---|
| § 68.10 | § 68.10(f) through (j) is now (g) through (k). |
| § 68.10(h) | Text ''paragraph (b)'' should be ''paragraph (g)''<br>Text ''paragraph (g)'' should be ''paragraph (i)'' |
| § 68.10(i) | Text ''paragraph (b)'' should be ''paragraph (g)'' |
| § 68.12(b) | § 68.10(b) should be § 68.10(g). |
| § 68.12(b)(4) | § 68.10(b)(1) should be § 68.10(g)(1). |
| § 68.12(d) | § 68.10(d) should be § 68.10(i). |
| § 68.12(c) | § 68.10(c) should be § 68.10(h). |
| § 68.96(a) | § 68.90(a)(2) should be § 68.90(b)(3). |
| § 68.180(a)(1) | § 68.10(f)(3) should be § 68.10(g)(3). |
| § 68.215(a)(2)(i) | § 68.10(a) should be § 68.10(a) through (f), § 68.96(a) and (b)(2)(i), followed by ''or;''. |

### *B. Summary of Final Rule*

EPA is finalizing all proposed corrections to cross referenced CFR section numbers.

### *C. Discussion of Comments and Basis for Final Rule Provisions*

EPA received no comments on this issue.

## XI. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders*.

### *A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This action is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. Any changes made in response to OMB recommendations have been documented in the docket. EPA prepared an analysis of the potential costs and benefits associated with this action. This analysis, ''Regulatory Impact Analysis: Reconsideration of the 2017 Amendments to the Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act, Section 112(r)(7)'' is available in the docket (Docket ID Number EPA–HQ–OEM–2015–0725).

### *B. Executive Order 13771: Reducing Regulation and Controlling Regulatory Costs*

This action is an Executive Order 13771 deregulatory action. Details on the estimated cost savings of this final rule can be found in EPA's analysis of

the potential costs and benefits associated with this action.[109]

*C. Paperwork Reduction Act (PRA)*

The information collection activities in this rule have been submitted for approval to the OMB under the PRA. The Information Collection Request (ICR) document that the EPA prepared has been assigned EPA ICR number 2537.05 and OMB Control No. 2050–0216. You can find a copy of the ICR in the docket for this rule, and it is briefly summarized here. The information collection requirements are not enforceable until OMB approves them.

On January 13, 2017 (82 FR 4594), EPA published in the **Federal Register** the Risk Management Program Amendments rule (Amendments rule). The Amendments rule added several requirements to the RMP rule, including several requirements that would impose information collection burdens on regulated entities. EPA is now finalizing a rule that reconsiders the Amendments rule, including retaining, retaining with modification, or rescinding provisions from the Amendments rule (Reconsideration rule).

This ICR addresses the Amendments rule information collection requirements impacted by the Reconsideration rule. A summary of how the Reconsideration rule impacts the Amendments rule information collection requirements is provided in the following table.

| Amendments rule information collection | Reconsideration rule action |
|---|---|
| **Improve information availability (applies to all facilities)** | |
| Make certain information related to the risk management program available to the public upon request. | Rescinded. |
| Hold a public meeting within 90 days of an accident subject to reporting under § 68.42 (*i.e.,* an RMP reportable accident). | Retained with modification. |
| **XRevise accident prevention program requirements (applies to P2 and P3 facilities unless otherwise specified)** | |
| Hire a third-party to conduct the compliance audit after an RMP reportable accident or after an implementing agency determines that conditions at the stationary source could lead to an accidental release of a regulated substance or identifies problems with the prior third-party audit. | Rescinded. |
| Conduct and document a root cause analysis after an RMP reportable accident or a near miss. | Rescinded. |
| Conduct and document a safer technology and alternatives analysis (STAA) for a subset of Program 3 facilities in North American Industrial Classification System (NAICS) codes 322 (paper manufacturing), 324 (petroleum and coal products manufacturing), and 325 (chemical manufacturing). | Rescinded. |
| **Improve emergency preparedness (applies to P2 and P3 facilities)** | |
| Meet and coordinate with local responders annually to exchange emergency response planning information. | Retained with modification. |
| Conduct an annual notification drill to verify emergency contact information. | Retained. |
| Responding facilities conduct and document emergency response exercises including: | Retained with modification. |
| A field exercise at least every ten years, and | |
| A tabletop exercise at least every three years. | |

*Respondents/affected entities:* Manufacturers, utilities, warehouses, wholesalers, food processors, ammonia retailers, and gas processors.

*Respondent's obligation to respond:* Mandatory (CAA sections 112(r)(7)(B)(i) and (ii), CAA section 112(r)(7)(B)(iii), 114(c), CAA 114(a)(1)).

*Estimated number of respondents:* 14,280.

*Frequency of response:* On occasion.

*Total estimated burden reduction:* 1,071,161 hours (per year). Burden is defined at 5 CFR 1320.3(b).

*Total estimated cost reduction:* $92,078,752 (per year), includes $8,259,750 annualized capital or operation & maintenance cost reduction.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. The OMB control numbers for the EPA's regulations in 40 CFR are listed in 40 CFR part 9. When OMB approves this ICR, the Agency will announce that approval in the **Federal Register** and publish a technical amendment to 40 CFR part 9 to display the OMB control number for the approved information collection activities contained in the final rule.

*D. Regulatory Flexibility Act (RFA)*

I certify that this action will not have a significant economic impact on a substantial number of small entities under the RFA. In making this determination, the impact of concern is any significant adverse economic impact on small entities. An agency may certify that a rule will not have a significant economic impact on a substantial number of small entities if the rule relieves regulatory burden, has no net burden or otherwise has a positive economic effect on the small entities subject to the rule.

The final RMP Amendments rule considered a broad range of costs on small entities based on facility type. As estimated in the 2017 Amendments RIA, the provisions in that final rule had quantifiable impacts on small entities. This action largely repeals, or retains with slight modification, the provisions incurring costs on small entities. As a result, EPA expects this action to provide cost savings for all facilities, including small entities. Specifically, as explained in Unit I.E.1, EPA estimates annualized cost savings of $87.4 million at a 3% discount rate and $87.8 million at a 7% discount rate.

The only new costs imposed on small entities would be rule familiarization with the final rule, which as discussed further, would not exceed 1% of annual revenues for any small entity affected by this rule. The final rule affects 5,193 facilities owned by small entities, none of which will experience economic burdens in excess of 1% of revenues as a result of this rule. This action will

[109] Regulatory Impact Analysis—Reconsideration of the 2017 Amendments to the Accidental Release Prevention Requirements: Risk Management Programs Under the Clean Air Act, Section 112(r)(7). This document is available in the docket for this rulemaking (Docket ID Number EPA–HQ–OEM–2015–0725).

relieve regulatory burden for all directly regulated small entities. The impact of this action on small entities is discussed further in the RIA, which is available in the rulemaking docket. We have therefore concluded that this action will relieve regulatory burden for all directly regulated small entities.

*E. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C 1531–1538, and does not significantly or uniquely affect small governments. The action imposes no enforceable duty on any state, local or tribal governments. While the private sector has compliance obligations under the RMP regulations, this action is deregulatory, in the aggregate, on the private sector.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action has tribal implications. However, it will neither impose substantial direct compliance costs on federally recognized tribal governments, nor preempt tribal law. There are approximately 260 RMP facilities located on tribal lands. Tribes could be impacted by the final rule either as an owner or operator of an RMP-regulated facility or as a tribal government when the tribal government conducts emergency response or emergency preparedness activities under EPCRA.

The EPA consulted with tribal officials under the EPA Policy on Consultation and Coordination with Indian Tribes early in the process of developing this regulation to permit them to have meaningful and timely input into its development. EPA hosted a public hearing on June 14, 2018 that was open to all interested parties and hosted a total of two conference calls for interested tribal representatives on June 25 and 26, 2018. A summary of each conference call is available in the docket for this action.

As required by section 7(a), the EPA's Tribal Consultation Official has certified that the requirements of the executive order have been met in a meaningful and timely manner. A copy of the certification is included in the docket for this action.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045 because it is not economically significant as defined in Executive Order 12866, and because EPA does not believe the environmental health risks or safety risks addressed by this action present a disproportionate risk to children. This action's health and risk assessments are contained in the chapter 9 of the RIA for this rule, available in the docket.

*I. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution or Use*

This action is not a ''significant energy action'' because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy. This action is not anticipated to have notable impacts on emissions, costs or energy supply decisions for the affected electric utility industry.

*J. National Technology Transfer and Advancement Act (NTTAA)*

This action does not involve technical standards.

*K. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

The EPA believes that this action may have disproportionately high and adverse human health or environmental effects on minority, low income, and/or indigenous peoples as specified in Executive Order 12898 (59 FR 7629, February 16, 1994). The documentation for this decision is contained in chapter 8 of the RIA, a copy of which has been placed in the public docket for this action.

*L. Congressional Review Act (CRA)*

This action is subject to the CRA and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

**List of Subjects 40 CFR Part 68**

Environmental protection, Administrative practice and procedure, Air pollution control, Chemicals, Hazardous substances, Intergovernmental relations, Reporting and recordkeeping requirements.

Dated: November 20, 2019.

**Andrew R. Wheeler,**

*Administrator.*

For the reasons set out in the preamble, title 40, chapter I, part 68, of the Code of Federal Regulations is amended as follows:

## PART 68—CHEMICAL ACCIDENT PREVENTION PROVISIONS

■ 1. The authority citation for part 68 continues to read as follows:

**Authority:** 42 U.S.C. 7412(r), 7601(a)(1),7661–7661f.

**§ 68.3 [Amended]**

■ 2. Amend § 68.3 by removing the definitions ''Active measures'', ''Inherently safer technology or design'', ''Passive measures'', ''Practicability'', ''Procedural measures'', ''Root cause'' and ''Third-party audit''.

■ 3. Amend § 68.10 by:

■ a. Revising paragraphs (a) introductory text, (b), (d), and (e);

■ b. Redesignating paragraphs (f) through (j) as paragraphs (g) through (k);

■ c. Adding new paragraph (f);

■ d. Removing the text ''paragraph (b) or paragraph (d)'' and adding ''paragraph (g) or paragraph (i)'' in its place in newly redesignated paragraph (h); and

■ e. Removing the text ''paragraph (b)'' and adding ''paragraph (g)'' in its place in newly redesignated paragraph (i).

The revisions and addition read as follows:

**§ 68.10 Applicability.**

* * * * *

(a) Except as provided in paragraphs (b) through (f) of this section, an owner or operator of a stationary source that has more than a threshold quantity of a regulated substance in a process, as determined under § 68.115, shall comply with the requirements of this part no later than the latest of the following dates:

* * * * *

(b) By March 14, 2018, the owner or operator of a stationary source shall comply with the emergency response coordination activities in § 68.93, as applicable.

* * * * *

(d) By December 19, 2023, the owner or operator shall have developed plans for conducting emergency response exercises in accordance with provisions of § 68.96, as applicable.

(e) The owner or operator of a stationary source shall comply with the public meeting requirement in § 68.210(b) within 90 days of any RMP reportable accident at the stationary source with known offsite impacts

specified in § 68.42(a), that occurs after March 15, 2021.

(f) After December 19, 2024, for any risk management plan initially submitted as required by § 68.150(b)(2) or (3) or submitted as an update required by § 68.190, the owner or operator shall comply with the following risk management plan provisions of subpart G of this part:

(1) Reporting a public meeting after an RMP reportable accident under § 68.160(b)(21) as promulgated on December 19, 2019;

(2) Reporting emergency response program information under § 68.180(a)(1) as promulgated on December 19, 2019;

(3) Reporting emergency response program information under § 68.180(a)(2) and (3) as promulgated on January 13, 2017, as applicable; and,

(4) Reporting emergency response program and exercises information under § 68.180(b) as promulgated on January 13, 2017, as applicable. The owner or operator shall submit dates of the most recent notification, field and tabletop exercises in the risk management plan, for exercises completed as required under § 68.96 at the time the risk management plan is either submitted under § 68.150(b)(2) or (3), or is updated under § 68.190.

* * * * *

**§ 68.12 [Amended]**

■ 4. Amend § 68.12:

■ a. By removing the text ''68.10(b)'' and adding ''68.10(g)'' in its place in paragraph (b) introductory text;

■ b. By removing the text ''68.10(b)(1)'' and adding ''68.10(g)(1)'' in its place in paragraph (b)(4);

■ c. By removing the text ''68.10(c)'' and adding ''68.10(h)'' in its place in paragraph (c) introductory text; and

■ d. By removing the text ''68.10(d)'' and adding ''68.10(i)'' in its place in paragraph (d) introductory text.

■ 5. Amend § 68.50 by revising paragraph (a)(2) to read as follows:

**§ 68.50 Hazard review.**

(a) * * *

(2) Opportunities for equipment malfunctions or human errors that could cause an accidental release;

* * * * *

■ 6. Amend § 68.54 by revising the first sentence in paragraph (a), removing the paragraph (b) subject heading, revising the first sentence in paragraph (b), revising paragraph (d), and removing paragraph (e).

The revisions read as follows:

**§ 68.54 Training.**

(a) The owner or operator shall ensure that each employee presently operating a process, and each employee newly assigned to a covered process have been trained or tested competent in the operating procedures provided in § 68.52 that pertain to their duties. * * *

* * * * *

(b) Refresher training shall be provided at least every three years, and more often if necessary, to each employee operating a process to ensure that the employee understands and adheres to the current operating procedures of the process. * * *

* * * * *

(d) The owner or operator shall ensure that operators are trained in any updated or new procedures prior to startup of a process after a major change.

■ 7. Amend § 68.58 by revising paragraph (a) and removing paragraphs (f) through (h).

The revision reads as follows:

**§ 68.58 Compliance audits.**

(a) The owner or operator shall certify that they have evaluated compliance with the provisions of this subpart at least every three years to verify that the procedures and practices developed under this subpart are adequate and are being followed.

* * * * *

**§ 68.59 [Removed]**

■ 8. Remove § 68.59.

■ 9. Amend § 68.60 by revising paragraphs (a) and (d) to read as follows:

**§ 68.60 Incident investigation.**

(a) The owner or operator shall investigate each incident which resulted in, or could reasonably have resulted in a catastrophic release.

* * * * *

(d) A report shall be prepared at the conclusion of the investigation which includes at a minimum:

(1) Date of incident;

(2) Date investigation began;

(3) A description of the incident;

(4) The factors that contributed to the incident; and,

(5) Any recommendations resulting from the investigation.

* * * * *

■ 10. Amend § 68.65 by revising the first sentence of paragraph (a) and revising the note to paragraph (b) to read as follows:

**§ 68.65 Process safety information.**

(a) The owner or operator shall complete a compilation of written process safety information before conducting any process hazard analysis required by the rule. * * *

(b) * * *

**Note to paragraph (b):** Safety Data Sheets (SDS) meeting the requirements of 29 CFR 1910.1200(g) may be used to comply with this requirement to the extent they contain the information required by paragraph (b) of this section.

* * * * *

■ 11. Amend § 68.67 by:

■ a. Revising paragraph (c)(2);

■ b. Adding the word ''and'' at the end of paragraph (c)(6);

■ c. Removing '', and'' and adding a period in its place at the end of paragraph (c)(7); and

■ d. Removing paragraph (c)(8).

The revision reads as follows:

**§ 68.67 Process hazard analysis.**

* * * * *

(c) * * *

(2) The identification of any previous incident which had a likely potential for catastrophic consequences;

* * * * *

**§ 68.71 [Amended]**

■ 12. Amend § 68.71 by removing paragraph (d).

■ 13. Amend § 68.79 by revising paragraph (a) and removing paragraphs (f) through (h).

The revision reads as follows:

**§ 68.79 Compliance audits.**

(a) The owner or operator shall certify that they have evaluated compliance with the provisions of this subpart at least every three years to verify that procedures and practices developed under this subpart are adequate and are being followed.

* * * * *

**§ 68.80 [Removed]**

■ 14. Remove § 68.80.

■ 15. Amend § 68.81 by revising paragraphs (a) and (d) to read as follows:

**§ 68.81 Incident investigation.**

(a) The owner or operator shall investigate each incident which resulted in, or could reasonably have resulted in a catastrophic release.

* * * * *

(d) A report shall be prepared at the conclusion of the investigation which includes at a minimum:

(1) Date of incident;

(2) Date investigation began;

(3) A description of the incident;

(4) The factors that contributed to the incident; and,

(5) Any recommendations resulting from the investigation.

* * * * *

■ 16. Amend § 68.93 by revising paragraph (b) and adding paragraph (d) to read as follows:

**§ 68.93 Emergency response coordination activities.**

* * * * *

(b) Coordination shall include providing to the local emergency planning and response organizations: The stationary source's emergency response plan if one exists; emergency action plan; updated emergency contact information; and other information necessary for developing and implementing the local emergency response plan. For responding stationary sources, coordination shall also include consulting with local emergency response officials to establish appropriate schedules and plans for field and tabletop exercises required under § 68.96(b). The owner or operator shall request an opportunity to meet with the local emergency planning committee (or equivalent) and/or local fire department as appropriate to review and discuss those materials.

* * * * *

(d) *Classified and restricted information.* The disclosure of information classified or restricted by the Department of Defense or other Federal agencies or contractors of such agencies shall be controlled by applicable laws, regulations, or executive orders concerning the release of that classified or restricted information.

■ 17. Amend § 68.96 by revising the first sentence of paragraph (a) and revising paragraphs (b)(1)(i) and (ii), (b)(2)(i) and (ii), and (b)(3) to read as follows:

**§ 68.96 Emergency response exercises.**

(a) * * * At least once each calendar year, the owner or operator of a stationary source with any Program 2 or Program 3 process shall conduct an exercise of the stationary source's emergency response notification mechanisms required under § 68.90(b)(3) or § 68.95(a)(1)(i), as appropriate, before December 19, 2024, and annually thereafter. * * *

(b) * * *

(1) * * *

(i) *Frequency.* As part of coordination with local emergency response officials required by § 68.93, the owner or operator shall consult with these officials to establish an appropriate frequency for field exercises.

(ii) *Scope.* Field exercises shall involve tests of the source's emergency response plan, including deployment of emergency response personnel and equipment. Field exercises should include: Tests of procedures to notify the public and the appropriate Federal, state, and local emergency response agencies about an accidental release; tests of procedures and measures for emergency response actions including evacuations and medical treatment; tests of communications systems; mobilization of facility emergency response personnel, including contractors, as appropriate; coordination with local emergency responders; emergency response equipment deployment; and any other action identified in the emergency response program, as appropriate.

(2) * * *

(i) *Frequency.* As part of coordination with local emergency response officials required by § 68.93, the owner or operator shall consult with these officials to establish an appropriate frequency for tabletop exercises, and shall conduct a tabletop exercise before December 21, 2026, and at a minimum of at least once every three years thereafter.

(ii) *Scope.* Tabletop exercises shall involve discussions of the source's emergency response plan. The exercise should include discussions of: Procedures to notify the public and the appropriate Federal, state, and local emergency response agencies; procedures and measures for emergency response including evacuations and medical treatment; identification of facility emergency response personnel and/or contractors and their responsibilities; coordination with local emergency responders; procedures for emergency response equipment deployment; and any other action identified in the emergency response plan, as appropriate.

(3) *Documentation.* The owner or operator shall prepare an evaluation report within 90 days of each field and tabletop exercise. The report should include: A description of the exercise scenario; names and organizations of each participant; an evaluation of the exercise results including lessons learned; recommendations for improvement or revisions to the emergency response exercise program and emergency response program, and a schedule to promptly address and resolve recommendations.

* * * * *

■ 18. Amend § 68.151 by revising paragraph (b)(1) to read as follows:

**§ 68.151 Assertion of claims of confidential business information.**

* * * * *

(b) * * *

(1) Registration data required by § 68.160(b)(1) through (6), (8), (10) through (13), and (21), and NAICS code and Program level of the process set forth in § 68.160(b)(7);

* * * * *

■ 19. Amend § 68.160 by revising paragraph (b)(21) and removing paragraph (b)(22).

The revision reads as follows:

**§ 68.160 Registration.**

* * * * *

(b) * * *

(21) Whether a public meeting has been held following an RMP reportable accident, pursuant to § 68.210(b).

■ 20. Amend § 68.170 by revising paragraph (i) to read as follows:

**§ 68.170 Prevention program/Program 2.**

* * * * *

(i) The date of the most recent compliance audit, the expected date of completion of any changes resulting from the compliance audit.

* * * * *

■ 21. Amend § 68.175 by revising paragraphs (e) introductory text and (e)(1), (5), and (6), removing paragraph (e)(7), and revising paragraph (k).

The revisions read as follows:

**§ 68.175 Prevention program/Program 3.**

* * * * *

(e) The date of completion of the most recent PHA or update and the technique used.

(1) The expected date of completion of any changes resulting from the PHA;

* * * * *

(5) Monitoring and detection systems in use; and

(6) Changes since the last PHA.

* * * * *

(k) The date of the most recent compliance audit and the expected date of completion of any changes resulting from the compliance audit.

* * * * *

■ 22. Amend § 68.180 by revising paragraph (a)(1) to read as follows:

**§ 68.180 Emergency response program and exercises.**

(a) * * *

(1) Name, phone number and email address of local emergency planning and response organizations with which the stationary source last coordinated emergency response efforts, pursuant to § 68.10(g)(3) or § 68.93.

* * * * *

■ 23. Amend § 68.190 by revising paragraph (c) to read as follows:

**§ 68.190 Updates.**

* * * * *

(c) If a stationary source is no longer subject to this part, the owner or operator shall submit a de-registration to

USCA Case #20-1022 Document #1826411 Filed: 01/29/2020 Page 90 of 91


EPA within six months indicating that the stationary source is no longer covered.

■ 24. Amend § 68.210 by:
■ a. Removing paragraphs (b), (c), (d), and (g);
■ b. Redesignating paragraphs (e) and (f) as paragraphs (b) and (c); and
■ c. Revising newly redesignated paragraphs (b) and (c).

The revisions read as follows:

**§ 68.210 Availability of information to the public.**

* * * * *

(b) *Public meetings.* The owner or operator of a stationary source shall hold a public meeting to provide information required under § 68.42(b), no later than 90 days after any RMP reportable accident at the stationary source with any known offsite impact specified in § 68.42(a).

(c) *Classified and restricted information.* The disclosure of information classified or restricted by the Department of Defense or other Federal agencies or contractors of such agencies shall be controlled by applicable laws, regulations, or executive orders concerning the release of that classified or restricted information.

■ 25. Amend § 68.215 by revising paragraph (a)(2)(i) to read as follows:

**§ 68.215 Permit content and air permitting authority or designated agency requirements.**

(a) * * *

(2) * * *

(i) A compliance schedule for meeting the requirements of this part by the dates provided in §§ 68.10(a) through (f) and 68.96(a) and (b)(2)(i), or;

* * * * *

[FR Doc. 2019–25974 Filed 12–18–19; 8:45 am]

BILLING CODE 6560–50–P

**CERTIFICATE OF SERVICE**

I hereby certify that pursuant to D.C. Circuit Rule 15(a), a copy of the foregoing Petition for Review was served on January 29, 2020 by first class mail, postage prepaid on the following:

Andrew Wheeler, Administrator
Office of the Administrator (1101A)
Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

William Barr
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Correspondence Control Unit
Office of General Counsel (2311)
United States Environmental Protection Agency
William Jefferson Clinton Federal Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

*/s/ Sarah K. Kam*
Sarah K. Kam